No. 26-1923

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

National Alliance to End Homelessness *et al.*,
*Plaintiffs-Appellees*,

v.

U.S. Department of Housing and Urban Development *et al.*,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the District of Rhode Island
Case No. 26-cv-436, Hon. Mary S. McElroy

# Plaintiffs-Appellees' Opposition to Emergency Motion for Stay Pending Appeal

Amy R. Romero
Kevin Love Hubbard
Lawyers' Committee for Rhode Island
56 Pine Street, Suite 200
Providence, RI 02903
(401) 238-3953
amy@lawyerscommitteeri.org

Madeline H. Gitomer
Christine L. Coogle
Kristin Bateman
Carrie Y. Flaxman
Robin Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
mgitomer@democracyforward.org

*(additional counsel on signature page)*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the nongovernmental Plaintiffs-Appellees National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc. report that they have no parent corporations, and that no publicly held corporation holds a 10% or greater ownership interest in any Plaintiff.

## TABLE OF CONTENTS


Introduction ........................................ 1

Statement ........................................ 3

A. The Continuum of Care Program ........................................ 3

B. The FY 2026 Notice of Funding Opportunity ........................................ 5

C. Proceedings Below ........................................ 7

Legal Standard ........................................ 10

Argument ........................................ 10

I. HUD Is Unlikely to Succeed on Appeal ........................................ 10

A. The set-aside is unlawful ........................................ 11

B. The FY 2026 NOFO is unlawful in several other ways ........................................ 17

II. The Equitable Factors Compel Denying a Stay ........................................ 18

Conclusion ........................................ 23

# TABLE OF AUTHORITIES

## Cases

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ....................................18

*InterGen N.V. v. Grina*, 344 F.3d 134 (1st Cir. 2003)............................................18

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)..............................................................................................18

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................10

*R.I. State Council of Churches v. Rollins*, 158 F.4th 304 (1st Cir. 2025). .............11

*Rhode Island v. Trump*, 155 F.4th 35 (1st Cir. 2025)...................................... 10, 22

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996).........................................................................20

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009)..............................16

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001)............................................................14

*United States v. George*, 886 F.3d 31 (1st Cir. 2018) ............................................17

*United States v. Gordon*, 875 F.3d 26 (1st Cir. 2017)............................................15

*Washington v. HUD*, 171 F.4th 473 (1st Cir. 2026)......................5, 6, 11, 14, 19-22

*Washington v. HUD*, No. 25-cv-626, 2026 WL 1863886 (D.R.I. June 29, 2026) .......................................................18

## Statutes

28 U.S.C. § 1292.....................................................................................................9

42 U.S.C. § 11360...................................................................................................3

42 U.S.C. § 11383...........................................................................................3, 13

42 U.S.C. § 11386a........................................................................................4, 13

42 U.S.C. § 11386b .......... 1, 4, 9, 11, 12-17

42 U.S.C. § 11386c .......... 4

Consolidated Appropriations Act, 2026, Pub. L. No. 119-75,
140 Stat. 173 (2026) .......... 5

McKinney-Vento Homeless Assistance Act, Pub. L. No. 100-77,
101 Stat. 482 (1987) .......... 3

Homeless Emergency Assistance and Rapid Transition to Housing Act,
Pub. L. No. 111-22, 123 Stat. 1632 (2009),
*codified at* 42 U.S.C. §§ 11381-11388 .......... 3

**Other Authorities**

24 C.F.R. § 578.3 .......... 3

24 C.F.R. § 578.5 .......... 3

24 C.F.R. § 578.9 .......... 3

H. Rep. No. 110-906 (2008) .......... 11

S. Rep. No. 110-216 (2007) .......... 11, 13

## INTRODUCTION

This case arises from the administration's attempt, once again, to radically upend the Continuum of Care (CoC) program, the federal government's primary program to address homelessness. The CoC program provides billions of dollars each year for nonprofits, local governments, and states to provide housing and support to hundreds of thousands of currently and formerly unhoused individuals and families. In establishing the CoC program, Congress identified only two activities—both of which are forms of permanent housing—as "proven to be effective at reducing homelessness." 42 U.S.C. § 11386b(d)(2). Congress allowed the Department of Housing and Urban Development (HUD) to incentivize these two permanent housing activities through the CoC program. *Id.* It further provided that HUD could incentivize other activities only after it determines, "based on research and after notice and comment to the public," that those activities are "proven effective" as well. *Id.* § 11386b(d)(2)(C).

In the fiscal year (FY) 2026 CoC notice of funding opportunity (NOFO), HUD set aside $1.3 billion—nearly one third of the program's funds—to incentivize new transitional housing and supportive-services-only projects, not permanent housing. But HUD did not show that its decision was research-based, nor did it conduct the statutorily required notice and comment to determine that those activities are "proven effective." The district court vacated the NOFO,

concluding that the NOFO is unlawful for this reason and therefore "may not proceed." App.10.

HUD now seeks an emergency stay from this Court, but none of the relevant factors warrants that stay. HUD is unlikely to succeed on the merits of the appeal because the district court properly held that the set-aside is unlawful. And Plaintiffs have raised multiple additional arguments that the set-aside and numerous other aspects of the NOFO are contrary to law, exceed HUD's statutory authority, and are arbitrary and capricious, each of which is sufficient to sustain the district court's judgment.

The equities also militate strongly against a stay. HUD has not shown that it suffers any irreparable harm, and it has failed to rebut the overwhelming evidence that Plaintiffs, Plaintiffs' members, and the public would be irreparably harmed by a stay. The NOFO would cause programs across the country to lose the funding they rely on to house vulnerable members of their communities, and a stay of the district court's decision would trigger cascading harms, forcing Plaintiffs and Plaintiffs' members to make impossible choices about which projects to prioritize, in light of the unlawful incentive HUD has imposed. This Court should therefore deny the motion to stay.

## STATEMENT

### A. The Continuum of Care Program

Congress enacted the McKinney-Vento Homeless Assistance Act in 1987 to establish a coordinated federal response to homelessness, and the HEARTH Act later amended that act to formally create the Continuum of Care program. Pub. L. No. 100-77, § 102, 101 Stat. 482, 484-85 (1987); *see also* Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, Pub. L. No. 111-22, §§ 1301-1306, 123 Stat. 1632, 1680-96 (2009), *codified at* 42 U.S.C. §§ 11381-11388. Now the largest federal grant program addressing homelessness, the CoC program funds housing and other services that support hundreds of thousands of individuals and families, as well as backbone functions that allow the system to operate. 42 U.S.C. §§ 11360(29), 11383. Local or regional "continuums of care"—coalitions composed of representatives of various entities involved in addressing homelessness, as well as people with lived experience of homelessness—are responsible for coordinating strategies to address homelessness within their geographic areas. *See id.* § 11360a(a); *see also* 24 C.F.R. §§ 578.3, 578.5(a). Those continuums apply for funding by designating a "collaborative applicant" to run a local competition to determine what projects to seek funding for and then to submit a CoC-wide application to HUD on behalf of the entire geographic area. 42 U.S.C. § 11360a(a), (f); *see* 24 C.F.R. § 578.9. HUD then awards funds through a national

competition that considers certain criteria for each individual project and for the CoC's full collaborative application and performance. *See* 42 U.S.C. § 11386a(b)(1), (2).

In creating the CoC program, Congress prioritized permanent housing and favored the renewal of existing projects. *See, e.g.*, *id.* §§ 11386c(b) (mandating that appropriated funds "shall be available for the renewal" of permanent housing projects), 11386a(b)(2)(B) (providing that each geographic area's annual "estimated grant amount" must be at least the amount needed "to provide 1 year of renewal funding for all expiring" awards). And it required HUD to "provide bonuses or other incentives" for activities "that have been proven to be effective at reducing homelessness" and to consider "the extent to which the recipient will … incorporate" such activities when awarding grants. *Id.* §§ 11386b(d)(1)-(2), 11386a(b)(1)(B)(iv)(II). Congress identified only two such "proven" activities, and both are permanent housing strategies: "permanent supportive housing for chronically homeless individuals and families" and, for families, "rapid rehousing" paired with services to help improve stability and incomes. *Id.* § 11386b(d)(2)(A), (B). Congress authorized HUD to identify other "proven effective" activities "based on research and after notice and comment to the public," *id.* § 11386b(d)(2)(C), but, to date, HUD has never used this process and therefore has never identified an additional activity eligible for incentives.

**B. The FY 2026 Notice of Funding Opportunity**

For FY 2026, Congress appropriated more than $4 billion for the CoC program, an amount similar to previous years' funding. *See* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399 (2026). The 2026 Appropriations Act establishes requirements for FY 2026 awards, including concrete deadlines: HUD was required to issue a NOFO for those funds by June 1, 2026 and make awards by December 1, 2026. 140 Stat. at 400. The act also requires HUD to make a significant portion of FY 2026 awards—at least 60% of the amount needed to provide one-year renewals of each CoC's expiring grants (called "Tier 1 grants")—based on the projects that CoCs select in their local competitions, without those projects needing to compete against projects in other geographic areas. *Id.* at 399.

On June 1, 2026, HUD issued the NOFO for FY 2026 CoC funding.[1] Suppl.App.146-273.[2] The FY 2026 NOFO represents HUD's efforts to "transition away from the Housing First model." App.4; *see generally Washington v. HUD*,

---

[1] On July 24, HUD amended the FY 2026 NOFO. The amended NOFO does not alter the provisions challenged in Plaintiffs' suit.

[2] HUD similarly tried to upend the CoC program for FY 2025, but Plaintiffs and several states sued, and the district court granted preliminary relief and summary judgment in their favor. When HUD sought a stay of a district court order, this Court denied HUD's motion, emphasizing that HUD's actions had "created chaos for the Continuums" and "guaranteed funding gaps" for many housing projects, risking "alarming increases in homelessness in the coming months." *Washington v. HUD*, 171 F.4th 473, 482-83 (1st Cir. 2026).

171 F.4th 473, 480 (1st Cir. 2026) ("Housing First describes a set of principles that prioritize access to supportive services and housing—particularly permanent housing[.]"). In particular, the FY 2026 NOFO sets aside $1.3 billion—nearly one third of the program funding and most of the funding that Congress did not already direct to Tier 1 grants—to go principally or exclusively to new transitional housing and supportive-services-only projects. Existing projects are categorically ineligible for this funding, guaranteeing that many effective existing permanent housing projects will not be renewed, threatening to force approximately 100,000 people back into homelessness. *See* Suppl.App.2 ¶ 8. As to new projects, HUD will first fund all new transitional housing and supportive-services-only projects that pass threshold criteria, regardless of their expected efficacy. *See* Suppl.App.234. If any of the $1.3 billion remains, only then will HUD allocate funds to other types of new projects (such as permanent housing)—even if those projects score higher on merit-based criteria. *See id.* This design incentivizes CoCs to seek funding for activities focused on transitional housing and supportive services only—even if those are less effective or less suited to local needs—as CoCs are otherwise unlikely to receive any portion of the $1.3 billion set-aside. *See* Suppl.App.61 ¶ 167 (explaining that, because CoCs would be competing with each other for set-aside funding, they would be compelled to abandon existing permanent housing projects in order to apply for funding for new projects eligible for the set-aside).

Beyond the set-aside, the NOFO preferences people with certain disabilities over those with other types of disabilities, Suppl.App.175; contains threshold criteria that improperly disqualify projects, Suppl.App.151, 208-10, 212-13; and requires that grantees comply with a long list of executive orders, including orders targeting diversity, equity, and inclusion, transgender and gender-nonconforming people, undocumented immigrants, abortion, and Housing First policies, Suppl.App.251-52.

### C. Proceedings Below

**1.** Plaintiffs—two national membership associations, other nonprofits, and local governments—brought suit, as did a coalition of states in a separate case, *Washington v. HUD*, No. 25-626 (D.R.I.). Plaintiffs promptly moved for preliminary relief and partial summary judgment.[3] In addition to their claim that the set-aside failed to comply with notice-and-comment requirements, Plaintiffs argued that the set-aside and other NOFO provisions exceeded HUD's statutory authority, were contrary to law, and were arbitrary and capricious. *See* Pls.' Mem. in Supp. of Mot. for Summ. J. 26-47, *NAEH*, No. 25-cv-636 (D.R.I. July 17, 2026), Dkt. No. 30-1 ("Pls.' MSJ"). Plaintiffs also argued that the Office of Management and Budget has unlawfully restricted CoC funding. *Id.* at 47-49.

---

[3] Plaintiffs have not yet moved for summary judgment on their claim that HUD unreasonably delayed noncompetitively renewing all FY 2025 awards that have or will expire in 2026; that claim remains unresolved.

Plaintiffs requested relief by no later than August 11, the date by which the NOFO required each local CoC to announce the results of its local competition, identifying which projects it would include (and which projects it would not) in its collaborative application to HUD. In addition to damaging CoCs' relationships with critical partners, the announcement of those choices would sound the death knell for some projects and cause them to act accordingly by halting new enrollments, laying off staff, and beginning to transition formerly homeless individuals and families out of their homes. *Id.* at 55-57. Plaintiffs sought to minimize these harms, as well as the further harms that will occur as a result of continued chaos and funding delays imposed by HUD.

**2.** On August 7, 2026, the district court granted Plaintiffs' motion in part and set aside the FY 2026 NOFO, ruling that the set-aside is unlawful due to HUD's failure to comply with notice-and-comment requirements. App.10. The district court found that HUD's efforts to "transition away from the Housing First model" in favor of new projects "that employ the use of transitional housing and that emphasize enrollment in supportive services" constituted a bonus or incentive under the statute. App. 4. Accordingly, the court "determine[d] that HUD's attempt to deemphasize its Housing First approach through the use of its $1.3 billion set aside falls within the third category of activities that governs HUD's ability to create incentives and allocate funding for eligible activities." App.7. Because that

$1.3 billion set aside bonus or incentive is not for permanent supportive housing or rapid rehousing services, the court concluded that HUD was required to "first engag[e] in the public notice-and-comment procedure required" by the statute. App.6-7; 42 U.S.C. § 11386b(d). Because the court determined that "HUD issued the 2026 NOFO in a procedurally invalid manner," it vacated the NOFO and "decline[d] to address" Plaintiffs' other claims regarding the set-aside, their many claims challenging other aspects of the NOFO, or their claim that OMB has unlawfully obstructed funding. App.5-6.

Nearly a week later, on August 13, HUD filed a notice of appeal and moved for a stay pending appeal in the district court.[4] The same day, the court denied HUD's motion. App.53. The court held that HUD was not likely to succeed on the merits and "lack[s] a cognizable harm in seeking to uphold agency action that the Court has set aside as violative of the law." App.52. The next day, August 14, HUD moved this Court for an emergency stay pending appeal. HUD requested a decision by August 21, to afford the agency "sufficient time to make new awards by December 1, 2026, as required by Congress." Emergency Mot. for Stay Pending Appeal ("Mot.") 1.

---

[4] The district court entered what is styled as a final judgment despite noting that there remain unresolved claims, *supra* n.3; *see also* App.1 n.1. The parties agree, however, that 28 U.S.C. § 1292(a)(1) confers appellate jurisdiction over this appeal.

## LEGAL STANDARD

Appellants seeking a stay pending appeal "bear the burden" to establish that the "now-familiar four factors set forth in *Nken*" favor such "extraordinary relief." *Rhode Island v. Trump*, 155 F.4th 35, 41 (1st Cir. 2025) (quotations omitted). Those factors are (1) whether the appellant "has made a strong showing" that it "is likely to succeed on the merits" of the appeal; (2) whether the appellant "will be irreparably injured absent a stay"; (3) whether a stay "will substantially injure the other parties"; and (4) "the public interest." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

## ARGUMENT

HUD cannot satisfy any of the factors needed to obtain a stay pending appeal, let alone all of them. HUD has not made a strong showing that it is likely to succeed on the merits of its appeal; it has not shown it will be irreparably injured absent a stay; and a stay would substantially injure Plaintiffs and their members, as well as the public interest.

### I. HUD Is Unlikely to Succeed on Appeal

HUD makes no "strong showing that it is likely to succeed on the merits"; that alone warrants denial of their motion. *R.I. State Council of Churches v. Rollins*, 158 F.4th 304, 312 (1st Cir. 2025).

### A. The set-aside is unlawful

The FY 2026 NOFO set-aside is unlawful for multiple independent reasons, including, as the district court properly held, that it violates statutory restrictions on incentives. Congress recognized the established effectiveness of permanent housing and wanted to ensure that HUD did not use any incentives to pursue alternative policies without following a rigorous process of review and consultation. *See* S. Rep. No. 110-216, at 2-4 (2007) (citing extensive research and directing HUD to provide incentives for permanent housing activities because "these strategies have been proven to reduce homelessness and should be expanded"); *see also* H. Rep. No. 110-906, at 34 (2008) (adding that "[a]dditional incentives can be added based on research and public comment"); *see generally* Suppl.App.39-40 ¶¶ 113-15, Suppl.App.42 ¶ 119. Accordingly, as explained, *supra* at 4, HUD may provide an "incentive[]" for an activity other than the two permanent housing strategies Congress identified *only* if it does so "based on research and after notice and comment to the public." 42 U.S.C. § 11386b(d)(2); *see Washington*, 171 F.4th at 480. The set-aside unlawfully provides an incentive for communities to apply for transitional housing and supportive-services-only activities, even though Congress did not endorse those programs and HUD has not "engage[d] in a public notice-and-comment process" as "the statute's plain and ordinary meaning directs." App.8 (quoting 42 U.S.C. § 11386b(d)(2)(C)).

HUD's attempts to reconcile the set-aside with the statute fall flat. *First*, HUD claims (at 5) that the NOFO does not create an "incentive" for providers and CoCs to use funding for new transitional housing and supportive services. But there can be no reasonable dispute that setting aside over a billion dollars—a "colossal amount," as the district court recognized, App.8—provides a heavy incentive. *See* Suppl.App.59 ¶ 162, Suppl.App.61 ¶ 167, Suppl.App.62 ¶ 169. Indeed, the administrative record shows that "investing" in the administration's favored, unproven activities was the entire point of the set aside. Suppl.App.121-22; *see also* Suppl.App.125 (stating that the "significant investment in new Transitional Housing is likely to impact both existing permanent housing providers and the individuals they serve"). And HUD itself appears to have acknowledged that this "invest[ment]" is an "incentive[]" in asserting that, "[a]t the same time, the NOFO *also* incentivizes … Permanent Supportive Housing." AR51 (emphasis added). As the district court correctly concluded, the set-aside "undoubtedly incentivizes grantees." App.8.

Protesting this conclusion, HUD contends that the "set-aside is not a bonus or other incentive" because those statutory terms apply only to "additional funding" on top of any "standard funding." Mot.5. But reading "bonuses or other incentives," 42 U.S.C. § 11386b(d)(1), to refer only to additional funding would render the reference to "other incentives" superfluous. Further, the provision refers

to "*funding under this part*"—which is inclusive of *all* CoC funding, with no suggestion of a distinction between standard and additional funding. *Id.* (emphasis added). Subsection 11386b(e) does not suggest otherwise, *contra* Mot.5; that provision simply allows "additional flexibility in how a [CoC] use[s] their funds" in instances in which a community has "demonstrably reduce[d] homelessness." S. Rep. No. 110-216, at 4.

Further, HUD protests (at 5) that treating the set-aside as an "incentive" would mean that "any selection criteria or requirement" would be an incentive requiring notice and comment—and that would conflict with HUD's statutory discretion to establish "criteria" for making awards, 42 U.S.C. § 11386a(a)-(b). But HUD elides the distinction between "activities" that may be incentivized—which include types of housing or projects, such as permanent housing or supportive services, *see id.* § 11383(a)—and the criteria for evaluating *how* an activity is carried out—which include an applicant's past performance and plans and which HUD retains discretion to impose, *see id.* § 11386a.

*Second*, HUD wrongly asserts (at 6) that, in any event, the set-aside did not require notice and comment because section 11386b(d) mandates incentives for specified activities but does not restrict HUD's authority to provide incentives for other activities. But HUD does not identify any statutory provision authorizing it to provide incentives for activities that are *not* proven effective, and any such

authorization would render the procedural requirements of section 11386b(d)(2) superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (cleaned up)). The plain meaning of that provision is that, as this Court recently observed, "HUD may identify and fund other effective strategies, but it may only do so 'based on research and after notice and comment to the public.'" *Washington*, 171 F.4th at 480.

HUD invokes (at 7) the provision's use of the term "includes" in contending that the list is illustrative rather than exhaustive. In doing so, HUD ignores the text that follows: two specific permanent housing activities and a catch-all—"any other activity"—that is circumscribed by the requirement that such activity be "determined by the Secretary, based on research and after notice and comment to the public, to have been proven effective." 42 U.S.C. § 11386b(d)(2)(C). HUD's interpretation would functionally erase that from the statute by permitting HUD to provide bonuses or incentives for any other activity the secretary wishes, regardless of whether he has determined it to be effective based on research and notice and comment.

That the subsequent subsection provides that the secretary "shall not" provide incentives that discourage "flexibility to serve families with children," 42

U.S.C. § 11386b(d)(3), does not somehow transform the meaning of subsection 11386b(d)(2)(C). *Contra* Mot.7-8. The "plain meaning" of that provision, *United States v. Gordon*, 875 F.3d 26, 33 (1st Cir. 2017), is that "any other activity" that the secretary wishes to incentivize must be "proven effective" "based on research and after notice and comment to the public," 42 U.S.C. § 11386b(d)(2)(C). Subsection 11386b(c) likewise has no bearing on what activities the secretary may incentivize. *Contra* Mot.8. It states that the statute may not be construed to "establish a limit on the amount of funding that an applicant may request" to create or rehabilitate housing. 42 U.S.C. § 11386b(c). Requiring HUD to undertake notice and comment before providing incentives for transitional housing in no way limits the amount of funding applicants can request, and subsection 11386b(c) does not address what limits *HUD* can or cannot impose.

HUD attempts (at 8) to characterize the set-aside as merely an example of the "funding priorities" that HUD has routinely implemented through NOFOs. But, while HUD has, in the past and in this NOFO, included selection criteria for carrying out activities in certain ways, it has never before incentivized an *activity*, other than those identified by Congress as proven, or as directed by Congress through appropriation acts, without first making the required determination—much less to the detriment of the activities Congress mandated incentivizing. As a matter of common sense, when the agency dedicates a third of the funds to incentivize

"any other activity" without the required process, it necessarily *dis*incentivizes the proven strategies—flouting the congressional demand in section 11386b(d). *See, e.g.*, Mot.3 (acknowledging that the NOFO prioritizes transitional housing and supportive-services-only projects "*as opposed to permanent housing*" (emphasis added)).

*Third*, HUD insists (at 9-10) that, even if the requirements of subsection 11386b(d)(2)(C) applied to the set-aside, it satisfied them because it "reviewed articles and peer-reviewed research," issued "public statements about the intended changes," and talked to people at "forums" and in "separate discussions." The district court rightly rejected HUD's "specious argument" that this "vague, undefined, and informal version of the notice-and-comment process" satisfies the statute's requirements. App.9. Even assuming that the statute does not import all the requirements of notice-and-comment rulemaking under the APA, *see* Mot.8-9, it requires "notice and comment to the public," against the background understanding that an "opportunity for comment must be … meaningful." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009). HUD's assertion that general public statements (which it failed to identify) and limited forums (most or all of which were invite-only) met this requirement, *see* AR54, cannot credibly be considered sufficient public notice of and a meaningful opportunity to comment on a specific determination that transitional housing and supportive-service-only

activities are "proven effective." *See also* Suppl.App.82-88 (undated HUD memorandum summarizing the forums, including no indication that the forums even involved discussion of whether transitional housing and supportive-services-only activities are proven effective); Suppl.App.30 ¶ 89 (describing concerns with such meetings, including that they "did not allow for differing perspectives and ideas"). At no point did HUD clearly solicit comment on a potential determination, offer a way for the public to submit comments, or actually make a determination after notice and comment that new transitional housing and supportive-services-only projects have "been proven effective." The district court thus properly held that the set-aside violates the notice and comment process unambiguously required by section 11386b(d)(2)(C).

### B. The FY 2026 NOFO is unlawful in several other ways

This Court can conclude that HUD is unlikely to succeed based on any one or more of Plaintiffs' claims. *Cf. United States v. George*, 886 F.3d 31, 39 (1st Cir. 2018) (explaining that the court is "at liberty to affirm a district court's judgment on any ground made manifest by the record"). To start, the set-aside is contrary to law in other ways, exceeds HUD's statutory authority, and is arbitrary and capricious. *See* Pls.' MSJ 26-28, 31-34. In addition, several of the selection criteria and conditions in the NOFO exceed HUD's statutory authority—some of which are also directly contrary to law. *Id.* at 26-30.

Plaintiffs also argued before the district court that numerous NOFO requirements and criteria are arbitrary and capricious. For example, as the district court previously concluded in Plaintiffs' earlier case challenging the FY 2025 NOFO, HUD acted arbitrarily and capriciously in abandoning Housing First in the FY 2025 NOFOs. *Washington v. HUD*, No. 25-cv-626, 2026 WL 1863886, at *3-4 (D.R.I. June 29, 2026). The FY 2026 NOFO suffers from the same problem. Further, in imposing service requirements, anti-harm-reduction criteria, a discriminatory disability priority, and amorphous "risk review" criteria, among other provisions, HUD failed to offer "reasoned explanation[s]" for "disregarding [the] facts and circumstances that underlay" prior NOFOs and failed to consider the "serious reliance interests" at stake. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). And HUD did not offer "rational connection[s] between the facts found and the choice[s] made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). The district court's vacatur could be affirmed on any of these independent grounds. *See InterGen N.V. v. Grina*, 344 F.3d 134, 141 (1st Cir. 2003).

## II. The Equitable Factors Compel Denying a Stay

HUD has also failed to meet its burden to show that the equitable factors merit a stay.

**A.** To begin, HUD has not demonstrated that it will suffer irreparable harm absent a stay. HUD's chief complaint is that the district court's order means that HUD cannot pursue its policy. But HUD's conviction (at 12) that its preferred policy "would be more effective" than its longstanding Housing First policy cannot override statutory mandates—even if that conviction were correct, which it is not. *See, e.g.*, *Washington*, 171 F.4th at 480 (recognizing that the "Housing First model is evidence-based, with studies consistently showing that people are more likely to maintain their housing and avoid a return to homelessness when they live in a Housing First facility"). And HUD's failure to comply with those statutory mandates cannot establish irreparable harm to the agency. *See* App.17 ("Defendants lack a cognizable harm in seeking to uphold agency action that the Court has set aside as violative of the law.").

HUD complains that the vacatur prevents it from meeting its statutory December 1 deadline to make awards. But that statutory deadline does not give HUD license to proceed with a NOFO that violates *other* statutory requirements. By the same token, HUD's complaint (at 11 n.4) that it cannot undertake notice and comment in time to meet the December 1 deadline is a problem of its own making and does not mean it may flout statutory requirements. Even disregarding the other ways in which the set-aside is unlawful, HUD's inability to undertake the process necessary to implement its preferred approach while also meeting the

statutory deadline simply means that it cannot implement that approach this year and should promptly proceed with a new, lawful 2026 NOFO. HUD should not be rewarded for its own delay in trying to impose its policy preferences without adhering to applicable legal requirements.

**B.** HUD has also failed to "dispute many of the 'immediate, predictable' harms that would flow to the plaintiffs and their constituents" if the stay were granted. *Washington*, 171 F.4th at 493. With a stay, HUD would be permitted to proceed with the unlawful NOFO at least while the appeal is pending—including by requiring applications, which, as Plaintiffs detailed in the district court, would cause them multiple irreparable harms. *See* Suppl.App.59-63 ¶¶ 161-73. CoCs would imminently be required to announce the results of their local competitions run under the NOFO's unlawful criteria and incentives. Pls.' MSJ 55. Publicizing the results of those local competitions would jeopardize CoCs' relationships with the providers who are not prioritized. Suppl.App.76 ¶¶ 16-17, Suppl.App.79-80 ¶ 30, Suppl.App.99 ¶ 37. This, in turn, would erode the goodwill that CoCs have built in their communities—another irreparable harm. Suppl.App.62-63 ¶¶ 172-73, Suppl.App.79 ¶ 29, Suppl.App.99 ¶ 37; *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (holding that "injury to goodwill" can be irreparable).

Further, the choices that CoCs make in their local competitions would cause some providers to wind down operations. Providers "must make long-term decisions today … based on projections of funding months down the road." *Washington*, 171 F.4th at 492; Suppl.App.59-62 ¶¶ 161-69. Once providers hear that they have not been prioritized for funding, some will "be forced to close or prepare to close their programs immediately," *Washington*, 171 F.4th at 492, forcing them to reduce staffing, stop enrolling new clients, move existing clients out to other locations or prepare them for the loss of housing, Suppl.App.63-64 ¶¶ 174-78. These outcomes cannot easily be unwound, and providers may not be able to return to the CoC if the NOFO is invalidated later. Suppl.App.59 ¶ 160, Suppl.App.64 ¶ 178. And, in the meantime CoCs would be forced to divert significant resources to figure out how to ameliorate the harms for projects that are at risk of losing funding. *E.g.*, Suppl.App.54-56 ¶¶ 145, 148-49, 151-52.

HUD never disputed the factual bases for these harms in the district court or that court's finding of irreparable harm in its motion in this Court. Instead, HUD baldly asserts (at 10) that, if this Court affirms the district court's order, "plaintiffs will simply be placed in the position they are at present, which is preparing to respond to a new NOFO"—a clearly inaccurate statement given the cascading harms that would occur if the unlawful NOFO is allowed to move forward during the appeal.

HUD also ignores the effect of the district court's order: Congress required HUD to issue a FY 2026 NOFO by June 1, 2026, and to make awards by December 1; the NOFO it issued has been vacated, leaving nothing in its place; and HUD is therefore now obligated by statute to issue a new NOFO as promptly as possible. Instead of promptly issuing a lawful NOFO in order to meet its statutory obligations, with its request for a stay, HUD is seeking to process awards under its preferred, unlawful NOFO that will irreparably harm Plaintiffs—and which will only further delay the promulgation of a lawful NOFO.

**C.** Finally, "there is generally no public interest in the perpetuation of unlawful agency action." *Rhode Island*, 155 F.4th at 50 (cleaned up). HUD contends (at 12-13) that a stay is necessary to ensure that HUD can make awards in time to get money to communities before existing grants begin expiring in January 2027.[5] Not so. Plaintiffs have every interest in ensuring that funding gets to communities—lawfully—as quickly as possible. But permitting HUD to proceed with implementing the vacated NOFO while the appeal is pending will not get funding out more quickly. As explained above, HUD is not likely to prevail on the merits and is therefore not likely to be permitted to award funds under the vacated

[5] This contention is unavailing for several reasons, including that, although multiple congressional deadlines have passed, HUD has still not renewed *hundreds* of awards for FY 2025—creating even more "chaos" and "guaranteed funding gaps" for CoC projects. *See Washington v. HUD*, 171 F.4th at 482; Suppl.App.274-76; Suppl.App.281-84.

NOFO. If HUD proceeds with accepting and processing applications under that NOFO, they will necessarily *not* be doing the things that will actually help get funds out more quickly: issuing, accepting, and processing applications under a new lawful NOFO. *See* App.13 ¶ 9(b) (HUD declarant stating that "HUD would … marshal as many resources as possible" to complete review of applications under the vacated NOFO by December 1). A stay would therefore likely cause, not mitigate, funding delays by allowing HUD to focus its efforts on the unlawful NOFO rather than pressing forward with a lawful one.

## CONCLUSION

The Court should deny the motion to stay.

August 21, 2026

Respectfully submitted,

/s/ *Madeline H. Gitomer*
Madeline H. Gitomer
Christine L. Coogle
Kristin Bateman
Carrie Y. Flaxman
Robin Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
mgitomer@democracyforward.org
ccoogle@democracyforward.org
kbateman@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs National Alliance to End Homelessness,*

Amy R. Romero
Kevin Love Hubbard
Lawyers' Committee for Rhode Island
56 Pine Street, Suite 200
Providence, RI 02903
(401) 238-3953
amy@lawyerscommitteeri.org
kevin@lawyerscommitteeri.org

*Counsel for All Plaintiffs*

Tony LoPresti
County Counsel
Kavita Narayan
Chief Assistant County Counsel
Meredith A. Johnson
Lead Deputy County Counsel

Stefanie Wilson
Deputy County Counsel
Leily Arzy
Litigation Fellow
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of Santa Clara*

John K. Whitaker
Senior Counsel
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
john.whitaker@nashville.gov

*Counsel for Plaintiff Metropolitan Government of Nashville and Davidson County*

Christopher M. Sanders
General Counsel to the King County Executive
Cristy J. Craig
Senior Deputy Prosecuting Attorney
Mika Rothman
Deputy General Counsel
Office of the King County Prosecuting Attorney
401 5th Avenue, Suite 600
Seattle, WA 98104
(206) 477-1163
chrsanders@kingcounty.gov
cristy.craig@kingcounty.gov

*National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

Lynette Labinger
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

Antonia K. Fasanelli
National Homelessness Law Center
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org

*Counsel for Plaintiffs National Alliance to End Homelessness and National Low Income Housing Coalition*

Toby Merrill*
Cassandra Crawford**
Graham Provost***
Kayla Svihovec***
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
cassandra@publicrightsproject.org
graham@publicrightsproject.org

mrothman@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*

* Admitted in Massachusetts. Not admitted in California.

** Admitted in North Carolina. Not admitted in California.

*** Admitted in D.C. Not admitted in California.

kayla.svihovec@publicrightsproject.org

*Counsel for Plaintiffs City of Boston, City of Cambridge, Martin Luther King, Jr. County, Metropolitan Government of Nashville and Davidson County, City of Tucson*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing brief complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,198 words. The opposition complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6); it has been prepared using Microsoft Word in proportionally spaced 14-point Times New Roman typeface.

/s/ *Madeline H. Gitomer*
Madeline H. Gitomer