# SUPPLEMENTAL APPENDIX

## TABLE OF CONTENTS

Declaration of Ann Marie Oliva, National Alliance to End Homelessness, Dkt. No. 30-4 ........ Suppl.App.1

Declaration of Sheila A. Dillon, Mayor's Office of Housing, City of Boston, Dkt. No. 30-8 ........ Suppl.App.72

Declaration of Kathryn J. Kaminski, County of Santa Clara Office of Supportive Housing, Dkt. No. 30-12 ........ Suppl.App.81

Memorandum from Robert Marbut, Senior Policy Advisor, to Caitlyn McKenney, Deputy Assistant Secretary for Community Planning & Development's Office of Special Needs, Homelessness Policy Forums–CoC Program (AR1–7) ........ Suppl.App.103

Memorandum from Caitlyn McKenney, Deputy Assistant Secretary for Community Planning & Development's Office of Special Needs, to Ronnie Kurtz, Assistant Secretary for Community Planning & Development, Review FY26 CoC NOFO (June 1, 2026) (AR39–74) ........ Suppl.App.110

U.S. Dep't of Hous. & Urb. Dev., FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO, No. CPD-2600-DC-0025 (June 1, 2026) (AR5006–5133) ........ Suppl.App.146

Notice and Request for Status Conference, *NAEH v. HUD*, No. 25-cv-636 (D.R.I. Apr. 22, 2026), Dkt. No. 84 ........ Suppl.App.274

Defs.' Status Report, *NAEH v. HUD*, No. 25-cv-636 (D.R.I. Aug. 17, 2026), Dkt. No. 107 ........ Suppl.App.281

**DECLARATION OF ANN MARIE OLIVA**
**NATIONAL ALLIANCE TO END HOMELESSNESS**

I, Ann Marie Oliva, declare the following under penalty of perjury:

1. My name is Ann Marie Oliva. I have personal knowledge of the facts contained in this declaration. If called upon to testify, I could and would testify competently as to the truth of the facts in this declaration.

2. I am the Chief Executive Officer of the National Alliance to End Homelessness ("the Alliance"). I have dedicated my career to educating the public on the nature of homelessness and its solutions, and to advancing best practices within the homeless services sector.

3. I have worked in homelessness assistance for more than 30 years. Early in my career I helped to implement the first U.S. Department of Housing and Urban Development (HUD) funded Continuum of Care (CoC) in the nation (Washington, DC–called the D.C. Initiative), and was for more than nine years a lead member of the District's team that responded to HUD's Notices of Funding Opportunity (NOFOs) for the legacy programs that Congress consolidated in 2009 to form the Continuum of Care Program.

4. I worked as a HUD technical assistance provider to help CoCs comply with HUD policy and regulations, respond to natural disasters (including Hurricane Katrina), and use data to better inform local decision-making. From 2007 to 2017 (spanning three Administrations), I served as HUD's Director of the Office of Special Needs Assistance Programs, then the Deputy Assistant Secretary for Special Needs and a member of the Senior Executive Service. During my 10-year tenure at HUD, I administered the CoC Program competition, and many of the operational structures that I understand are currently in place were implemented under my leadership. I also oversaw the implementation of the Homeless Emergency Assistance and Rapid

Transition to Housing (HEARTH) Act, which modernized and amended the McKinney-Vento Homeless Assistance Act and formally authorized the CoC Program. This included leading the drafting and clearance of applicable regulations, including the current CoC Program Interim Rule. I also partnered with the U.S. Department of Veterans Affairs (VA) to design and implement evidence-based programs for Veterans experiencing homelessness that led to an overall decrease of more than 50 percent in Veteran homelessness nationwide.

5. I have worked directly in communities from coast to coast over the last 10 years, which gives me a sense of operational and political challenges our members experience locally.

6. This experience and corresponding expertise provide me with knowledge and perspective on the CoC Program application and awards process, as well as the harms our members face as a result of HUD's actions.

**A. Overview**

7. On June 1, 2026, HUD issued the FY 2026 Notice of Funding Opportunity (NOFO).

8. The FY 2026 NOFO again imposes sweeping changes to HUD's funding commitments, including a $1.3 billion set-aside that will cap permanent housing investments for people experiencing homelessness. HUD's cut to permanent housing alone will likely force more than 97,000 people back onto the streets and in shelters. Program participants are some of the most vulnerable members of our society and include families with children, unaccompanied youth, people with disabilities (including physical, mental, behavioral, and substance use related), people who are experiencing homelessness for the first time as well as people considered chronically homelessness, people who are fleeing or attempting to flee domestic violence or human trafficking, and people who are older or veterans.

9. A return to unsheltered homelessness carries catastrophic consequences for the people whose assistance and support will be de-funded because of this NOFO: exposure to extreme weather events; life-threatening infections; unmanaged chronic illnesses; lack of sobriety supports and relapse; predatory violence; sexual assault; and the escalation of behavioral health crises. Research consistently shows that mortality rates among people experiencing unsheltered homelessness are several times higher than for housed populations and for individuals with disabilities who lose permanent housing, the risk of premature death increases dramatically within months. This policy shift will not only erase years of progress in stabilizing the most vulnerable people in communities across the country, but it will also directly result in avoidable medical crises, suffering, and preventable loss of life. Responding to years of HUD guidance, CoCs have specifically placed people who are most vulnerable to the harms of homelessness in the PSH units this NOFO will defund.

10. The FY 2026 NOFO is also already beginning to cause harm, and that will get worse come August 11, when CoCs must announce what projects they will include, exclude, or reduce in their applications for funding: CoCs will be forced to eliminate or drastically reduce permanent supportive housing and rapid re-housing programs; CoC-funded permanent housing sites that are cut through the local competitive process will begin to close their doors; impacted providers (especially those whose grant renewal dates are early in the year) will start to wind down operations and lay off staff; and thousands of stably housed individuals and families will face an increased risk of eviction or program displacement. This is a brief and incomplete snapshot of the cascading consequences.

11. At the same time, CoCs and providers also have an urgent need for clarity on what their FY 2026 funding will be.

**B. About the Alliance and Our Members**

12. The Alliance has substantial expertise in the factors driving homelessness as well as evidence-based and emerging best practices that end people's homelessness.

13. The Alliance is a nonprofit, nonpartisan membership organization that seeks to ensure that no American is homeless and does so by mobilizing all sectors of American society in an alliance to end homelessness.

14. We have more than 10,000 members that span all 50 states. Our members include nonprofit organizations, people with lived experience of homelessness, service providers, practitioners, researchers, funders, businesses, and local and state government entities dedicated to ending homelessness. Our members, many of whom previously or currently receive CoC grants from HUD, focus on making homelessness in the United States a rare, brief, and a one-time occurrence through the provision of coordinated, compassionate, and high-quality homelessness response services.

15. The Alliance's members play a significant role in the organization in at least three ways.

16. First, Alliance members guide the Alliance's agenda and activities. Members sit on a series of formal councils and advisory bodies that advise the Alliance on its various workstreams, including its Leadership Council, Research Council, Community Strategic Team (Lived Experience Advisors Council), and Capacity Building Network. Members also guide the Alliance's activities by shaping the content and agenda of the Alliance's biannual conferences, which act as a central forum for members and other community leaders to share best practices and lessons learned from their communities, drive innovations, and build lasting solutions for ending homelessness. Alliance members help shape those conversations by responding to calls

for presentations with proposed talks and panels and by filling out robust surveys at the end of conferences that inform future conferences.

17. Second, Alliance members provide crucial financial support that facilitates Alliance activities. Members pay registration fees that provide up to 85 percent of the funds necessary to run the annual conferences, and some members provide direct donations that fund the Alliance's broader activities.

18. Finally, Alliance members comprise roughly a quarter of the Alliance's Board of Directors. In that capacity, Alliance members play a direct role in leading the organization, setting priorities, and in selecting Alliance leadership, including future board members and the Alliance officers.

19. Because we have an agenda that reflects the needs of our members, we are able to effectively serve them by: (1) conducting and disseminating research that provides data and support for effective, evidence-based solutions to end homelessness; (2) educating opinion leaders and policymakers about proven strategies and advocating for policies that support sustainable solutions to ending homelessness; (3) collaborating with public and private sectors to build the capacity of local communities and CoCs to implement solutions; (4) offering intensive, on-the-ground technical assistance tailored to its members' local needs, including how to manage the CoC or track data; and (5) fostering a collaborative approach to ending homelessness by convening members across the country—through annual conferences and other fora—to share best practices and learn from one another.

20. The Alliance also offers its members specific services regarding the CoC grant program, including analysis and training on HUD's policy and funding priorities. Such services facilitate the ability of Alliance members to compete for and comply with grants issued under the

CoC program. In addition, we analyze grant requirements issued in NOFOs and advise our members on how to create the most effective, efficient, and equitable homeless response system under a competition's process and requirements. Our reach in this area is broad—for example, over 3,500 people registered for our most recent webinar on the FY 2026 NOFO.

**C. The Continuum of Care Program**

21. The CoC Program funds critical housing and services to support individuals and families experiencing homelessness, mainly by accessing and maintaining permanent housing. The CoC Program currently funds nearly 7,000 individual projects. The primary goal of a CoC is to end homelessness in a specific geographic area through the development and implementation of unified, community-wide strategy to prevent and end homelessness. Key responsibilities of CoCs include, but are not limited to: coordinating all aspects of services for individuals and families experiencing homelessness, from street outreach to emergency shelter, transitional housing, and permanent housing; managing funding to operate the Continuum of Care Program, which involves planning how to use HUD funding to support the community's homeless population; collecting data such as annual or biannual counts of the homeless population (point-in-time counts), as well as an annual enumeration of emergency shelters, transitional housing units, permanent housing beds and other beds/services that make up a community's homeless assistance system; and fostering collaboration among a wide range of partners to ensure that services are delivered efficiently and effectively.

22. Permanent housing and funding stability have been cornerstones of the Continuum of Care (CoC) Program since its creation.

23. The HEARTH Act requires HUD to provide incentives for CoCs to use funding for "activities that have been proven to be effective at reducing homelessness." 42 U.S.C. § 11386b(d)(1). Congress identified two (and only two) activities that meet that bar, and both are

Case: 26-1226 Document: 00118495633 Page: 9 Date Filed: 07/21/2026 Entry ID: 6836472

permanent housing strategies: (1) permanent supportive housing for chronically homeless individuals and families and (2) rapid re-housing for homeless families. *Id.* § 11386b(d)(2). Congress also authorized HUD to identify other proven-effective strategies based on research and after notice and comment, but HUD has never done so.

24. Congress also required that minimum amounts of funding be directed to permanent housing projects for certain populations. In particular, at least 10 percent of appropriated funds must go toward permanent housing for homeless families with children. 42 U.S.C. § 11386b(b). In addition, so long as it would leave enough funds available to renew all existing projects, 30 percent of appropriated funds must go to new permanent housing projects for individuals and families with disabilities. *See id.* § 11386b(a)(1), (2), (4).

25. Today, nearly 88 percent of the CoC Program's funding goes to permanent housing approaches.

26. But permanent housing cannot operate effectively without confidence in the stability of the funding. Therefore, in the CoC Program Congress also appropriately prioritized stability for communities, projects, and formerly homeless people by protecting the opportunity of existing grants to be renewed.

27. Congress protected CoCs' ability to obtain renewals of existing projects by ensuring that they could apply for enough funding to cover those renewals. In general, the statute requires HUD to consider "the need within [each CoC's] geographic area" when making awards, and it treats that need as the geographic area's "estimated grant amount." 42 U.S.C. § 11386a(b)(2). That need amount is determined by a regulatory formula that looks to factors related to population size and poverty. *Id.*; *see also* 24 C.F.R. § 578.17(a)(3). But if that is not

enough to renew all existing grants for the area, the higher amount—the amount needed to renew all expiring grants—will govern. 42 U.S.C. § 11386a(b)(2)(B)(iii).

28. Congress also provided further protections for renewals of existing permanent housing projects in order to maximize business continuity and stability, and therefore the ability for projects to operate effectively over time. To do this, Congress mandated that funding appropriated for the CoC Program be available to renew permanent housing awards. *See* 42 U.S.C. § 11386c(b). It also limited HUD's discretion to deny renewals. In particular, the statute requires HUD to determine whether to renew existing permanent housing awards based on the CoC's certification as to two things only—that a demonstrated need for the project remains and that the project complies with program requirements and appropriate quality and habitability standards. *Id.* § 11386c(b). The statute makes clear that this is not meant to limit HUD's ability *to renew* existing projects in accordance with other statutory sections. *See id.* § 11386c(c). But it does not authorize HUD to reject renewals based on any other factors. *See id.*

**D. The CoC Program Competition Application Process**

29. Congress codified the CoC Program into law to modernize the federal government's approach. It supports a community-based approach to addressing homelessness that enables local and regional entities to coordinate strategies best suited to the particular needs of their geographic areas. The statute accordingly recognizes local "continuums of care" (CoCs)—coalitions composed of representatives of various entities involved in addressing homelessness as well as people with lived experience of homelessness—that are responsible for addressing homelessness within their localities or regions.

30. Consistent with that community-wide approach, the application for CoC funding happens at the community level. Each CoC must designate a "collaborative applicant" that will apply for funding on behalf of the whole community.

31. The statute and binding regulations establish the maximum amount that each geographic area is eligible to receive. *See* 42 U.S.C. § 11386a(b)(2); 24 C.F.R. § 578.17(b). This amount is meant to reflect the community's relative need. The need amount is determined by a regulatory formula that looks to factors related to population size and poverty, or by the amount needed to renew all expiring CoC grants for one year (called the Annual Renewal Demand, or ARD), whichever is higher. 42 U.S.C. § 11386a(b)(2)(B); 24 C.F.R. § 578.17(a)(3). Currently, for most CoCs, ARD is higher than the formula-based amount. This framework ensures that communities can apply for enough funding to continue serving people in existing programs—either by seeking renewal of successful projects or reallocating that funding to another project that can better serve those people.

32. This statutorily defined need amount is the maximum amount for which each CoC can apply (not including bonus funding). HUD must inform CoCs of this amount when it issues a NOFO so that CoCs know the total amount they are permitted to apply for on behalf of their communities.

33. After HUD issues a NOFO for CoC funding, the CoC must run a local competition to select the projects it will include in the CoC's application to HUD. In other words, individual service providers submit applications for particular projects to the CoC's collaborative applicant, and the collaborative applicant then submits a CoC-wide application to HUD. That CoC-wide application puts forth the projects that the collaborative applicant selected in the local competition, in ranked order (called the "priority listing").

34. In general, projects must apply through this locally run competition and cannot apply to HUD on their own. The only exception to this rule is referred to as the "Solo Application" process, which is reserved for rare instances when an applicant attempted to

participate in the local competition but was unreasonably excluded from participating by the CoC.

35. Although the NOFO sets forth the general criteria and process by which HUD will select projects for funding, it does not provide CoCs or project applicants with all of the information they need to apply. Rather, HUD must also make the actual application available on its online grant portal, "e-snaps." This application provides the questions that CoCs and project applicants must answer to get points as described in the NOFO. This is normally accompanied by a "detailed instructions" document that provides guidance on how to respond to these questions. For example, the NOFO may indicate that there are 3 points available related to whether the CoC has implemented street outreach procedures to ensure all persons experiencing homelessness are aware of the housing and services providers within the CoC's geographic area. The question(s) in the application, accordingly, may require CoCs to describe how often street outreach encounters lead to permanent housing, or require submission of data to support permanent housing placements by outreach providers. The detailed instructions may include information about how to fill out the budget chart for each application type or how to document match funding.

36. A collaborative applicant and its project applicants need all three of these documents (the NOFO, the CoC and project applications, and the detailed instructions) *and* the CoC's ARD in order to confidently both complete the local competition and submit an application to HUD.

37. Once applications are submitted to HUD, HUD then evaluates CoCs' applications and awards funds through a competitive process that considers criteria that are largely based on the CoC's application overall. For instance, HUD must look to factors like "the methodology"

the CoC used to "to determine the priority for funding local projects," the CoC's plan for reducing homelessness and achieving related goals, and the CoC's "previous performance" in achieving certain outcomes in the community. *See* 42 U.S.C. § 11386a(b)(1).

38. Because CoCs apply at the community-wide level, and because HUD must consider a CoC's overall application in making funding decisions, project applications are interdependent. If a CoC includes a disfavored project on its application, that can drag the entire CoC's application down and reduce other projects' likelihood of selection as well. And if the CoC includes projects that are not ultimately selected, that represents a loss to the entire community. That loss, moreover, has effects that will last long past the current funding year. In most instances, the base amount that CoCs can apply for is limited to the amount needed to renew their existing grants. So, if the CoC receives less grant money this year, that will reduce the amount it is even eligible to apply for in subsequent years.

**E. The FY 2026 NOFO**

39. On June 1, 2026, HUD issued a NOFO announcing the competition for $4.04 billion in CoC funding for FY 2026. HUD estimates it will make approximately 7,000 awards under this NOFO.

40. Despite releasing the FY 2026 NOFO on June 1, HUD still has not informed CoCs of the amounts they are eligible to apply for, despite the statutory requirement that it do so concurrently with issuing the NOFO. *See* 42 U.S.C. § 11386a(b)(2)(A). This means that CoCs do not know the bottom-line amount they can apply for overall, and it also means they do not know the amounts for which they can apply for CoC Bonus funding, DV Bonus funding, and CoC Planning and Unified Funding Agency grants, which are tied to either the CoC's preliminary pro rata need (the need amount as determined by a regulatory formula) or final pro rata need (which is the higher of the preliminary pro rata need or the amount needed to renew all expiring grants).

*See* FY 2026 NOFO at 11, 12, 25, 90. It also means that CoCs do not know how much funding they can receive in Tier 1 (which, as explained further below, corresponds to the amount of funding that HUD must award according to CoCs' selections, without nationwide competition). That is particularly problematic under this year's NOFO because, given the Set-Aside discussed below, permanent housing projects listed in Tier 2 are exceedingly unlikely to get funding. So, if a CoC misestimates its Tier 1, it could accidentally place a permanent housing project partially or completely in Tier 2 (thinking that was still Tier 1). That would result in all new projects in Tier 2 receiving lower scores—and lower likelihood of selection—while the permanent housing project would also have a vanishingly small chance of receiving funding.

41. HUD has also failed to post the actual applications in e-snaps and corresponding detailed instructions, leaving CoCs and project applicants to guess what various criteria mean or what information they will need to provide with only 25 days remaining before CoCs must inform applicants of whether their applications will be accepted, rejected or reduced.

42. Communities are unclear on many aspects of the NOFO, and to date HUD has failed to provide timely or complete answers to questions, even where such answers are needed to submit an application. On June 4, 2026, HUD held a meager 16-minute webinar about the NOFO with no substantive guidance provided, and no opportunity for applicants to ask questions. Further, neither the question and answer (Q&A) nor chat functionality was enabled on the webinar platform. Many members report that they have emailed HUD at the address HUD provided for questions about the NOFO, but that their questions have gone unanswered for weeks.

43. Even so, communities have done their best to understand the incredibly complex and convoluted selection process that the FY 2026 NOFO puts forth. As communities have

analyzed this NOFO and prepared to apply, its impacts have become more and more clear. The NOFO is already causing massive instability in communities and, if implemented, would devastate communities' homelessness response systems by stripping funding from existing permanent housing projects regardless of merit and by directing funding to strategies not proven effective at reducing homelessness.

44. Further contributing to the chaos, late afternoon on July 16 (the day before this filing), HUD announced its "intent to modify" the FY 2026 NOFO. HUD, *Continuum of Care Competition*, https://perma.cc/D7WJ-PTTR. It posted a "preview" version of the modified NOFO that is "not yet effective," but that HUD will "make effective" at some time in the next week, "pending further agency deliberation." The "previewed" modification introduces an entirely new process for certain CoCs (including one it has already identified) that will deepen the chaos in those regions.

**1. A massive set-aside for new transitional housing and supportive-services-only projects will defund permanent housing and renewals**

45. The FY 2026 NOFO adopts a massive and unprecedented set-aside for new projects, with a heavy priority for transitional housing and supportive-services-only projects (Set-Aside). In particular, it sets aside $1.3 billion for new projects only, despite Congress's command that appropriated funds be available to renew existing projects, and despite the fact that this set-aside guarantees that significant numbers of existing projects will be ineligible for renewal, no matter how effective. Worse, the set-aside is principally available only for new transitional housing and supportive-services-only projects. New permanent housing projects can receive a share only if that money remains after HUD makes awards to *all* transitional housing and supportive-services-only projects that applied. Given the total amount of funding available, this set-aside acts as a de facto cap on existing permanent housing projects.

46. The FY 2026 NOFO implements this set-aside through a waterfall that designates the order in which projects will be funded. FY 2026 NOFO at 88–89. First, HUD will award certain administrative grants to each CoC. Then, it will make awards that CoCs included in their Tier 1—i.e., the top portion of each CoC's priority listing—so long as they pass "eligibility thresholds." (As required by a recently enacted statute, the NOFO allows CoCs to list projects totaling 60 percent of the amount needed to renew all the CoC's existing grants in Tier 1.) Then, it will ensure that funds are allocated to satisfy congressionally mandated earmarks—$104 million for certain types of projects to assist victims of domestic violence and $430 million for permanent housing for families with children. If those statutory minimums were not already satisfied through the awards to Tier 1 projects, then HUD will select additional projects by score until it meets the minimum allocation requirements. Next, it will select new transitional housing or supportive-services-only projects ranked in Tier 2 in order of project score until $1.3 billion in new projects have been selected. Then, if and only if there are not enough transitional housing and supportive-services-only projects to reach $1.3 billion, HUD will allocate funding to other new projects, in order of project score, until it reaches $1.3 billion. Finally, once it reaches $1.3 billion in new projects, it will award the remaining funds—if there are any—to existing projects in order of score.

**2. Selection criteria effectively force communities to abandon proven strategies**

47. The FY 2026 NOFO sets out four levels of review that HUD will conduct: threshold review, "merit" review, "risk" review, and additional factors that HUD will consider. "Merit" review applies only to Tier 2 projects, but the other levels of review apply to both Tiers. At each level, HUD pushes unproven and ineffective strategies at the expense of proven ones.

*a. Amorphous "risk review" and additional criteria threaten to reject projects on virtually any grounds*

48. The NOFO provides that HUD retains discretion to reject applications based on a host of amorphous factors ("Risk Review" and "Additional Factor" Criteria) that effectively give HUD free reign to deny awards on virtually any grounds.

49. The NOFO states that all projects must pass "risk review," which looks at criteria that purportedly bear on each project "applicant's likelihood of successfully carrying out the project." FY 2026 NOFO at 86. The NOFO provides various undefined criteria for assessing that, such as the applicant's "[a]bility to promote self-sufficiency and economic independence." *Id.* at 87. It also looks to the applicant's "[h]istory of illegal discrimination" and "[h]istory of … facilitating illicit drug use or other illicit activities that conflict with the purposes of this NOFO"—with HUD, not a court, apparently being the sole arbiter of what is "illegal" and with no explanation of what HUD deems "illegal." *See id.* at 87. The NOFO also states that HUD will rely on potentially biased or unverified information, such as "news reports," to assess applicant's past performance. *Id* at 86.

50. The NOFO reserves to HUD the option to consider—and reject projects based on—amorphous additional factors after completing all other review steps. *Id.* at 87. These other factors include things like "the overall projected impact on the … priorities in this NOFO," the "[l]ikelihood that the proposed project will result in the benefits expected," and a "[b]road range of recipients beyond recurrent recipients." *Id.* Although the NOFO says that HUD will consider these additional factors "to the extent allowed by law," it does not provide any additional explanation of when it views itself as permitted to consider these factors or provide any explanation as to what these factors mean.

51. This "risk review" and consideration of additional factors give HUD substantially more unfettered discretion than ever before to reject applications.

52. The inclusion of these amorphous factors—and the accompanying threat that HUD might reject any project it does not like—distorts CoCs' decision-making in selecting the projects to include on their applications. In particular, these factors pressure CoCs to screen out projects that HUD might reject for ideological reasons (such as a history of promoting diversity, equity, and inclusion) and to otherwise conform to HUD's wishes, to reduce the risk of being rejected on some subjective ground.

***b. Threshold and merit criteria effectively force communities to abandon proven strategies***

53. The FY 2026 NOFO contains a host of threshold and merit criteria that, individually and in combination, effectively force communities to defund proven strategies in favor of unproven and ineffective ones.

54. Threshold review criteria apply to all projects—both at Tier 1 and Tier 2. Threshold review determines if an individual project is eligible for funding on a pass/fail basis. If a project fails to meet any threshold requirement, it is disqualified from eligibility and any further consideration for funding. FY 2026 NOFO at 58. For some threshold requirements for new projects, the NOFO lists multiple criteria, each with separate point values, and requires projects to attain a minimum point value to be eligible, but not necessarily to satisfy all listed criteria. FY 2026 NOFO at 63–69. However, the NOFO further provides that, if the project is selected, it must meet *all* listed threshold criteria before its grant will be executed. FY 2026 NOFO at 62.

55. Merit review applies only to projects in Tier 2. At the merit review stage, HUD evaluates the CoC's application overall and assigns the CoC a score. To calculate that score,

HUD assigns points for various "merit criteria" that look to the CoC's activities and the overall composition of projects in the CoC's application. That CoC score then factors into a separate score that HUD assigns individual projects. The individual project score is based on the CoC's score (worth 50 percent), how highly the project was ranked in the CoC's application (worth 40 percent), and whether the project mandates participation in supportive services (worth 10 percent). *Id.* at 90. At each level of the waterfall described above (after Tier 1), projects are generally selected in order of their project score, unless they are disqualified based on HUD's review of "risk" or additional factors. *See id.* at 89. It is important to note, however, that score only matters within each level of the waterfall. In other words, a low scoring new transitional housing project will be funded well before a higher scoring permanent housing project—if any permanent housing projects can be funded at all in Tier 2 given the total amount available and the selection process outlined in the NOFO.

56. Through both threshold and merit criteria, the NOFO pushes CoCs to abandon the practices that research and experience have proven are most effective at minimizing homelessness, including a "Housing First" approach —which prioritizes providing housing to people without any preconditions like sobriety, employment, or participating in treatment or other services—and to impose service requirements instead (Service Requirements Criteria); to stop all harm reduction activities in their communities (Anti-Harm Reduction Criteria); and to promote unproductively punitive law enforcement responses to homelessness (Law Enforcement Criteria). *See* FY 2026 NOFO at 28–34. That Law Enforcement Criteria include points for CoCs that do not take actions that "interfere with" local efforts to advance the objectives of "[q]uickly clear[ing] tents and encampments," "[d]ecreas[ing] the public use of illicit drugs," pursuing "involuntary commitment," and "shar[ing] information … in accordance with the Sex Offender

Case: 26-1226 Document: 00118495633 Page: 20 Date Filed: 07/21/2026 Entry ID: 6836472

Registry and Notification Act (SORNA)" (Local Policies Criterion). FY 2026 NOFO at 80–81. This deters CoCs from advocating against those types of local efforts.

57. ***Non-statutory threshold criteria for Tier 1 projects.*** An overarching problem is that the NOFO requires Tier 1 projects to meet threshold criteria that have no grounding in the statute or regulations, but rather implement HUD policy objectives. This is improper as applied to Tier 1 projects because Congress provided that, for FY 2026, HUD *must* award a certain amount of funding—for each CoC, 60 percent of the amount needed to renew all expiring projects—"based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399. In other words, for this portion of funding, CoCs get to decide which projects receive awards, so long as they are "consistent with" statutory requirements. Nonetheless, HUD has imposed threshold requirements that are not limited to requirements imposed by statute and regulation.

58. For example, to obtain certain points toward meeting the minimum required to pass threshold review, projects must have a record of having at least 50 percent of participants exit with employment income within 24 months or have a plan to achieve that benchmark; and must provide services in a way "that will result in" *all* program participants participating in services at least 20 hours per week; must "partner[] with first responders and law enforcement" and "cooperate … with the enforcement" of public camping and public drug use laws; and must show that the support offered will help participants achieve "self-sufficiency" (which the NOFO incorrectly defines to mean no reliance on any public or private assistance, even from mainstream programs) within 24 months. FY 2026 NOFO at 6, 63–65, 67–68.

59. ***Service Requirements Criteria.*** The FY 2026 NOFO includes multiple criteria that pressure CoCs to put forth applications for projects that mandate services. For projects

subject to merit review, the NOFO makes mandating services the single largest individual scoring factor affecting projects' likelihood of selection within each level of the waterfall. In particular, out of the 100 possible points available to a project, projects will receive up to 10 points if "they have or will incorporate supportive service participation requirements." FY 2026 NOFO at 90. By comparison, projects can receive a total of 50 points for their CoC's score on the dozens of other merit criteria combined. *See id.* In addition, in the "merit" review of the CoCs' overall application, the NOFO assigns points for demonstrating that certain percentages of housing projects within the CoC mandate participation in supportive services, *id.* at 79; demonstrating certain numbers of CoC-funded units mandating substance abuse treatment as a condition of participation in the program, *id.* at 78; and for not restricting CoC-funded housing projects from requiring treatment or sobriety as a condition of assistance, *id.* at 85. Threshold criteria also pressure CoCs to put forth projects that impose service requirements by assigning points based on the results the project will receive. That prediction of the future necessarily requires a subjective assessment—and applicants know that HUD will evaluate that through its anti-Housing-First lens.

60. ***Anti-Harm Reduction Criteria.*** At the threshold review stage, the FY 2026 NOFO disqualifies applicants that do not certify that they will not "operate[] illegal drug injection sites or 'safe consumption sites' in violation of 21 U.S.C. 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 U.S.C. 863" (Safe Drug Use Certification). FY 2026 NOFO at 60; *see also id.* at 108. This requirement applies not just to the grantees' use of grant funds, but also to any activity the grantee engages in, even with non-federal funds. While the condition states only that grantees may not engage in activity that other

laws already prohibit, Defendants appear to have an expansive view of what those laws prohibit, and have included this condition to deter lawful harm reduction activities. In addition, at the merit review stage, the NOFO assigns 10 points to CoCs that "[p]rohibit CoC-funded housing projects from operating drug injection sites or 'safe consumption sites,' knowingly distributing drug paraphernalia on or off property under their control, knowingly permitting the use or distribution of illicit drugs on property under their control, or conducting any of these activities under the pretext of 'harm reduction.'" FY 2026 NOFO at 85. To obtain these points, a CoC would have to bar projects from operating harm reduction services even with the project's own, non-CoC funding.

61. ***Law Enforcement Criteria.*** At the threshold and merit review stages, applicants must cooperate with first responders and law enforcement to receive certain points, including by helping enforce local laws on public camping and public drug use. *Id.* at 65, 80. In addition, to receive certain merit points, a CoC must show that it does not take actions that (in HUD's judgment) "interfere with" local efforts to advance the objectives of "[q]uickly clear[ing] tents and encampments," "[d]ecreas[ing] the public use of illicit drugs," pursuing "involuntary commitment," and "shar[ing] information … in accordance with the Sex Offender Registry and Notification Act (SORNA)." *Id.* at 80–81. This appears to broadly penalize CoCs that advocate against or otherwise express opposition to the policies that the NOFO favors.

***c. Self-sufficiency criteria conflict with Congress's intent and ignore challenges some populations face***

62. The FY 2026 NOFO also adopts multiple criteria (Self-Sufficiency Criteria) that threaten to disqualify applicants that do not, in HUD's judgment, adequately promote "self-sufficiency"—which the NOFO (improperly) defines as "the ability to meet basic needs,

including a place to live, *without public or private assistance*." FY 2026 NOFO at 6 (emphasis added).

63. In particular, for renewal projects to pass threshold review, the NOFO states that HUD will assess the "applicant's performance in assisting program participants to achieve and maintain self-sufficiency." *Id.* at 61. Projects that fail HUD's assessment will be disqualified from consideration. Similarly, at the "Risk Review" stage, HUD identifies a project's "[a]bility to promote self-sufficiency and economic independence" as a "sufficient and independent basis" to reject an application. *Id.* at 87. This also fails to account for the statutory selection criteria requirement that performance measures account for the challenges faced by the program participant. 42 U.S.C. § 11386a(b)(1)(A) (providing that criteria for awarding funds shall take into account "the previous performance of the recipient regarding homelessness" as measured by criteria "that shall take into account barriers faced by individual homeless people").

64. The McKinney-Vento Act makes clear that Congress did not intend to advance that particular notion of "self-sufficiency"—and did not establish a goal of moving unhoused people, particularly those with disabilities, off of public benefits. Indeed, far from aiming to end homeless individuals' reliance on any assistance, Congress specifically directed CoCs to *promote* access to, and use of, other mainstream programs that could assist those populations, such as Medicaid or the Supplemental Nutrition Assistance Program. *See* 42 U.S.C. §§ 11313(a)(7), 11381(3), 11386a(b)(1)(D), 11386b(d)(2)(B). And, consistent with the statute, HUD has long considered increasing participants' benefits-based income to be a sign of strong performance. *See id.* § 11386a(b)(1)(A)(v). Indeed, the NOFO's conception of "self-sufficiency" fails to account for the realities of serving certain communities. For example, many program participants

have disabilities, trauma histories, or safety needs that require ongoing support and create barriers to achieving the type of "self-sufficiency" the NOFO envisions.

***d. A preference for people with certain disabilities discriminates against people with other disabilities***

65. The FY 2026 NOFO also announces a preference for people with certain disabilities, to the exclusion of people with other types of disabilities (Discriminatory Disability Priority). In particular, the NOFO proclaims that "able-bodied people" should "move to self-sufficiency" while individuals "over 62 years old, physically disabled, [or] developmentally disabled" are "likely to never be able to return to the workforce." FY 2026 NOFO at 30. Based on that discriminatory premise for which the Administration provides no evidence to support, the NOFO further announces that the latter populations "should be prioritized for Permanent Supportive Housing." *Id.* Contrary to federal disability law, this provision impermissibly relies on stereotypes about disabilities and creates a second-class tier of disabilities that excludes and harms individuals with mental health disabilities and substance use disorders.

66. The NOFO does not award points based on this priority, but the statement that this population "should be prioritized" pressures applicants to do just that, given that HUD requires applications to "support the goals of this NOFO" and retains discretion to reject or select projects based on their "projected impact" and "[l]ikelihood" of "result[ing] in the benefits expected." *Id.* at 11, 87.

***e. Eligibility limits for CoC Bonus funding unfairly disadvantage communities with relatively higher need***

67. The FY 2026 NOFO also establishes arbitrary limits on CoCs' eligibility for bonus funding (Bonus Limits), and those limits systematically disadvantage communities with higher relative need in favor of communities with lower relative need.

68. Bonus funding is an amount that CoCs can apply for on top of their statutorily defined need. *See* 24 C.F.R. § 578.17(b)(4). No community in the entire country has enough resources to meet their overall need.

69. The NOFO provides for a "CoC Bonus," which is an additional amount that CoCs can apply for, for "new project[s]," beyond their statutorily defined need. *See* FY 2026 NOFO at 11–12. The NOFO provides that each CoC can apply for CoC Bonus projects worth up to 15 percent of their statutorily defined need—but further establishes minimum and maximum award amounts that actually make CoCs eligible for widely diverging amounts. *Id.* The specific floors and caps vary based on whether the CoC split or merged in the last three years or not. As an example, the bonus for a CoC that neither split nor merged is a minimum of $500,000 (even if 15 percent of its need is lower) and a maximum of $5 million (even if 15 percent of its need amount is far higher).

70. This means that the amounts CoCs can apply for bear little relation to their actual demonstrated need.

71. The Bonus Limits systematically disadvantage larger CoCs with more people experiencing homelessness and more need in favor of smaller CoCs with relatively lower numbers of people experiencing homelessness. It does this in two ways.

72. First, CoCs with higher relative need cannot compete for as much funding (in relation to their need) as CoCs with lower relative need.

73. Second, the bonus limits disadvantage larger CoCs with greater relative need in competing for their statutorily defined need amounts that are ranked in Tier 2. That is because in Tier 2 scoring, HUD assigns projects up to 40 points each based on how CoCs prioritize projects within the funding available to that CoC—funding that includes statutorily defined need *and*

Bonus funding. See NOFO at 90. So, projects ranked towards the top of the list receive significantly more points than those at the bottom.

74. This means that for smaller CoCs, even projects that are for funding beyond their statutorily defined need (that is, funding needed to maintain services in their communities) may score higher than a project for a larger CoC that is within their statutorily defined need. That's because smaller CoCs have a much larger Tier 2 amount relative to the size of their statutorily defined need, so a project in the middle of their Tier 2 list may be outside of their statutory need amount, but still receiving a relatively high Tier 2 score under the NOFO's formula. Meanwhile a larger CoC could have a project that is within its statutorily defined need, and because it's towards the bottom of its list (as a result of the Bonus Limit's ceiling), it would receive a much lower score under the NOFO.

75. An example helps illustrate this. Take two CoCs: a large one with $100 million in statutorily defined need and a small one with $1.5 million in statutorily defined need. Because of the Bonus Limits, the larger CoC would be eligible for $5 million in CoC bonus funding, while the smaller CoC would be eligible for $500,000 in CoC bonus funding. Imagine each puts forward an identical $500,000 project and ranks it towards the bottom of the portion of their list that goes towards meeting their statutorily defined need. The larger CoC's project would score approximately 8 out of 40 available points based on their ranking placement—because it's close to the bottom of its list. But the smaller CoC's project would score approximately 30 points—because with the Bonus Limit floor, their list can continue for many more projects—even though that is beyond their statutorily defined need. And if they both received perfect scores of 60 on the other, "merit"-based criteria, the large CoC's project would score 68, while the smaller CoC's identical project would score 90—and be much more likely to receive funding. Thus, the Bonus

Limits—through an incredibly byzantine selection process—systematically disadvantage CoCs with higher relative need in favor of CoCs with lower relative need.

**3. Post-award conditions impose ideological and other restrictions not authorized by Congress**

76. The FY 2026 NOFO requires successful grantees to agree to award conditions (Post-Award Conditions), many of which are the same as or similar to conditions that courts have repeatedly held likely unlawful.

77. ***E.O. Conditions.*** The NOFO states that grantees "must follow … Presidential Executive Actions affecting federal financial assistance programs" (E.O. Conditions). FY 2026 NOFO at 106–07. The NOFO lists 11 executive orders that grantees must follow, including:

a. Executive orders that broadly seek to eradicate all diversity, equity, and inclusion activities. *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order 14173; *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order 14151; *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332;

a. Executive orders that purport to require adherence to the view that sex is binary and immutable and that people's gender identities should not be recognized. *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168 ("Gender Ideology" Executive Order); *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332 (Grantmaking Executive Order);

b. An executive order that purports to bar grant funds from being used to fund or promote elective abortion. *Enforcing the Hyde Amendment*, Executive Order 14182;

c. An executive order directing the end of "support for 'housing first' policies." *Ending Crime and Disorder on America's Streets*, Executive Order 14321 (Homelessness Executive Order); and

d. An executive order that mandates verifying immigration status and seeks to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." *Ending Taxpayer Subsidization of Open Borders*, Executive Order 14218.

78. The NOFO also separately requires grantees to comply with "Immigration Requirements" set forth in the *Ending Taxpayer Subsidization of Open Borders* Executive Order. FY 2026 NOFO at 107.

79. These executive orders instruct federal agencies on what to do but do not purport to impose obligations on the public. Nonetheless, the NOFO's requirement that grantees "follow" or "[c]ompl[y] with" these executive orders appears to require grantees to act in accordance with those orders' policies. And these requirements cause grantees to fear that they will face potentially ruinous False Claims Act litigation and liability if they are found to promote diversity, equity, and inclusion; to respect transgender and nonbinary individuals' gender identities; or to engage in other lawful activities.

80. ***Safe Drug Use Condition.*** The NOFO also includes a post-award condition (Safe Drug Use Condition) requiring grantees to commit to not violating various drug-related laws. FY 2026 NOFO at 108. This mirrors the threshold Safe Drug Use Certification requirement described above and appears meant to deter lawful harm reduction activities.

Case: 26-1226 Document: 00118495633 Page: 29 Date Filed: 07/21/2026 Entry ID: 6836472

81. ***Judicial Restriction.*** The FY 2026 NOFO includes a provision (Judicial Restriction) that purports to restrict courts' ability to grant relief that would extend beyond the boundaries of that court's district. In particular, the NOFO provides that "if any part or provision of the award agreement or terms of this NOFO are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective as to such jurisdiction." FY 2026 NOFO at 108.

**F. In adopting the FY 2026 NOFO, HUD has disregarded many important considerations, misconstrued and ignored evidence, and failed to consider alternatives**

82. The FY 2026 NOFO does not consider the significant evidence that demonstrates the most effective approaches to addressing homelessness.

**1. HUD's justifications for this NOFO fall flat**

83. On July 13, 2026, HUD produced the administrative record for the FY26 CoC NOFO. This collective justification for the NOFO included two memos—the first was from Caitlyn McKenney, Deputy Assistant Secretary for Community Planning and Development's Office of Special Needs, regarding "Review FY26 CoC NOFO," (hereinafter the "NOFO Memo"). It is a recommendation memo outlining the "policy goals and objectives" proposed in the FY2026 NOFO. The second is a memo from Dr. Robert Marbut, Senior Policy Advisor, regarding "Homeless Policy Forms – CoC Program," which provided a purported summary of approximately 40 forums on the topic of "homelessness and the CoC program" (hereinafter the "Marbut Memo").

84. **CoC Program Context and History is Lacking.** The AR displays a stunning lack of understanding of the CoC program requirements and the history of the program. For example: (1) the NOFO Memo repeatedly discusses an abrupt shift towards Housing First in 2013, when in fact HUD and other federal agencies had repeatedly adopted and promoted Housing First for years prior; (2) the slide deck that accompanies the Marbut Memo significantly

misunderstands key aspects of the CoC program, including stating that HUD "Cut[s] CoC NOFA Funding for Emergency Shelters" in 2013, when in fact the CoC program has never included emergency shelter as an eligible activity; (3) the NOFO Memo repeatedly confuses and conflates Housing First and permanent housing, two related but different interventions to address homelessness; (4) the NOFO memo consistently states that HUD has not allowed providers to require case management services when, in fact, HUD's own regulations *require* case management in Rapid Re-Housing Programs, and providers are allowed to require some non-disability related services like case management to ensure smooth program operation; 5) the NOFO Memo incorrectly states that no new Transitional Housing (TH) or Supportive Service Only (SSO) programs have been allowed, even though HUD has historically allowed these interventions when they have been needed and supported by the evidence—for example, TH is an eligible component for CoC-Youth Homelessness Demonstration Program (YHDP) grants and SSOs were specifically allowed in HUD's Special CoC NOFO for Unsheltered and Rural projects (SNOFO); and 6) the NOFO Memo asserts that YHDP renewals have only been awarded "non-competitively," which fails to acknowledge the critical context that the one time HUD *did* award YHDP renewals competitively (in 2023), Congress immediately expressed its displeasure at the change, including appropriations report language about it the following year.

85. **Misleading or Incorrect Data.** HUD consistently mischaracterizes or misuses data in the AR. The NOFO Memo relies heavily on non-academic citations, including press clippings from dubious sources, to support HUD's position. Where legitimate academic citations are included, HUD's descriptions generally fall into three categories: omission of pertinent literature, misrepresentation/mischaracterization of the literature, or selective representation

regarding findings of the research. Further, the slide deck misleadingly mixes data sources and lacks clear/accurate labels for the information it presents.

86. **Lack of Evidence for Transitional Housing or Supportive Service Only Programs**. Although HUD spends a lot of time in the NOFO Memo incorrectly refuting the efficacy of permanent housing and/or Housing First, it provides zero evidence as to the efficacy of TH or SSO programs as contemplated in the NOFO. It does include a report about transitional housing for youth and young adults, but transitional housing for that population is already allowed through the YHDP projects.

87. **McKinney-Vento Act Requirements**. Throughout the NOFO Memo, HUD does not consider key aspects and requirements of the authorizing legislation in recommendations regarding the FY2026 NOFO, as described throughout this declaration.

88. **Alternative Approaches**. Maybe most importantly, HUD does not even fleetingly consider other ways to reach their policy goals that would not result in de-funding a major portion of the nation's permanent housing programs for people experiencing homelessness. For example, they could submit a proposal to Congress to fund a demonstration program on a modernized type of transitional housing – which would serve the dual purpose of funding new projects that align with their approach and developing evidence for the model. Or, they could take a similar approach to the one used by HUD for the *Special NOFO to Address Unsheltered and Rural Homelessness*, by asking Congress for permission to use Section 231 (recaptured) funds to award new transitional housing and service projects. They could also work closely with the U.S. Department of Health and Human Services to align resources to ensure behavioral health and health services are available to CoC program participants. Yet, according

to the NOFO Memo, they don't even consider these more humane and effective options that would not result in the displacement of thousands of people from their homes.

**2. HUD failed to accurately characterize the feedback it received**

89. The Marbut Memo purports to summarize the "listening sessions" he has held across the country. The memo is undated, but it is clear it does not reflect contemporaneous notes from each meeting; it is a high-level summary after the fact that lacks nuance and fails to include information shared by attendees not aligned with his ideologies and approaches to homelessness. The threadbare summary also states that there was "general consensus" among attendees on certain points, including that Housing First is not working and there is a need to reduce renewals. Our members attended many of these listening sessions (both those that were and were not invite-only) and shared very different takeaways; there was not a consensus on these topics, suggesting that the Marbut Memo does not accurately reflect these sessions. For example, our members reported that the meetings did not allow for differing perspectives and ideas—when they tried to share their experiences and concerns, they were shut down. Our members did not find that the large majority of attendees were in agreement with the principles set forth in the Marbut Memo. Many questions went unanswered by HUD. Further, the slide deck that Dr. Marbut used in these meetings was similarly flawed, including incorrect, confusing, and misleading data.

**3. Causes of homelessness**

90. Much of the FY 2026 NOFO is based on the premise that because homelessness has increased in past years, our country's approach to addressing homelessness must be a failure. HUD points to Housing First and the prioritization of permanent housing as the reasons why homelessness has risen.

91. The evidence tells a very different story. First, the recently released 2025 Annual Homelessness Assessment Report (AHAR) found that the country experienced a 3.3 percent decrease in homelessness from 2024 to 2025. This decrease cuts against HUD's sweeping claims in the NOFO. The 2025 AHAR also made clear that there are permanent housing units available for less than ten percent of people who need them. This supports a finding made in the 2024 AHAR, which concludes that the nation is suffering an affordable housing crisis, rising inflation, and stagnating wages, all significant contributors to homelessness in the United States.

92. The NOFO and the NOFO memo rely on the 2024 AHAR, but the report does not support the conclusions HUD makes. Notably, nowhere in the report analyzing the national and local causes (as reported by CoCs across the country), does HUD identify "Housing First" or prior HUD policies as a reason for the previously rising homelessness rates. The same holds true for the 2025 AHAR, which was released earlier this year.

93. A growing body of research suggests a strong connection between homelessness and housing affordability – or the lack thereof. A 2023 report by Pew Charitable Trust notes "a large body of academic research has consistently found that homelessness in an area is driven by housing costs, whether expressed in terms of rents, rent-to-income ratios, price-to-income ratios, or home prices."[1] A more recent report from the Joint Center for Housing Studies of Harvard University found "much of the increase in housing instability comes from growing housing costs and a lack of affordable housing." The study goes on to state that "proposed and implemented cuts to federal housing resources will weaken assistance programs that are already underfunded

---

[1] Alex Horowitz et al., *How Housing Costs Drive Levels of Homelessness,* Pew (Aug. 22, 2023), https://www.pew.org/en/research-and-analysis/articles/2023/08/22/how-housing-costs-drive-levels-of-homelessness.

relative to the demonstrated need."[2] HUD's attempt to connect high rates of homelessness to the approaches most employed by the communities working to address the issue strives to find a causal link where none exists. There is significant evidence showing that the rates of homelessness in the country are a result of significant gaps in affordable housing. The NOFO then goes on to make drastic, sweeping changes to our country's approach to addressing homelessness based on the erroneous conclusion it sets forth in the NOFO.

**4. Set-Aside**

94. The FY 2026 NOFO creates a $1.3 billion Set-Aside. The Set-Aside 1) reserves this funding for new projects only, and 2) prioritizes Transitional Housing and Supportive Service Only projects. The Set-Aside essentially imposes a cap on permanent housing funding in the NOFO at approximately 60%, and on renewals at 60%. Because HUD is prioritizing funding to go to Transitional Housing and Supportive Service Only projects first, regardless of local community needs, and regardless of whether permanent housing projects have earned higher scores, Set-Aside funding will likely not be used for permanent housing. And because the set-aside is for new projects only, the funding will not be used for renewals.

95. This Set-Aside alone will dramatically increase homelessness.

96. Since creation of the CoC Program, HUD has never made appropriated funding categorically unavailable for existing projects (aside from the unimplemented attempts for FY 2025, which we previously challenged in litigation).

---

[2] *The State of the Nation's Housing 2025,* Joint Center for Housing Studies of Harvard University at 8–9 (2025), https://www.jchs.harvard.edu/sites/default/files/reports/files/Harvard_JCHS_The_State_of_the_Nations_Housing_2025.pdf.

97. A critical problem with this approach is that in our country today, roughly 88 percent of all CoC Program funds are slated to support permanent housing in some capacity. And while this is a national average, many Alliance members actually spend more than 90 percent of the CoC's funding on permanent housing programs that provide a lifeline for seniors, veterans, families, and people with physical and mental disabilities. In one year, the Set-Aside will drop the amount of funding for permanent housing projects to 60 percent. By withholding $1.3 billion in funds from these projects, the Set-Aside threatens to force tens of thousands of individuals and families back into homelessness. This remarkable Set-Aside not only departs from local planning and investments during the last decade, but also prevents communities from setting local priorities to end homelessness.

98. The Set-Aside marks a shift toward time-limited, less stable interventions and will have the most devastating impact on people currently living in CoC-funded permanent housing. Individuals with disabilities, chronic health conditions, or long histories of homelessness rely on long term rental subsidies and intensive supportive services to maintain stability. If the Set-Aside is implemented, many of these residents will lose their housing because their programs cannot be renewed at current funding levels, forcing them into involuntary exits.

99. According to HUD's own data, nearly 18,000 people on average became homeless for the first time each week in 2024. CoCs, even the highest performing ones, cannot keep up with the current demand for rehousing assistance. Withholding funding for renewals for proven strategies that reduce homelessness and displacing permanently housed residents in those programs who have overcome homelessness and trauma will set even the highest performing localities like Dallas and Miami back. Most CoCs will be set back years.

100. In addition to the number of individuals and families that will be thrust back into homelessness as a result of the Set-Aside, the Set-Aside raises numerous additional issues for CoCs and providers.

101. First, although nonprofit providers are permitted to administer tenant-based rental assistance for permanent housing projects, they are not for transitional housing. Rental assistance is an effective approach in many CoCs because it allows projects to utilize existing rental stock within the community, rather than building from the ground up or purchasing/master leasing entire structures they then must manage (often without the specific expertise needed to successfully do so). Congress recognized this and amended the CoC's authorizing statute to allow nonprofit organizations to administer rental assistance for permanent housing. However, the statute does not explicitly allow nonprofit organizations to administer rental assistance for transitional housing, and the regulation does not allow for it.

102. Thus, when up to a third of projects under this NOFO are abruptly switched from permanent housing to transitional housing, the providers who have been administering rental assistance will no longer be able to do so.

103. For providers that can even switch from permanent housing to transitional housing (many cannot for a variety of reasons), they will need to determine whether they can provide support through lease or ownership of property instead, which carries a significant increase in risk and requires time, planning, and resources to invest. Many providers will be unable to provide this support and thus will be unable to participate in the CoC program as they have in the past.

104. The "transition grants" that the NOFO provides for do not resolve the problems with shifting to transitional housing. For one, providers have to convert their *entire* project to

transitional housing—and could not protect permanent support for residents with serious disabilities or others for whom transitional housing would not work, while moving partially to a transitional housing model. This creates an impossible choice for providers. In addition, as explained further below, many existing providers—namely, nonprofits—cannot effectively switch to transitional housing because, by regulation, they are not permitted to offer tenant-based rental assistance in transitional housing (though they can for permanent housing).

105. Second, HUD states that individuals living in permanent housing may be eligible for transitional housing, attempting to downplay the consequences of the massive shift away from permanent housing. But this ignores that it is not practicable to simply move individuals and families from permanent housing into transitional housing programs, and efforts to do so will place enormous burdens on CoCs and tenants alike that would risk many of those individuals and families becoming homeless again.

106. But that aside, it's also not permissible under the law. The NOFO allows transitional housing projects to serve only "persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act" (with some exceptions and slight variations for specified programs serving survivors of domestic violence and/or youth). FY 2026 NOFO at 42. Generally, persons residing in permanent housing do not meet the definition of "homeless" under the statute and regulation unless they become literally homeless, i.e., "lack[] a fixed, regular, and adequate nighttime residence" for a period of time. 24 C.F.R. § 578.3(1); 42 U.S.C. § 11302(a)(1)–(4).

107. HUD attempts to circumvent this by relying on two very narrow circumstances where a person may qualify because they "will imminently lose their primary nighttime residence": (A) someone who will "lose their primary nighttime residence within 14 days, have

no subsequent residence identified, and have no other resources or support networks to obtain other permanent housing" ("Category 2"); or, (B) someone who is "fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking, and who lack resources and support networks to obtain other permanent housing" ("Category 4").[3]

108. There are several issues with HUD's guidance, publicly issued just prior to publication of the FY 2026 NOFO. For Category 2, it ignores the practical impossibilities of aligning an individual's lease and right to abode, eviction procedures, and termination of funding, with an available transitional housing bed within the 14-day period. Local policies detail how available resources like transitional housing, rapid rehousing, or permanent supportive housing are matched with people experiencing homelessness. As it stands, no community in the country has enough resources to meet the demand for any single intervention. Even if it were possible from a timing standpoint—which it is likely not—an individual being exited from a permanent housing program would then have to be placed on a priority list with other individuals and families experiencing homelessness for consideration of placement into new transitional housing. As such, an individual or family may not meet the criteria to receive placement to be prioritized for this new transitional housing, Additionally, providers must collect proof of eligibility for every person served, and the documentation requirements for eligibility for Category 2 require proof that the individual or household has to physically leave the unit within 14 days (usually proven by an eviction notice or similar documentation), not just that project funding is ending in 14 days, as HUD's new self-serving guidance suggests. Furthermore,

---

[3] *See* Program Participants' Eligibility to Move from Permanent Supporting Housing [*sic*] (PSH) / Rapid Re-Housing (RRH) to Transitional Housing (TH), U.S. Dep't of Housing and Urban Development at 1 (May 2026), https://www.hud.gov/sites/default/files/CPD/documents/CoC/PH-to-TH-guidance.pdf.

HUD has entirely failed to account for the fact that residents in permanent housing have leases and rights of abode, the varying state laws governing tenant eviction, and difficulties that impacted individuals will face in trying to document their eligibility for transitional housing, or the trauma of dislocation for those individuals. And for Category 4, for a survivor to move from their permanent housing unit into a transitional housing bed, in addition to the issues of getting out of the person's lease for their housing, the survivor will have to provide documentation—again—to demonstrate eligibility for the transitional housing bed.

109. Third, the Set-Aside forces CoCs to make choices that will harm their clients—as they must choose which projects to preserve (or try to preserve) and which to sacrifice. In some instances, the Set-Aside also irrationally forces choices that are not even consistent with the FY 2026 NOFO's (misguided) purposes. For example, the Santa Clara County CoC has a Transitional Housing project for homeless youth and young adults that is highly successful in achieving permanent housing outcomes, but because HUD's set aside for Transitional Housing is only for new, not renewal, projects, the CoC is now forced to decide whether to list this highly effective project in Tier 1 to preserve it for renewal, which would likely mean that a similarly successful permanent supportive housing project that houses individuals with disabilities would not be able to be preserved for renewal and therefore likely lose funding.

110. CoCs themselves operate permanent supportive housing (PSH) projects in partnership with agencies and other partners, and they cannot simply convert those into new transitional housing projects to take advantage of the New Project Set-Aside. Among other reasons, it is not uncommon for permanent housing projects to be deed-restricted, such that providers are forbidden from shifting to a different type of housing.

111. Further, many clients of permanent supportive housing have severe disabilities; they cannot simply be moved to transitional housing. For example, a permanent housing project serving people with chronic health issues cannot just shift to transitional housing. The individuals they serve depend on services like support in accessing regular healthcare appointments and adhering to a daily medication regimen to keep their conditions in check, and the nature of the services offered in transitional housing are meaningfully different. Further, evidence shows that transitional housing can exclude those who need the most support. Individuals participating in transitional housing are less likely to remain housed than those in permanent housing, and people relying on transitional housing are likely to continue to need assistance once the support ends.[4]

112. In addition, transitional housing is often more expensive for clients and providers alike.[5] That means CoCs and providers will be able to serve fewer people with the same amount of money. It is also less effective in reducing homelessness compared to other approaches, like

---

[4] Samantha Batko & Pear Moraras, *Evidence Shows Permanent Supportive Housing Helps People Exit Homelessness. A Proposed Funding Change Would Cut Those Programs*, Urban Institute (Nov. 18, 2025), https://www.urban.org/urban-wire/evidence-shows-permanent-supportive-housing-helps-people-exit-homelessness-proposed.

[5] See Brooke Spellman et. al., *Costs Associated with First-Time Homelessness for Families and Individauls,* U.S. Dep't of Housing and Urban Development, Office of Policy Development and Research at ES-3 (March 2010), https://www.huduser.gov/publications/pdf/costs_homeless.pdf (finding that transitional housing was the "most expensive model for individuals"); s*ee also* HUD, Notice of Funding Availability (NOFA) for the Fiscal Years 2013 and 2014 Continuum of Care Program Competition, FR-5700-N-31B, at 10 (2013), https://perma.cc/SK7R-YAL8 (noting research showing that transitional housing is generally "more expensive""); Daniel Gubits et. al., *Family Options Study*, U.S. Dep't of Housing and Urban Development, Office of Policy Development and Research (Oct. 2016), https://www.huduser.gov/portal/family_options_study.html (finding high monthly costs of transitional housing programs).

Case: 26-1226 Document: 00118409563 Page: 41 Date Filed: 07/21/2026 Entry ID: 6836472

rental assistance.[6] Research has also shown that transitional housing did not improve residential stability compared to permanent supportive housing.[7]

113. The Set-Aside also marks a departure from services and programs that are working. There is a large and growing evidence base demonstrating that permanent housing with services is an effective solution to homelessness. People experiencing homelessness who access housing faster with the appropriate services are more likely to remain stably housed. This is true for both PSH and RRH. PSH has a one-year housing retention rate of up to 98 percent and some communities see as high as 100 percent (based on CoC-level data[8]). Studies have also demonstrated that rapid re-housing helps people exit homelessness quickly—in one study, an average of two months—and remain housed. A variety of studies show that between 75 percent and 91 percent of households remain housed a year after being rapidly re-housed.[9]

114. PSH has been found to be a particularly effective approach to ending homelessness for high-need populations, such as individuals and families with a disability who

---

[6] Samantha Batko & Pear Moraras, *Evidence Shows Permanent Supportive Housing Helps People Exit Homelessness. A Proposed Funding Change Would Cut Those Programs*, Urban Institute (Nov. 18, 2025), https://www.urban.org/urban-wire/evidence-shows-permanent-supportive-housing-helps-people-exit-homelessness-proposed (comparing transitional housing to Housing First, finding that often, transitional housing excludes those who need the most support, that participants are less likely to remain housed when using transitional housing, and that people relying on transitional housing still need assistance once the program end).

[7] Maureen A. Hayes et al., *The SHIFT Study: Final Report. Serving and Housing Interventions for Families in Transition*, American Institutes for Research (2021), https://www.air.org/sites/default/files/2021-06/SHIFT_Service_and_Housing_Interventions_for_Families_in_Transition_final_report_0.pdf.

[8] Nat'l Summary of Homeless Sys. Performance 2020-2024, U.S. Dep't of Housing & Urban Dev. (June 12, 2025), https://files.hudexchange.info/resources/documents/National-Summary-of-Homeless-System-Performance.pdf.

[9] *See also* Daniel Gubits et al., *Understanding Rapid Re-Housing*, U.S. Dep't of Housing & Urban Dev. (July 7, 2018), https://www.huduser.gov/portal/sites/default/files/pdf/Systematic-Review-of-Rapid-Re-housing.pdf.

experience chronic patterns of homelessness, for communities that implement it with fidelity to the model. Positive outcomes include: a significant decrease in use of shelter stays, positive shifts in health use from crisis to preventive care, reduction in justice system interactions, improved child welfare outcomes, and cost-effectiveness. In accordance with the HEARTH Act's goal of bringing vulnerable individuals and families to safe and stable housing, since at least 2016, HUD has strongly encouraged CoCs to prioritize individuals and families who experience chronic patterns of homelessness and who may have the most "severe service needs" for available PSH units. This directive is backed by strong evidence showing that prioritization of these populations for PSH is effective in reducing chronic homelessness, which has been confirmed by the experience of CoCs.

**5. Service Requirements and Housing First**

115. "Treatment first" or mandatory-service models are less effective and more costly at ending homelessness and may exclude the most vulnerable individuals who cannot meet these requirements.[10] This approach undermines our members' ability to tailor interventions to promote stability and self-sufficiency, leaving vulnerable individuals and families (including homeless youth and survivors of domestic violence)—particularly those with disabilities or histories of chronic homelessness—at heightened risk of program failure, housing loss, and a return to homelessness.

116. Compounding this harm, the alternative models prioritized by the FY 2026 NOFO often require participants to comply with rigid, coerced treatment plans including mandatory substance use treatment, mental health programming, and intrusive case management directives

---

[10] Sam Tsemberis et al., *Housing First, Consumer Choice, and Harm Reduction for Homeless Individuals with a Dual Diagnosis*, NAT'L LIBR. OF MED. (Apr. 2004), https://pmc.ncbi.nlm.nih.gov/articles/PMC1448313/.

to remain eligible for housing. For people with disabilities, trauma histories, or complex behavioral health conditions, these requirements strip away personal autonomy and dignity, forcing individuals to engage in services that may not be clinically appropriate, wanted, or effective. Mandating sobriety does not produce sobriety. These unsound mandates will lead directly to further housing loss, re-traumatization, and disengagement from care, pushing individuals into crisis, hospitalization, incarceration, or back onto the streets.

117. Further, HUD's approach in the NOFO does not include quality standards or safeguards to ensure that the treatment they want to require is of high quality. There is, for example, no discussion of Medication Assisted Treatment or standards for mental health treatment. Typically, at a minimum, CoCs would be required to show documentation that they are working with a state or local behavioral health department to ensure a level of quality for the health and/or behavioral health services being required, and/or that they (and their staff) are properly accredited to provide the services contemplated in the NOFO. This NOFO pushes CoCs to fund treatment, on incredibly rapid timelines, without giving them the time or tools to ensure that the treatment is safe and beneficial.

118. In addition, about 1 in 25 U.S. adults live with a serious mental illness, while 157 million people live in a Mental Health Professional Shortage Area (where the number of health professionals in an area cannot meet the current need).[11] In 2023, more than three-fourths of direct services provider respondents reported that they were forced to turn away new referrals due to ongoing staffing shortages.[12] According to the University of California, San Francisco

[11] Health Workforce Shortage Areas, https://data.hrsa.gov/topics/health-workforce/shortage-areas.

[12] *The State of America's Direct Support Workforce Crisis 2023,* American Network of Community Options and Resources at 2 (2023), https://www.ancor.org/wp-content/uploads/2023/12/2023-State-of-Americas-Direct-Support-Workforce-Crisis_Final.pdf.

(UCSF) Benioff Homelessness and Housing Initiative's California Statewide Study of People Experiencing Homelessness "participants discussed numerous barriers to receiving treatment or other help to reduce use or enter recovery. They reported times where they were ready to engage with treatment services but [services] were unavailable, either because there weren't openings at local treatment facilities and wait times were long, or the staff were unresponsive to their needs, or the treatment was far away."[13]

119. HUD also gets the evidence wrong on Housing First and service requirements. Research endorsed by HUD in 2023 found the Housing First model to be more effective than mandated treatment models, particularly in its ability to create "greater long-term housing stability," to reduce costs (by shortening stays in hospitals, prisons, and elsewhere), and to "successfully house people with intersecting vulnerabilities, such as veterans and people with a history of substance abuse" and "mental illness challenges."[14]

120. This research, discussed in HUD's *Evidence Matters* newsletter, which overwhelmingly supports Housing First, is now purportedly a basis for HUD's departure from the approach. HUD explains in the NOFO Memo that it believes Housing First includes two aspects: "no participation requirements or preconditions, and indefinite assistance without time limits." AR 43-44. It goes on to state that the studies largely focused on the lack of "preconditions," not the lack of service requirements, and thus was reflective of Housing First.

---

[13] Margot Kushel & Tiana Moore, *Toward a New Understanding, The California Statewide Study of People Experiencing Homelessness,* Benioff Homelessness and Housing Initiative, University of California San Francisco at 64 (June 2023), https://homelessness.ucsf.edu/our-impact/studies/california-statewide-study-people-experiencing-homelessness.

[14] *See* U.S. Dept. of Housing and Urban Development, *Housing First: A Review of the Evidence*, EVIDENCE MATTERS at 11 (Spring/Summer 2023), https://web.archive.org/web/20250112024308/https:/www.huduser.gov/portal/sites/default/files/pdf/EM-Newsletter-Spring-Summer-2023.pdf.

HUD also asserted that because initial programs to implement Housing First required participants to agree to occasional staff visits, any successes described in the Evidence Matters newsletter support HUD's proposed service requirements approach, rather than Housing First.

121. These explanations are beyond the pale, for several reasons. First, HUD's attempt to distinguish prior Housing First programs from those offered now fail; the programs HUD described *were* Housing First programs. Second, permanent housing projects, like rapid-rehousing, can and often do require the exact type of meetings HUD describes—case management meetings. *See, e.g.*, 24 C.F.R. 578.37(a)(1)(ii)(F). What cannot be required is disability-related services, like substance abuse treatment. As described in this declaration, those requirements often lead to lower retention rates.

122. Once this is accounted for, HUD's argument—the basis of its entire departure from Housing First in favor of service requirements—quickly falls apart.

123. HUD emphasizes that "too few entities create the accountability and structure needed to help an addict recover or a young person finish school and find meaningful employment," AR 44, but this ignores other research, previously endorsed by HUD, that indicates that requiring treatment "produces inferior housing stability outcomes" and can counterproductively cause individuals experiencing homelessness to "disengage[] from critical services."[15] Another study that compared Housing First approaches to service requirement approaches found that the Housing First approaches led to higher program retention rates and

---

[15] *Id.* at 13; *see also, e.g.*, Sam Tsemberis, et al., *Housing First, Consumer Choice, and Harm Reduction for Homeless Individuals With a Dual Diagnosis*, AM. J. PUB. HEALTH (Apr. 2004), https://pmc.ncbi.nlm.nih.gov/articles/PMC1448313/#sec13.

lower substance use among participants.[16] Similarly, a study found PSH using a Housing First approach "with client-centered practices foster housing retention of a traditionally difficult-to-house population and is in line with other research linking Housing First with superior housing retention rates compared with abstinence-based programs."[17] Further, many of our members have built successful programs using Housing First approaches.[18]

124. In addition, HUD repeatedly cites research showing *positive* housing outcomes in support of its efforts to impose service requirements. For example, HUD relies on a 2021 "systematic review of 26 studies," which found that Housing First had an "88% decrease in days spent homeless," and a "41% increase in days spent housed" compared to treatment first assistance. AR 44. For a federal program focused on housing stability, these are undoubtably numbers that support the Housing First approach. But because it purports that the outcomes related to "physical health, mental health, alcohol use, and illegal drug use" all had either negligible or unfavorable outcomes, HUD argues this study supports a different approach in the CoC program. First, this is wrong. A housing program should first and foremost be focused on housing and stability. But second, it also misstates the study results. The study concludes that not only did Housing First "decrease[] homelessness by 88%," it also "showed health benefits and

---

[16] Deborah K. Padgett et al., *Substance Use Outcomes Among Homeless Clients with Serious Mental Illness: Comparing Housing First with Treatment First* Programs, Community Mental Health Journal (January 2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC2916946/.

[17] Clare Davidson et al*., Association of housing first implementation and key outcomes among homeless persons with problematic substance use*, NAT'L LIBR. OF MED. at 11 (Nov. 2014), https://pubmed.ncbi.nlm.nih.gov/25022344/.

[18] Brown et al., *Housing First as an effective model for community stabilization among vulnerable individuals with chronic and non-chronic homelessness histories*, J. OF COMM'TY PSYCH. (Vol. 44, Issue 3, April 2016) (studying King County PSH program and finding 44% reduction in days hospitalized when comparing PSH tenants to a comparison group), https://onlinelibrary.wiley.com/doi/abs/10.1002/jcop.21763.

reduced health services use."[19] The study concludes by finding that "Housing First programs can more effectively reduce homelessness and improve housing stability for homeless populations with a disability than Treatment First."[20]

125. HUD also argues that this systematic review included many limitations that resulted in "mixed" and "lacking" evidence. *See* AR 44. But that is merely an attempt to mask the conclusions of the systematic review of twenty-six peer reviewed studies published in journals or government reports: "Housing First programs improved housing stability and reduced homelessness more effectively than Treatment First. In addition, Housing First programs showed health benefits and reduced health services use."[21] HUD's dismissal of this significant body of evidence in favor of Housing First based on standard study limitations does not pass muster.

126. HUD cites to other studies that also show the benefits of Housing First. See AR 44-45. But HUD argues that these approaches often include levels of "robust, intensive treatment services" that it asserts are "exceedingly rare" among CoC providers. It provides no support for that assertion, and none exists. Housing First approaches can and do include varying levels of services, including robust ones. HUD cannot baselessly argue that because Housing First providers offer services, service requirements are therefore beneficial. The opposite is true, and HUD's analysis is flawed.

127. Similarly, HUD argues that the HUD-VASH program—a program that serves homeless veterans—is not evidence of the efficacy of Housing First, because it requires participants to receive case management services as needed. But that requirement is consistent

[19] Yinan Peng et al., Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health Among Homeless Populations with Disability: A Community Guide Systematic Review, 26 J. Pub. Health Mgmt. & Prac. 404 (2020).

[20] *Id.*

[21] *Id.*

with Housing First and is something *all* rapid rehousing requires. Services are required on a *voluntary* basis. *See* 89 Fed. Reg. 65769, 65775 (2024); 24 C.F.R. § 578.37(a)(1)(ii)(F). In addition, even that minimal requirement was only added in 2024—and most of the reduction in veteran homelessness happened in the years before that change was made.[22]

128. The HUD provisions mandating service requirements are not only unsupported by research; they cause numerous issues that significantly impact individuals experiencing domestic violence.

129. Projects that receive funding under the Violence Against Women Act (VAWA) cannot, by law, comply with the mandatory service requirement criteria in the FY 2026 NOFO. These projects are at significant risk of losing funding, and the CoC as a whole will lose points if these projects are included in the collaborative application. This will lead to CoCs either losing funding, discouraging CoCs from including those projects in their application, or discouraging organizations receiving VAWA funding from participating in the local competition. Undoubtedly, this will negatively affect clients experiencing homelessness and domestic violence.

130. Other CoCs and providers are put in an impossible position because HUD did not consider state and local laws when it issued this NOFO. Housing First is supported by swaths of evidence, and some states and localities require or incentivize providers to use a Housing First approach. But doing so will now jeopardize CoC funding for entities in those jurisdictions.

131. For example, one member provider is currently in the midst of executing new contracts for supportive housing with their governmental partner. That governmental entity

[22] Shawn Liu, *Veteran homelessness continues downward trend: 56% since 2010*, Veterans Affairs (June 25, 2026), https://news.va.gov/147673/veteran-homelessness-continues-downward-trend/.

requires them to employ Housing First strategies. That provider is determining whether they want to risk noncompliance with local law, or risk losing federal funding. They are caught in an impossible predicament.

**6. Anti-Harm Reduction Criteria**

132. HUD seeks to eliminate harm reduction activities by CoCs and providers, even when conducted with non-federal funding. HUD's approach is not supported by the significant evidence that finds that harm reduction is effective. Further, the evidence HUD does cite does not stand for the propositions HUD asserts. For example, the FY 2026 NOFO states that two-thirds of homeless individuals self-reported *regular use* of hard drugs. But the study actually says that almost one third reported regular current use; the two-thirds figure is when study participants were asked about *lifetime* use.[23] And regardless, this study ultimately recommends permanent supportive housing as a critical intervention—which the NOFO disincentivizes (and thus fails to mention). HUD also relies on another study to support that "homeless individuals self-report high rates of substance use disorder (SUD) and mental illness." It does so despite an explicit warning at the beginning of the study explaining that the study should not be used to make these representative conclusions.[24] HUD also mischaracterizes data in an article it cites about overdoses in King County, which included data not from just PSH but also subsidized housing and recovery housing more generally[25]; it also focuses on data from 2020–2023 while

[23] Margot Kushel & Tiana Moore, *Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness*, Benioff Homelessness and Housing Initiative (June 2023), https://homelessness.ucsf.edu/sites/default/files/2026-04/CASPEH_Report_62023_v4.pdf.

[24] Janey Rountree et al., Health Conditions Among Unsheltered Adults in the U.S., Calif. Pol'y Lab (2025), https://capolicylab.org/wpcontent/uploads/2025/11/Health-Conditions-Among-Unsheltered-Adultsin-the-US.pdf.

[25] FY 2026 NOFO at 31 (*citing* Claudia Gross Shader, *Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach*, Seattle Office of City Auditor (July 2024),

ignoring that (1) *all* overdoses rose during COVID-19 and have fallen steadily *since* 2023 and (2) the majority of overdose deaths occur in private or rented residences, not housing service sites.[26]

133. The FY 2026 NOFO also includes no discussion of the evidence that shows that harm reduction approaches can reduce overdoses,[27] and that the presence of overdose prevention sites do not make communities less safe.[28]

**7. Law Enforcement Criteria**

134. There is significant evidence that criminalization of homelessness does not reduce homelessness or increase public safety. Policies that target actions related to homelessness do not "yield a long-term reduction in the number of people experiencing homelessness on a given

---

https://seattle.gov/documents/Departments/CityAuditor/auditreports/OverdoseAndCrimeConcentrationsAudit.pdf).

[26] *Overdose deaths in King County,* King County, https://kingcounty.gov/en/dept/dph/health-safety/safety-injury-prevention/overdose-prevention-response/data-dashboards#toc-Overdose-deaths.

[27] *See, e.g.,* Kirk B. Fetters, *Projected Outcomes of Reducing Federal Funding for Syringe Service Programs via Executive Order*, JAMA Network Open (June 2026), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2850494?guestAccessKey=438021e4-bc12-4d8d-8bfc-1a67ee258e94&__cf_chl_f_tk=vjPqyXSsUgyg9q0mkFUbRlLXAHUsdLMtf_IfcaEo8L4-1782967636-1.0.1.1-ZGD8CHwWIC7xxgjw9Itf6ScULbR5TqyzPHCKdnKtTic#251081603; *see also* Jennifer Ng et al.*, Does evidence support supervised injection sites*? Can Fam Physician (Nov. 2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5685449/; Jerome M. Adams, *Making the Case for Syringe Service Programs*, PUBLIC HEALTH REPORTS (Jul 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7407057/.

[28] Aaron Chalfin et al., *Overdose Prevention Centers, Crime, and Disorder in New York City,* Jama Network Open Public Health (Nov. 2023), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2811766?__cf_chl_f_tk=alv9E2AIkF61kpJPt9iMfn_u1e5M7MaufKpXZsNoIac-1783012142-1.0.1.1-x1xxwuNJ_vzpAHENyES_U8PyKMt5HRe_jWQQYesBZKw.

night."[29] Further, law enforcement officials themselves have acknowledged that criminalization policies are ineffective. A nationwide survey of almost 100 police departments found that a "crime control approach" is "unlikely to produce desired results for the police, the public or the individuals living on the streets."[30] The NOFO and administrative record's reliance on anecdotal evidence and selective news articles – including more than one-third (47) total of which are posts on X/Twitter, a self-publishing platform with no editorial oversight, does not change that there is no empirical evidence that criminalization reduces homelessness or that displacing encampments helps people get housed.[31] Instead, criminalization forces people to move from one public area to another, or lands them in jail, where individuals may suffer interruptions in access to public benefits, shelter, and even their own possessions.

135. Unsurprisingly, then, criminalization, exacerbates the conditions of poverty. Studies have found that the destruction of property, which often occurs during encampment clearing, can pose additional obstacles to work, education, and access to services.[32] It also harms individuals'' health, as it often involves the "seizure of medical items," and "disrupts access to

---

[29] Hannah Lebovits & Andrew Sullivan, *Do Criminalization Policies Impact Local Homelessness?,* POLICY STUDIES JOURNAL at 11 (Jul 2025), https://onlinelibrary.wiley.com/doi/10.1111/psj.70056.

[30] Robert Hartmann McNamara et al., *Policing the Homeless: Policy, Practice and Perceptions,* 36 POLICING: INT'L J. at 357, 369 (2013), https://www.researchgate.net/publication/255979657_Policing_the_Homeless_Policy_Practice_and_Perceptions.

[31] Nicole DuBois et al., *Criminalizing Homelessness Worsens the Crisis, Research Shows*, National Alliance to End Homelessness (Feb. 4, 2025), https://endhomelessness.org/wp-content/uploads/2025/02/CriminalizingWorsensTheCrisis_NAEH_2-4-25.pdf.

[32] *Id.*

healthcare."[33] These approaches are often also more expensive than other approaches a local community may deem more effective.[34]

136. The FY 2026 NOFO's one-size-fits-all approach to mandatory involvement of law enforcement strips CoCs of local autonomy. Many CoCs do work with law enforcement on numerous issues, tailoring their approach to the needs of their communities. But emphasizing law enforcement in the way the NOFO requires for certain points would counterproductively cause unhoused people to lose trust in providers. The Law Enforcement Criteria also threaten to disadvantage or disqualify CoCs and projects based on the state and local laws of the jurisdictions in which they operate. Various criteria require projects and CoCs to "cooperate with" enforcement of local laws on public camping (among other things), but it is unclear how applicants can meet those criteria if the local jurisdiction does not have or does not enforce camping bans against unhoused individuals, like in Providence, RI. The Law Enforcement Criteria also require CoC applicants to identify local laws and policies that help or hinder the CoC's ability to quickly clear encampments, decrease the public use of illicit drugs, engage in involuntary commitment, and comprehensively share information in accordance with SORNA.

---

[33] *Id.*

[34] Sarah Gillespie et al., *Costs and Offsets of Providing Supportive Housing to Break the Homelessness-Jail Cycle,* Urban Institute (July 2021), https://www.urban.org/sites/default/files/publication/104499/costs-and-offsets-of-providing-supportive-housing-to-break-the-homelessness-jail-cycle_0.pdf; *see also New King County Data Shows Stable Housing Associated with Sustained Reductions in Jail Bookings*, News Release (June 2026), https://content.govdelivery.com/accounts/WAKING/bulletins/41c4b1c ( "[J]ail bookings declined nearly 27% in the first year after people moved into housing and continued to fall over time, reaching a 37.6% reduction within three years."); *The Cost of Long-Term Homelessness in Central Florida*, Supportive Housing Network of New York (2014), https://shnny.org/uploads/Florida-Homelessness-Report-2014.pdf; *Crisis Assistance: Helping Out On The Streets*, White Bird Clinic (2020), https://whitebirdclinic.org/wp-content/uploads/2020/06/CAHOOTS-Media-Guide-20200626.pdf (In Oregon, Crisis Assistance team handled 24000 calls, which is about 20% of the 911 total calls and only required police backup 250 times.).

Although HUD wrote this criterion to focus on the CoC's activities and not the laws and policies of the jurisdiction, it appears to be designed to prioritize grantees in states and localities with favored policies, as the Homelessness E.O. and OMB's related apportionment footnote direct HUD to do.

137. The Law Enforcement Criteria also include points to CoCs that demonstrate that they do "not interfere with or impede local efforts" on clearing encampments, decreasing public illicit drug use, pursuing involuntary commitment, and comprehensively sharing information under SORNA (Local Policies Criterion). CoCs are concerned that they will be deemed to "interfere with or impede" those types of local efforts if they advocate against them, for example, by opposing policies that vigorously enforce public camping bans or that pursue involuntary commitment of unhoused individuals, or by supporting measures like Rhode Island's Homeless Bill of Rights, which gives unhoused individuals a right to privacy in their personal property, even if in an encampment.

**8. Self-Sufficiency Criteria**

138. HUD's definition of self-sufficiency will disincentive CoCs serving clients most in need. Under the FY 2026 NOFO, clients with severe disabilities, or those clients facing obstacles to self-sufficiency as HUD newly defines it, would hurt the CoC's chances at receiving points under these criteria. Thus, a CoC may be inclined to serve individuals most likely to reach "self-sufficiency" fastest—which could leave behind those most in need. Or, a CoC may decide to prioritize those most in need. Those CoCs would then jeopardize their funding, as they would likely achieve lower scores under this NOFO.

**9. Discriminatory Disability Priority**

139. The Discriminatory Disability Priority threatens to displace people with great need from their housing. People who do not have the physical or developmental disabilities that

the FY 2026 NOFO prioritizes still require the support that permanent supportive housing provides. For example, some people in permanent supportive housing have a serious and persistent mental illness, sometimes with a comorbid substance use disorder. In MLK County, for example, more than 75 percent of individuals served by CoC-funded PSH have mental health disabilities. Many individuals and families with these conditions do not have, and may never have, the chance to be financially independent, especially in this economy and housing market. The Discriminatory Disability Priority threatens to create a mass exodus of people leaving permanent supportive housing because they do not meet the narrow category of disabilities the NOFO prioritizes.

**10. Amorphous Risk Review Criteria and Consideration of Additional Factors**

140. The amorphous risk review criteria would allow HUD to turn away an otherwise high-performing program for politicized, arbitrary, or other improper reasons, without any recourse for review. In a landscape where federal agencies have terminated even existing grants based on illegal criteria such as how residents of a particular state voted in an election, these provisions create immense uncertainty that politically-disfavored projects or applicants will be punitively refused funding. *See, e.g.*, *City of Saint Paul v. Wright*, 816 F. Supp. 3d 65, 74 (D.D.C. 2026) ("Defendants freely admit that they made grant-termination decisions primarily—if not exclusively—based on whether the awardee resided in a state whose citizens voted for President Trump in 2024"); *Illinois v. Vought*, 820 F. Supp. 3d 727, 731-32 (N.D. Ill. 2026) (OMB made decision to "target plaintiffs and direct (or guide) the agencies to terminate public-health grants"); *Harvard v. HHS*, 798 F. Supp. 3d 77 (D. Mass. 2025) (terminations in retaliation for protected speech); *AAUP v. Trump*, 815 F. Supp. 3d 907 (N.D. Cal. 2025) ("[T]he unrebutted record in this case shows that Defendants have used the threat of investigations and economic

Case: 26-1226 Document: 00118495633 Page: 55 Date Filed: 07/21/2026 Entry ID: 6836472

sanctions to impermissibly coerce the [university] to stamp out faculty, staff, and student "woke," "left," "anti-American," "anti-Western," and "Marxist" speech.").

141. The amorphous criteria also distort CoCs' decisionmaking. A CoC may be wary of including a project in Tier 1 (or at all) if there is concern the provider has engaged in activities that HUD disfavors, like promoting DEI or acknowledging people's gender identities. These criteria create a looming threat of rejection that pushes CoCs to exclude projects for ideological and political reasons, rather than based on their ability to address homelessness effectively.

**11. Bonus Limits**

142. The Bonus Limits will redistribute funding from communities with higher relative need to communities with lower relative need. These limits make CoCs with lower homelessness per capita eligible for extra funding equal to as much as 61.2 percent of their need, while leaving CoCs with more homelessness per capita eligible for an amount equal to only as little as 3.5 percent of their need. These Bonus Limits will cause communities with higher rates of homelessness—communities that represent more than 40 percent of the total homeless population—to lose access to nearly $93 million in funding. And they will systematically disadvantage CoCs with higher relative need in the competition for *all* funding, not just bonus funding.

## G. The FY 2026 NOFO Is Harming Alliance Members and Our Nation's Most Vulnerable Populations

143. With the FY 2026 NOFO, HUD has again destabilized the CoC program. The chaotic rollout is leaving communities scrambling to apply while many critical questions remain unanswered, and forcing them to divert resources otherwise spent planning their homelessness response. In addition, the NOFO—with its harmful approaches and ideological conditions—is causing some providers to withdraw from the CoC program. The NOFO is also forcing CoCs to

make devastating choices about which existing projects to prioritize for funding. When CoCs make those choices—which they must inform their local applicants of by no later than August 11, 2026—that will in some instances cause irreversible consequences: The projects that are not selected or ranked highly will begin winding down their programs. And, of course, if HUD is permitted to make awards under the FY 2026 NOFO, CoCs and service providers will lose critical funding in their communities and be forced to eliminate or drastically reduce many permanent housing programs on which individuals and families rely. At the same time, CoCs and service providers also face harm from prolonged uncertainty about what projects will receive funding for FY 2026, and will suffer harm to their programs and community-wide responses to homelessness if FY 2026 funding is delayed, especially given the delays with FY 2024 and FY 2025 funding.

**1. The chaotic application process and destabilizing FY 2026 NOFO selection criteria are forcing CoCs and providers to divert limited resources away from their primary missions**

144. The FY 2026 NOFO's destabilizing selection criteria, as well as the chaotic manner in which HUD has rolled out the NOFO, are draining the resources of CoCs and providers and diverting time and attention away from their primary missions.

145. The NOFO guarantees that many existing projects will not receive funding in FY 2026. This forces CoCs and providers to engage in contingency planning now, particularly to determine how they can soften the blow to clients whose housing will no longer be funded. This is incredibly time-intensive and diverts CoCs' resources away from fulfilling their primary missions, including by working on system planning, improving processes for connecting people with needed support, analyzing homelessness data to identify needs, engaging partners and people with lived experience, and continually improving strategies to reduce homelessness.

146. The chaotic manner in which HUD has rolled out the NOFO has exacerbated the drain on CoCs' resources. Over a month and a half after the NOFO was issued, HUD still has not notified CoCs of the amounts they are eligible to apply for.

147. Nor has HUD posted the actual application with the questions that grantees must address. Though HUD released the NOFO on June 1, 2026, the deadline imposed by Congress, as of July 17, HUD has not opened e-snaps, the online application portal, and has not released the actual application or detailed instructions that accompany the NOFO. It is extremely challenging for CoCs to make selections, or to prepare their applications, when the application forms are not available and CoCs do not know precisely what HUD will require.

148. This information is critical, because it provides details as to how the NOFO criteria will be assessed, and it allows CoCs and providers to know what information they need to collect and organize. Particularly where HUD has released a NOFO that represents a radical shift in the CoC program, CoCs and providers need time to understand how to put their application together.

149. In addition, applicants have many questions about vague, ambiguous, and inconsistent aspects of the NOFO, but their questions to HUD have gone unanswered, in some cases for weeks. CoCs and projects are left to guess about what some aspects of the NOFO mean, are unable to begin preparing applications, and are unable to make fully informed decisions about what projects to put forward. The uncertainty, and need to attempt to decipher the NOFO, forces communities to spend even more resources to respond to the NOFO than normal.

150. Further straining their resources, HUD has also published two other NOFOs for homelessness funding with concurrent application timelines: for Youth Homelessness programs

(posted on June 10 with an August 10 due date) and the CoC Builds program (posted on June 23 with a deadline of July 24). And the Department of Health and Human Services has opened a NOFO for a program to support homeless individuals with substance use disorders or serious mental illness at the same time as well (posted on June 17 with a deadline of July 17). Thus, CoCs and providers must apply to as many as four federal NOFOs at the same time.

151. Applying to a NOFO is time- and resource-intensive in any circumstances. But applying to multiple NOFOs at once, when the agency has not yet provided information necessary to actually move forward, is a tremendous drain. In addition, given the significant changes the NOFO seeks to implement, Alliance member CoCs must spend even more resources to analyze project and client data and hold meetings to make hard decisions about the fate of CoC projects. CoCs also must begin the intensive work it will take to make the types of transitions the NOFO effectively requires, like pivoting from permanent housing to transitional housing and from rental assistance to a leasing model. To take just one example, a member CoC had hoped to dedicate time this summer and fall to a project seeking to reduce costs for vital records and documents for homeless individuals. As a result of the FY 2026 NOFO, that work has been put on hold, because assessing the impact of this NOFO on the CoC is time-intensive and must take priority.

152. The time needed to respond to this particularly chaotic application process is preventing CoCs from fully performing their primary roles of coordinating their communities' homelessness response and improving overall system performance. For example, one CoC member is fielding numerous questions from service providers regarding the NOFO changes. The criteria are vague, and the CoCs don't have the application or instructions, so it is a time-intensive process that often results in answers that are insufficient for the providers.

**2. The FY 2026 NOFO is already causing some providers to withdraw from the program, and will cause more withdrawals the longer the process goes on**

153. The FY 2026 NOFO is already causing some providers to withdraw from the CoC program. This makes CoCs' homelessness response systems less effective and forces CoCs to spend already scarce resources on crisis management rather than on direct system improvements and homelessness response efforts.

154. Various aspects of the NOFO are causing providers to withdraw from the CoC program in some instances. For example, some cannot quickly pivot to providing transitional housing or services-only projects. That is for a variety of reasons, including that nonprofits are not permitted to provide transitional housing by means of rental assistance, the model many currently use for their permanent housing projects. In addition, many longstanding permanent supportive housing projects also receive funding from other sources that restrict their ability to pivot, or also have long-term restrictions on property use. For at least one member CoC, a key provider in their region cannot pivot because insurance carriers are unwilling to provide insurance for the project if it is converted to transitional housing. For some, mandating services or supporting aggressive law enforcement responses is antithetical to their values. Some domestic violence projects have decided not to apply because they cannot mandate services while remaining compliant with other federal laws—and so know both that they will not be competitive and also that being included in a CoC's application would bring down the entire CoC's score and thus hurt the entire community's chances. Some providers cannot give up providing harm reduction services (with non-federal funds) that save lives in their communities. And some cannot risk being targeted for supposed non-compliance with ideological conditions that appear to bar DEI activities, or to prohibit conduct that recognizes and respects the identifies of transgender and nonbinary individuals. Nor can they simply abandon those activities while

remaining true to their missions and values, as multiple providers including a faith-based member have reported.

155. Whether it be because they do not expect they could receive funding, because they cannot sacrifice their values and missions, or because they fear False Claims Act or other sanctions for their lawful activities if they continue with the program, some providers are choosing to drop out of the program and not seek funding again.

156. This results in a loss of institutional knowledge and expertise in the community.

157. It also fractures relationships with critical partners. For example, member CoCs have worked hard to build relationships with landlords so that the landlords will accept referrals from homelessness service agencies. The loss of funding will leave those landlords with vacant units or with having to undertake expensive eviction processes—and make them less willing to engage with the program going forward. This, in turn, will decrease future housing opportunities for people experiencing homelessness.

158. Providers' withdrawing also forces CoCs to spend resources finding, and in some instances training, suitable replacements. For instance, an Alliance member that is a small rural CoC has heard that at least two providers will pull out of the program. This has forced the CoC to divert resources to identify organizations that could provide the services the community needs. In some instances, this can be a particular drain where the replacement provider has no experience with federal grants and requires substantial training and technical assistance on grant applications and management.

159. One CoC member has been informed by a state domestic violence coalition that if the conditions are unchanged by the time the CoC must submit their application, they will not participate given the service requirements that conflict with their obligations under other federal

laws. This will be an incredible loss for this CoC, which has made significant strides in addressing homelessness for individuals experiencing domestic violence in the past several years in part through CoC funding. At the same time, if the high-performing DV service provider does participate, the CoC will be disadvantaged under the criteria in the NOFO, because their collective score would decrease.

160. The farther along the FY 2026 NOFO process progresses, more providers will likely drop out. Members report that providers are getting "burned out." And once CoCs notify applicants that they will not be included in the CoC's application (or will be listed low enough that they are unlikely to obtain funding), those applicants will plan accordingly. Once they internalize, and begin planning for, not having CoC funding, it will be harder to reverse course if the FY 2026 NOFO is blocked and HUD issues a new one. Every time an organization has to pivot, it is a drain on its resources, and some providers will not pivot back to the program once they have turned away.

**3. The FY 2026 NOFO is forcing CoCs and providers to make impossible decisions now and threatens to erode trust and damage important relationships**

161. Given how the NOFO structures the selection process, it is highly unlikely that HUD will award funding to existing projects that CoCs place in Tier 2 of their priority listing. This is because little or no funding will remain after HUD allocates funds at higher levels of the waterfall—to Tier 1 projects, congressionally mandated earmarks, and the $1.3 billion for new projects. Some communities can also see now that, given the scoring criteria, they will likely rate lower than other CoCs and therefore be particularly unlikely to receive any renewal funding for projects placed in Tier 2.

162. As a result, CoCs are forced, now, to make the extremely difficult decision whether to (1) sacrifice a significant portion of their renewal projects to apply for new

transitional housing and supportive-services only project that, given the Set-Aside, stand a much higher chance of receiving funding, or (2) to put forward as many of its renewal projects as it can, to at least try to retain funding for those projects even if the likelihood is very small for projects in Tier 2.

163. Further complicating the decision, CoCs must apply for grants to run their Homeless Management Information Systems process (which collects data on homelessness in the community) and Coordinated Entry (which coordinates intake, assessment, and referrals for the whole community). Those provide necessary infrastructure for the community's entire homelessness response system, so CoCs face a lot of pressure to include them in their Tier 1—even though that in most instances means an existing permanent housing project will be displaced and defunded.

164. The choice of which projects to select and how to rank them is particularly difficult because, if the CoC loses funding overall, that affects not only the funding the community will receive for FY 2026, but also reduces the amount it can even apply for in subsequent years. In other words, losing funding now has lasting effects—and would affect a CoC's ability to provide critical housing and services for many years into the future.

165. Many CoCs have more high-performing projects than they can include in Tier 1. They now face the impossible position of having to choose which of its high-performing projects to protect by placing them in Tier 1, and which to list in Tier 2 or exclude from the CoC's application altogether.

166. Further complicating matters, CoCs are fearful that even projects that they place in Tier 1 will be rejected based on the amorphous "risk" review criteria and additional factors—given that those factors seem to reserve to HUD the discretion to reject projects on virtually any

ground. This makes the decision even harder, as CoCs must worry that, if they include in Tier 1 a project that recognizes people's gender identities, engages in DEI activities, or uses a Housing First approach, HUD will reject the project and the CoC will not receive even the limited Tier 1 funding that Congress intended to essentially guarantee them. Some CoCs are very concerned that even their Tier 1 projects will be jeopardized as a result of the unclear risk review criteria, and are trying to guess at what HUD might hope to see in order to best protect their funding.

167. The NOFO is pushing CoCs to make terrible choices about which projects to put forward for funding. For example, CoCs are not seeking funding for permanent housing that they cannot fit in Tier 1, and are instead replacing it with transitional housing projects that are eligible for the Set-Aside. Those projects will not be able to serve as many people. The NOFO is also incentivizing CoCs and providers to serve people with lower service needs (at the expense of those with higher-needs) to meet the Self-Sufficiency Criteria and performance metrics. It is also pressuring CoCs to direct resources to people with physical and developmental disabilities to the exclusion of people with mental health and substance use disabilities. And it is using this funding to pressure CoCs to pressure their whole communities to abandon life-saving harm reduction services. Under the NOFO, CoCs and providers also must choose between putting forward a competitive application and exercising their First Amendment right to recognize people's gender identities or to express their own views on local policies on encampments, involuntary commitment, and more.

168. CoCs must make these decisions by August 11, 2026, at the absolute latest, because the FY 2026 NOFO requires CoCs to notify project applicants by then whether they were selected for inclusion on the CoC's priority listing, rejected, or reduced. FY 2026 NOFO at

96 (requiring CoCs to provide this notice 15 days before the August 26 deadline for CoCs to submit their community-wide applications to HUD).

169. Providers, too, face terrible choices. Providers' staff, many of whom have dedicated their careers to serving unhoused youth and young adults, families with children, survivors of domestic violence, people with disabling conditions, and other unhoused populations, are considering reallocating grants that are currently successfully housing vulnerable people in order to be competitive under the FY 2026 NOFO, putting the very people they have assisted at risk of homelessness yet again. As explained above, permanent housing projects cannot just quickly convert to transitional housing for many different reasons.

170. These decisions will have devastating human consequences. CoCs often cannot serve as many people in transitional housing as they could in permanent supportive housing—so CoCs must now grapple with the heartbreaking decision who will be able to keep their unit and who will become homeless.

171. These shifts in funding will erode the effectiveness of communities' response to homelessness, defund proven strategies, and leave vulnerable individuals and families without needed homes and support.

172. In addition, once CoCs make these decisions and notify project applicants, that will likely damage relationships between the CoCs and the providers in their areas. If an existing project is included only at Tier 2, that will be seen as a "death sentence" given the grim prospects for existing projects at that tier. And, of course, projects that are not included on the CoC's application at all are guaranteed not to receive funding. This will damage CoCs' relationships with those providers and threatens to erode the trust that CoCs have built among providers and formerly unhoused people in their communities.

173. In some instances, Alliance members that are local governments will face significant pressure to "backfill" funding for projects that are not selected or that are listed in Tier 2. But local governments will not be able to meet that need for all projects likely to be cut by the FY 2026 NOFO, due to steep federal cuts to social safety net programs across the board. This inability to promise to provide alternative funding to rescue CoC projects will also likely damage relationships, both between the CoC and service providers and between the CoC and the clients served by those programs.

**4. When CoCs make their local selections in August, unselected and lower-ranked projects will in some instances immediately begin winding down**

174. In some instances, providers who are not selected for their CoC's application, or who are ranked lower down, will immediately begin preparing to shut down their programs, given the certainty or near certainty that those projects will not receive funding.

175. This will include stopping enrolling new clients and maintaining wait lists, moving clients out to other locations or preparing them for the upcoming loss of housing, reducing case manager hours, and laying off staff.

176. Providers are already operating in a state of uncertainty given the dramatic changes the FY 2026 NOFO seeks to implement. For example, in the Cambridge CoC, some projects have already paused referrals (i.e., are not accepting new individuals for assistance) for fear of creating more tenancies that would be at risk from the likely loss of renewals of existing permanent housing projects.

177. And once projects receive the more official signal that they will not or likely will not receive funding—as a ranking in Tier 2 or exclusion from the priority listing altogether would portend—some will begin taking irreversible steps to wind down their projects.

178. Once providers begin taking these steps—laying off staff, ending partnerships, exiting clients—they cannot easily be unwound. Once they start this process, they may not be able to return to the CoC later, even if circumstances change.

**5. If HUD makes awards under the FY 2026 NOFO, CoCs, providers, and the individuals and families they serve will face a devastating loss of support**

179. If HUD is permitted to make awards under the FY 2026 NOFO, communities will face a cascading crisis: CoCs will be forced to eliminate or drastically reduce many permanent supportive housing and rapid rehousing programs; CoC-funded permanent housing sites will face operating shortfalls; and thousands of individuals currently stably housed will face an increased risk of eviction or program displacement. CoCs in turn will be forced to redirect limited funds away from reducing unsheltered homelessness and into emergency stabilization efforts simply to prevent widespread returns to homelessness.

180. The NOFO's defunding of existing permanent housing projects will not only erase years of progress in stabilizing the most vulnerable people in our communities, but it will also directly result in avoidable medical crises, suffering, and preventable loss of life. Individuals will be forced into shelters, hospitals, jails, encampments, or the streets—where they will not be able to obtain the stability and intensive services they need, increasing strain on social and emergency services networks.

181. The NOFO's defunding of renewals will have the most devastating impact on people currently living in CoC-funded permanent housing. Individuals with disabilities, chronic health conditions, or long histories of homelessness rely on long term rental subsidies and intensive supportive services to maintain stability. If the set-aside is implemented, many of these residents will lose their housing because their programs cannot be renewed at current funding levels, forcing them into involuntary exits.

182. Additionally, clients currently assisted by permanent housing will not be eligible to access transitional housing projects that the NOFO aims to create given HUD's definition of homelessness and eligibility criteria, and given that it costs more to provide transitional housing, the same funding will not serve as many people. Thousands of households will also lose access to supportive services. For these households, the disinvestment in permanent housing is not merely a service reduction, it is a life-threatening disruption that reverses years of progress to stability and self-sufficiency. Project applicants and housing/service providers will face immediate operational and financial crises. Projects that were designed, funded, and staffed around evidence-based permanent housing models will be forced either to downsize, convert to entirely different interventions, such as costly or infeasible transitional housing, or close altogether. Providers will be required to rapidly rework budgets, reassign staff, and make difficult decisions about which households to evict due to reduced capacity. Many communities have built their homeless response systems around permanent supportive housing and rapid re-housing as the backbone of stability. This sudden shift guts that foundation.

183. This will have particularly harmful impacts on chronically homeless individuals with severe and persistent disabilities. For example, in MLK County, more than 75 percent of individuals served by CoC-funded PSH have mental health disabilities. Those individuals require the intensive supportive services that permanent supportive housing provides and cannot be effectively served through transitional housing, which is not designed to support people with those types of long-term needs. People in this permanent housing cannot just be moved to transitional housing—and instead will in many instances find themselves without critically needed assistance and at risk of hospitalization or housing loss.

184. The FY 2026 NOFO's changes, and its defunding of permanent housing, will also have impacts on people waiting for housing—making them less likely to get the support they need. For example, in Santa Clara County, nearly 6,000 homeless households are currently on the community waitlist for permanent housing. Seventy percent of those households are highly vulnerable (due to the degree of their disabling conditions, episodes of homelessness, or other adverse life experiences) and are in need of permanent supportive housing. That includes substantial numbers of households that have experienced domestic violence or that qualify as chronically homeless.

185. The NOFO's defunding of permanent housing also undermines the impact of communities' investments in permanent housing from other sources. For example, the Santa Clara County CoC's projects, many of which have been in operation for years, have been heavily leveraged by matching funds from the County and the Santa Clara County Housing Authority, and by the County's funding of permanent housing developments. These are substantial local investments into permanent housing made in partnership with HUD and can never be regained if these programs are forced to shutter due to loss of funding.

186. The Alliance completed an analysis of the impact of the FY 2026 NOFO's major changes.[35] The analysis uses publicly available data compiled from several sources including the FY 2025 Award Announcements with supplemental information other sources like the 2025 Housing Inventory Count. The analysis, which likely understates the devastation that CoCs face given data limitations, shows that the FY 2026 NOFO's changes threaten to cause as many as 97,000 people to lose housing.

---

[35] See *Changes to HUD Policy Threaten Efforts to End Homelessness: At Least 97,000 People Could Lose Housing,* National Alliance to End Homelessness (June 2, 2026), https://endhomelessness.org/resources/hud-policy-changes-threaten-efforts-to-end-homelessness/.

187. As an example, a member CoC in Maryland stands to lose $1.1 million in permanent housing funding, which will impact upwards of 70 individuals losing their permanent supportive housing, many of whom are single women and families. Another member CoC in California reports they anticipate losing more than $26 million annually despite showing a recent reduction of almost 20% in unsheltered homelessness in the last year. In Texas, 39 percent of permanent housing beds are funded through the CoC program and altering this funding may result in 5,616 people losing their housing due to the loss of just over $67 million in funding. A CoC in the South anticipates losing funding that supports housing for 1,050 people—most of whom will be forced back into homelessness because there is nowhere else to place those people.

188. Given the magnitude of these losses, CoCs will need to make requests for emergency funding from State and local government or philanthropic partners, reduce the number of housing units, reduce or discontinue services, or lose their share of permanent supportive housing units to standard low-income units. Without funding, permanent supportive housing properties struggling to maintain even the most basic of operations will likely default on loans and lose federal Low-Income Housing Tax Credits. Projects that previously received capital funding to create new permanent housing are often subject to lengthy deed restrictions that require the project to continue to operate as permanent housing and will no longer be able to meet that commitment. For example, a member who operates permanent supportive housing in multiple CoCs that span five different states reports that they will not be able to fulfill their Land Use Restriction Agreements without service dollars and partners, which jeopardizes more than 400 of their units.

189. In short, the set-aside for new projects directly undermines the Homelessness Assistance Act, destabilizes its long-term investments in permanent housing, and reverses more than a decade of coordinated homelessness strategy.

190. In sum, existing permanent housing programs will face abrupt shortfalls, forcing them to either reduce or eliminate essential housing subsidies and supportive services. This directly destabilizes programs that currently house individuals with disabilities, chronic homelessness histories, and other high-needs populations including homeless youth, older adults and survivors of domestic violence, undermining years of system-level planning and investment in housing stability. Indeed, HUD has historically directed CoCs to prioritize the *most* vulnerable individuals and families for permanent supportive housing, in particular, and communities have followed this direction. Hence, those are the people who stand to lose their housing as a result of HUD's actions. For clients of the CoCs, the consequences are dire: the loss of permanent housing subsidies will result in involuntary exits to unsheltered homelessness, heightened exposure to health risks, and, for the most vulnerable populations, increased risk of mortality. The policy deprioritizes evidence-based permanent housing programs, erodes the hard-won stability of CoC systems, and threatens the safety and lives of the individuals these programs were designed to protect.

**6. These harms are exacerbated by the context of the past 18 months**

191. These harms must be viewed in the context of 18 months' worth of patterned federal actions and chaos that have wrought so much havoc on funding recipients that their faith

in HUD – a once trustworthy partner – is now misplaced.[36] This latest action reinforces the same pattern of confusion, chaos, and unpredictable harm.

192. In the past 18 months, Alliance members have faced funding freezes and ongoing funding delays that have or are currently impacting three rounds of funding (FY24, FY25 and now FY26) for these critical programs; received altered grant agreements with unlawful terms; suffered the loss of HUD field offices and the staff who once helped them with routine technical matters; experienced the cancellation and reinstatement of technical assistance; and have had to work with clients, staff, and landlords/vendors through continuous cash flow gaps and funding uncertainty. The compounding effect of the pattern of actions by this administration has already caused irreversible harm to our members, some of whom had providers be forced to close their programs, lay off staff, and exit formerly homeless individuals and families back into homelessness. Worse, many of our members are unable to apply to the NOFO through no fault of their own.

**7. Delays in awarding FY 2026 funding also cause CoCs and providers harm**

193. At the same time, CoCs and providers also need certainty. Delays in HUD making FY 2026 awards will leave them in the dark about what funding they will receive next year. While the fate of this NOFO remains uncertain, it is difficult for CoCs and providers to even make educated guesses about what projects will be funded going forward.

194. Providers' existing grants begin expiring in January 2027. Based on available data, roughly 10 percent of FY 2025 grants will expire in the first three months of 2027. For those providers in particular, delays are especially problematic.

[36] These compounding harms are further detailed in a prior Oliva declaration in a related case. *See* Third Supplemental Declaration of Ann Marie Oliva ¶¶ 9-24, *Nat'l Alliance to End Homelessness v. HUD*, No. 25-cv-636 (D.R.I.) (Dkt. No. 75-1).

195. With funding uncertain, some members will have to begin winding down. They will not be able to accept new clients, given the risk that they would have to withdraw that support in the near future. That risk is particularly salient because withdrawing support would retraumatize those individuals, erode the trust they had built, and potentially cause long-term harm to those individuals' openness to accepting help.

196. Even those members who are more likely to receive funding under this NOFO would face harm from delays, as they would be left with gaps in funding. Some providers, particularly smaller ones, do not have the resources to bridge gaps—particularly because they have already had to tap those resources in the last two funding years. They will therefore face serious challenges in finding alternative funding to maintain their housing projects and retain their staff. And while some providers may be able to temporarily fill gaps, whether through assistance from local governments or otherwise, that funding must be diverted from other critical services and programs. Money spent to temporarily keep a project afloat is money that cannot be spent on public health, public safety, or social services, harming local communities. After HUD's efforts to cut CoC renewal funding last year, Congress intervened in February 2026 and gave CoCs and their providers much needed certainty that FY 24-25 funding would be renewed. Providers have no such assurances this time, and cannot indefinitely shift funding and resources without the certainty that they will get an award.

197. Time is of the essence. The NOFO puts the Alliance's members in a terrible position. If HUD proceeds with the FY 2026 NOFO, Alliance members will face devastating harm to their programs, their missions, and their ability to effectively serve their communities. At the same time, ongoing uncertainty about FY 2026 funding also means that CoCs and

providers cannot plan and communities will again have to cut back programs or divert resources as they, yet again, face gaps in funding resulting from delayed awards.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of July, 2026

Ann Marie Oliva
Chief Executive Officer
National Alliance to End Homelessness

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*,<br><br>*Defendants*. | Case No. 26-cv-436-MSM-AEM |

**DECLARATION OF SHEILA A. DILLON**

I, SHEILA A. DILLON, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the following is true and correct:

1. My name is Sheila A. Dillon. This declaration is based on my knowledge, professional education and experience, and review of relevant records. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the City of Boston.

2. I have been employed as the Chief and Director of the Mayor's Office of Housing ("MOH") of the City of Boston since 2013. Prior to my current role I was the Director of the Massachusetts Bureau of Rental Assistance. I have spent more than 30 years of my career in affordable housing and community development programs, including the oversight of programs to address homelessness.

3. MOH is responsible for addressing homelessness, creating and preserving

Case 1:26-cv-00430 Document 75 Filed 01/21/2026 Page 2 of 9 PageID #36472

affordable housing, and ensuring that renters and homeowners can secure and maintain safe, stable housing. MOH also develops and implements the City of Boston's housing creation and homelessness prevention plans and collaborates with local and national partners to find new solutions for homelessness and to build more accessible housing, particularly for those with lower incomes.

4. As the Chief and Director of MOH, I oversee all functions of MOH, including our homelessness prevention and family stabilization programs.

5. In furtherance of this work, MOH routinely applies for and receives various grants from HUD, including Continuum of Care ("CoC") grant funding. MOH has received CoC funding every year for more than twenty-five years due to the strong performance of the City of Boston in implementing permanent supportive housing programs that stabilize households exiting homelessness. The City of Boston CoC (the "Boston CoC") has consistently received increases in its CoC award in the form of new funding for CoC Bonus projects, Domestic Violence ("DV") Bonus projects, and other competitive funding opportunities. This is a result of Boston's strong performance on the CoC application and its overall system performance, as demonstrated by decreases in unsheltered homelessness, homelessness among veterans, and chronic homelessness in Boston.

6. Since 2011, Boston has reduced homelessness among veterans by 60%. Since 2007, Boston has reduced chronic homelessness by 26% and unsheltered homelessness by 57%. For decades, Boston has consistently had one of the lowest rates of unsheltered homelessness of all major cities in the United States. Boston was also cited by the U.S. Department of Veterans Affairs for being among three cities in the nation that ended chronic homelessness among

veterans.[1]

7. HUD awards points to CoC applicants based on a variety of metrics, including past performance and success in grant management. In 2024, HUD awarded the Boston CoC 158.75 out of 200 total points, 7.25 points above the national median.

8. In Boston, approximately 1,927 formerly homeless individuals and families are housed using CoC grant funding. These households include some of the most vulnerable members of the community: 1,447 people with disabilities, 213 children, and 457 seniors over 65. This group includes 197 veterans, 166 of whom have a disability.

9. The process for obtaining CoC funding begins when HUD issues a Notice of Funding Opportunity ("NOFO"), which outlines award eligibility and scoring criteria. Based on this notice, Boston hosts a local competition to submit a collective application to HUD consisting of individual project applications. This process includes developing and publishing Boston CoC's policies for acceptance and scoring of projects in accordance with HUD's new priorities, holding a public application process for new projects, conducting review and scoring of new applications and renewal applications, and preparing applications for HUD's ultimate review and funding determination.

10. HUD issued a Notice of Funding Opportunity on June 1, 2026, for the CoC program covering fiscal year 2026 ("FY26 NOFO").

11. The Boston CoC is currently scoring local applications. Local applications were due to the Boston CoC on July 6, 2026, and the Boston CoC plans to notify applicants whether they have been accepted by August 11, 2026. As of this writing, HUD has not released its project

[1] *See* VA Homeless Programs: VA 25 Cities Initiative, available at: https://www.va.gov/homeless/25cities.asp

Case: 26-1045 Document: 00118395637 Page: 77 Date Filed: 01/21/2026 Entry ID: 6836472

applications, a necessary step in the selection process.

12. In putting together its application, the Boston CoC evaluates local applicants and ranks them by priority and score, with the highest priority projects in "Tier 1" and the remainder in "Tier 2." Tier 1 projects are funded so long as they pass HUD's threshold review, while Tier 2 projects are subject to additional merit review and are only considered if there is funding remaining after the Tier 1 projects have been allocated. The FY26 NOFO caps a CoC's Tier 1 projects at 60% of the overall funding needed to renew existing projects ("Annual Renewal Demand"). By contrast, Tier 1 funding has historically been allocated at anywhere between 90% and 100% since tier-based scoring was implemented in 2013.

13. Contrary to longstanding "Housing First" practices, the FY26 NOFO shifts focus away from Permanent Supportive Housing ("PSH") and Rapid Rehousing ("RRH") (together, Permanent Housing or "PH") and instead prioritizes new, Transitional Housing ("TH") and Supportive Services Only ("SSO") projects. The NOFO sets aside $1.3 billion for new projects only, limiting the number of existing projects that can be renewed. In allocating these set aside funds, the NOFO indicates that HUD will first fund TH and SSO projects, only turning to PH projects if any funding remains. Thus, any PH projects relegated to Tier 2 will almost certainly not be funded.

14. Permanent Housing projects in Boston that will be lost to these cuts include Pine Street Inn's Housing Works Partnership Consolidated, which has been operating for 10 years and currently provides rapid rehousing to 134 homeless individuals, and Bridge Over Troubled Waters' Rapid Rehousing Plus project, which has been operating for 5 years and currently provides rapid rehousing to 86 homeless young adults.

15. Accounting for the FY26 NOFO's abandonment of Housing First principles and

numerous other drastic policy shifts will be a costly, labor intensive process. Some current subrecipients who have developed and refined successful, evidence-based programs will be unable to certify their compliance with new award conditions or will be otherwise ineligible or non-competitive because of the rapid shifts in HUD's priorities; some have already chosen not to reapply; and some will be unable to overhaul their programs quickly enough to bring them into compliance within the required timeline. Specifically, providers in Boston have raised concerns with MOH that the FY26 NOFO's intolerant position on harm reduction programs may cause their agency to drop out of the competition.

16. These concerns and others like it are likely to cause the Boston CoC to lose the benefit of its experienced partners and thus compromise its ability to provide stable services for vulnerable community members.

17. When providers have had to step away from the program in the past, Boston has faced significant challenges in finding qualified and adequately resourced replacements to fill the gap. Even where such replacements do exist, the administrative costs to train and onboard new providers will create significant strain on the City.

18. Providing homeless individuals and families with Permanent Housing reduces their reliance on other publicly funded systems — such as jails, hospital inpatient programs, emergency shelters, psychiatric institutions, and emergency rooms — creating net savings for taxpayers. A 2015 analysis found that in Massachusetts, Permanent Supportive Housing programs save taxpayers $13,401.00 per person per year. [2]

19. 93% of Boston's CoC grant funds are dedicated to Permanent Housing programs,

---

[2] *See* "Home & Healthy for Good: Progress Report 2015", Massachusetts Housing and Shelter Alliance, December 2015. Available at: https://archives.lib.state.ma.us/entities/journalfile/781879ae-1c95-4b22-95ad-c0d820e85037

Case 1:26-cv-00436-MSM-AEM Document 79 Filed 07/17/26 Page 6 of Entry ID: 6836472

which exclusively fund housing for formerly homeless households, including people with disabilities. This prioritization of PH aligns with HUD's longstanding "Housing First" model, as reflected in many years of CoC NOFOs.

20. For example, the 2024-2025 NOFO, issued on July 31, 2024, identified Permanent Housing as HUD's top priority, and explained that "CoC Program funded projects should help individuals and families move quickly into **Permanent Housing without preconditions** and ensure that participants can choose the services they need to improve their health and well-being and remain in their housing." *See* 2024-2025 NOFO at p. 8 (emphasis added).

21. For the FY26 NOFO, the maximum amount that the Boston CoC can expect to receive for Permanent Housing projects is less than $32,986,103. Because of the NOFO's $1.3 billion new project set aside, and the cap on Tier 1, the Boston CoC cannot reasonably expect to receive funding for Permanent Housing projects beyond this amount. The Tier 1 renewal request will also include funding for HMIS and Coordinated Entry projects, which support administrative and compliance functions that are required by HUD. Because of these restrictions on funding for existing and successful projects, Boston will need to attempt to transfer tens of thousands of dollars supporting hundreds of clients in PH projects to locations, projects, and services that will qualify for TH.

22. The obstacles the Boston CoC will face in attempting this conversion of project types are numerous.

23. First, most clients housed in PH projects will not be eligible for TH housing by nature of being presently sheltered. Thus, in order to satisfy the TH requirements, Boston understands HUD's guidance on this issue to require each client to jump through numerous

administrative hoops to demonstrate an imminent risk of loss of housing in the next 14 days, which may include the initiation of a court proceeding.

24. Second, because of the strict service requirements that accompany new TH programs in the FY26 NOFO, as well as the well-documented higher cost of TH relative to PSH and RRH[3], the same amount of money previously allocated to PH programs will be able to serve significantly fewer individuals if successfully transitioned to TH programs. This will lead to the loss of housing for individuals and families even if the total funding amount were maintained. The Boston CoC does not have the resources necessary to move everyone currently housed by the Continuum into TH or alternative non-CoC-funded permanent housing, and no matter what mitigating steps are taken, there will undoubtedly be individuals who are displaced in this process.

25. Third, even for those who are successfully able to transition from a PH to a TH project, a sudden shift from a permanent housing arrangement to a temporary, transitional accommodation only guaranteed for 2 years at a time is devastating and destabilizing. Research indicates that forced moves, such as evictions, are linked to long lasting consequences such as PTSD, and higher emergency department usage[4] as well as poorer health outcomes for mothers and their children, including adverse birth outcomes and childhood health outcomes.[5]

---

[3] *See* HUD, Office of Policy Development and Research, *Costs Associated with First-Time Homelessness for Individuals and Families*, (March 2010) Available at: https://www.huduser.gov/publications/pdf/costs_homeless.pdf

[4] *See* Smith, et. al. *Eviction, post-traumatic stress, and emergency department use among low-income individuals in New Haven*, CT (Preventive Medicine Reports, 2022) Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC9502672/#fn-group1

[5] *See* Desmond and Kimbro. *Eviction's Fallout: Housing, Hardship, and Health* (Social Forces, 2015) Available at: https://academic.oup.com/sf/article-abstract/94/1/295/1754025?redirectedFrom=fulltext

Case: 25-1 ... Document: ... Page: 81 Date Filed: 01/21/2026 Entry ID: 6836472

26. Nonetheless, the FY 2025 NOFO prioritizes mandatory treatment and required supportive service participation and penalizes applicants that follow the longstanding Housing First model. At Tier 2 project selection, HUD will allocate points to projects that abandon Housing First principles, by rewarding projects that mandate participation in supportive services.

27. The reduction in available funding for Permanent Housing would require Boston to eliminate approximately $18 million in Permanent Housing projects in favor of new services-only and temporary housing projects with strict mandatory service, treatment, and employment requirements.

28. Boston has no alternative funding to renew these grants. Eliminating the required $18M would mean approximately 636 households would lose their Permanent Housing. The resulting increase in homelessness would strain Boston's shelters, streets, jails, emergency rooms, and mental health treatment providers. A 2020 study found that in Massachusetts, people experiencing homelessness who were placed in Permanent Supportive Housing incurred $5,267.00 less in health care costs than those who were not.[6]

29. Beyond the risks of losing access to housing or shelter, the Boston CoC's clients are likely to lose trust in the CoC's ability to provide reliable services if the current model is upended. Clients who are asked to leave their stable housing programs may not accept further assistance from the Boston CoC.

30. This risk of lost trust extends to providers and the community as well. The programs funded by the Boston CoC rely on numerous community partners to operate. Boston

[6] *See* Brennan et. al, *The Preventive Effect of Housing First on Health Care Utilization and Costs Among Chronically Homeless Individuals*, published December 12, 2020. Available at: https://www.bluecrossmafoundation.org/publication/preventive-effect-housing-first-health-care-utilization-and-costs-among-chronically

Case: 26-1495 Document: 00118456... Page: 82 Date Filed: 07/21/2026 Entry ID: 6836472

CoC funds go towards project-based, sponsor-based, and tenant-based rental assistance, *see* 24 C.F.R.§ 578.51(c)-(e), as well as supportive services including community health centers and substance use treatment providers. Property owners, service providers, and other businesses in Boston rely on these payments, and may be less willing to work with the Boston CoC if their contracts are disrupted by these rapid policy changes.

31. To align with HUD's new policy priorities, the drastic changes Boston has made to its local competition process have been time and labor intensive, and the changes Boston will need to make to its housing programs portfolio will be even more time-consuming. Critically, once these changes are publicly announced on or before August 11, 2026, FY25 projects that will not receive FY26 renewal funding may choose to begin reducing staff, reducing or closing new client referrals, or closing early entirely. The resulting program closures, staff reductions, and lease modifications will be exceedingly difficult if not impossible to reverse should the FY26 NOFO be enjoined later on in this proceeding. If Boston's longstanding, proven effective PH projects are wound down now, they may be gone for good.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 16th day of July, 2026.

Signed by:
Sheila Dillon
ECCEF321B23F4C3...

Sheila A. Dillon
Chief and Director
Mayor's Office of Housing
City of Boston

**DECLARATION OF COUNTY OF SANTA CLARA DIRECTOR FOR OFFICE OF SUPPORTIVE HOUSING KATHRYN J. KAMINSKI**

I, KATHRYN J. KAMINSKI, declare as follows:

1. I am a resident of the State of California. I have personal knowledge of all facts stated in this declaration, and if called to do so, I could and would testify to them competently under oath.

2. I am the Director for the County of Santa Clara Office of Supportive Housing (OSH or the "Department"), a position I have held from August 18, 2025 to present. Prior to this position, I served as Acting Director from July 2024 until August 2025 and as Deputy Director of OSH for four years, overseeing OSH's contracts and grants team, fiscal team, Continuum of Care (CoC) team, and the supportive housing system, which encompasses services including emergency shelter, short-term financial assistance to quickly prevent or lift households out of homelessness, interim and transitional housing, rapid rehousing, and permanent supportive housing. Prior to serving as Deputy Director, I served as the CoC Quality Improvement Manager for approximately three years, overseeing the county-wide CoC efforts including policy development and implementation, system performance measurement, the CoC collaborative application, and federal grant compliance. Prior to becoming employed with the County of Santa Clara, I worked for the City of San José Housing Department from January 2015 to September 2017 as a Development Officer, where I managed HUD grants such as the Community Development Block Grant (CDBG), Emergency Solutions Grant (ESG), and Housing Opportunities for People with AIDS (HOPWA) programs, including compliance with federal regulations, budgeting, reporting, contract development, subrecipient management and monitoring, and program evaluation. Prior to employment with the City of San José, I was employed as a Senior Associate at TDA, Inc., a national consulting firm, from September 2011

Case: 26-1226 Document: 00118495633 Page: 84 Date Filed: 07/21/2026 Entry ID: 6836472

to December 2014, where I provided training and technical assistance to grantees receiving federal funding from HUD. Overall, I have more than fourteen years of experience with a broad variety of activities relating to grant management and program oversight for HUD-funded programs.

3. In my role as Director of OSH, I oversee the department budget, the administration of all grants and contracts, delivery of services, and management of the County's affordable housing loan portfolio.

4. I am familiar with the terms and conditions of HUD's federal fiscal year 2026 Notice of Funding Opportunity for the Continuum of Care grant program, released in June of 2026 ("FY 2026 NOFO").

**Background on OSH and the CoC Grant Program**

5. OSH's mission is to increase the supply of housing and supportive housing that is affordable and available to extremely low-income and/or special needs households. OSH supports the County of Santa Clara's mission of promoting a healthy, safe, and prosperous community by working to end and prevent homelessness.

6. Since the late 1980s, government agencies and community-based organizations in Santa Clara County have partnered to address the needs of homeless individuals and families. In 1992, these organizations formed the Santa Clara County Collaborative on Affordable Housing and Homeless Issues (the "Collaborative"), an unincorporated association. In addition to improving coordination and services, the Collaborative was formed to meet the 1995 HUD requirement that all communities submit a collective application for HUD CoC funds.

7. From 1992 to 2013, the Steering Committee of the Collaborative served as the governing board for administration of CoC program funds and as the primary entity for planning

and coordinating homeless services.

8. In 2013, regional local governments, non-profit housing leaders, and other stakeholders came together to reorganize the structure of the Santa Clara County Continuum of Care ("Santa Clara County Continuum" or the "Continuum") to improve regional coordination of federal, state, and local resources towards reducing homelessness in the county. Through this process, OSH was designated as the Collaborative Applicant on behalf of the Santa Clara County Continuum. The role of the Collaborative Applicant is to submit the annual application to HUD for CoC Program funds on behalf of all grantees in the Continuum's geographic area, and to administer the CoC to ensure that the operation of the Continuum and use of grant funds meet HUD's requirements. The Continuum's collaborative application includes project applications from the County of Santa Clara and on behalf of non-profit organizations that receive their CoC grant funds directly from HUD.

9. A large portion of CoC funding for which the County of Santa Clara is the recipient supports rental assistance and/or case management for residents of Permanent Supportive Housing (PSH) programs, which provide services such as case management and clinical, educational, vocational, and housing services to help chronically homeless households obtain and keep their housing.[1] The rental assistance and case management services supported through HUD CoC project grants are provided to residents of PSH developments and residents utilizing tenant-based housing vouchers throughout the county. Case management matches clients to the services and resources they need to remain stably housed.

[1] Under HUD regulations and the McKinney-Vento Act, a "chronically homeless" person is someone who has experienced homelessness for a year or longer—or who has experienced at least four episodes of homelessness totaling 12 months in the last three years—and also has a disabling condition that prevents them from maintaining work or housing. HUD, *Homeless emergency Assistance and Rapid Transition to Housing: Defining "Chronically Homeless,"* 80 Fed. Reg. 75791 (Dec. 4, 2015).

10. In addition to PSH programs, a significant portion of CoC funding in Santa Clara County supports Rapid Rehousing (RRH) programs, which provide time-limited rental assistance for up to two or three years, paired with supportive services such as case management and clinical, educational, vocational, and housing services to help individuals and families in Santa Clara County exit homelessness and return quickly to permanent housing. RRH is a key component of the Santa Clara County Continuum's response to homelessness because it connects people to housing as quickly as possible by providing rental assistance and other supportive services like housing search and case management for up to two or three years.

11. As of the last "Point-in-Time Count" in 2025,[2] over 10,000 individuals in Santa Clara County were experiencing homelessness, but the true number is most likely higher. These individuals and families are some of the most vulnerable residents of the county and many will require the types of permanent housing supports currently provided by CoC grants to exit homelessness and obtain housing. Many struggle with psychiatric conditions, chronic health problems, mental health and substance use disorders, family trauma, and other challenges, and require additional and ongoing case management and supportive services in order to help ensure that they maintain housing stability. The households served by CoC grants are as diverse as the population of Santa Clara County as a whole and include veterans, seniors, survivors of domestic violence, families with children, former foster youth, and people with disabilities.

12. Despite the success of the County's permanent housing programs at keeping households stably housed, particularly households who were once chronically homeless, the

[2] The Point-in-Time (PIT) Count is a bi-annual census of sheltered and unsheltered people experiencing homelessness on a single night in January. As a condition of funding, HUD requires Continuums to conduct this count every other year, as well as an inventory of beds and housing units that serve people experiencing homelessness. Continuums must submit this data to HUD. *See* https://www.hudexchange.info/programs/hdx/pit-hic/#2025-pit-count-and-hic-guidance.

number of people newly entering homelessness outpaces the County's capacity to house them, due to systemic factors such as lack of affordable housing supply in the region and stagnating wages—particularly for low-income households—not keeping up with rental costs.[3] As noted in the 2025 Point-in-Time Count Report for Santa Clara County, the increase in the number of homeless individuals counted during the 2025 Point-in-Time Count compared to the 2023 Count was due to an increase in sheltered homeless individuals and households. This increase reflects shelter capacity growth and higher utilization rates of shelter beds due to improvements in the County's system for connecting those in need with shelter.[4] The County also implemented new methodology to obtain a more accurate and comprehensive representation of the homeless population for the 2025 Point-in-Time Count, so increases in numbers may be reflective of improvements in survey practices as well.

13. CoC funding for PSH and RRH programs supports rental subsidies and services that have been critical to assisting thousands of residents in not only resolving their homelessness, but achieving housing stability. The housing case management provided with CoC funding includes building life skills such as assistance with applying for housing and jobs, paying rent and utilities, and connection to food resources and other basic needs. Housing vouchers and rental subsidies do not cover the entire amount of rent, thus, these services are essential for supporting residents to create a plan to cover their portion of the rent and to stay housed. Case managers also support residents with the annual voucher renewal process and assist tenants in interactions with their landlords. CoC funds are also used to provide or connect residents to mental health and substance use treatment services, financial literacy, health

---

[3] 2025 Point-in-Time Count Report for Santa Clara County at 5, *available at* https://files.santaclaracounty.gov/exjcpb1571/2025-09/santa-clara-county-point-in-time-count-2025-final-report.pdf?VersionId=Rl1.G6aaDKy9frtsmdKUrEepVwgOmZQ3.

[4] *Id.* at 4.

insurance and healthcare, and job training. While housing vouchers make housing affordable for individuals and families in CoC-funded programs, the supportive services are critical in assisting households in stabilizing their housing, meeting their basic needs, and improving their income and quality of life. Without these wrap-around services, households may be at risk of losing their housing voucher/subsidy and their home.

**The County Has Invested Significantly in Aligning its Housing Programs With Longstanding HUD Policies**

14. From the time it began participating in the CoC Program, the County has invested significantly in housing models and other practices that aligned with HUD's longstanding policies, including implementing Housing First principles, establishing coordinated entry policies that prioritized placement of the most vulnerable households in permanent supportive housing, and training providers on compliance with HUD's Equal Access Rule prohibiting discrimination on the basis of sexual orientation and gender identity, in addition to other protected characteristics. This investment includes contracting with an expert consulting agency to provide the training and technical assistance necessary to implement all of these longstanding policies and requirements, as well as to support the County CoC's application and compliance with HUD's notoriously complex requirements for CoC grantees.

15. These policies have been successful in reducing chronic homelessness in Santa Clara County. Santa Clara County's local data demonstrates the effectiveness of this model. For example, a May 2026 report showed that slightly more than 96 percent of households in permanent supportive housing programs in Santa Clara County, the vast majority of whom met the definition of "chronically homeless" at the time of program entry, remained stably housed for 12 consecutive months after enrollment. For the County's Rapid Rehousing Programs, 78 percent of program participants exited to a permanent housing destination within 24 months of

enrollment. Both of these metrics far exceed the stable housing benchmark required by HUD for the types of new transitional housing projects that the FY 2026 NOFO prioritizes, which is that 50 percent of households move into some type of permanent housing within 24 months after program enrollment.

16. HUD's historic prioritization of permanent housing programs that are implementing the Housing First model enabled the Santa Clara County Continuum to increase its annual CoC award from less than $11 million in 2010 to nearly $50 million in 2024, largely for renewal projects that the Continuum has been able to stably fund year after year. During that same period, the Santa Clara County CoC awards specifically for permanent housing programs—which comprise the bulk of the total award—increased from approximately $7.8 million in 2010 to over $44 million in 2025.

17. Along with the growth in CoC funding, the County has significantly invested local funds into CoC projects by providing matching funds, as required by the CoC Program, from the County and from the Santa Clara County Housing Authority. Additionally, the County has invested in the funding of permanent housing developments. One significant source of investments in permanent housing developments has come from voters in the county passing a general obligation bond measure in 2016, known as the 2016 Measure A Affordable Housing Bond, reflecting the local community's support of permanent housing as a solution to ending homelessness. The County's investment also includes 856 additional permanent supportive housing and rapid rehousing units *currently* under construction or approved by the County Board of Supervisors (as of July 2026). The County has historically relied on CoC grants as a primary source of funds to provide rental assistance and supportive services to individuals and families placed into rapid rehousing units in these developments and to provide supportive services to

Case: 26-1224 Document: 00118495633 Page: 90 Date Filed: 07/21/2026 Entry ID: 6836472

residents in permanent supportive housing units. Under the FY 2026 NOFO, there will likely not be CoC funding to provide the necessary rental assistance and supportive services to support people in new permanent housing units funded by the County and currently under construction. CoC funds supporting families and individuals at existing permanent housing units in operation are likely to be reduced or eliminated, putting the tenants at risk of losing housing and the creating financial risk for the projects.

18. As a result of its relative success in prior HUD CoC competitions, OSH depends heavily on the CoC grant program to fund critical housing subsidies and services to support individuals and families experiencing homelessness. The County's partnerships with HUD, the State of California, local jurisdictions, and non-profits, and the coordination of these efforts through the Santa Clara County Continuum, have resulted in huge strides in meeting community needs to reduce homelessness, even amid unprecedented challenges. For example, from 2015 to 2019, the County's supportive housing system helped nearly 9,000 households move from homelessness to permanent housing and doubled both the number of supportive housing units and temporary shelter capacity. From 2020 to 2025, the County's supportive housing system helped over 20,800 people move from homelessness to permanent housing.

**Harms from HUD's FY 2026 NOFO**

19. There are many terms and conditions in the FY 2026 NOFO that are concerning because they significantly depart from longstanding prior HUD policies and requirements and because they do not reflect evidence-based best practices for resolving homelessness.

20. In particular, because of the large set aside ($1.3 billion) for only new transitional housing and/or supportive-services-only projects (the "set aside"), and the funding process laid out at pages 88 to 91 of the FY 2026 NOFO, it is very unlikely that funding will be left over for

any renewal projects in Tier 2 of the competition after HUD has finished selecting new projects. Therefore, any renewal projects that cannot be placed in Tier 1 are very likely to lose CoC funding under this NOFO. The renewal projects that will very likely go unfunded under the FY 2026 NOFO are precisely those that, as I explained above, have shown incredible success year after year at meeting HUD's own success metrics.

21. Therefore, in preparing for the local competition, the Santa Clara County Continuum is forced to make extremely difficult decisions regarding which renewal projects, among the more than 30 projects that each serve individuals with high needs, to preserve in Tier 1. These decisions mean that the remaining renewal projects must either find alternative funding, transition to a completely new project, or shut down. Due to the short time frame required for conducting the local competition, announcing the results, and submitting the final NOFO application to HUD, these decisions—with the weight of life or death consequences for the individuals and families being served—have to be made in a matter of weeks.

22. At the outset, because of the NOFO's conditions, including HUD's reduction in funding for permanent housing renewal projects through the set aside, members of the Santa Clara County Continuum and the County have had to divert significant additional resources above and beyond what is typically required to prepare the local competition. The County diverted staff time to analyze project and client data to assist the Continuum's Board of Directors in making careful decisions about the fate of CoC projects, because the wellbeing and lives of so many people served by these projects are at stake. Because the County is the Continuum's lead entity, County staff time was also diverted to organize multiple meetings of the Continuum's Board of Directors and a grantee working group, to understand the drastic policy changes included the FY 2026 NOFO as compared to previous NOFOs, discuss the difficult decisions

about what projects to preserve for renewal funding, and attempt to mitigate against the inevitable harms to households losing their stable permanent housing as a result of the FY 2026 NOFO. I participated in several of these meetings, which included incredibly difficult discussions, such as whether to prioritize funding for projects serving seniors with disabling conditions who have experienced chronic homelessness or projects serving youth and young adults at high risk of trauma and human trafficking if they remain unhoused. Forcing communities to make these decisions in a very short time period puts incredible strain on the relationships the partners have built over decades of working collaboratively to serve all populations in need.

23. These decisions are made more difficult by the fact that the Santa Clara County Continuum must include its Homeless Management Information System (HMIS) infrastructure in its Tier 1 listings, so that it may be renewed. HUD requires all Continuums to maintain a HMIS, which is a software system for coordinating services and client information across homelessness assistance and service providers within the region. The County of Santa Clara manages the HMIS for the Continuum, including through more than $3 million annually in contracts with a software vendor (with over $20 million invested overall since the County adopted HMIS), as well as OSH staff members providing administrative support and data analysis services. The CoC HMIS grant covers approximately half of the cost of HMIS administration and the remaining costs are covered by local funds. Following HUD's example, the State of California now also requires recipients of state grants relating to homelessness to maintain and provide reports from a HMIS database. Thus, HMIS is critical to maintaining eligibility for both federal and state funding, as well as an irreplaceable tool for managing client services, reporting outcomes, and evaluating programs and projects. Because of the set aside in

Case 1:26-cv-00436 ... Document 33 ... Filed 07/21/2026 ... Page 93 ... Entry ID: 6836472

the FY 2026 NOFO, the HMIS project would likely lose CoC funding if not included in Tier 1, and therefore, to maintain compliance federal and state requirements, the Santa Clara Continuum must assign dollars within its Tier 1 allocation to HMIS instead of to other renewal projects for permanent housing and transitional housing.

24. The FY 2026 NOFO also forces other choices that seem to contradict some of HUD's stated goals, like prioritizing transitional housing. For example, the Santa Clara County CoC has a transitional housing project for homeless youth and young adults that is highly successful at achieving permanent housing outcomes, but because HUD's set aside is only for new, not renewal, projects, the CoC is forced to decide whether to list this highly effective project in Tier 1, versus a permanent supportive housing project that houses individuals with disabilities or permanent housing project serving people fleeing domestic violence.

25. It is almost inevitable that a permanent housing or other project not selected for funding in the local competition will need to begin winding down once that determination has been made, because the high likelihood of funding discontinuation would make it irresponsible to continue to enroll households in the program knowing they would be at risk of an abrupt loss of subsidy and supportive services. This wind-down includes stopping accepting new applications or referrals for clients, which in turn leads to an even greater backlog of people waiting in the queue for housing support. CoC Grantees must also plan for the transition or layoff of staff working on CoC-funded permanent housing projects that are very likely to lose funding.

26. In response to the FY 2026 NOFO, the Santa Clara County Continuum is attempting to transition some projects, including rapid rehousing projects, into new transitional housing projects. However, there are significant difficulties and costs resulting from these

changes, and the new transitional housing projects, even if they are selected for funding by HUD in the Tier 2 process, are unlikely to perform as successfully as the Continuum's existing rapid rehousing projects. This will lead to increased exits back into homelessness for clients. The Santa Clara County Continuum has historically prioritized permanent housing projects through its local competition not just in response to prior, longstanding HUD policy but also because local experience—backed by data—showed that transitional housing projects much more often had worse outcomes for ending homelessness than permanent housing solutions. The Continuum has retained the few transitional housing projects that have proven to be successful because they either serve a specific population (young adults) whose needs can be met by temporary housing programs, or because they achieve better outcomes by combining transitional housing with rapid rehousing services and supports.

27. The first problem with transitioning existing rapid rehousing projects into transitional housing projects is that the clients must qualify under the definition of "homeless" in the relevant statute and HUD regulations (this is stated in the FY 2026 NOFO at page 42), and current residents of permanent housing projects that are being forced to close or transition will therefore not be eligible to move into the transitional housing program because they are not "homeless" as defined in those sources. I am aware that HUD has issued guidance purporting to highlight two circumstances where someone living in a permanent housing project might qualify as homeless—if they are fleeing domestic violence or will imminently lose their residence within 14 days—but in practical reality many people will not meet these conditions. If a permanent housing resident is forced to wait until they are within 14 days of losing their housing to become eligible for transitional housing, it is extremely unlikely that a transitional housing unit will be available within that timeframe. Therefore, current residents of closed or transitioned permanent

housing programs will likely be forced to become homeless again (and likely on the street or other place not meant for human habitation because emergency shelters and similar programs are already at capacity), in order to be eligible for transitional housing or a different permanent housing program. I anticipate that the transition process will be very traumatizing for individuals and families recovering from homelessness or chronic homelessness.

28. An additional aspect that makes transitioning permanent housing projects into transitional housing projects difficult is that, for transitional housing projects, non-profit organizations are not allowed to administer rental assistance payments directly to landlords. Rather, those payments must be administered through public agencies like the County or the public housing authority. This will likely discourage landlords from continuing in the project if it is switched from permanent housing to transitional housing, as there are efficiencies for the landlords in receiving rental payments from non-profits that public agencies cannot provide. Therefore, transitioning permanent housing projects to transitional housing projects places the Santa Clara County Continuum at risk of losing longstanding partnerships with landlords that have been willing to offer their units to clients needing subsidies. It is already difficult to recruit new landlords to participate in these types of programs, and transitional housing projects are even less enticing to landlords because of the higher rates of tenant turnover. Transitional Housing rental subsidies are also much less common than permanent housing program subsidies. I expect transitioning projects from permanent housing program subsidies to transitional housing subsidies would require the Continuum to conduct significant outreach and education to landlords to establish understanding and interest from landlords.

29. There are other programmatic issues arising from the FY 2026 NOFO—in particular, the requirement that for a new transitional housing project to be selected and to

receive an executed grant agreement, it must require clients to participate in at least 20 hours per week of services, activities or employment, with limited exceptions for individuals over age 62 or with certain disabilities (excluding alcohol or substance use disorders). *See* FY 2026 NOFO at page 62-64 (new project threshold criteria for transitional housing), and page 90 (Tier 2 project selection process).

30. This is a significant shift that will likely result in more clients disengaging from programs, or service providers being required to terminate clients who do not or cannot comply with the hours requirement. This requirement will also likely generate significant additional costs for compliance which the CoC grants will not adequately compensate (including staffing to provide additional activities, monitoring for compliance, and documenting that a client's disabilities make them exempt from the requirement), and therefore create additional financial strains that jeopardize the security of these projects. Additionally, California requires that recipients of certain State-funded homelessness assistance grants *not* require assisted individuals to receive treatment or perform any other activities as a condition of receiving shelter, therefore, CoC applicants in the Continuum that modify their programs to meet the mandatory services requirement, may risk non-compliance and not be eligible for state homelessness assistance grants at all, which also threatens the viability of these projects and make it more difficult for the Continuum to recruit new project applicants.

31. Relatedly, the mandatory services requirement, in addition to other conditions in the FY 2026 NOFO (such as compliance with the Administration's Executive Orders pertaining to DEI programs, gender identity, and immigration) has discouraged some project applicants in the county—particularly those that serve survivors of domestic violence—from applying for funding under this NOFO. Other service providers for survivors of domestic violence that

currently operate within the county are discouraged from submitting projects as new applicants because the conditions in the FY 2026 NOFO will require them to make programmatic changes and certifications that are not aligned with their values and missions. For example, the requirement that transitional housing clients participate in at least 20 hours per week of services, activities or employment is not aligned with effectively serving survivors fleeing domestic violence or human trafficking. When people are fleeing domestic violence or human trafficking situations, service providers are focused first and foremost on ensuring the client's safety and security, not requiring them to participate in services or gain employment immediately. Additionally, the prohibition on nonprofit organizations providing rental assistance would significantly limit the options victim services agencies have to support their clients. Agencies serving survivors must protect the confidentiality of their clients and do not share client level information with other partners. The requirement for a public agency to administer rental assistance means these agencies cannot offer rental assistance directly, greatly limiting programmatic options for agencies serving survivors. Therefore, the Santa Clara County Continuum is currently in a position to lose a significant portion of its DV bonus funding because of the FY 2026 NOFO. Not to mention, the loss of the programs specializing in serving survivors of domestic violence is a devastating blow to the community's continuum of care.

32. The human cost of this potential loss of funding would be enormous. Thousands of Santa Clara County residents who are experiencing or at risk of homelessness rely on these CoC-funded programs. As of June 30, 2026, the Santa Clara County CoC grants providing permanent housing were serving 2,610 people (1,820 households), including over 2,059 adults and 551 minor children. People housed in these programs include 876 seniors (55+), 1,330 households (73%) with a mental health disorder, 844 households (46%) with a chronic health

condition, 416 households (23%) with developmental disabilities, and 784 households (43%) with physical disabilities. All households in PSH programs have a disabling condition, as the eligibility for PSH programs has long included a requirement that people served have a disabling condition that "is expected to be long-continuing or of indefinite duration and substantially impedes the individual's ability to live independently."[5] In fact, HUD requires that CoC programs "must, to the maximum extent feasible, ensure that people with more severe service needs and levels of vulnerability are prioritized for housing and homeless assistance."[6]

33. The loss of CoC funding would likely result in participants of these programs losing their housing and being unable to access services they have relied on to achieve and maintain stability and independence. Loss of housing interventions such as RRH would also increase the burden on the County's emergency shelter/temporary housing programs and other safety net programs because, without access to rental assistance, the households are more likely to become homeless or chronically homeless.

34. The expected increase in persons returning to homelessness due to the loss of CoC funding for permanent housing projects will also have significant downstream impacts because of the great need for housing in Santa Clara County. There are currently nearly 6,000 homeless households on the County's Community Queue waiting for permanent housing. Based on the vulnerability assessment performed for every household in need of housing in order to prioritize them for housing interventions in the Community Queue, 70 percent of these households score within the permanent supportive housing range, meaning they have the highest vulnerability scores (due to the household's degree of disabling conditions, incidents of chronic

---

[5] 24 CFR § 578.103.
[6] HUD Office of Community Planning and Development, Notice CPD-17-01 at 5 (Jan. 23, 2017), https://www.hud.gov/sites/documents/17-01cpdn.pdf.

Case: 26-1926 Document: 00118495633 Page: 99 Date Filed: 07/21/2026 Entry ID: 6836472

homelessness, and other adverse life experiences and risk factors). Of these households, 44 percent are survivors of domestic violence and 43 percent meet the statutory definition of chronically homeless. New households—including families with children—are being added to the Community Queue list each day due to the structural factors causing homelessness discussed above. In March 2026, 362 households completed a housing assessment for the first time, and 54 percent of those households scored within the permanent supportive housing level of housing intervention needed (meaning they experience multiple risks and vulnerabilities, such as chronic health issues and physical disabilities, they have been a victim of crime or domestic violence, or they have experienced homelessness for a long duration, among other factors). The likely increase in the number of chronically homeless individuals and households as a result of the FY 2026 NOFO will also result in greater public and community costs due to more emergency room visits, interactions with law enforcement, and incarceration.[7]

35. We know from a comprehensive study conducted in 2015, that the public costs of providing services to residents who are experiencing chronic homelessness in Santa Clara County are far higher than the public cost when these same individuals are permanently housed. The difference is especially stark for the most high-needs, chronically homeless individuals, for

---

[7] From at least 2005 to 2014, HUD encouraged Continuums to create new permanent supportive housing projects dedicated for chronically homeless individuals and households. From 2014 onwards, HUD required Continuums to prioritize chronically homeless individuals and households for permanent supportive housing units, "[t]o ensure that all PSH beds funded through the CoC Program are used as strategically and effectively as possible." HUD Office of Community Planning and Development, Notice CPD-14-012 at 2 (July 28, 2014), https://www.hud.gov/sites/documents/14-12cpdn.pdf; *superseded by* Notice CPD-16-11 (July 25, 2016), https://www.hud.gov/sites/documents/16-11cpdn.pdf. In November 2025, HUD withdrew both CPD-14-012 and CPD-16-11. The Santa Clara County Continuum continues to prioritize the most vulnerable individuals and households because that is, as HUD stated, the most effective use of permanent supportive housing units and reduces public costs compared to leaving these households to cycle through shelters, temporary housing, hospitals, jails, and/or unsheltered homelessness.

whom the study found an average annual cost reduction of $42,706 when comparing the pre-housing public costs associated with these households compared to the post-housing public costs. While costs overall are higher now than in 2015, the causal relationship between providing stable housing for high-needs households and significant reduction in associated public costs for serving those households remains true.[8]

36. While my most pressing concern is the harm that the FY 2026 NOFO will cause to clients who are in permanent housing programs that are forced to close, or to transition to transitional housing projects, the County will also be directly harmed by the FY 2026 NOFO. Because of the set aside and loss of funding for renewal projects, the County must now choose whether to absorb the costs of some projects, including two permanent supportive housing renewal projects that will likely be shuttered if the County does not do so. The FY 2026 NOFO puts the County's rapid rehousing programs at significant risk. These projects will be placed into Tier 2 because the Continuum needs to preserve Tier 1 funds for the projects that serve the most vulnerable households, which primarily is permanent supportive housing. As discussed above, renewal projects in Tier 2 are very unlikely to be awarded because of the new project set-aside. Based on our understanding of the NOFO, the opportunity to retain these critical funds that are supporting successful rapid rehousing programs is to apply for transition grants to convert these programs from rapid rehousing to transitional housing. We are forced to choose between three negative outcomes – absorb the costs to keep the successful program in operation, place it into Tier 2 where it is unlikely to be funded and wind down the program, or transition to a program type that has less positive outcomes for clients. The County will likely also need to absorb the

---

[8] Daniel Flaming, et al, *Home Not Found: The Cost of Homelessness in Silicon Valley* (2015), *available at* er_homenotfound_report_6.pdf.

Case: 26-1226   Document: 00118495633   Page: 101   Date Filed: 07/28/2026   Entry ID: 6836472

costs of an infrastructure grant for coordinated entry (also a condition of eligibility for HUD CoC funding), to allow more room within the Santa Clara County Continuum's Tier 1 allocation to preserve the permanent supportive housing projects that house the most vulnerable members of the community.

37. The Santa Clara County CoC's local competition has historically been uncontroversial because projects were ranked based on demonstrated outcomes and community needs. The FY 2026 NOFO upends the process because so many renewal projects have little to no chance of being awarded funding in Tier 2, despite high performance. Informing recipients and subrecipients that their projects were not selected for Tier 1 may damage relationships between the Continuum and project applicants, and between the County of Santa Clara and its subrecipients for CoC project funding, because it will be seen as a "death sentence" for the project, given the grim prospects for projects ranked in Tier 2. The County of Santa Clara will likely face significant pressure to absorb the costs for additional projects, which it will not be able to do for all CoC projects whose funding will likely be cut by the FY 2026 NOFO, due to steep federal cuts to social safety net programs across the board. The fact that the County cannot promise to provide alternative funding to rescue CoC projects will also likely damage relationships between the County and service providers, and between the County and the clients served by these programs.

38. The FY 2026 NOFO wrests away local control over the competition and prevents communities from continuing to invest in programs and interventions that have been most successful in meeting local needs. Normally, when a project is shut down or not selected for renewal funding, that is a local community decision, based on the fact that the project is not performing well at reducing homelessness. When this decision has been made in the past our

Case: 26-1226 Document: 00118495633 Page: 102 Date Filed: 08/21/2026 Entry ID: 6836472

local community has made a plan to ensure the clients enrolled in the program receive the support they need to remain housed, typically by transferring to another program. Now, because of the FY 2026 NOFO's major reallocation of funds and constellation of other challenging conditions, the NOFO will lead to a large number of projects being forced to shut down or drastically change, all at once, regardless of the needs of the local community and without adequate time or resources to meet the needs of the program participants currently enrolled in the programs.

39. Overall, even for projects ranked in Tier 1, I fear that there is significant risk that the Santa Clara County Continuum will lose a substantial amount, or possibly even all, of its CoC funding. This is due to changes to the scoring criteria that disadvantage communities that excelled under HUD's previous priorities and policies, and the broad discretion that HUD has reserved for itself to reject projects and applicants using vague and subjective criteria under "Risk Review." The possible loss of funding will have negative consequences for our community well into the future, because it will reduce or possibly eviscerate the Santa Clara County Continuum's annual renewal demand, and therefore the amount of funding that the Continuum is eligible to receive, for subsequent years.

40. This funding uncertainty—for a program that is fundamentally about stability—comes at a time of great budgetary strain for the County of Santa Clara (due primarily to federal funding cuts for safety net services the County is required to provide). The County, like entities across California and the nation, is facing budget deficits that seriously strain the County General Fund resources the County has available to fund programs if longstanding federal grant funds are cut off. To meet the County's obligation to deliver a balanced budget, County departments, agencies, and executive leadership made very difficult choices—including cutting programs,

Case: 26-1226 Document: 00118495633 Page: 103 Date Filed: 08/21/2026 Entry ID: 6836472

services, and staff positions—in the most recent fiscal year's Adopted Budget to close a $787 million budget deficit while maintaining critical services for the community. If the County were deprived of its CoC funding, it would struggle to sustain its CoC-funded services that serve homeless families with children; unhoused transition-age youth (age 18-24); chronically homeless adults; and survivors of domestic violence, sexual assault, human trafficking and/or stalking.

41. The County's fiscal year runs from July 1 to June 30, and the County has already entered into all of its service agreements for projects funded by the County's CoC grants for the County's 2026-2027 fiscal year—although the current CoC grant agreements for some of these projects will end before June 30, 2027 and may not be renewed due to the FY 2026 NOFO. In prior years, the County could contract for services each fiscal year with reasonable reliance on the stability of CoC renewal funds, even if the federal fiscal year and HUD CoC annual award timeline were not directly aligned with the County's fiscal year. In other words, the County could budget and plan for the costs of its permanent housing, transitional housing, and other CoC-projects each year with the expectation that, absent a significant reduction in appropriation of funding by Congress, the funding would come, even if there was a short gap to fill.

42. In my own experience, aside from the FY 2025 CoC NOFO that was enjoined, I am not aware of HUD ever having made changes to the CoC program this abruptly and without the opportunity for Continuums to prepare for and respond to the changes. In past years, when HUD has considered significant changes to the CoC program, it has either tested those changes through a demonstration program, such as the Youth Homelessness Demonstration Program, which allowed grantees to apply for waivers to test new strategies or models or implemented changes incrementally over time. It does not seem that HUD considered these alternatives to

implementing the changes it seeks to require Continuums to adopt through the FY 2026 NOFO.

43. Lastly, HUD's delay in providing project application guidance further adds to the challenges for CoCs to prepare for the competition. As of the date of this declaration, HUD has not yet made project application forms available in e-snaps. *E-snaps* is the electronic CoC Program Application and Grants Management System that HUD's Office of Special Needs Assistance Programs (SNAPS) uses to support the CoC Program funding application and grant awards process. Based on my experience with the e-snaps application process, the forms will need to be redesigned to reflect the substantial changes in the FY 2026 NOFO. Although the deadline for submission is quickly approaching, potential applicants are currently unable to view the new forms to prepare project applications. It takes an immense amount of work to prepare individual project application forms and Continuum application narratives to submit to HUD, even when there are not huge changes like in the FY 2026 NOFO, and I am concerned that HUD's chaotic and disorganized roll-out of the FY 2026 NOFO will harm the Santa Clara County Continuum's ability to prepare a quality application in time before the deadline.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED at San José, California this 16th day of July, 2026.

Kathryn J. Kaminski

**For: Caitlyn McKenney, DAS for Community Planning and Development's Office of Special Needs**

**From: Dr. Robert Marbut, Senior Policy Advisor**

**Regarding: Homelessness Policy Forums – CoC Program**

The Office of Community Planning and Development (CPD) has coordinated closely with the Office of Field Policy and Management (FPM) to convene a diverse group of CoC stakeholders at in-person discussions across the nation. I have personally led and completed 40 forums on the topic of homelessness and the CoC program, within Washington, DC and 19 of the states that are most negatively impacted by homelessness. The attendees have consistently represented a wide range of stakeholders including current CoC Collaborative Applicants and recipients, local elected officials, privately funded organizations, healthcare partners, local agencies, and law enforcement. Forum attendees have reflected diverse thinking about homelessness policy based on their firsthand perspectives.

The Forums are intimate and quite lengthy, with most going over three hours. Several forums have even lasted longer than four hours due to the amount of conversation. Each forum begins with a presentation I lead on HUD homelessness data over the years using HUD's Annual Homelessness Assessment Report. This part of the forum lasts for about 30 minutes. The remainder—and lion's share—of the time is dedicated to unfiltered Q&A from the audience. I have consistently answered all questions regardless of question type. The questions I have received have ranged in topic from national trends, to specific questions about the NOFOs, to philosophical issues, and most everything in between. There has been universal positive feedback for the Forums, with people specifically appreciative of the unlimited nature of the Q&A. In bringing together a wide range of participants, I've also found that many of the relevant stakeholders who are not CoC-recipients appreciate the opportunity to better understand the CoC program and even desire to become applicants for funding. Most of the attendees, including most of the former detractors, agree in conversation that:

- The status quo is not working.
- There is a need to reduce "automatic renewals" and bring back true competition.
- We need to bring back "wraparound services" in the form of treatment and recovery services.

**<u>Format for the Community Homelessness Forums</u>:**

- Informal pre-Forum meet & greet time (30-minutes).
- Hosted and emceed by a local HUD regional staff member.
- Timing:
  - 20-minute power point by Dr. Robert G. Marbut Jr.
  - Q&A for at least 100 minutes.
  - In all but 2 Forums (due to travel commitments), Forums have been extended past the 2-hour posted time to include additional sharing and Q&A time (adding between 35 and 125 minutes to the program). Most of the Forums have run for about 3 hours with the longest being Miami that went over 4 hours.

Post event: Dr. Marbut and Soledad Ursua have had hundreds of individual meetings with attendees. In some cases, post-Forum meetings have included add-on homelessness service agency site tours.

**<u>Reception</u>:**

The Forums have been very candid and lively, with a lot of honest exchange of information. There has been very positive feedback for doing these localized gatherings. Attendees especially like that fact that HUD staff stays until every last question is answered.

I have found that attendees appreciate the opportunity to have a multitude of homelessness partners in the same room, including stakeholders that are not the usual "players" in the CoC space (e.g. law enforcement and state, county & city departments of health). Several elected officials have remarked to me that they've never seen this diverse of a group in the same room.

At the end of each Forum, there is generally 60-75% percent support for the reforms, with about 15-20% not supportive (the unsupportive group is normally CoCs' staff members and agencies who are fearful of losing funding due to competition). These estimated percentages are based on comments made and questions asked during the Forums, as well as post-Forum individual meetings. I and/or my colleague Soledad Ursua generally visit one-on-one with every attendee.

<u>There is a general consensus among attendees that</u>:

- The status quo of Housing First is not working.
- There is a need to reduce renewals, stop making them automatic, and bring back true competition.

- HUD and organizations on the ground need to bring back "wraparound services" in the form of treatment and recovery services.
- Fentanyl and Meth have changed the homelessness and recovery landscape drastically in a variety of ways including the size and types of treatment cohorts, as well as the types of treatment services needed. The Housing First principle and practice of no treatment requirements does not align with the reality of the drug crisis in 2026.
- There is agreement that there needs to be more clarity around how a person can move from PSH to TH. People prefer simple, common-sense definitions. For the most part over the last two decades, HUD and/or Congress have artificially changed the technical definitions of different homelessness cohorts. With almost all of these statistical contortions, the reported numbers have skewed downwards to report artificially political favorable lower numbers that do not accurately reflect the real-world condition of homelessness. Even with these changes, "homelessness" has increased.
- Homelessness is more than the loss of housing, it is the loss of finances, credit worthiness, vehicle/transportation, meaningful employment, family, hope and community, and generally includes addiction and untreated mental illness.

<u>There has been less consensus around</u>:

- How should we measure success. Some stakeholders want to use "self-sufficiency" (per the 2009 HEARTH ACT) as the key measure of success, while others want to use retention of CoC-funded housing. Self-sufficiency is one of the key measures Congress asked HUD, CoCs and agencies to ultimately measure success by, but this is a much higher standard to reach than measuring how many people receive subsidized government housing.
- Encampments. The role of law enforcement and local government in clearing encampments draws discussion, specifically around utilization of the provisions of the SCOTUS decision in *City of Grants Pass v. Johnson* to clear encampments?
- Disability and Substance Use Disorder. There is agreement around the obvious distinctions between treatable Substance Use Disorders and disabilities such as physical handicaps or developmental disabilities. There is a lack of consensus around how to address those distinctions in practice within homelessness assistance.

**<u>Stakeholder Feedback that Informs HUD Policy:</u>**

Dr. Marbut has been tracking comments, inputs and questions, and has in turn passed on this information to Caitlyn McKenney. The dialogue has focused on the following topics:

- Measurement of Success & Data:
  - How to measure success. Attaining self-sufficiency versus retaining subsidized housing.
  - Self-sufficiency. How to accurately measure self-sufficiency and how to advance it within the CoC program.
  - Trends around AHAR, HMIS and PITC data sets.
  - HUD's 2013 policy shift to mandate Housing First. Especially given that homelessness was decreasing between 2007-2013.

- Philosophical and Content Issues:
  - The homelessness reforms being led by the Mayors of San Francisco, Austin, Houston, Philadelphia and Portland in the direction of advancing treatment and recovery and public safety on the streets.
  - The positive role of supportive service participation requirements and the outcomes that were lost when HUD mandated Housing First in 2013.The impact of the loss of HUD investment in wraparound services by shifting the CoC program to focus exclusively on Permanent Housing.
  - The impact of untreated mental illness, Meth, and Fentanyl on homelessness. Both how it has increased the death rate among the homeless population, and how it has changed the types of treatment services that are needed.
  - Encampments and how forceful should the government be in cleaning up encampments
  - Questions around the Clinton welfare reforms (which included program participation requirements, work requirements, transparent measurements and stricter eligibility standards).
  - What can elected officials and homelessness service agencies do about unresponsive CoCs, or CoCs that push away new providers and applicants.
  - The need for investment in Transitional Housing and emergency shelter and services. The problems that have been caused as a result of unbalancing the continuum of care among emergency services/shelter, transitional housing and longer-term housing.

  - The exacerbating effect that a rise in addiction and untreated mental illness paired with a reduction in treatment services has had on the homeless population.
  - The need for common sense reforms.

- Administrative:
  - The nuances of "Tier 1" and the level of "automatic renewal" versus the need for real competition.
  - Gratitude for the unlimited Q&A with HUD and questions around the lack of HUD engagement with CoCs at the local level in recent years. As a point of reference, HUD has not conducted these kinds of Forums in an organized way on this topic set since 2010.
  - The ability of providers to transition their renewal grants from PSH to TH.
  - The ability of program participants to transition from PSH to TH.
  - The definition of "disability" and how to ensure that individuals with treatable Substance Use Disorders and mental illness receive appropriate care.
  - Questions about SSO, specifically what is included and who can apply for these funds?
  - HUD's Housing Standard requirements and how aspects of these requirements have limited the provision of Transitional Housing (e.g. bathrooms and kitchens in unit).
  - How to help the CoC transition and rebalance their distribution of assistance.
  - The need to modernize the PIT count and HMIS to measure outcomes better.

- Miscellaneous Issues:
  - Why has HUD not presented this data before . . . the conjecture is the data was not supporting the messaging?
  - What are examples of best practice agencies?

**Forum Attendees Have Included:**

- Mayors and/or mayor staff members.
- City council members.
- City managers and senior staff members (e.g. HHS, community services, etc.).
- Police chiefs, police command staff members and patrol officers.
- Fire fighters and EMTs.
- County administrators and senior staff members.
- County commissioners/supervisors.
- Sheriffs and patrol deputies.
- Medical examiners and coroners.
- Heads of mental health authorities.
- Heads of housing authorities.
- CoC Collaborative Applicant staff members and leaders.
- State and local homelessness agencies.
- Existing CoC awardees (mostly PSH providers).
- Faith based organizations.
- Individuals with lived experience, community advocates and activists.
- SUD treatment providers.
- Business leaders from affected areas of their respective communities.
- District Senate and Congressional staff members.
- Gubernatorial staff members.
- Other decision-making stakeholders.

**Homelessness Forums Hosted to date:**

- San Francisco, CA (2/17/2026).
- Fresno, CA (2/18/2026).
- Bakersfield, CA (2/18/2026).
- Orange County, CA (2/20/2026) Mini-forum.
- National Citygate Meeting (3/3/2026 and 3/4/2026) Mini-forums.
- Charleston, WV (3/6/2026).
- New Orleans, LA (3/11/2026).
- Huntsville, AL (3/12/2026).
- Austin, TX (3/13/2026).
- Portland, OR (3/17/2026).

- Coeur d'Alene and State, ID (3/18/2026).
- Spokane, OR (3/19/2026).
- Houston, TX (3/23/2026).
- Dallas, TX (3/25/2026).
- Ft. Worth, TX (3/25/2026).
- Detroit, MI (3/31/2026).
- Cleveland, OH (4/1/2026).
- Columbus, OH (4/1/2026).
- Cincinnati, OH (4/2/2026).
- National Best Practices Summit (4/12-14/2026).
- Washington, DC (4/15/2026).
- Baltimore, MD (4/16/2026).
- Philadelphia, PA (4/17/2026).
- Newark, NJ (4/27/2026).
- New York, NY (4/27/2026).
- Rochester, NY (4/29/2026).
- Buffalo, NY (4/30/2026).
- Boston, MA (5/1/2026).
- Orlando, FL (5/11/2026).
- Tampa Bay, FL (5/12/2026).
- Sarasota & Manatee Counties, FL (5/12/2026).
- Miami and the 3 South Counties, FL (5/14/2026).
- Cheyenne and State, WY (5/18/2026).
- Denver and State, CO (5/19/2026).
- Salt Lake City and State, UT (5/21/2026).
- San Diego, CA (5/26/2026).
- Las Ve.g.as, NV (5/28/2026).
- Reno, NV (5/29/2026).

**For: Ronnie Kurtz, Assistant Secretary for Community Planning and Development**

**From: Caitlyn McKenney, Deputy Assistant Secretary for Community Planning and Development's Office of Special Needs**

**Subject: Review FY26 CoC NOFO**

**INTRODUCTION.**

This recommendation memo outlines the policy goals and objectives proposed for the FY26 CoC NOFO as HUD works to reform its homelessness programs. In doing so, I also outline the relevant facts and data that informed the policy decisions. The NOFO has substantial differences compared to CoC NOFOs under previous Administrations.

**BACKGROUND.**

The FY26 appropriation Act directs HUD to publish a FY26 CoC NOFO by June 1, 2026.[1] Between the beginning of this Administration in January 2025 and today, HUD has consistently informed the public—and CoC stakeholders in particular—that HUD is making a "paradigm shift" away from the failures of Housing First policy and towards recovery and self-sufficiency. Further, the President signed two Executive Orders implicating HUD and HUD homelessness programs in particular: *Ending Crime and Disorder on America's Streets*[2] and *Addressing Addiction through the Great American Recovery Initiative*.[3]

One of the primary policy initiatives of HUD, and specifically of CPD, has been to reform homelessness programs, especially the CoC program—the single largest Federal homelessness program. Since the beginning of 2025, CPD leadership has met with numerous stakeholders on the issue of homelessness including while visiting service providers and crisis hotspots such as Skid Row in downtown Los Angeles where thousands of people fill the sidewalks and streets in tents and RVs as gangs and drug traffickers prey on them.[4] Los Angeles City Officials declared Skid Row a "Typhus Zone" in 2018.[5] HUD has also organized and attended 40 local forums across 19 states and the District of Columbia to convene homelessness stakeholders including CoC recipients, law enforcement, local elected officials, and healthcare providers.

---

[1] Transportation, Housing and Urban Development, and Related Agencies Appropriations Act, 2026 (2026 Appropriations Act), Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, H.R. 7148.
[2] Exec. Order No. 14321, 90 Fed. Reg. 35,817 (July 29, 2025).
[3] Exec. Order No. 14379, 91 Fed. Reg. 5,081 (Feb. 3, 2026).
[4] Jamie Paige, *Gangs Operating Out of Tents, RVs on Skid Row in Los Angeles*, New York Post (May 28, 2026), https://nypost.com/2026/03/01/us-news/gangs-operating-out-of-tents-rvs-on-skid-row-in-los-angeles/.
[5] Dennis Romero & Andrew Blankstein, *'Typhus zone': Rats, trash infest Los Angeles' Skid Row, fueling outbreak*, NBC News (Oct. 15, 2018), https://www.nbcnews.com/news/us-news/typhus-zone-rats-trash-infest-los-angeles-skid-row-fueling-n919856.

Prior to 2025, HUD had routinely "automatically" renewed 85-95% of CoC grants without tie to competitive score every year since 2013. This was enabled by an approach that shirked accountability and lost its focus on outcomes and merit. The "auto-renewal" approach has caused more harm than good to the most vulnerable Americans, failing to deliver on the purposes it was designed to serve. The data is clear that this approach has failed, and we've been left instead with record high rates of homelessness despite year-over-year increases in funding for the program. This Administration inherited a system that incentivizes the speed at which individuals can receive subsidized housing and the permanency of that subsidy rather than the quality of services that enable individuals and families to reach self-sufficiency.

There are many homeless individuals who will never regain self-sufficiency or independence. HUD acknowledges that this select subpopulation may need long-term government assistance. But there are countless more individuals who can become self-sufficient, and who deserve the opportunity to do so. HUD's past policies have failed to afford them that opportunity, because those policies were predicated on the false assumptions that recovery and self-sufficiency are not possible for the chronically homeless and that the Federal government's best offer is a no-strings-attached, indefinitely subsidized housing unit. This false assumption has caused tremendous harm to vulnerable Americans.

It is evident that the status quo on federal homelessness policy has not resulted in an America with fewer homeless individuals and families. The opposite is true. HUD, and the federal government, are far from the first to recognize this reality and the need for a new approach. Cities and states across the country, and across the political spectrum, have already begun to reevaluate their approaches to homelessness in favor of public safety, accountability, and recovery for those who need it. San Francisco has taken a law-and-order stance on public illicit drug use and invested in housing conditioned on treatment and sobriety.[6] California declared increased efforts to remove homeless encampments across the state.[7] Portland has implemented a camping ban and invested heavily in short-term shelter and housing.[8] Anchorage declared no major homeless encampments for the

---

[6] Luz Pena, *SF Mayor Signs Legislation for Officers to Arrest Drug Users, Send Them to RESET Center*, ABC7 News (Feb. 17, 2026), https://abc7news.com/post/san-francisco-mayor-signs-legislation-police-sheriff-deputies-arrest-drug-users-send-reset-center/18613975/.
[7] Marisa Kendall, *Newsom Launches Task Force to Clear CA Homeless Encampments*, CalMatters (Aug. 29, 2025), https://calmatters.org/housing/homelessness/2025/08/newsom-homeless-encampments-task-force/.
[8] Michaela Bourgeois, Anthony Kustura, *Portland Resumes Homeless Camping Ban Enforcement, Focuses on Connecting Portlanders with Shelter*, KOIN 6 News (Oct. 30, 2025), https://www.koin.com/news/portland/portland-resumes-homeless-camping-ban-enforcement-focuses-on-connecting-portlanders-with-shelter/.

first time in a decade after investing treatment and public safety partnerships.[9] Houston's Mayor declared he would be "reclaiming our public spaces."[10] Seattle is making new investments, not in permanent supportive housing, but in shelter.[11] Multnomah County, Oregon is funding sobering centers and recovery beds.[12] New York has taken steps to make it "easier to commit people with severe mental illness."[13]

The public has increasingly questioned the approaches and philosophies entrenched in existing homelessness policy.[14] In any major U.S. city, the intertwined realities of homelessness, addiction, and mental illness are inescapable. So is the sense that ever-increasing taxpayer investment in existing approaches has failed to alter the visible crisis on the streets.

HUD's policy changes described below, as implemented in the 2026 CoC NOFO, are grounded in data and consistent with a broad shift in public opinion and with policy changes playing out at the local level across the nation. And importantly, they align with the CoC program's statutory goals of reducing homelessness, mitigating trauma to individuals and the community, and optimizing self-sufficiency. This NOFO also comports with statutory requirements by moving the program toward a true continuum of care that addresses the "many and complex" causes of homelessness instead of limiting to a one-size-fits-all approach.

**THE BIG PICTURE—RATIONALE FOR A SHIFT AWAY FROM "HOUSING FIRST"**

In 2013, HUD made a drastic policy shift to mandate Housing First across the CoC program. While proponents of Housing First disagree on the definition of the policy, HUD has consistently described the policy along the lines of "rapid placement and stability in permanent housing in which admission does not have preconditions . . . and in which

---

[9] Press Release, Anchorage Assembly, Chair Constant Statement on Homelessness Milestone (Mar. 3, 2026), https://www.muni.org/Departments/Assembly/PressReleases/Pages/Chair-Constant-Statement-on-Homelessness-Milestone.aspx.
[10] Dominic Anthony Walsh, *Mayor Whitmire Wants to 'End Homelessness' in Houston This Year. The Effort Faces Challenges*, Houston Public Media (Feb. 28, 2026), https://www.houstonpublicmedia.org/articles/news/city-of-houston/2026/02/28/544667/homeless-houston-mayor-whitmire-policy/.
[11] Stephannie Stokes, *Next Homeless Shelter Village in Wilson's Surge to Be in South Seattle*, Seattle Times (May 7, 2026), https://www.seattletimes.com/seattle-news/homeless/next-homeless-shelter-village-on-wilsons-surge-to-be-in-south-seattle/.
[12] *County Investments Add More Than 250 Recovery and Stabilization Beds*, Multnomah Cnty. (Oct. 28, 2024), https://multco.us/news/county-investments-add-more-250-recovery-and-stabilization-beds.
[13] Maya Kaufman, Katelyn Cordero, & Jason Beeferman, *New York Makes It Easier to Commit People with Severe Mental Illnesses*, POLITICO (May 1, 2025), https://www.politico.com/news/2025/05/01/new-york-makes-it-easier-to-commit-people-with-severe-mental-illnesses-00322145.
[14] Will James, *Homelessness Continues to Get Worse. Should Seattle, and the U.S., Still Embrace 'Housing First'?*, KUOW (Jan. 8, 2025), https://www.kuow.org/stories/housing-first-seattle-history-homelessness-homeless.

housing assistance is not conditioned upon participation in services."[15] In the 2013 NOFO, HUD dramatically de-prioritized Transitional Housing and Supportive Service Only (SSO) projects. In recent NOFOs, HUD has simply not allowed any new Transitional Housing or SSO projects.[16] While Housing First may have been well intentioned at its start, in implementation the policy has become "housing only." The 2013 shift in resources and attention away from case management and supportive services towards housing placements and retention is captured well by one family homelessness provider:

> *"The [2013] shift in HUD funding to rapid rehousing programs was seismic for nonprofit organizations providing homeless services at the local level … Following the HUD money, emphasis in the field shifted to finding landlords willing to take a risk by renting to referrals from homeless services agencies instead of providing services. Service providers, encouraged by HUD, eliminated case manager positions and hired housing locators instead."*[17]

The results have been devastating. While advocates claimed that Housing First would end all types of homelessness by 2020, the approach has profoundly failed to deliver on its promises.[18] After focusing on permanently subsidized housing with no conditions for more than a decade, homelessness reached the highest number ever recorded at the highest rate of increase ever recorded in 2024.[19]

Chronic homelessness, which Permanent Supportive Housing was intended to address, has increased by 80.5% since 2013 to the highest number on record. This is despite a 44% increase nationwide in Permanent Supportive Housing beds during the same time according to HUD's own data in the forthcoming 2025 AHAR.[20]

There are more people today than ever before who are dependent on indefinitely subsidized housing for homelessness. According to HUD's own data in the forthcoming 2025 AHAR, the nation's supply of Permanent Supportive Housing has increased by 111%

---

[15] U.S. Dep't of Housing & Urban Dev., *Notice of Funding Opportunity (NOFO) for Fiscal Year (FY) 2024 and FY 2025 Continuum of Care Competition*, No. FR-6800-N-25, 17 (July 31, 2024), https://www.hud.gov/sites/dfiles/CPD/documents/CoC/Foa_Content_of_FR-6800-N-25_1-9-download.pdf.
[16] Recent NOFOs had no threshold criteria for Transitional Housing or SSO projects other than Coordinated Entry, meaning no new TH or SSO projects were eligible for funding.
[17] Covenant House International, National Network for Youth & School House Connection, *"To Become the Best Version of Myself": Youth-Supportive Transitional Housing Programs as An Essential Resource for Addressing Youth Homelessness* 23 (2021), https://www.covenanthouse.org/sites/default/files/2023-08/Transitional-Housing.pdf.
[18] Tina Trenkner, *Are Cities' Pledges to End Homelessness Working?*, Governing (Mar. 26, 2012), https://www.governing.com/archive/gov-homelessness-rising-decade-after-pledges-to-end-it.html.
[19] U.S. Dep't of Housing & Urban Dev., *The 2024 Annual Homelessness Assessment Report (AHAR) to Congress: Part 1: Point-In-Time Estimates of Homelessness* 15 (2024), https://www.huduser.gov/portal/sites/default/files/pdf/2024-AHAR-Part-1.pdf.
[20] 2025 AHAR part 1.

since 2007. When Rapid Rehousing is included, the supply of Permanent Housing (Permanent Supportive Housing and Rapid Rehousing) has increased by 188%. During the same time period, the nation's supply of Transitional Housing has decreased by 59.5% (more than half).[21]

One of just four objectives for the CoC program, as set out in the McKinney-Vento Act, 42 U.S.C. § 11381(4), is to optimize self-sufficiency among homeless individuals and families. This objective is aided by Transitional Housing and SSO projects, which are two of just five eligible project types in the Continuum of Care rule that make up a true *continuum* of assistance (24 CFR 578.37) that address the "many and complex" causes of homelessness and serves the "diverse needs" of each Continuum's geographic area. 42 U.S.C. § 11301(a)(3). HUD intends to re-invest in these project types, for the reasons described below, that have been cut out since 2013 and has communicated this to the public repeatedly.[22] Further, the NOFO provides CoCs with new flexibility to prioritize projects that promote self-sufficiency, increase employment income over government assistance, and promote treatment and recovery.

HUD's historical implementation of Housing First has funded Permanent Housing to the exclusion of Transitional Housing and Supportive Service Only projects, and mandated "fidelity" to the Housing First model within CoC-funded projects.[23] HUD's use of the term "Housing First" has focused on two key aspects: no participation requirements or preconditions, and indefinite assistance without time limits.

It is important to note that none of the policy changes discussed below or any of the criteria or certifications in the NOFO requires sobriety to obtain assistance, apart from the promotion of recovery housing for individuals in recovery who want a sober-living environment. Aside from creating space for sober living, the NOFO does not advance preconditions for assistance. Further, the NOFO does not include any sweeping requirement for participation in any form of treatment to obtain assistance, apart from encouraging a select number of beds for which treatment is the purpose. Likewise, nothing in the discussion below or the NOFO eliminates the role of Permanent Supportive Housing in the CoC program. HUD's paradigm shift away from Housing First is about *bringing back* a healthy diversity of assistance, level of competition, and focus on services and recovery. It is not about eliminating Permanent Supportive Housing, cutting funding, forcing sobriety

[21] *Id.*
[22] Listserv Message from Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., to Stakeholders, *subject:* FY25 CoC NOFO for Public Review (July 3, 2025).
[23] *See* scoring criteria on page 86 of the Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., *Notice of Funding Opportunity (NOFO) for Fiscal Year (FY) 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants* 86 (2024), https://www.hud.gov/sites/dfiles/CPD/documents/CoC/Foa_Content_of_FR-6800-N-25_1-9-download.pdf.

and treatment, or criminalizing homelessness. Claims to the contrary do not change this fact.

The following discussion will examine HUD's historical stance on Housing First and the body of research on the outcomes of a Housing First approach to homelessness. In 2022, HUD's Office of Policy Development and Research (PD&R) published an issue of its *Evidence Matters* newsletter on the topic of Housing First.[24] When describing Housing First, the authors focus heavily on the "no preconditions" aspect of the model rather than the "no participation requirements." However, today, HUD finds that the weakness in the nation's homelessness system is not that too few entities condition assistance on sobriety, but rather that too few entities create the accountability and structure needed to help an addict recover or a young person finish school and find meaningful employment. Even the *Evidence Matters* report acknowledged that the first program to implement Housing First—Pathways to Housing—initially required program participants to agree to two staff visits per month. This is the kind of participation requirement that HUD seeks to advance now. The study cited by HUD in *Evidence Matters* compared Pathways to Housing to "treatment first" programs that *preconditioned* housing on treatment. As mentioned above, HUD is not advancing preconditions in the NOFO.

Advocates for Housing First claim that the approach is not "one-size-fits-all" because participants get to choose from a range of interventions and services. HUD finds that while this may be the intention of the model, the historical practice of funding housing subsidies to the exclusion of services has resulted in a one-size-fits-all approach on the ground.[25] The NOFO includes rating criteria to incentivize the existence of and investment in these critical services.

Proponents of Housing First often refer to the approach as "evidence-based," but the reality is that a robust body of evidence on homelessness assistance and outcomes is lacking. And what evidence exists is mixed. A 2021 systematic review of 26 studies found that participants in Housing First assistance compared to "treatment first" assistance had an 88% decrease in days spent homeless during the evaluation period (based on one study) and a 41% increase in days spent housed during the evaluation period.[26] Physical health, mental health, alcohol use, and illegal drug use all had unfavorable or negligible outcomes in Housing First assistance compared to "treatment first". Most of the studies assessed

---

[24] Office of Policy Dev. & Research, U.S. Dep't of Housing & Urban Dev., *Evidence Matters: Transforming Knowledge into Housing and Community Development Policy* (Spring/Summer 2023), https://docs.huduser.gov/archives/portal/sites/default/files/pdf/EM-Newsletter-spring-summer-2023.pdf.
[25] See quote above from provider about the "seismic shift" in 2013.
[26] Yinan Peng et al., *Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health Among Homeless Populations with Disability: A Community Guide Systematic Review*, 26 J. Pub. Health Mgmt. Prac. 404 (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC8513528/.

participants at two years or less following the receipt of housing. All participants received behavioral healthcare. Only one study compared homelessness outcomes between Housing First and "treatment first." The systematic review did not evaluate a net impact on homelessness within a community. Notwithstanding the short evaluation period, limited number of studies, and lack of community-wide evaluation, the review indicates favorable individual housing outcomes for Housing First assistance. However, this is only in comparison to "treatment first" assistance that "required participants to be in psychiatric treatment and substance-free prior to permanent housing."

Another 2021 study examined the long-term outcomes of permanent supportive housing for the chronically homeless population in Boston across a 14-year period in which 95% of participants had a psychiatric illness and 93% had a substance use disorder.[27] By the end of the 14-year period, 45% of the participants had died while housed. At 1 year, housing retention was at 82% but fell to 36% by 5 years. The authors of this study point out that the "Pathways to Housing" study cited frequently by advocates for Housing First examined a model that provided assertive community treatment (ACT) to tenants 24-hours a day. In that study, the housing retention at five years was 88%. This level of robust, intensive treatment services is exceedingly rare among CoC providers and supports HUD's decision to incentivize a similar level of care in this NOFO.

In the *Evidence Matters* issue, HUD points to an observational 2010 study examining outcomes of clients placed in residential treatment or transitional housing prior to independent housing compared to clients placed directly in independent housing.[28] The authors found that individuals placed directly into independent housing had "more days in their own place…but no differences on other clinical or community adjustment outcomes." The authors further noted that "studies using randomized controlled trials of these conditions are needed to establish causation."

Another example of the lack of strong evidence for Housing First at an individual level, let alone the community level, appears in a 2017 study cited in the *Evidence Matters* newsletter. The study compared client use of mental health treatment services in programs that had a "high fidelity" to Housing First versus those with a "low fidelity."[29] The study found that clients in high fidelity programs had a larger *increase* in outpatient service utilization from pre-enrollment to post-enrollment compared to clients in low fidelity

[27] Jill S. Roncarati et al., *Housing Boston's Chronically Homeless Unsheltered Population: 14-Years Later*, 59 Med. Care S170, S171(Supp. 2 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC7958978/.
[28] Jack Tsai, Alvin S. Mares & Robert A. Rosenheck, *A Multi-Site Comparison of Supported Housing for Chronically Homeless Adults: "Housing First" Versus "Residential Treatment First"*, 7 Psychol. Serv. 219 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC3151537/.
[29] Todd P. Gilmer et al., *Fidelity to the Housing First Model and Variation in Health Service Use Within Permanent Supportive Housing*, 66 Psychiatric Serv. 1284 (2015), https://psychiatryonline.org/doi/10.1176/appi.ps.201400564.

programs. Unlike Permanent Supportive Housing writ large, all of the programs in the study were focused on mental health treatment and had 24/7 crisis teams and intensive care teams available to residents. Clients in high fidelity programs had higher use of inpatient, crisis, and residential services pre-enrollment compared to clients in “low fidelity” programs. This fact, in addition to measuring *increases* in service utilization rather than raw service utilization, suggests that the results were driven by client acuity, not the effectiveness of a particular model. As made clear in the study, these programs represented a unique subset of Permanent Supportive Housing in California generally. All of the programs in the study provided the kind of robust, on-site, full-time, clinical treatment that HUD is promoting in the NOFO and that is lacking in existing projects. If the study demonstrates anything, it’s that treatment services in housing are beneficial for individuals who need them.

The findings from existing studies on Housing First interventions vary, and the body of literature is not robust. Importantly, none of the studies examine the impact of varying types of assistance on the total homelessness population in a community over time. Most studies focus on “retention” of housing subsidy—the impact of a housing model on the length of time an individual stays there—which HUD does not find to be an indicator of a sustained and meaningful community-wide reduction in homelessness or the optimization of self-sufficiency. The CoC program in its current state “retains” tens of thousands of individuals in taxpayer-funded housing, yet homelessness remains at record high levels. If the purpose of the CoC program is to reduce homelessness for an entire community, not just at the individual level, there is no robust “evidence based” approach to doing so. What does exist is evidence that, despite increasing reliance on Housing First, homelessness has not meaningfully decreased in America over the last decade. Rather, it has increased. This fact is in itself a reason to take a different approach.

HUD’s analysis of HUD-VASH in the *Evidence Matters* issue betrays a paradoxical argument made by adherents of Housing First. The analysis points to HUD-VASH, a program distinct from the CoC program, as “one of the more successful demonstrations of the efficacy of the Housing First approach.”[30] But as admitted in *Evidence Matters,* HUD-VASH “regulations do require clients to communicate with VA case managers at least once a month.” HUD-VASH implementation guidance updated in 2024 directs the provision of “regular ongoing case management, outpatient health services, hospitalization, and other supportive services as needed” and states that, “*as a condition* of rental assistance, a HUD-VASH eligible veteran must receive the case management services noted above, as

[30] There is one population for whom homelessness has consistently, significantly decreased—veterans. Veteran homelessness has decreased 42% since 2013 while unsheltered, chronic, and overall homelessness have increased by 36%, 80%, and 27% respectively.

needed."[31] Based on HUD's historical definition of "Housing First," HUD-VASH is not a Housing First program. It therefore cannot be evidence that Housing First works at scale. Rather, it even suggests that assistance conditioned on participation in services works, and at a national scale, not just an individual one.

The NOFO maintains a significant focus on Permanent Housing as one part, not the whole, of the Continuum of Care. Nothing in the NOFO eliminates the role of Permanent Supportive Housing, or tenant-based housing subsidies more broadly, in the Continuum of Care. HUD acknowledges that these interventions can be necessary and effective, especially for certain subpopulations such as the elderly (PSH) or families (tenant-based subsidies). The role of short-term financial assistance and subsidy for homeless families is supported by findings in the HUD Family Options Study.[32] HUD's shift away from Housing First is a shift to reintroduce the role of Transitional Housing and robust wraparound services, not to eliminate the roles that PSH and versions of rapid-rehousing may offer.

The *Evidence Matters* issue claims that the "embrace" of Housing First principles "contributed to a 30 percent reduction in homelessness rates between 2005 and 2007." But if this is the case, then it is unclear why the *mandate* of Housing First principles from 2013 to 2024—a much longer time frame with more aggressive implementation —did not deliver a similar reduction. Instead, homelessness *increased* almost 30% across the nation.

In HUD's 2024 Annual Homelessness Assessment Report (AHAR), HUD pointed to several factors that "likely" contributed to the highest number on record since 2007:

> *Our worsening national affordable housing crisis, rising inflation, stagnating wages among middle- and lower-income households, and the persisting effects of systemic racism have stretched homelessness services systems to their limits. Additional public health crises, natural disasters that displaced people from their homes, rising numbers of people immigrating to the U.S., and the end to homelessness prevention programs put in place during the COVID-19 pandemic, including the end of the expanded child tax credit, have exacerbated this already stressed system.*[33]

Generally, it's difficult to establish causality behind increasing rates of homelessness. There is evidence to suggest that the 2023-2024 leap in homelessness was driven in large

---

[31] *Section 8 Housing Choice Vouchers: Revised Implementation of the HUD-Veterans Affairs Supportive Housing Program*, 89 Fed. Reg. 65,857 (Aug. 13, 2024) (emphasis added).
[32] *The Family Options Study*, HUD User, https://www.huduser.gov/portal/family_options_study.html.
[33] Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., *The 2024 Annual Homelessness Assessment Report (AHAR) to Congress, Part 1: Point-in-Time Estimates of Homelessness* v (2024), huduser.gov.

part by immigration.[34] However, there is no evidence to support the claim that "systemic racism" existed or had a causal impact on the 2024 increase.

HUD acknowledges that there are likely a multitude of factors driving changes in homelessness across the country. Housing affordability may be one factor, but when analyzed at an individual level, research indicates that homeless individuals point to social factors behind their loss of housing more frequently than economic factors. When asked to report the reasons for leaving their last housing, one study found that 95% report a social or health reason compared to 47% reporting an economic reason. Among economic factors, loss of income is the most commonly cited—almost twice as common as "housing costs were too high."[35]

In the *Evidence Matters* issue, HUD stated that homelessness will be solved when "political will and the investment of resources" is aligned with Housing First. Yet the nation has experienced more than a decade of federal funding dedicated exclusively to the Housing First model that has only increased year-over-year, a 111% increase since 2013.

As described in detail below, this NOFO takes many steps to return the CoC program to its purpose of promoting community-wide efforts to reduce homelessness by restoring true competition and a true continuum of assistance; and prioritizing treatment, economic independence, and public safety to address the diverse root causes of homelessness for an array of subpopulations.

## POLICY RATIONALE FOR NOFO REFORMS

### 1. Competition

Congress requires the Continuum of Care Program to be a "national competition between geographic areas." 42 U.S.C § 11386a. While it is true that CoCs run local competitions within their geographic areas to select projects, this local competition by no means equates to a "national competition between geographic areas." Under the FY24 NOFO, 90% of every CoC's Annual Renewal Demand was conditionally awarded without any connection to CoC score or project merit.[36] This means that only about 10% of CoC awards were competed on the basis of merit (CoC score) between geographic areas. For the few

---

[34] Bruce Meyer, *New Research Shows 60% of Historic Homelessness Increase Prompted by Immigration Policy*, Univ. of Chi. Harris Sch. of Pub. Pol'y (May 6, 2025), https://harris.uchicago.edu/news-events/news/new-research-shows-60-historic-homelessness-increase-prompted-immigration-policy.

[35] Margot Kushel & Tiana Moore, *Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness* 38 (2023), https://homelessness.ucsf.edu/sites/default/files/2026-04/CASPEH_Report_62023_v4.pdf.

[36] U.S. Dep't of Hous. & Urb. Dev., Notice of Funding Opportunity: Fiscal Year 2024 and Fiscal Year 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants, at 94 (FR-6800-N-25).Tier 1 of FY24-25 CoC NOFOTier 1 of FY24-25 CoC NOFO

projects that were awarded based on merit, CoC score comprised 50% of the project-level score and a general "commitment to Housing First" comprised 10%.[37] In fact, since 2013, the most competitive CoC competition required only 15% competition on the basis of merit, and the least competitive required merely 5% competition.

Still, the FY 26 appropriations act included a new provision overriding this for FY26 and directing the Secretary to "select projects totaling not less than 60 percent of the annual renewal demand for reach collaborative applicant based on rankings determined by the local continuum of care."[38] With clear direction from Congress, the NOFO sets "Tier 1" funding at 60%.

Competition drives outcomes, effectiveness, innovation, and accountability, which is why this NOFO proposes competing 40% of Annual Renewal Demand on the basis of merit (CoC score) between geographic areas. The CoC program was authorized as a competitive program, not an entitlement program. HUD acknowledges that applicants expect and have previously relied on year-over-year renewal of their projects. Setting Tier 1 at 60% provides reasonable assurance to CoCs that their highest performing renewal projects can reasonably expect renewal funding, while giving meaning to "a national competition between geographic areas."

It's important to note that a decrease in Tier 1 from a historical high of 95% to this year's 60% is not equivalent to cutting funding or projects. The funding available through this NOFO remains at a historic high, and HUD intends to award it in full to every deserving applicant. Tier 1 determines what share of that funding is awarded to projects based on merit, not how many projects are awarded in total.

In previous years, Youth Homelessness Demonstration Program (YHDP) renewal projects have been awarded "noncompetitively," meaning that CoCs do not rank YHDP projects in Tier 1 or Tier 2 at all. The appropriations act expressly provides HUD with the discretion to award YHDP projects "competitively or non-competitively."[39] This NOFO awards YHDP projects competitively in order to further healthy competition and accountability. Given the set-aside for new projects discussed below, making YHDP projects competitive provides CoCs with more flexibility than they would otherwise have to determine which renewal projects to prioritize.

---

[37] U.S. Dep't of Hous. & Urb. Dev., Notice of Funding Opportunity: Fiscal Year 2024 and Fiscal Year 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants,. Dep' (FR-6800-N-25).of Hous. & Urb. Dev., Notice of Funding Opportunity: Fiscal Year 2024 and Fiscal Year 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants,*Id.* at 94. (FR-6800-N-25).

[38] Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399 (2026).

[39] Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. D (2026)

HUD is aware that some measure of assurance about the future funding status of projects is important to CoC recipients. This is especially true given the typical period of performance of a CoC grant is one year and competition occurs annually. HUD also allows renewal grant recipients to reimburse themselves for eligible costs incurred between the end of the prior year's period of performance and the date a new grant agreement is executed. At the same time, HUD finds that competitive federal funding with a one-year period of performance should never constitute so significant a portion of a non-profit's resources that loss of that competitive funding would shutter the organization. In fact, the statute directs HUD to score projects on how well they leverage public and private resources and mainstream funding sources and requires at least a 25% funding match from other sources. 42 USC 11386d, 42 USC 11386a(b)(1)(D).

Arguments in favor of setting Tier 1 at a high level favor giving recipients the ability to plan long-term and the assurance that they will receive ongoing funding unless the CoC decides otherwise. For some recipients, CoC funding constitutes a large enough share of their resources that losing a year of funding would be detrimental to the organization. HUD is aware of these challenges but does not find them to outweigh the positives (and the statutory requirement) of healthy national competition. In addition, Congress's decision to set Tier 1 at 60% for this year more than adequately addresses these concerns by providing recipients with a significant level of assurance—the majority of their funding—while still allowing for at least some healthy competition.

**2. Restoring Balance to the Continuum of Care.**

The NOFO makes changes to restore balance to the Continuum of Care, namely, by creating a significant set-aside for new Transitional Housing and SSO projects. From 2007 to 2009 the supply of bed types nationwide had a nearly equal distribution between Emergency Shelter, Transitional Housing, and Permanent Supportive Housing.[40] During this time, the number of homeless individuals was decreasing consistently.[41] By 2013, the supply of Permanent Supportive Housing beds began to increase dramatically while Transitional Housing supply plummeted. In FY24, as in previous years, 88% of the CoC national award went to Permanent Housing, and only 1% supported Transitional Housing projects.[42]

Despite the fact that Transitional Housing and SSO projects are two of just five eligible project components established in 24 CFR 578.37, the extreme disparity has persisted. By

---

[40] *2024 AHAR Part 1*.
[41] *Id.* at 2.
[42] Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., *HUD's 2024 Continuum of Care Program Funding Awards* 1, https://files.hudexchange.info/reports/published/CoC_AwardComp_NatlTerrDC_2024.pdf.

investing in Transitional Housing and SSO projects, this NOFO restores the "continuum" to the Continuum of Care Program to help individuals and families access a pathway of services based on need and with the goal of self-sufficiency for those who are able. As mentioned above, in prior years HUD has routinely prohibited applications for any new Transitional Housing or SSO projects.[43] This NOFO shifts its focus from awarding nearly 90% of CoC funding to Permanent Housing to expand opportunities for other components of the CoC Program that have been shut out. At the same time, the NOFO also incentivizes and maintains Permanent Supportive Housing with robust supportive services for chronically homeless individuals.

Transitional Housing is defined by HUD as housing limited to 24 months of assistance with the goal of facilitating movement to permanent housing. HUD has consistently interpreted movement to permanent housing to include housing that is market rate, non-CoC subsidized, or housing with family. Transitional Housing can be tenant-based, sponsor-based, or project-based, providing flexible options for individual needs. Supportive Service Only (SSO) projects are similarly flexible, funding the provision of services in non-CoC funded housing or shelter or in standalone facilities. This includes childcare, workforce development, legal services, behavioral healthcare, street outreach, mobile healthcare clinics, and employment training—a wide array of critical services and care that HUD routinely hears is needed from stakeholders.

As discussed earlier, following HUD's policy change in 2013, Transitional Housing supply has decreased 59% nationwide as Permanent Supportive Housing increased 44%. HUD makes a reasonable inference that there are individuals and families living in PSH now who would have otherwise been served in Transitional Housing prior to HUD's policy decision to remove funding. The data supports this inference. Transitional Housing is limited to two years of assistance, and many individuals and families remain in PSH for a similar amount of time despite its assurance of indefinite assistance. According to HUD's most recent publicly available data, 41.7% of households remain in PSH for less than three years.[44] PSH is also serving youth and families with children who very likely do not need indefinite government subsidized housing and would have been served by Transitional Housing prior to 2013. More than 86% of individuals living in PSH are under age 65, and a significant 17.4% of individuals are children under age 18.[45]

Based on HUD's knowledge, many Transitional Housing providers made changes to reclassify their programs when HUD made its 2013 pivot away from Transitional Housing. In

---

[43] Recent NOFOs have had new project criteria for all components except SSO and TH.
[44] U.S. Dep't of Hous. & Urb. Dev., *The 2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2* 8-8 (2022), https://www.huduser.gov/portal/sites/default/files/pdf/AHAR-Part-2-2022.pdf.
[45] *Id.*

August 2013, the National Alliance to End Homelessness shared examples of Transitional Housing providers "that have retooled their transitional housing programs into a different program type," and in 2016 they shared how Transitional Housing projects were being turned into Rapid Rehousing and Permanent Supportive Housing.[46]

By HUD regulation, the main difference between Transitional Housing and PSH is time—24 months of assistance versus indefinite assistance. By HUD regulation, the differences between Transitional Housing and Rapid Rehousing are almost non-existent apart from increased flexibility in the types of rental assistance that can be provided by Transitional Housing. Rapid Rehousing is limited to Tenant Based Rental Assistance, whereas Transitional Housing spans multiple forms of rental assistance and all eligible costs of the CoC program.[47] The distinction is important, because Transitional Housing is more amenable to site-based projects compared to scattered-site Tenant Based Rental Assistance commonly provided through Rapid Rehousing. Site-based housing naturally facilitates concentrated supportive services and engagement with peers and case managers better than Tenant Based Rental Assistance scattered throughout the community. While similar on paper, in practice, the goals of Rapid Rehousing and Transitional Housing differ. Rapid Rehousing is known as having a primary goal of speed—how quickly an individual can sign a lease.[48] Transitional Housing is known for being tied to a more robust provision of supportive services.[49]

The level of service provision, and the associated costs, was one of the primary drivers of HUD's shift away from Transitional Housing. In a 2010 PD&R research report, HUD asked the question, "Should transitional housing continue to be emphasized as an option for all homeless?"[50] The report notes ongoing decreases in chronic homelessness from 2007 to 2009. It also notes that "transitional housing is the most expensive model [compared to shelter and Permanent Supportive Housing], frequently offering more privacy and a

---

[46] Nat'l Alliance to End Homelessness, *Retooling Transitional Housing: Success Stories* (video) (2013), https://endhomelessness.org/resources/videos/retooling-transitional-housing-success-stories/?gad_source=1&gad_campaignid=22810019714&gclid=Cj0KCQjwz9_QBhD_ARIsADnSCfD3rff_GJibnrcfWrSWPwDmlwno09peaD4i1L5OOqCbRk9xK7m02PwaAnKMEALw_wcB; Nat'l Alliance to End Homelessness, *Transitional Housing Conversion: A Building Owner's Toolkit* (2016), https://endhomelessness.org/resources/toolkits-and-training-materials/transitional-housing-conversion-a-building-owners-toolkit/.

[47] U.S. Dep't of Hous. & Urb. Dev., *List of CoC Eligible Activities*, HUD Exch., https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-eligible-activities/coc-eligible-activities-overview/list-of-coc-eligible-activities/.

[48] Nat'l Alliance to End Homelessness, *Rapid Re-Housing: A History and Core Components* (2014), https://endhomelessness.org/resource/rapid-re-housing-a-history-and-core-components/.

[49] *What is a Continuum of Care?*, Nat'l Alliance to End Homelessness (Jan. 14, 2010), https://endhomelessness.org/resources/policy-information/what-is-a-continuum-of-care/.

[50] U.S. Dep't of Hous. & Urb. Dev., *Bridging the Gap: Homelessness Policy*, 1 Insight, no. 1, 2011, at 1, https://www.huduser.gov/portal/periodicals/insight/insight_1.pdf.

comprehensive range of on-site services." But as discussed above, it is this level of supportive service provision that HUD finds lacking in the current system and seeks to incentivize and invest in during this competition.

Further, today HUD finds that Transitional Housing is a missing component in the Continuum of Care for helping individuals and families reach self-sufficiency. While the level of service investment may cost more than housing alone, HUD finds that the net results of self-sufficiency over indefinite dependence on a federal housing subsidy are likely to outweigh the initial investment in services. While the 2010 report refers to Transitional Housing as merely a "way station for people waiting for voucher assistance," HUD today finds this to be an unfair characterization both of what Transitional Housing was intended to be and how it operates today. The FY26 NOFO rejects the idea that any form of homelessness assistance should be merely a "way station" for more government assistance or a "hammock" for lifelong government assistance.[51]

Because of the decline in Transitional Housing supply, it's difficult to find recent studies on the effectiveness and outcomes of Transitional Housing compared to other forms of housing assistance. As discussed earlier, a 2010 study of clients placed in treatment or transitional housing prior to independent living compared to clients placed directly in independent living found that individuals placed directly into independent housing had "more days in their own place ... but no differences on other clinical or community adjustment outcomes."[52]

For subpopulations such as homeless youth, data suggests that Transitional Housing has positive outcomes for housing and employment. A study released by Covenant House International found that among youth exiting Transitional Housing programs across 15 U.S. cities, 73% exited to stable housing and 69% were employed or in school upon exit. When youth stayed in transitional housing for at least one year, these percentages increased to 83% and 75% respectively.[53] HUD believes that the provision of structure and quality supportive services driving these outcomes is facilitated in part by the site-based provision of housing that allowed under Transitional Housing and not under Rapid Rehousing.

HUD collects system performance data that tracks outcomes between each of the components of the CoC program. This data indicates that Rapid Rehousing has the highest level of increases in earned income, despite low levels of earned income increases across

[51] Sec. Scott Turner (@secretaryturner), *Social Safety Nets*, Instagram (Apr. 21, 2025), https://www.instagram.com/reel/DIufOe8RHe1/.
[52] Jack Tsai, Alvin S. Mares & Robert A. Rosenheck, *A Multi-Site Comparison of Supported Housing for Chronically Homeless Adults: "Housing First" Versus "Residential Treatment First"*, 7 Psychol. Serv. 219 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC3151537/.
[53] *See* Covenant House Int'l, Nat'l Network for Youth & Sch. House Connection, *supra* note 17, at 23.

all CoC project types. However, HUD finds that differences in performance outcomes are likely to be an artifact of the difference in acuity of needs between participants in Permanent Supportive Housing—where disability is an eligibility requirement—and Rapid Rehousing. By making speed the primary goal, Rapid Rehousing self-selects the easiest to serve populations.

HUD used to support Transitional Housing. In 2010, HUD's PD&R study stated that "Transitional Housing has been an important element of the Department's efforts to respond to the housing needs of homeless families and individuals."[54]

Only three years later, HUD would pivot decisively against Transitional Housing.

HUD finds that the time between 2007 and 2013 (when HUD first started collecting PIT count data and when HUD stopped investing in Transitional Housing) provided only six years to observe the national outcomes of the homelessness response and make a drastic pivot away from Transitional Housing. Now, HUD has two decades of homelessness data and 13 years of data spanning HUD's single-minded investment in Permanent Housing. During those first six years (2007 to 2013), homelessness decreased 8.8%. During the last 23 years (2013 to 2026), homelessness increased 27%,[55] not to mention the other negative outcomes described above. It is well past time for HUD to recognize that funding Transitional Housing is a necessary part of the CoC program.

HUD has carefully considered that, by creating a large set-aside for new TH and SSO projects, renewal projects will be limited. HUD acknowledges that current PSH and RRH renewal projects have historically relied on a near-guarantee of future funding and that a significant investment in new Transitional Housing is likely to impact both existing permanent housing providers and the individuals they serve. HUD has taken numerous steps to provide clarity and guidance that provides a path for both current providers and current participants to maintain funding and assistance under the structure of the NOFO. Again, HUD has organized nearly 40 forums with key stakeholders all over the country and had numerous other discussions with CoC recipients and other homelessness providers. HUD has also issued numerous public statements in national media outlets, social media, and other outlets about HUD's intent to end Housing First and return the program to diverse solutions that incentivize self-sufficiency and recovery. This includes lengthy policy discussion and detailed program requirements contained in the FY25 December NOFO and the forthcoming FY26 NOFO.

[54] U.S. Dep't of Hous. & Urb. Dev., *Life After Transitional Housing* (2010), https://www.huduser.gov/portal/publications/pdf/LifeAfterTransition.pdf
[55] 2025 AHAR.

The NOFO also makes consistent reference to the "transition grant" opportunity. This option, authorized in the FY26 appropriations act, allows existing Permanent Housing renewal grants to transition from one project component to another (i.e., TH or SSO) over the course of a year.[56] While HUD wants to ensure that existing renewal projects have the opportunity to secure funding as a new type of project, HUD also wants to see the applicant pool broadened to first-time recipients. The transition grant opportunity combined with a generous set-aside for new projects balances these competing interests.

HUD has also published guidance on the eligibility and recordkeeping requirements as they relate to individuals moving from permanent housing to transitional housing.[57] HUD acknowledges the concern that current permanent housing residents would not qualify for transitional housing because they do not meet the definition of "literal homelessness."[58] However, such residents may very well meet the definition of "at imminent risk of homelessness." HUD does not construe any of its regulatory requirements to require an individual in permanent housing to sleep on the street for a night in order to be eligible for transitional housing. According to the guidance, residents currently living in permanent housing projects may be eligible for assistance in transitional housing projects. No one should be prohibited from moving from indefinite government assistance to time-limited government assistance. The NOFO consistently promotes and incentivizes reducing unsheltered homelessness and connecting individuals and families to assistance and services that help those who are able recover and regain self-sufficiency. HUD's proposed investment in *a different form of housing assistance* should not change the number of people who can be served with that assistance while it may change who provides the assistance. The FY26 funding available is more than HUD has ever previously made available, and HUD intends to award it in full.

Because of the set-aside for new TH, the NOFO does not include an option for new "joint TH-RRH" projects. The joint TH-RRH project option is not a component described in statute or regulation and adds unnecessary complexity to an already-complex program and NOFO. The NOFO does not impact existing joint projects but rather encourages TH projects.

The NOFO has a set-aside of $104 million for new Domestic Violence (DV) projects (FY26 and FY25 set-aside authorized by appropriation). The appropriations language allows HUD

---

[56] Consolidated Appropriations Act, 2026, Pub. L. 119-75, div. D, tit. II, § 226(a), 140 Stat. 173, 418 (Feb. 3, 2026).
[57] Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., *Program Participants' Eligibility to Move from Permanent Supporting Housing (PSH) / Rapid Re-Housing (RRH) To Transitional Housing (TH)* (2024), https://www.hud.gov/sites/default/files/CPD/documents/CoC/PH-to-TH-guidance.pdf.
[58] U.S. Dep't of Hous. & Urb. Dev., *Category 1: Literally Homeless*, HUD Exch., https://www.hudexchange.info/homelessness-assistance/coc-esg-homeless-eligibility/four-categories/category-1/.

to add eligible projects based on the Secretary's determination of need.[59] The NOFO allows DV Bonus applications for Transitional Housing. In recent years, DV Bonus projects have been limited to Rapid Re-housing and Coordinated Entry. For the population of individuals and families impacted by DV, Transitional Housing is a key tool for providing community and support to recover and regain self-sufficiency in a safe environment. According to the 2025 National Network to End Domestic Violence National Summary, 71% of programs providing services to victims were providing emergency shelter and 39% were providing "Transitional or Other Housing." The majority of unmet requests for services from victims were for "emergency shelter, hotels, motels, transitional housing, and other housing."[60] The Department of Justice Office on Violence Against Women published a report in January 2025 citing "widespread shortages in emergency shelters, transitional housing, and long term affordable housing."[61] The report also points to the need for partnerships with law enforcement and substance abuse programs to "deliver comprehensive, wraparound services" for DV survivors.[62] Clearly, short-to-medium term shelter and housing assistance is critical for DV survivors and their families. The proposed NOFO promotes more types of DV Bonus projects rather than restricting them.

In addition to the unmet need for Transitional Housing expressed by victim service providers, HUD considered the impact of Tier 1 and the set-aside prioritizing new Transitional Housing and SSO projects on applicants for the DV Bonus. Allowing Transitional Housing for DV Bonus projects ensures that DV projects do not face a competitive disadvantage among other CoC projects.

In addition to the considerations above, HUD considered that state or local governments may have to reallocate local resources in order to maintain consistent levels of funding for existing Permanent Housing providers in the CoC. Shifting local funding priorities in response to changes in federal funding is not new to local government. When HUD made its policy shift in 2013, local funding priorities shifted.

HUD is aware that the statutory definition of "homeless" includes individuals and families living in Transitional Housing but not in Rapid Rehousing despite the similarities. Individuals in Transitional Housing are served for a limited period of time before moving out

---

[59] Consolidated Appropriations Act, 2026, Pub. L. 119-75, div. D, tit. II, 140 Stat. 173, 399 (Feb. 3, 2026) (allocating $52,000,000); Consolidated Appropriations Act, 2024, Pub. L. 118-42, div. F, tit. II, 138 Stat. 25, 363 (Mar. 9, 2024) (same).
[60] Nat'l Network to End Domestic Violence, *20th Annual Domestic Violence Counts Report: National Summary* (2026), https://nnedv.org/wp-content/uploads/2026/03/20th-Annual-DV-Counts-Report-National-Summary-FINAL-EN.pdf.
[61] U.S. Dep't of Just., Off. on Violence Against Women, *30 Years of the Violence Against Women Act: A Legacy and Future of Safety and Justice* 14 (2025), https://www.justice.gov/ovw/media/1385701/dl?inline.
[62] *Id.*

of homelessness into self-sufficiency or other assistance. As HUD makes significant investment in Transitional Housing, individuals may move from existing Permanent Housing into Transitional Housing thereby increasing the number of individuals considered homeless. This is, in part, one of the reasons that HUD has chosen to focus on unsheltered homelessness as an indicator of community-wide efforts to reduce homelessness. A well-designed local homelessness system has flow-through, with the number of people in the system staying the same or decreasing. Ultimately, HUD finds that how people are being served by taxpayer dollars is more important than how the government has chosen to count homeless individuals.

HUD has also considered that there may be existing Permanent Housing providers who are not selected in the local CoC competition process due to the priorities of the HUD NOFO, or who are ranked lower by the CoC and do not end up being awarded funding under this NOFO. For those who are heavily reliant on CoC funding, this may result in reductions in capacity or even end the operations of the project entirely. However, for every project that is not selected or awarded, another project will be. HUD has determined that it is important to select projects at the local and federal levels that have merit and the capacity to operate with excellence, rather than continue to fund projects of lesser merit and lesser capacity to operate.

HUD is aware that many providers operate on multi-year timelines. At the same time, HUD knows that communities understand the CoC program is an annual competition. HUD has communicated its shifting priorities for over a year, giving providers sufficient time to adjust their timelines and plan as needed, as described above. HUD will continue, as it has in the past, to incentivize the leveraging of other funding sources so that projects are not fully reliant on federal funding for their existence.

HUD has determined that even though there are existing networks of PSH providers, the competitive opportunity provided in this NOFO will ensure better long term results and stronger relationships within CoCs and with their external partners. Further, the NOFO encourages a wide array of ongoing and new partnerships within communities (e.g., court systems, healthcare providers, family services) that serve to strengthen a true community-wide response to homelessness.

HUD is aware that CoCs that choose to invest in SSO projects over Transitional Housing or other housing-related projects may see a decrease in the number of CoC-funded units. While this is ultimately a matter of CoC choice, HUD finds that the increased investment in Transitional Housing helps alleviate this concern. Transitional Housing is time-limited, allowing for increased throughput and therefore more individuals and families served. Further, SSO projects may help individuals in shelter or on the streets address the

underlying causes of homelessness, facilitating their movement into non-CoC funded permanent housing and increasing availability across CoC-funded units.

HUD is increasing resources available to CoCs. A shift in how and where funding is used, is not necessarily a change in the number of people served. CoCs have significant discretion under the NOFO to balance the types of projects they fund. In any event, HUD is confident that the increased investment in Transitional Housing and SSO projects will increase positive outcomes for individuals and communities. HUD finds that there should be no strain on shelter providers caused by the increased investment in Transitional Housing and services. If anything, the NOFO provides new opportunity for shelter providers to compete for SSO funding or even funding for Transitional Housing, as many shelters operate both emergency shelter and Transitional Housing.

**3. Optimizing Self-Sufficiency through Supportive Services and Treatment and Recovery.**

One of the primary purposes of the CoC Program, as outlined in 42 U.S.C. § 11381, is to optimize self-sufficiency. Through the set-aside for new TH and SSO projects, and the merit review scoring criteria, the NOFO offers CoCs opportunities to prioritize and invest in projects that advance economic independence for those who are able to attain it. HUD recognizes that not every homeless individual or recipient of homelessness assistance will be able to return to self-sufficiency. However, everyone deserves an opportunity. Many of the 745,000 homeless individuals and families and 500,000 more living in housing for the homeless can attain self-sufficiency if given the right tools and support, including those who have experienced chronic homelessness.

**Treatment and Recovery**

According to multiple comprehensive studies and HUD's own Point-In-Time Count data, homeless individuals self-report high rates of substance use disorder (SUD) and mental illness—especially the unsheltered population.[63] Within HUD-funded Permanent Supportive Housing, 41% of adult-only households self-report a SUD. One CoC-funded provider in a large urban setting shared with HUD that 68% of residents in CoC-funded housing have a SUD and 97% have a mental health condition or SUD. The opioid overdose fatality rate increased by more than 1400% among the homeless population in Boston between 2013 and 2018.[64] The homeless population's overdose fatality rate was 12 times

---

[63] Janey Rountree et al., *Health Conditions Among Unsheltered Adults in the U.S.* 5 (2025), https://capolicylab.org/wp-content/uploads/2025/11/Health-Conditions-Among-Unsheltered-Adults-in-the-US.pdf ; UCSF Benioff Homelessness & Housing Initiative, *supra* note 33, at 43.
[64] Caroline Cawley et al., *Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic*, 5 JAMA Network Open e221870 (2022).

higher than the general population in Massachusetts. In Los Angeles County in 2024, the overdose fatality rate among homeless individuals was 46 times higher than among the population at large.[65] The results of ignoring the prevalence of substance use disorder among homeless individuals are deadly. Every substance use disorder is medically treatable.[66]

According to HUD's own data, 19.5% of exits from Permanent Supportive Housing among adults living alone are due to death. Between 2019 and 2022, the share of adults living alone who died in Permanent Supportive Housing increased from 13% of exits to 20%, and the *number* of adults who died increased by 31%.[67] According to reporting on data from the San Francisco Medical Examiner's Office between 2020 and 2025, 23% of overdose deaths in San Francisco occurred inside Permanent Supportive Housing.[68] In the first four months of 2025, the share of overdose deaths in PSH was 30% compared to 20% outdoors and 3.5% in shelter.[69] According to a 2022 study from JAMA, "deaths among people experiencing homelessness in San Francisco more than doubled to 331 deaths during the first year of the COVID-19 pandemic, driven by a large increase in overdose deaths." [70]

The City of Seattle reported a 282% increase in overdose deaths in King County's Permanent Supportive Housing (and other subsidized housing) between 2020 and 2023.[71] The report states that, in 2023, overdose fatalities in King County among those living in Permanent Supportive Housing for the homeless comprised 21% of total overdose fatalities in the County, just 3% less than unsheltered and emergency shelter combined.[72]

A 2023 focus group of residents in Permanent Supportive Housing in New York found that overdose was a significant concern within PSH and "created significant trauma for tenants and staff" and that this was true despite "heterogeneity in PSH buildings' current overdose

---

[65] L.A. Cnty. Dep't of Pub. Health, *Final PEH Report 2026 — Lives Lost: Mortality Trends and Prevention Opportunities for People Experiencing Homelessness in LA County, 2015–2024* 2 (2026), http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2026.pdf.
[66] Nat'l Inst. on Drug Abuse, *Drugs, Brains, and Behavior: The Science of Addiction: Treatment and Recovery* (2020), https://nida.nih.gov/publications/drugs-brains-behavior-science-addiction/treatment-recovery
[67] U.S. Dep't of Hous. & Urb. Dev., *supra* note 44, at 8-8.
[68] Susan Dyer Reynolds, *Housing First, Morgue Second*, The Voice of San Francisco (Aug. 28, 2025), https://thevoicesf.org/housing-first-morgue-second/.
[69] Matt Dorsey on X: "Fatal drug overdoses in Permanent Supportive Housing now account for nearly 1-in-3 of all drug deaths in San Francisco (up from 1-in-5 last year). We need drug-free/recovery options in our PSH portfolio — and @RafaelMandelman and I are working on legislation to accomplish that." / X.
[70] Cawley et al., *supra* note 47.
[71] Seattle Off. of City Auditor, *Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach* (2024), https://www.seattle.gov/documents/departments/cityauditor/auditreports/overdoseandcrimeconcentrationsaudit.pdf.
[72] *Id.*

prevention efforts and adoption of harm reduction principles."[73] The study drew out a subtheme that "tenants using drugs alone behind closed doors was a common factor in overdose deaths."[74]

In 2023, overdoses fatalities in single room occupancies (SROs) or "supportive housing" comprised 10% of all overdose fatalities in New York city, with 13% occurring outdoors and 4% occurring in shelter.[75] Taken together, the data above suggest that overdose fatalities are disproportionately high among homeless individuals and that the PSH environment is more dangerous than shelter settings.[76]

Public reporting has revealed the prevalence of addiction enablement in the name of "harm reduction" within homelessness assistance, and CoC-funded Permanent Supportive Housing in particular.[77] Service providers are known to hand out drug paraphernalia and supervise the use of illicit drugs.[78] Proponents of "harm reduction" argue that lives are saved by supervising drug use, or by providing clean needles and pipes.[79] But while supervision may help reverse an overdose or clean pipe prevent viral infection, its not clear that these practices have actually reduced overdoses and overdose fatalities broadly. In fact, evidence suggests that "safe consumption sites" have had no impact on overdose death rates.[80] Instead, the data above suggests that isolated housing for individuals with SUD and the facilitation of illicit drug use in that housing has only compounded the effects of an opioid crisis.[81] HUD finds that HHS's "Dear Colleague" letter on "harm reduction" accurately delineates true lifesaving care (Narcan, medication disposal boxes) from illicit drug use facilitation (pipes, foil, needles.)[82]

---

[73] Marina Gaeta Gazzola et al., *Understanding Overdose Risk and Response in Permanent Supportive Housing: Results of Focus Groups with Tenants, Staff, and Leaders*, 20 Addiction Science & Clinical Practice 91 (2025), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC12664209/.
[74] *Id.*
[75] N.Y.C. Dep't of Health & Mental Hygiene, Epi Data Brief No. 142, *Unintentional Drug Poisoning (Overdose) Deaths in New York City in 2023* 9 (2024), https://www.nyc.gov/assets/doh/downloads/pdf/epi/databrief142.pdf.
[76] By contrast, data in Los Angeles is limited. When evaluating overdose fatalities among homeless individuals in Los Angeles County, the public health department removed fatalities in Permanent Supportive Housing from their findings. *See* Los Angeles County Department of Public Health, *Final PEH Report 2026—Lives Lost: Mortality Trends and Prevention Opportunities For People Experiencing Homelessness in LA County, 2015-2024* (2026), http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2026.pdf.
[77] Jonathan Choe, *Devastating Conditions Inside Plymouth Housing Expose Tragic Reality*, Fix Homelessness (Feb. 23, 2024), https://fixhomelessness.org/2024/devastating-conditions-inside-plymouth-housing-expose-tragic-reality/.
[78] Tara Campbell, *Rogue Nonprofit Workers Set Up Pop-Up Safe Injection Site in San Francisco Tenderloin*, ABC7 San Francisco (Sept. 15, 2020), https://abc7news.com/san-francisco-tenderloin-safe-injection-site-pop-up/6424213/.
[79] N.C. Harm Reduction Coalition, *Safer Crack Use*, https://www.nchrc.org/about-2/harm-reduction/crack-use/.
[80] Found. for Drug Policy Sols., *Supervised Consumption Sites: Ineffective and Illegal* 3 (2026), https://gooddrugpolicy.org/wp-content/uploads/2026/04/SCS-Report-April-2026.pdf.
[81] Exec. Order No. 14367, *Designating Fentanyl as a Weapon of Mass Destruction*, 3 C.F.R. (2025), https://www.whitehouse.gov/presidential-actions/2025/12/designating-fentanyl-as-a-weapon-of-mass-destruction/.
[82] Substance Abuse and Mental Health Servs. Admin., *Updated Harm Reduction Funding Guidance* (July 23, 2025), https://www.samhsa.gov/sites/default/files/dear-colleague-letter-upated-hr-funding-guidance.pdf.

The NOFO incentivizes CoCs to partner with a wide array of treatment providers to advance treatment and recovery for individuals with a SUD or Serious Mental Illness (SMI). These rating criteria include identifying partnerships with specialty courts and other Assisted Outpatient Treatment (AOT) providers, encouraging the CoC to leverage court orders to advance recovery. It also includes investment and partnerships to provide peer support, counseling, recovery housing, and access to detox support. The NOFO also scores CoCs on their ability to identify barriers to using involuntary commitment as an intervention tool to connect the most hard-to-treat populations with appropriate levels of care.

Proponents of Housing First and "harm reduction" claim that participation in treatment and services must always be voluntary. They argue that treatment that is accepted voluntarily is more effective and leads to better outcomes than mandatory treatment. While HUD is not advancing mandatory treatment in this NOFO generally, there is research that supports the effectiveness of AOT over voluntary treatment. A study in New York found that AOT patients had decreased rates of hospitalization and increased engagement in outpatient treatment.[83] The NOFO does not incentivize, and certainly does not require, treatment requirements across the board. It does incentivize CoCs to use their own PIT count data on the number of individuals who self-report chronic substance abuse to create beds/units dedicated to treatment, in which assistance is conditioned on participation in treatment. CoCs that already have these services and beds in place, or who are willing to create them, indicate to HUD that they are better equipped to serve this subpopulation and optimize self-sufficiency for all subpopulations.

The NOFO advances treatment and recovery by incentivizing CoCs to coordinate with behavioral healthcare providers, provide access to detox beds, invest in on-site treatment provision, create recovery housing, and dedicate units to the purpose of treatment and recovery.

The NOFO also provides bonus points to CoCs whose projects do not permit the use or distribution of illicit drugs on their premises. Critics believe that a restriction on illicit drug use prevents individuals from maintaining housing while in treatment or recovery (including relapse). The data above shows the opposite: enabling drug does not reduce overdose deaths and may contribute to fewer recoveries and more deaths. Further, the NOFO does not create an incentive to require *sobriety* nor to require eviction for first-time violation. Program participants may be at varying stages in their recovery journey, and the taxpayer-funded housing they reside in should support and facilitate that recovery, not enable deadly drug use.

---

[83] Marvin S. Swartz et al., *Assessing Outcomes for Consumers in New York's Assisted Outpatient Treatment Program*, 61 Psychiatric Servs. 976 (2010), https://pubmed.ncbi.nlm.nih.gov/20889634/.

The countervailing argument is that PSH without conditions saves money and stabilizes individuals in order to then provide treatment and services. But HUD finds that, broadly, PSH in practice accomplishes neither of those ends. A comprehensive evaluation of the evidence authored by the National Academies "found no substantial evidence that PSH contributes to improved health outcomes" and that "there is insufficient evidence to demonstrate that the PSH model saves health care costs or is cost effective."[84] Spending on the CoC program alone has more than doubled since 2013, with the vast majority of that spending dedicated to PSH and rapid-rehousing (which is by regulation considered permanent housing). Homelessness has reached record high levels, and overdose deaths inside of PSH units are prevalent. Safety and stability *first* does not require a private, isolated, subsidized apartment unit first.

**Self-Sufficiency**

The CoC program has done a poor job of optimizing self-sufficiency. HUD's data reveals low rates of increased employment income and exits to unsubsidized housing. As of 2023, a median of only 6% of individuals in CoC-funded housing across the nation increased their earned employment income during that reporting period. In comparison, 33% of individuals in CoC-funded housing increased their benefits and welfare income.[85] Nationwide, 76.1% of Permanent Supportive Housing residents are under age 65 and 17.4% under age 18.[86] Yet in Permanent Supportive Housing, only 13.2% of all households exited their housing. Of that percentage, only 12.9%, or 1.7% of total participating households, exited to unsubsidized housing. Nearly twice as many exits were due to death.[87]

One way to advance both recovery and self-sufficiency is through participation requirements. Service participation requirements have been successfully employed in many federal social service programs and have strong bipartisan support. [88]

In accordance with 24 CFR 578.75(h), this NOFO encourages supportive service agreements that meet individual needs and advance individual progress towards self-sufficiency and independent living goals set forth in 42 U.S.C. 11386a(b)(1)(F). This NOFO provides points to CoCs that can demonstrate a significant investment in supportive services and projects that have supportive service participation requirements, because the

[84] Nat'l Acads. of Scis., Eng'g, & Med., *An Evaluation of Permanent Supportive Housing Programs for Homeless Individuals*, Project No. PGA-STS-15-01, https://www.nationalacademies.org/projects/PGA-STS-15-01.
[85] Office of Special Needs Assistance Programs, U.S. Dep't of Housing and Urban Dev., *Continuum of Care (CoC) System Performance Measures Data Since FY 2015* (Excel data file) (2025), https://files.hudexchange.info/resources/documents/System-Performance-Measures-Data.xlsx.
[86] U.S. Dep't of Hous. & Urb. Dev., *supra* note 44, at 8-3.
[87] U.S. Dep't of Hous. & Urb. Dev., *supra* note 44, at 8-8.
[88] Cicero Inst., *National Crime Poll* (2025), https://ciceroinstitute.org/research/national-crime-poll/.

level of supportive service engagement is indicative of a community's ability to provide the services people need in order to regain self-sufficiency and independent living.

It's worth noting that by existing CoC regulation, all current Rapid Rehousing projects already implement a requirement that residents meet with a case manager at least monthly. 24 C.F.R. 578.37(a)(1)(ii)(F). Under the NOFO, this existing regulatory requirement sufficiently meets the incentives for participation requirements.

The NOFO ensures that DV projects must comply with VAWA's anti-discrimination requirements and that DV projects will not be penalized for adequately protecting their DV program participants under 34 USC 12491; 24 CFR 5.2005(b)(1).

HUD considered promoting investment in supportive services aimed at advancing self-sufficiency without incentives to require participation in those services. Opponents of participation requirements argue that participation is more meaningful if the choice to participate is entirely optional. It is certainly the case that individual choice is critical to success. In fact, HUD finds that well-designed participation requirements empower individual choice while pairing it with accountability, which is critical to achieving personal goals. The HUD-VASH program, serving homeless veterans, is an example of housing assistance tied to participation in case management and supportive services.[89] Veteran homelessness is the only subpopulation of homelessness that has seen significant year-over-year decline for the last two decades.[90]

The NOFO includes threshold criteria for new Transitional Housing projects that can describe how they will provide a level of supportive services that facilitates at least 20 hours per week of program participant engagement in services, activities or employment. HUD's intent is to ensure that taxpayer-funded assistance is being utilized effectively to meet the purposes of Transitional Housing—to facilitate movement to Permanent Housing within 24 months. 42 USC 11360. The 20 hours per week was determined by hearing from numerous stakeholders and evaluating the level of services provided at programs with positive outcomes at optimizing self-sufficiency within 24 months. The rating criteria was designed to allow broad flexibility in meeting the criteria. As indicated in the NOFO, "services and activities" can include a wide array of high to low intensity engagement. The rating criteria also clarifies that employment contributes to the 20 hours per week, and that elderly individuals and those with a handicap or developmental disability are not subject to the 20 hours per week. Because of the flexibility of this criteria, Transitional Housing

---

[89] FR-6476-N-01: "As a condition of HCV rental assistance, both tenant-based voucher and PBV, a HUD-VASH eligible veteran must receive the case management services noted above, as needed, directly from or arranged by the VA."
[90] *2024 AHAR Part 1*, *supra* note 40.

applicants in rural areas or other jurisdictions with limited resources should not be disadvantaged.

The NOFO incentivizes CoCs to coordinate and partner in service of specific homelessness subpopulations—families, youth, veterans, chronically homeless, individuals with justice system involvement, and others. The statutory selection criteria direct HUD to measure CoCs based on *the extent to which the recipient will address the needs of all relevant subpopulations*. 42 USC 11386a(b)(1)(B)(iv)(I). HUD finds that robust coordination with partners in the community, both inside and outside of the CoC itself, is indicative of the CoC's ability to promote communitywide commitment to the goal of ending homelessness. 42 USC 11381(1).

HUD has considered that the increased focus on supportive service investment in the NOFO may be difficult to implement in CoCs where existing resources for services are limited. HUD's goal is two-fold—both to see CoCs increase the investment of local resources in supportive services and to increase HUD's investment in supportive services through the CoC Program. The NOFO rating criteria contemplates both non-CoC investment in supportive services and CoC investment in supportive services, and provides points for either, so that CoCs can make investments based on local resources and priorities. In hearing directly from stakeholders, HUD also recognizes that there are many service-rich providers who do not currently receive CoC funding. This NOFO provides opportunities for CoCs to invest in providers that are already operating with high levels of services.

HUD is aware that some states have longstanding state-level Housing First mandates, and that these local laws may create competing obligations for CoC recipients under the NOFO. But every applicant regardless of jurisdiction has the opportunity to compete for and receive funds. HUD cannot accommodate local conditions in a nationwide funding competition—it is up to CoCs to determine the best solutions to ending homelessness within their geographic contexts, which includes applicable state and local law. Further, HUD finds that the benefits of advancing recovery as a means to self-sufficiency across all fifty states outweigh the challenges that applicants in a select few states may face who wish to utilize both local homelessness funding and federal funding.

**4. Safety and the Impact of Homelessness.**

Safety and security for all members of the public, especially those living unsheltered, is essential to promoting a community-wide commitment to the goal of ending homelessness and to minimizing the trauma caused to individuals, families, and communities by homelessness. The McKinney-Vento Act names not just the trauma caused to individuals

and families, but also to “communities”. 42 USC 11381(2). That’s because homelessness does not occur in a vacuum, and its effects—especially unsheltered homelessness in public spaces—impact the entire community.[91] This NOFO encourages CoCs to assist in preventing and minimizing the trauma associated with living on the streets or in encampments and with related public illicit drug use.

The NOFO also puts an increased focus, by way of rating criteria points, on unsheltered homelessness outcomes compared to reductions in sheltered homelessness. The rating criteria provide points both for meaningful, year-over-year reductions in unsheltered homelessness PIT counts (including compared to prior to COVID) and for reductions in homeless encampments. Minimizing trauma caused to families and communities by homelessness is most closely connected to unsheltered homelessness and encampments, where individuals live in dangerous environments and the community faces the impacts of dangerous environments.[92]

Unchecked public camping and public illicit drug use inhibit nonprofit providers and local government from effectively addressing homelessness.

The harms of unchecked encampments and public drug use particularly impact the most vulnerable subpopulations such as children and survivors of domestic violence and trafficking.[93] In 2024, there were 18,557 people in families with children experiencing unsheltered homelessness on a single night in January.[94] These are families with children whose primary nighttime location is somewhere such as a car, the street, a public park, a train station, or an encampment. Data shows that adverse childhood experiences, including lack of housing and exposure to substance abuse, are associated with increased occurrences of homelessness in adulthood.[95]

First responders and law enforcement are often the first to encounter homeless individuals in crisis and should be aware of the available services to triage individuals into safe and appropriate services, ideally alongside non-law enforcement service providers in the

---

[91] Marc Cota-Robles, *Los Angeles Post Office Parking Lot Overrun by Homeless Encampment*, ABC7 Los Angeles (Apr. 2, 2026), https://abc7.com/post/los-angeles-post-office-parking-lot-overrun-homeless-encampment/18826260/.

[92] Nina Joudeh and Jamie Paige, *Deadly Bacteria at a Bay Area Homeless Encampment Sparks Urgent Calls for Action*, N.Y. Post (Jan. 17, 2026), https://nypost.com/2026/01/17/us-news/deadly-bacteria-at-a-bay-area-homeless-encampment-sparks-urgent-calls-for-action/.

[93] Charlie Harger, *This kid’s going to die’: Neighbors say 9-year-old abandoned in tent off Aurora. CPS claims he’s not in danger*, KIRO (Dec. 19, 2025), https://mynorthwest.com/seattles-morning-news/9-year-old-tent-aurora/4174872; Melissa Henry, *‘Prostitution, drugs, human trafficking’: Colorado Springs business owner calls on leaders to address homelessness problems*, KKTV (Nov. 7, 2025), https://www.kktv.com/2025/11/08/prostitution-drugs-human-trafficking-colorado-springs-business-owner-calls-leaders-address-homelessness-problems/.

[94] *2024 AHAR Part 1*, *supra* note 40.

[95] Megan Burgasser, *Adverse Childhood Experiences Tied to Higher Homelessness*, UC News (May 12, 2025), https://www.uc.edu/news/articles/2025/05/adverse-childhood-experiences-tied-to-higher-homelessness.html.

Continuum of Care. Executive Order 14321 § 3 reflects the need for cooperation. This NOFO encourages COCs to work with law enforcement, first responders, and their state and local governments to assist homeless individuals in encampments or suffering from substance abuse to address barriers to maintaining housing and minimize the trauma associated with homelessness. The NOFO provides points to CoCs that cooperate with first responders including law enforcement to protect public safety and connect individuals to services, because law enforcement involvement is indicative of a community-wide effort to reduce homelessness.

According to one report, as unsheltered homelessness increased in King County, gun crimes tied to homeless encampments increased by 122% in just the first six months of 2022. Between 2017 and 2020, 50% of all arrests in Portland, Oregon were of homeless individuals despite the homelessness population comprising only 2% of the total population. According to the same report, drug overdoses were the most common cause of death among homeless individuals in New York City between 2018 and 2021. The number of deaths doubled during that short time period.[96] One recent study indicates that in some states, as many as half of unsheltered homeless individuals are registered sex offenders.[97]

None of the realities above suggest that the entire homeless population is engaged in criminal or illicit activity despite significant disproportionality, nor that those are cannot be rehabilitated. Data also indicates that homeless individuals are victims of crime at higher rates than the general public.[98] Gun violence in encampments, fatal drug overdoses on the streets, and sexual assault in encampments all perpetuate harm and trauma to homeless individuals and families. Tragically, the violence and harm are so commonplace that outreach providers are left to consider the discovery of human remains in encampments an “expectation.”[99]

Public camping and public illicit drug use go hand in hand. “Open air drug markets” threaten public safety and hurt residents, tourists, and local businesses, not to mention

---

[96] Megan Burgasser, *Adverse Childhood Experiences Tied to Higher Homelessness*, UC News (May 12, 2025), https://www.uc.edu/news/articles/2025/05/adverse-childhood-experiences-tied-to-higher-homelessness.html, at 4.
[97] Cicero Inst., *Sex Offenders: An Overlooked but Significant Subpopulation of the Homeless* (2024), https://ciceroinstitute.org/research/sex-offenders-an-overlooked-but-significant-subpopulation-of-the-homeless/.
[98] San Diego Cnty. Dist. Att'y, *DA Shares First-of-Its Kind Crime Data, Proposes Three-Point Plan to Address Intersection of Crime and Homelessness* (Mar. 21, 2022), https://www.sdcda.org/content/MediaRelease/Homeless%20Data%20and%20Plan%20News%20Release%20FINAL%203-21-22.pdf.
[99] Frank Sumrall, *Volunteer Group Finds Human Remains in Seattle Park: ‘It’s Now an Expectation’*, MyNorthwest (Jan. 9, 2024), https://mynorthwest.com/local/volunteer-group-human-remains-seattle-park-its-now-an-expectation/3947793.

perpetuate harm to the individuals caught in the cycle of addiction.[100] Recently, San Francisco Supervisor Matt Dorsey gave a voice to this reality:[101]

> *"Nothing that we are doing as a city to enable or tolerate public drug use is helping anybody. Not our neighborhoods, not our businesses, not our economy. But least of all, not anybody on the streets at the end of the rope addicted to a drug like fentanyl."*

While research on the effects on illicit drug decriminalization is unclear, what is clear is that permissive policies towards drug use have not led to a decrease in overdose fatalities in America. Decriminalization advocates rest their case on the premise that law enforcement involvement increases overdose deaths and hinders treatment, but as Charles Fain Lehman puts in, the data simply does not support this premise:

> *The argument for decriminalization, after all, wasn't merely that it would have no effect on public health and order. It was that policing drug possession substantially contributed to overdose deaths and other drug-related harms by discouraging people from seeking treatment for fear of legal consequences and by putting them in situations (jail, i.e.) where they would lose tolerance, leading to a fatal overdose. If the evidence is split between "did nothing" and "made things worse," there is almost no reason to conclude that decriminalization made the Pacific Northwest's situation better than it was before decriminalization.*[102]

Critics of law enforcement involvement in homelessness and efforts to reduce encampments and public drug use accuse those in favor of "criminalizing" homelessness. But law enforcement involvement can be a positive first step towards assistance, and communities that prioritize safety in public spaces minimize trauma instead of perpetuating harm. The goal of the NOFO's focus on encampments, illicit drug use, and law enforcement involvement is not to jail, fine, or endlessly move unsheltered individuals. None of those things on their own reduces homelessness or provides necessary services. Rather, public safety tools and interventions create additional entry-points to services and care. It is clear that encampments and environments fueled by public illicit drug use are

---

[100] Makenna Marks, *Open-Air Drug Market in Downtown Portland Hurting Local Businesses*, KPTV FOX 12 Oregon (Nov. 22, 2024), https://www.kptv.com/2024/11/22/open-air-drug-market-downtown-portland-hurting-local-businesses/.
[101] Lyanne Melendez, *Fentanyl Crisis: San Francisco Looks to Bring in Expert Drug Market Intervention Strategies with Help of New Nonprofit Funding*, ABC7 News Bay Area (2026), https://abc7news.com/post/fentanyl-crisis-san-francisco-looks-bring-expert-drug-market-intervention-strategies-nonprofit-funding/18397189/.
[102] Charles Fain Lehman, *Did Drug Decriminalization Increase Overdoses?*, The Causal Fallacy (2024), https://thecausalfallacy.com/p/did-drug-decriminalization-increase; Charles Fain Lehman, *Why Drug Decriminalization Failed*, Public (2024), https://www.public.news/p/why-drug-decriminalization-failed.

inherently unsafe. HUD finds that advancing public safety by addressing these realities is critical to minimizing trauma caused to individuals, families, and the community.

Well-designed approaches to disincentive public camping result in treatment and shelter beds filled, not jail cells. Under the Safer Kentucky Act passed in 2024, 92% of unlawful camping charges filed in the first year were non-jailable first offenses.[103] These engagements were opportunities for the provision of services, not efforts to incarcerate. According to one report, 150 cities in 32 states have passed ordinances banning or restricting public camping with California having the largest share.[104] As Devon Kurtz puts it, restrictions on public camping are a tool to match individual needs with appropriate levels of care:[105]

> *When cities ban street camping, local courts often set up specialized dockets that focus on homelessness. These dockets, commonly known as "homeless courts," help disentangle vulnerable people (who are often both victims and perpetrators of crimes) from the criminal justice system. Not all homeless people would participate in this program; it would engage only those who have broken the law. Not all homeless people who break the law would be eligible, either. These courts have considerable discretion to match people who are primarily homeless and secondarily criminals with support while ensuring that those who are primarily criminals and secondarily homeless are held fully responsible for their crimes.*

The public is supportive of policies that advance public safety related to homelessness. According to national polling in 2025, there is strong bipartisan support for public camping bans and stricter enforcement of drug laws, with 75% of voters in favor of "moving individuals into shelters over allowing camping," and in 2024, 60% of voters were in favor of "stricter drug enforcement near service providers, including penalties for facilities permitting drug activity."[106]

Advancing public safety policies has been shown to decrease homelessness. Two years after the City of Austin reinstated a ban on public camping, unsheltered homelessness

---

[103] Paul Webster and Caleb Jacobs, *Safer KY Act isn't cruel. It's a solution that's working. | Opinion*, Courier Journal (Mar. 24, 2026), https://www.courier-journal.com/story/opinion/contributors/2026/03/24/safer-kentucky-act-homelessness-camping-ban-jail-law-enforcement/89199931007/?gnt-cfr=1&gca-cat=p&gca-uir=false&gca-epti=z1188xxp002450n11----l115650c11----e1188xxv003344&gca-ft=142&gca-ds=sophi

[104] Robbie Sequeira, *Many More Cities Ban Sleeping Outside, Despite a Lack of Shelter Space*, Stateline (Jan. 27, 2025), https://stateline.org/2025/01/27/many-more-cities-ban-sleeping-outside-despite-a-lack-of-shelter-space/.

[105] Devon Kurtz, *With Louisiana Homeless Bill, Democrats Once Again Smear Sensible Policy as Jim Crow*, The Federalist (Apr. 27, 2026), https://thefederalist.com/2026/04/27/with-louisiana-homeless-bill-democrats-once-again-smear-sensible-policy-as-jim-crow/.

[106] Cicero Inst., *National Crime Poll* (Oct. 2025), https://ciceroinstitute.org/research/national-crime-poll/.

decreased by one-third.[107] Several years after Colorado Springs restricted public camping near creeks and waterways, unsheltered homelessness decreased by 19%.[108] In March this year, Anchorage leaders announced no major homeless encampments for the first time in over ten years pointing to “a policy choice” to “pair public safety, outreach, shelter access, housing placement, and behavioral health investment.”[109]

Firefighters, EMTs, police officers, and co-response social workers and clinicians play a crucial role in meeting individuals where they are in the midst of a mental health or addiction crisis. By providing emergency services, first responders often witness and respond to the impacts of encampments and public drug use in a way that service providers simply do not. Further, first responders witness and respond to the impact of homelessness on non-homeless members of the community.[110] Service providers do not. Research on co-response is evolving, but early adoption in cities like Seattle has had positive results.[111] For these reasons, HUD acknowledges the critical role of first responders in reducing homelessness and mitigating trauma caused by homelessness. The proposed NOFO encourages partnership with first responders, including by representation on the CoC’s governing board.

HUD also finds that organizations that operate so-called “safe consumption sites” for illicit drugs, knowingly permit the use or distribution of illicit drugs on property under their control, distribute drug paraphernalia, or otherwise assist individuals in consuming illicit drugs in the name of “harm reduction” are not only potentially violating criminal federal law (21 U.S.C. 856, 863). Such providers are also perpetuating root causes of homelessness, entrenching barriers to housing stability, and putting vulnerable residents at risk of harm to health and even loss of life. As discussed above, there is data showing a disproportionate rate of fatal overdose inside of Permanent Supportive Housing units, including HUD-funded

---

[107] Katy McAfee, Ben Thompson, *Austin’s Homeless Population Dispersing After 2 Years of Camping Ban Enforcement*, Community Impact (May 25, 2023), https://communityimpact.com/austin/central-austin/city-county/2023/05/25/austins-homeless-population-dispersing-after-2-years-of-camping-ban-enforcement/.
[108] Brief of Amicus Curiae Cicero Institute in Support of Petitioner at 14, City of Grants Pass v. Johnson, 603 U.S. 643 (2024) (No. 23-175).
[109] Anchorage Assembly, *Chair Constant Statement on Homelessness Milestone* (Mar. 3, 2026), https://www.muni.org/Departments/Assembly/PressReleases/Pages/Chair-Constant-Statement-on-Homelessness-Milestone.aspx.
[110] Bonny Chu, *Horror Video Captures Repeat Offender Allegedly Attacking 75-Year-Old Woman, Gouging Her Eye With Spiked Stick*, Fox News (May 24, 2026), https://www.foxnews.com/us/horror-video-captures-repeat-offender-allegedly-attacking-75-year-old-woman-gouging-her-eye-spiked-stick.
[111] Acad. Training to Inform Police Responses, *Assessing the Impact of Co-Responder Team Programs: A Review of Research*, Office of Justice Programs (Mar. 2021), https://www.ojp.gov/library/publications/assessing-impact-co-responder-team-programs-review-research; Matthew J. Teti et al., *PROTOCOL: Co-Responding Police-Mental Health Programs and the Impact on Justice and Social Service Outcomes: A Systematic Review*, 21 Campbell Systematic Reviews e70051 (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12230866/; Nat’l League of Cities, *Seattle, WA: Community Response Model* (June 30, 2025), https://www.nlc.org/resource/seattle-wa-community-response-model/.

PSH. Individuals in recovery or working towards sobriety deserve safe living environments that do not immerse them in behavior and surroundings that are counter to recovery. HUD has heard from individuals with lived experience in recovery and from providers, that living environments must be conducive to recovery rather than threatening. Asking applicants, new and renewal, to certify compliance with 21 USC 856 and 863 ensures that funding is utilized to reduce homelessness, not subsidize fatal substance abuse.

HUD acknowledges that for many current CoC recipients, certification of compliance with federal law on Drug Involved Premises may constitute a significant shift away from their core philosophy of operation. However, HUD's position on Drug Involved Premises has been clear to the public both in Executive Order 14321 and prior communications to grantees.[112] Further, HUD finds that there are many homelessness providers that are not currently CoC recipients who operate housing and services that provide safe, drug-free environments. For current providers who are not willing to certify to compliance with federal law, new providers who are willing are welcomed by HUD in their place.

It is important to note that nothing in the NOFO advantages applicants on the basis of location or local law. Instead, the NOFO asks CoCs to share how they intend to overcome impediments or leverage existing capabilities to further safety and connection to assistance for hard-to-reach homeless populations. HUD intends to prioritize federal funding on homelessness where there is good reason to believe it will be most effective, and for the reasons described above, that includes evaluating the status of encampments and public drug use and asking applicants to certify adherence to federal law and not impede law enforcement efforts.

## RATIONALE FOR ADDITIONAL ELEMENTS OF THE NOFO

### 1. Streamlining the CoC Program for More Effective Use of Funding

The NOFO provides bonus points for CoCs that are Unified Funding Agencies (UFAs) or CoCs that merged in the most recent registration period. In previous NOFOs, HUD has awarded bonus points for merged CoCs to encourage the creation of high-capacity CoCs. There are nearly 400 CoCs across the nation with varying levels of capacity, and merging into higher performing CoCs increases effectiveness. HUD also finds that UFAs improve effectiveness and safeguard taxpayer funding. UFAs enter into a single grant agreement for all the projects in the geographic area and are held by HUD to a higher standard of financial control and capacity. 24 CFR 578.11. For these reasons, HUD is encouraging the formation

[112] Stakeholder listserv message announcing the FY25 CoC NOFO explicitly referenced 21 USC 856.

of UFAs and the merging of CoCs to streamline the CoC program and ensure the most effective use of funding.

**2. Accountability to Taxpayers**

HUD finds that the structure of the CoC program at times circumvents local elected officials and therefore direct accountability to taxpayers at the local level. HUD has heard from stakeholders that local governing bodies and elected officials often have no authority, or even influence, over the utilization of federal homelessness funding. The NOFO includes rating criteria points for CoCs with governing boards that include elected officials. HUD is aware that, historically, there has been no such incentive for CoCs to involve elected officials in decision-making. However, similar criteria was included in last year's NOFO, giving CoCs ample time to make additions to their governing boards.

**3. Compliance with Federal Anti-Discrimination Law**

HUD has found that CoC-funded homelessness providers have prioritized assistance and contracts on the basis of race.[113] HUD acknowledges that under previous Administrations, racial preferences were allowed or even encouraged.[114] The NOFO requires applicants to certify to compliance with federal law prohibiting illegal discrimination, including illegal racial discrimination.

The NOFO states that HUD will not penalize recipients for adherence to prior year grant terms and conditions.

**4. Protecting Religious Liberty**

The NOFO provides a "level playing field" for faith-based organizations to compete for CoC funding and participate in the community-wide efforts of their local CoCs. Faith-based organizations first served the nation's homelessness population long before the Federal government was ever involved.[115]

In recent years, the mandate to abide by Housing First has excluded numerous faith-based service providers from even applying to receive CoC funding. Many faith-based homelessness programs require participation in services as a condition of assistance, and these requirements are central to their philosophy of ministry and operation. Some faith-based organizations have reported subrecipient grant conditions imposed at the local level

---

[113] Aaron Sibarium, *EXCLUSIVE: In Cities Across America, Homeless Services Are Doled Out Based on Race and Sexual Identity*, Wash. Free Beacon (Apr. 29, 2026), https://freebeacon.com/america/exclusive-in-cities-across-america-homeless-services-are-doled-out-based-on-race-and-sexual-identity/.
[114] The FY24-25 CoC NOFO required CoCs to affirmatively market assistance to "Black and Brown persons or communities."
[115] *History of The Salvation Army*, Salvation Army USA, https://www.salvationarmyusa.org/about-us/our-history/.

that prohibit co-religionist hiring practices. Promoting equal access for faith-based organizations directly advances the goals of the CoC program by increasing the number and diversity of program providers and increasing overall competition for CoC funds.

**5. Timing**

Congress directed HUD to publish the NOFO by June 1 and announce awards by December 1. In order to provide ample time both for CoCs to solicit and prepare applications and for HUD to sufficiently review applications, the NOFO has an application submission deadline of August 26, 2026. HUD recognizes that a regular competition cadence is beneficial for stakeholders and for HUD. Barring litigation outcomes or congressional directive, HUD intends to follow a June 1/December 1 timeline for remaining CoC competitions during this Administration.

**6. Award Transfers**

Finally, the NOFO puts careful guardrails around the transfer of awards, a type of transfer not contemplated by 24 CFR part 578. HUD is cognizant that the award-transfer process can be used to circumvent the competitive process. HUD's operating procedure for the transfer of CoC awards prior to grant agreement execution was only developed in recent years. HUD recognizes that there are certain circumstances in which changes happen to a previous year grant agreement that necessitate a correction to an CoC award prior to grant agreement execution. The NOFO carefully lays out these specific circumstances and acknowledges that HUD maintains sole discretion on the transfers of awards outside of these explicit circumstances. By providing this information in the NOFO, HUD is ensuring that CoCs and project applicants have ample time to put forward applications that the recipient fully intends to implement and is capable of doing so. At the same time, HUD is also providing clarity around how it treats transfer requests to ensure appropriate use of funding. HUD encourages CoCs in the NOFO to utilize the reallocation process to ensure that funding is going to projects with the capacity to operate in compliance with program requirements.

**7. Weighing Options for Funding Structure**

HUD weighed various options for the funding structure of the NOFO. The funding structure—weighing bonus amounts, types of new projects, and share of renewals—is the most impactful aspect of the CoC NOFO. As discussed above, the CoC NOFO had consistently set Tier 1 at upwards of 85% of CoC Annual Renewal Demand (ARD) and recently prohibited any new Transitional Housing or SSO projects except for Coordinated Entry projects.

Congressional appropriations for this year requires HUD to award at least 60% of each CoC's Annual Renewal Demand based on the ranking determined by the CoC. HUD finds that setting Tier 1 no higher than 60% accomplishes the competitive aims discussed above. HUD considered renewing projects across Tier 1 and Tier 2 at a level consistent with past years. Given that only 3.5% of FY24 funding went towards new projects and 88% went to a form of permanent housing, HUD believes pursuing this funding structure would maintain similar levels of renewal projects and project type, both of which are counter to the benefits of competition, new projects, and a balance of projects discussed above.

HUD considered creating a set-aside for new Permanent Housing reflective of the December 2025 CoC NOFO. However, given the Tier 1 level set by Congress and the high percentage of existing Permanent Housing renewal projects, this option would squeeze out almost any opportunity for new TH and SSO projects, critical to ensuring a diverse set of solutions, optimizing self-sufficiency, and creating meaningful reductions in homelessness.

Consistent with the practice in recent years and with the McKinney-Vento Act, HUD decided to rely on the suspension clause of 42 USC 11386b(a) by making funding available for existing projects at a level that obviates the feasibility of a set-aside for new permanent housing.

In order to balance assurance of funding with healthy competition and a significant investment in project types that rebalance the Continuum of Care and optimize self-sufficiency as described in detail in earlier sections of this memo, HUD decided to create a set-aside for new projects with a preference for Transitional Housing and SSO projects of $1.30 billion (32 percent of the total funding).

Due to the increased level of competition, the NOFO also creates a generous "bonus" opportunity for CoCs to apply for projects in excess of their Final Pro Rata Need (FPRN). The proposed bonus amount is 15% of the CoC's FPRN with limitations that provide the majority of CoCs a minimum amount of $500,000 and a maximum amount of $5,000,000.[116] The limitations prevent the unnecessary incentivization of CoCs splitting to create more, smaller CoCs or the dis-incentivization of CoCs merging. Setting the bonus amount at a percentage of FPRN without a floor and ceiling, as was done in the past, skews bonus awards to be made not on merit but rather on the existing resources of the CoC. This allowed large CoCs to increase their ARD due to bonus awards, with the increase in ARD and bonus opportunity compounding year over year.

[116] The exceptions are for CoCs that recently split ($250,000 minimum) and CoCs that recently merged ($10,000,000 maximum.)

While Tier 1 project selections are not evaluated on merit, Tier 2 project selections apply a limited remainder of funding to a pool of project applications that exceed that funding. For this reason, the proportion of the limited remainder of funding that a particular CoC is eligible to apply for in bonus funding is a crucial detail. The more bonus funding a CoC has, the larger their share of the pool of project applications becomes and the more likely they are to be awarded those projects.

But bonus funding amount does not derive from CoC performance, merit, or outcomes—at least not in any direct way. Instead, it's a measure of the existing volume of resources that the CoC has. This preference in prior years for existing capacity and resources has stifled true competition based on merit and minimized the ability of small CoCs to increase their resources. Given these factors, HUD finds that the loss of bonus funding to a small number of CoCs due to a ceiling is outweighed by the more level playing field created as a result.

In recent years, HUD has requested from Congress the use of recaptured Section 231 funds to supplement the funding available in the CoC NOFO. HUD has significant discretion on the use of Section 231 funds under both the Emergency Solutions Grant (ESG) program and the CoC program. HUD considered utilizing a portion of Section 231 funds for the FY26 CoC NOFO. HUD also considered that Section 231 authorizes a narrow set of rural eligible activities for a small set of grants that are not otherwise authorized under the NOFO. HUD decided that the benefits of utilizing the full balance of Section 231 funds at a later date to provide targeted funding outweighed the downsides of lowering ARD amounts across the board by a small percentage and limiting eligible activities to the standard CoC eligible activities for a small number of grants. HUD finds that this downside is mitigated by the set-aside for new projects, which are not reliant on renewal demand, including the impacts of Fair Market Rent (FMR) increases and Cost of Living Adjustments—both of which are used to calculate an updated CoC ARD each year.



U.S. Department of Housing and Urban Development

# FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO

CPD-2600-DC-0025

Applications are due by 8:00 PM Eastern Time on 08/26/2026.

Community Planning and Development

# TABLE OF CONTENTS


**I. BASIC INFORMATION ........................................ 5**
A. Summary ........................................ 5
B. Agency Contact(s) ........................................ 7
**II. ELIGIBILITY ........................................ 9**
A. Eligible Applicants ........................................ 9
B. Eligible Applications ........................................ 11
C. Cost Sharing or Matching ........................................ 26
**III. PROGRAM DESCRIPTION ........................................ 28**
A. Purpose ........................................ 28
B. Goals and Objectives ........................................ 28
C. Authority ........................................ 34
D. Unallowable Costs ........................................ 35
E. Indirect Costs ........................................ 35
F. Program History ........................................ 35
G. Other Information ........................................ 38
**IV. APPLICATION CONTENTS AND FORMAT ..... 44**
A. Standard Forms, Assurances, and Certifications 44
B. Budget ........................................ 46
C. Narratives and Other Attachments ........................................ 54
D. Other Application Content ........................................ 54
**V. APPLICATION REVIEW INFORMATION .......... 58**
A. Threshold Review ........................................ 58
B. Merit Review ........................................ 69
C. Risk Review ........................................ 86
D. Selection Process ........................................ 87
E. Award Notices ........................................ 94
**VI. SUBMISSION REQUIREMENTS AND DEADLINES ........................................ 96**
A. Deadlines ........................................ 96
B. Submission Methods ........................................ 97
C. Other Submission Information ........................................ 102
D. False Statements ........................................ 102
**VII. POST-AWARD REQUIREMENTS AND ADMINISTRATION ........................................ 106**
A. Administrative, National and Departmental Policy Requirements, and General Terms and Conditions ........................................ 106
B. Environmental Requirements ........................................ 108
C. Remedies for Noncompliance ........................................ 110
D. Reporting ........................................ 110
**VIII. CONTACT AND SUPPORT ........................................ 115**
A. Agency Contact ........................................ 115
B. esnaps.hud.gov ........................................ 116
C. SAM.gov ........................................ 116
D. Debriefing and Appeals ........................................ 116
E. Applicant Experience Survey ........................................ 121
F. Other Online Resources ........................................ 121
**APPENDIX ........................................ 123**
Appendix I. Definitions ........................................ 123

# BEFORE YOU BEGIN

If you are a good candidate for this funding opportunity, register in the required systems and review the application materials. If you are already registered, confirm that your information is current and active.

### SAM.gov Registration

You must have an active and up-to-date account with SAM.gov, at the time of application and throughout the life of any award.

To register, go to SAM.gov Entity Registration and click Get Started. From the same page, you can also click the Entity Registration Checklist for the information you will need to register.

It can take several weeks to register in SAM.gov, so get started now if you are planning to apply. SAM.gov also provides each organization with a unique entity identifier (UEI). A valid UEI is required to apply for funding.

### esnaps.hud.gov Registration

You must have an active esnaps.hud.gov account to submit your application. See step-by-step instructions at the CoC Registration and Competition home page.

See Section VI.B. Submission Methods.

### Find the Application Package

Use the Grants Search at Grants.gov and search for opportunity number CPD-2600-DC-0025 . The application package has all the online forms you need to apply. You also need to access the Download Instructions link and review the content before you apply.

If you have other technical difficulties using Grants.gov, contact the Support Center on Grants.gov.

To get updates on changes to this notice of funding opportunity (NOFO), click Subscribe from the View Grant Opportunity page on Grants.gov.

**Application Deadline**
Applications are due by 8:00 PM Eastern Time on 08/26/2026.
See Section VI.A. of this NOFO.

**HUD Listserv**
To get **email alerts** about current and future funding opportunities, **subscribe** to HUD's Funding Opportunities listserv.

# I. BASIC INFORMATION

I. Basic Information

A. Summary

B. Agency Contact(s)

TABLE OF CONTENTS

# I. BASIC INFORMATION

See Contact and Support section of this NOFO.

## A. Summary

**Federal Agency Name:**
United States Department of Housing and Urban Development (HUD)

**HUD Program Office:**

Community Planning and Development

**Announcement Type:**

Initial

**Program Type:**

Discretionary

**Paperwork Reduction Act Information:**

2506-0044

**Due Date for Intergovernmental Review:**

See Section VI.C.1.

**Key Facts**

**Opportunity Name:**
FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO

**Opportunity Number:**
CPD-2600-DC-0025

**Federal Assistance Listing(s):**
14.267

**Key Dates**

**Application Due Date: 8:00:00 PM Eastern Time on:**
08/26/2026

**Anticipated Award Date:**
12/01/2026

**Estimated Performance Period Start Date:**
01/01/2027

**Estimated Performance Period End Date:**
12/31/2027

### 1. NOFO Summary

The Continuum of Care (CoC) Program is a national competition between geographic areas designed to:

- promote a community-wide commitment to the goal of ending homelessness;

- provide funding for efforts by nonprofit providers, States, Indian Tribes or Tribally Designated Housing Entities [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)], and local governments to quickly rehouse homeless individuals and families, persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, and homeless youth while minimizing the trauma and dislocation caused by homelessness;
- promote access to, and effective utilization of, mainstream programs and programs funded with State or local resources; and
- optimize self-sufficiency among homeless individuals and families.

Self-sufficiency, consistent with the purposes of the McKinney-Vento Act, 42 U.S.C. § 11381(4), means the ability to meet basic needs, including a place to live, without public or private assistance. This is consistent with dictionary definitions of the term. The Oxford English Dictionary defines *self-sufficiency* as the "state or condition of not needing or relying on external assistance, support, or aid." Similarly, Merriam-Webster defines *self-sufficient* as "able to maintain oneself or itself without outside aid: capable of providing for one's own needs."

The goal of the Youth Homelessness Demonstration Program (YHDP) is to support the development and implementation of a coordinated community approach to preventing and ending youth homelessness and sharing that experience with and mobilizing communities around the country toward the same end. The population to be served by the demonstration program is homeless youth ages 24 and younger, including unaccompanied and pregnant or parenting youth.

## 2. Funding Details

### Type of Funding Instrument

G (Grant)

### Available Funds

Funding of approximately **$4,040,000,000** is available through this NOFO.

Additional funds may become available for award. Use of these funds is subject to statutory constraints. All awards are subject to the selection process contained in this NOFO.

On February 3, 2026, the President signed H.R. 7148 authorizing the Consolidated Appropriations Act, 2026 (Public Law 119-75) which makes approximately $4,010,000,000 in CoC Program funding available.

Of the $4,010,000,000, HUD is making available at least $52,000,000 for Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus) projects.

Additionally, HUD is making available approximately $52,000,000 in funding from the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4) for Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus) projects, described in section II.B.3.eof this NOFO. HUD reserves the right to use the earliest available

fiscal year funds for projects that are able to meet the FY 2025 CoC DV Bonus obligation deadline (September 30, 2027), so long as the total amount awarded for each DV Bonus project is consistent with the funding process outlined in V.D3.d.

HUD may add to the total amount with available funds that have been carried over or recaptured from previous fiscal years. All requirements in the FY 2026 application process, including requirements for the entire CoC Consolidated Application and the total amount of funds available, are included in this NOFO.

### Estimated Number of Awards

7000 awards from available funding

**Length of Performance Period:**

12-month project period and budget period

18-month project period and budget period

24-month project period and budget period

36-month project period and budget period

42-month project period and budget period

48-month project period and budget period

60-month project period and budget period

Length of Periods Explanation:

## B. Agency Contact(s)

See Contact and Support section of this NOFO.

Case: 26-1923 Document: 00118495633 Page: 155 Date Filed: 08/21/2026 Entry ID: 6836472



# II. ELIGIBILITY

II. Eligibility

A. Eligible Applicants

B. Eligible Applications

C. Cost Sharing or Matching

TABLE OF CONTENTS

# II. ELIGIBILITY

## A. Eligible Applicants

If your organization is not an eligible applicant, your application won't be reviewed or scored, and you won't receive funding from HUD.

### 1. Eligible Entity Types:

00 (State governments)

01 (County governments)

02 (City or township governments)

04 (Special district governments)

06 (Public and State controlled institutions of higher education)

07 (Native American tribal governments (Federally recognized))

08 (Public housing authorities/Indian housing authorities)

11 (Native American tribal organizations (other than Federally recognized tribal governments))

12 (Nonprofits having a 501(c)(3) status with the IRS, other than institutions of higher education)

Additional Information on Eligibility

You cannot apply as an individual.

For-profit entities are not eligible to apply for grants or to be subrecipients of grant funds.

To be eligible for funding under the FY 2026 Continuum of Care and Youth Homelessness Demonstration Program Grants NOFO, project applicants must meet all statutory and regulatory requirements in the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act) and the CoC Program Rule found in 24 CFR part 578 (the Rule).

Project applicants can obtain a copy of the Act and the Rule on HUD's website or by contacting the NOFO Information Center at 1-800-483-8929. Individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities may visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs for more information on how to make an accessible telephone call to HUD.

A faith-based organization may apply on the same basis as any other organization, subject to the requirements in 24 CFR 5.109, and receive the full protections for religion in Federal law, including the Free Speech and Free Exercise Clauses of the Constitution, the Religious Freedom Restoration Act (42 U.S.C. § 2000bb-1), Title VII of the Civil Rights Act (42 U.S.C. §§ 2000e-1(a), 2000e-2(e), and the Americans with Disabilities Act (42 U.S.C. § 12113(d)). HUD does not engage in any unlawful and improper conduct, policies, or practices that target faith-based organizations.

An organization may seek a religious accommodation from any requirements of this program or other HUD requirement that substantially burden its religious exercise under the Religious

Freedom Restoration Act or other applicable law, consistent with 24 CFR 5.109(c). If such an accommodation is requested, HUD will not deny the organization unless it determines that doing so is necessary to further a compelling governmental interest and is the least restrictive means of achieving that interest, consistent with applicable law.

Faith-based organizations may also hire, fire, and make other employment decisions on the basis of their sincerely held religious beliefs, including requiring employees to adhere to religious tenets, practices, and standards of conduct, without jeopardizing their eligibility to receive HUD funds, consistent with applicable law.

A faith-based organization may not use direct financial assistance from HUD to support or engage in any explicitly religious activities except where consistent with the Free Exercise Clause and Establishment Clause of the First Amendment, the Religious Freedom Restoration Act, and any other legal protections for religious exercise. Such an organization also may not, in providing services funded by HUD, or in their outreach activities related to such services, discriminate against a program beneficiary or prospective program beneficiary on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.

## 2. Restrictions

### a. Statutory and Regulatory Requirements

You must meet the current General Statutory and Regulatory Eligibility Requirements. If you do not meet these requirements, your application won't be scored, and you won't receive funding from HUD. This is a threshold requirement for all HUD funding.

### b. Resolution of Civil Rights Matters

If you have any outstanding or unresolved judgments for violating civil rights laws, you must settle them before you apply. If you don't, settle the civil rights law violations before you apply, your application won't be scored, and you won't receive funding from HUD. This is a threshold requirement for all HUD funding.

Applicants with outstanding, unresolved judgments against them for violations of civil rights laws must resolve those judgments before the application submission deadline or the applicant will be deemed ineligible.

**(1)** An applicant is ineligible for funding if the applicant has received notice of a judgment imposed against them for violations of:

**(a)** the Fair Housing Act or a substantially equivalent state or local fair housing law for discrimination because of race, color, religion, sex, national origin, disability or familial status; or

**(b)** Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Section 109 of the Housing and Community Development Act of 1974, the Americans with Disabilities Act, or the Violence Against Women Act or substantially equivalent state or local laws.

**(2)** HUD will determine if actions to resolve the judgment taken before the application deadline date will resolve the matter. Examples of actions that may be sufficient to

resolve the matter include, but are not limited to:

**(a)** Current compliance with a voluntary compliance agreement signed by all the parties;

**(b)** Current compliance with a HUD-approved conciliation agreement signed by all the parties;

**(c)** Current compliance with a conciliation agreement signed by all the parties and approved by the state governmental or local administrative agency with jurisdiction over the matter;

**(d)** Current compliance with a consent order or consent decree; or

**(e)** Current compliance with a final judicial ruling or administrative ruling or decision.

## B. Eligible Applications

1. An application from an eligible entity is considered for funding if it meets basic threshold requirements and passes merit review.

2. Your application must support the goals of this NOFO.

**3.** The following types of project applications will be eligible for completion and submission under this NOFO.

**a. *CoC Planning projects.*** All Collaborative Applicants are eligible and encouraged to apply for CoC Planning funds which they may use according to 24 CFR 578.39. CoC Planning project applications must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. Planning projects will not affect a CoC's available amount for new and renewal project applications because it is not included in the CoC's ARD calculation.

**b. *UFA Costs projects.*** Only those CoC-designated Collaborative Applicants approved for UFA designation by HUD are eligible to apply for UFA Costs project funds as described in 24 CFR 578.41. UFA Costs project applications must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. UFA Costs projects will not affect a CoC's available amount for new and renewal project applications as it is not included in the CoC's ARD calculation.

**c. *CoC Bonus Project.*** The CoC Bonus allows CoCs to use up to 15 percent of their Final Pro Rata Need (FPRN) to create one or more new project applications with the following limitations:

**(1)** The CoC Bonus amount for a Split CoC that is not a New Tribal CoC will be no less than $250,000 and no more than $3,000,000;

**(2)** The CoC Bonus for a Merged CoC will be no less than $750,000 and no more than $10,000,000;

**(3)** The CoC Bonus for a CoC that is neither a Split CoC nor a Merged CoC will be no

less than $500,000 and no more than $5,000,000.

**(4)** The CoC Bonus for a New Tribal CoC will be no less than $500,000 and no more than $5,000,000.

**Definitions:**

**Split CoC** is a CoC that has newly registered during the prior three registration periods (FY 2023 CoC Registration period or later) and includes geographic area that was previously associated with another CoC that continues to operate.

**Merged CoC** is a CoC that includes geographic area that was associated with one or more other CoCs in any of the prior three registration periods (the FY 2023 CoC Registration period or later) and that CoC no longer operates.

**New Tribal CoC** is a CoC that has newly registered in one of the prior three registration periods (FY 2023 CoC Registration period or later) that includes a Formula Area [see section 2.b.(3)of Appendix I].

**d.** ***Domestic Violence, Dating Violence, Sexual Assault, and Stalking Renewal Projects (DV Renewal Projects).*** Are eligible renewal projects that were previously funded, in whole or in part, with DV Bonus funding or were at some point expanded using DV Bonus funding and serve the population described in **III.G.11.c**.

**e.** ***Domestic Violence, Dating Violence, Sexual Assault, and Stalking New Projects (DV Bonus and DV Reallocation Projects).*** A new DV project created through (1) the DV Bonus or (2) through reallocation of renewal DV projects.

**(1)** CoCs may apply for DV Bonus projects where the total amount for one year of funding for all DV Bonus applications is up to 20 percent of its Preliminary Pro Rata Need (PPRN); however, this amount is limited to:

- A minimum of $50,000 if 20 percent of the CoC's PPRN is less than $50,000; or
- A maximum of $5 million if 20 percent of the CoC's PPRN is more than $5 million.

**(2)** CoCs may reallocate eligible DV Renewal projects to create new DV Reallocation projects.

**(3)** New projects or expansion projects created with DV Bonus or DV Reallocation funding must meet DV Bonus and DV Reallocation project requirements. Additionally, the sum of all DV Reallocation applications must be for the same amount of funding made available from the DV Renewal funding being reallocated.

**(4)** DV Bonus and DV Reallocation may only be used to create new SSO-Coordinated Entry, Rapid Re-housing (PH-RRH), and Transitional Housing (TH) projects.

**(a)** For PH-RRH and TH projects, the application must demonstrate:

The project applicant's experience serving individuals and families of persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking, and their ability to house survivors and meet safety outcomes.

**(b)** For Supportive Services Only Coordinated Entry (SSO-CE) projects, the

application must demonstrate:

The project is designed to implement policies, procedures, and practices that equip the CoC's coordinated entry to better meet the needs of homeless individuals who are experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking.

**(5)** The following restrictions apply to the DV Reallocation process:

**(a)** DV Renewal projects that have a SSO-CE component cannot be reallocated.

**(b)** Reallocated DV Renewal funding cannot be used to expand a CoC or YHDP Renewal grant.

**(c)** DV Renewal projects cannot be reallocated to create new non-DV CoC projects. If HUD determines that a project applicant incorrectly classified one or more new projects as a DV Reallocation, HUD may reclassify the project(s). For example, if the proposed project is not dedicated to serving individuals and families fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, HUD may condition the project to ensure the required population is served.

To avoid any potential delays in funding or a loss in ARD, CoCs should review the FY 2026 GIW provided by HUD to determine which renewal projects were originally awarded DV Bonus or DV Reallocation funds, including CoC projects that were expanded with DV Bonus or DV Reallocation funding in a prior year competition.

**(d)** If a project does not have enough funding available from reallocation sources, HUD will reduce the project to the amount available, if any, and determine if the project is feasible at the reduced rate.

**f. *New Projects Created with CoC Bonus or Through the CoC Reallocation process.*** CoCs may apply for the following types of new CoC projects through the CoC Bonus or CoC Reallocation processes:

**(1)** SSO projects.

**(2)** TH projects.

**(3)** PH-PSH projects.

**(4)** PH-RRH projects.

**(5)** Dedicated HMIS projects for the costs at 24 CFR 578.37(a)(4) that may only be carried out by the HMIS Lead, which is the recipient or subrecipient of an HMIS grant and is listed on the HMIS Lead form in the CoC Applicant Profile in e-snaps. Additionally, if the CoC has organizations within its geographic area that are victim service providers, the HMIS Lead, or subrecipient, may request HMIS funds for a comparable database. Victim service providers may also request HMIS funds in their project application budgets to enter data into a comparable database.

**(6)** SSO-CE projects to develop or operate a Coordinated Entry system.

In addition to the fact that HUD may reject a CoC Bonus or CoC Reallocation project as described elsewhere in this NOFO, HUD may reclassify, reduce, or reject a CoC Bonus or

CoC Reallocation project as described below.

If HUD determines that a CoC Bonus or CoC Reallocation project applicant or a Collaborative Applicant incorrectly classified one or more new projects as reallocation or CoC Bonus, HUD may reclassify the project(s) as either reallocation or CoC Bonus if the CoC exceeded either its reallocation or CoC Bonus amounts. For example, if a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, and there are CoC Bonus funds available, HUD may reclassify the new project application as CoC Bonus during its review. If a project applicant uses both reallocation and CoC Bonus amounts to create a single new project but did not have enough available from either source, HUD will reduce the project to the amount available, if any.

If a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, HUD may reduce the funding amount or reject the new project application during its review.

For new projects created through the CoC Bonus process, HUD must determine whether the CoC has demonstrated that the projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**g. *Youth Homeless Demonstration Program (YHDP).*** Consistent with the requirements of the Consolidated Appropriations Act, 2026, funding for the CoC Program may be used to competitively or non-competitively renew or replace grants for YHDP projects.

In order to ensure the best use of federal dollars, HUD will competitively award all YHDP projects, including renewal and replacement YHDP projects. CoCs seeking to reallocate YHDP projects may only reallocate to other youth projects. See section II.B.3.h. of this NOFO for additional information.

While YHDP projects can use the replacement process to consolidate projects as outlined in section II.B.3.h these projects cannot consolidate with non-YHDP projects. YHDP Renewal projects may apply to expand its current project through the YHDP Replacement process. Unified Funding Agencies (UFAs) are prohibited from moving funds out of or into YHDP-funded projects and mixing funding from any other non-YHDP funded project. UFAs may replace eligible YHDP renewal projects through the YHDP Replacement process.

To ensure YHDP activities are implemented in an effective, consistent, and proven way, all YHDP projects funded under this NOFO may only be used to serve homeless youth, age 24 and younger and all YHDP Renewal and YHDP Replacement projects, including YHDP reallocation, are subject to the following provisions of the Rule, as may be amended from time to time, except where they conflict with NOFO requirements, or with the Special YHDP Activities identified in section IV.B.2 of this NOFO: 24 CFR 578.3, 578.15, 578.23, 578.25, 578.29, 578.31, 578.37, 578.43, 578.45, 578.47, 578.49, 578.51, 578.53, 578.55, 578.57, 578.59, 578.61, 578.63, 578.73, 578.75, 578.77, 578.79, 578.81, 578.83, 578.85, 578.87, 578.89, 578.91, 578.93(a)-(b), 578.93(d)-(e), 578.95, 578.97, 578.99, 578.103(a)(3)-(14),578.103(a)(16)-(18), 578.103 (b),–578.103 (e), 578.105, 578.107 and 578.109. The requirements of 2 CFR 200.306, as may be amended from

time to time, with the exception of 200.306(b)(5) apply. Federal fair housing and nondiscrimination requirements cannot be waived.

**h.** ***New YHDP Projects Created through YHDP Replacement processes.*** CoCs may replace renewing YHDP project(s) to create one or more new YHDP Replacement projects, including YHDP Reallocation.

**(1)** YHDP Renewal project applicants may submit renewal applications for minor changes to a project, including adding or modifying select Special YHDP Activities listed in section IV.B.2 of this NOFO; however, if a renewing YHDP project applicant chooses to modify the current project in a way that does not meet the definition of renewal project found at Appendix I of this NOFO, it must submit a YHDP Replacement project application.

**(2)** A YHDP Renewal project applicant may apply to expand its current project through the YHDP Replacement process. See section II.B.3.i for more information.

**(3)** A YHDP Replacement project application must include the grant number from the YHDP Renewal project(s) being replaced with the YHDP Replacement project application. The CoC's Collaborative Applicant is responsible for ensuring that only a renewal YHDP or replacement YHDP project application is submitted through the CoC Project Priority Listing for each eligible YHDP project. If the Collaborative Applicant submits both a renewal project application and YHDP replacement project application for the same project, HUD will only select the renewal YHDP project application;

**(4)** HUD will only fund new YHDP Reallocation projects through the YHDP Replacement process as described below and in section IV.B.2 of this NOFO:

**(a)** TH or Crisis Residential Transitional Housing, which is a form of transitional housing that is short-term, low-barrier, using a congregate living setting, and provides access to the following supportive services in particular: family engagement and unification, case management, emergency triage services, and other supportive services whose purpose is to move youth rapidly into stable housing.

**(b)** SSO, including, but not limited to, housing search and placement services, case management, or street outreach.

**(c)** SSO-CE.

**(d)** SSO - Host Home and Kinship Care. A model in which a family agrees to permit a youth to reside with them. Recognizing that the addition of another person in the home may increase costs to the family, HUD will entertain applications that propose to house youth with families and to subsidize the additional costs attributable to housing the youth. The residence is in a community-based setting. The family could be related to the youth and the length of stay may be time-limited or without time limits. YHDP funds may be used to subsidize the increased costs to the family that are attributable to housing the youth. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination by the recipient for HUD review upon request.

**(e)** HMIS.

**(f)** Permanent Housing, including PH-PSH and PH-RRH projects. Current YHDP recipients may apply for Permanent Housing projects through the YHDP Replacement process only when the recipient is consolidating multiple (up to 10) existing YHDP Permanent Housing renewal grants. In these instances, the YHDP Replacement project must have the same recipient as the existing renewal grants being consolidated and the BLIs for the YHDP Replacement project application must match the sum of the BLIs for each of the individual projects as they appear on the grant agreement, or the grant agreement as amended.

**(5)** HUD will review new YHDP Reallocation and YHDP Replacement project applications to ensure the activities requested are eligible and the amounts requested do not exceed the amounts available for YHDP reallocation or, in the case of YHDP Replacements, the ARA of the renewal project(s) being replaced. HUD will not reject YHDP project applications for not meeting threshold requirements; however, HUD may require YHDP grant recipients to correct or revise information submitted after the final award announcement, prior to executing the grant agreement. HUD will not select YHDP project applications that fail to score high enough according to the Tier 2 scoring process described in V.D.

**(6)** YHDP Replacement projects may establish an operating start date that will be the day after the end of the previous grant term for the expiring YHDP renewal.

**(7)** A YHDP renewal project applicant may submit a YHDP Replacement application to change from one program component to another eligible component. Replacement grant applications to change program components must fully transition to the new component by the end of the 1-year YHDP Replacement grant term and may only apply for renewal in the next CoC Program Competition under new the component.

YHDP grants changing component types that include housing costs (e.g. PHH, PH-RRH, or TH) to an SSO grant may not pay for rental assistance or leasing costs with SSO grant funding during the transition period. While the project is transitioning to SSO during the 1-year period after award, the project must use other funding to cover housing costs while it transitions to the new component.

**(8)** YHDP Replacement projects cannot request capital costs (i.e., new construction, acquisition, or rehabilitation).

**i. *Expansion Project.*** The process used by eligible renewal project applicants to add funds to an existing CoC Renewal, DV Renewal or YHDP Renewal project to expand its current operations either through reallocation, DV Bonus or a CoC Bonus project application. The new funding being added to the existing renewal must be submitted as a new project in e-snaps. This portion of the project is known as new expansion project.

HUD will allow project applicants to apply for new expansion projects to expand existing projects to increase the number of units, persons served, services provided to existing program participants, or to add additional activities to HMIS and SSO-CE projects.

The new expansion project applications must meet the project eligibility and project quality thresholds in V.A.4.a and V.A.4.c of this NOFO and must be for the same component as the project being expanded. Additionally, the renewal project being expanded must have

an expiration date in CY 2027.

In the case of YHDP Replacement applications to expand existing YHDP Renewal projects, applicants must submit a YHDP Replacement and a YHDP Reallocation application separately and each project must be included in the CoC's Priority Listing.

If a project application does not meet the following requirements, or if the renewal project the new project application is proposing to expand is not selected for award, HUD will review the new expansion project and will consider it as a standalone project during the selection process provided that the project is feasible on its own with its requested funding and provided it passes project eligibility and project quality threshold requirements.

If both the new expansion project and the renewal project it expands are conditionally selected for funding, one grant agreement incorporating both approved project applications will be executed.

**(1)** The following limitations apply to expansion grant applications:

**(a)** If the new expansion project exceeds the amount of funding available to the CoC under the reallocation or Bonus processes, HUD will reduce the funding request for the new expansion project to the available amount, which could affect the activities of the new expansion project.

**(b)** HUD will not fund expansion applications that include requests for capital costs (i.e., new constructions, rehabilitation, or acquisition) and will only allow 1-year funding requests.

**(c)** Recipients cannot apply to expand a project included in a grant consolidation during the same funding year. If an applicant applies to expand a project included in a grant consolidation, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

**(d)** CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding cannot be used to expand a YHDP renewal project.

**(e)** If CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding is used to expand a DV Renewal project, the entire expanded project must be 100 percent dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraph (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and the project must meet all the DV project requirements in sections II.B.3.d and II.B.3.e of this NOFO.

**(f)** New YHDP projects created with reallocated YHDP funding may be used to expand an existing YHDP renewal project through the YHDP Replacement process. The expansion YHDP project must meet the requirements of a new YHDP Replacement application.

**(2)** Project applicants expanding an eligible CoC Renewal or DV Renewal project must:

**(a)** submit a separate renewal project application and the new project application with expansion information (both projects must be ranked by the CoC with unique rank numbers);

**(b)** in the new project application, enter the grant number of the eligible renewal project proposed for expansion;

**(c)** indicate how the new project application will expand units, beds, services, persons served, or services provided to existing program participants, or in the case of HMIS or SSO-CE project applications, how the current activities will be expanded for the CoC's geographic area; and

**(d)** ensure the funding request for the expansion grant is within the funding parameters allowed under CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation amounts available.

**(3)** Project applicants expanding an eligible YHDP Renewal project through the YHDP Replacement process must:

**(a)** submit a new YHDP Reallocation project application with the expansion information through the YHDP Replacement process, including the grant number of the YHDP Renewal project being expanded.

**(b)** indicate how the expansion project application will expand units, beds, services, persons served, or services provided to existing program participants.

**(c)** ensure the funding request for the YHDP Reallocation application to expand the YHDP Renewal project is within the funding parameters allowed under the YHDP Reallocation amount available.

**(d)** ensure the YHDP Renewal and YHDP Reallocation project applications meet the requirements in sections II.B.3.h and II.B.4 of this NOFO.

**(4)** DV Bonus and DV Reallocation Expansion Applications.

**(a)** DV Bonus and DV Reallocation funds can only be used for an application to expand an existing renewal project if the new expansion project is dedicated to individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking and who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(b)** Project applicants may use DV Bonus funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population; however, only the new project application for the expansion will be considered for DV Bonus funds.

**(c)** If an applicant proposes to use DV Reallocation funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population, the entire project, including the renewal project being

expanded, must serve 100 percent individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking and who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. In the case of DV Reallocation Projects, HUD will use the Tier 1 and Tier 2 selection process described in sections V.D.3.a and V.D.3.b of this NOFO.

**j.** ***Consolidation Project.*** HUD encourages the consolidation of eligible renewal grants. Applicants intending to use the consolidation process to combine two or more, but no more than 10, eligible renewal projects (including renewing YHDP projects and renewal Special NOFO Competition projects), may do so through the renewal project application. The projects being combined during a grant consolidation will continue uninterrupted.

To be eligible for consolidation, the projects must have the same recipient and be for the same component. This does not apply to CoCs that HUD designates as UFAs, because UFAs enter into a single renewal grant agreement with HUD for the CoC's entire geographic area. If applicable, HUD issues a separate UFA grant agreement that only includes YHDP grants.

**(1)** The period of performance and budget period of the expiring grants must have end dates in CY 2027. Applicants intending to use the consolidation process must ensure:

**(a)** Budget Line Items (BLIs) for the consolidated project application submitted exactly match the sum of the BLIs for each of the individual projects as they appear on the grant agreement, or the grant agreement as amended;

**(b)** inclusion of the expiring grant numbers with period of performance and budget period start and end dates for the projects that are consolidating;

**(c)** are in good standing with HUD, meaning none of the projects have:

**i.** outstanding audit or monitoring findings,
**ii.** outstanding obligation to HUD that is in arrears,
**iii**. unresolved construction delays,
**iv.** a history of poor financial management/drawdown issues,
**v.** history of low occupancy levels, or lack experience in administering the project type, or
**vi.** other capacity issues.

**(d)** the projects have the same recipient and are for the same component.

**(2)** YHDP Renewal projects that wish to consolidate may establish a single YHDP Replacement grant to replace multiple YHDP Renewal grants.

**(3)** The following projects cannot be consolidated and if a project application meeting these characteristics attempts to consolidate, HUD will not consider the consolidation, but rather select the projects individually provided they pass project eligibility and project quality threshold requirements:

**(a)** a DV Renewal project cannot consolidate with a CoC Renewal project (a project not dedicated to serving individuals and families who meet the eligibility criteria in Section III.G.11 of this NOFO, including a project originally funded under the Special

**Suppl.App.164**
HUD-AR-05024

NOFO Competition, and a YHDP Renewal project), or a project originally funded under the Special CoC NOFO Competition;

**(b)** a YHDP Renewal project cannot consolidate with a CoC Renewal project (including those projects originally funded under the Special CoC NOFO Competition) or a DV Renewal project;

**(c)** a project originally funded under the Special CoC NOFO Competition through the Rural Set Aside cannot consolidate with any other type of project (e.g., a project originally funded with DV Bonus or a project originally funded through the Unsheltered Set Aside in the Special NOFO Competition) except another project originally funded through the Rural Set Aside. This means, a project originally funded under the Special NOFO through the Rural Set Aside can only consolidate with another Special CoC NOFO Competition project originally funded through the Rural Set Aside;

**(d)** a TH and a PH project cannot consolidate to form a Joint TH/PH-RRH component project;

**(e)** transition grants cannot consolidate with any other project; and

**(f)** recipients cannot apply to consolidate projects and apply to expand the consolidated project during the same funding year. If an applicant applies to expand projects that are involved in a consolidation of grants, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

**(4)** To request the consolidation of eligible renewal projects, project applicants must submit renewal projects for the individual projects to be included in the consolidation and each project application must identify the grant number that will survive which must be the grant number with the earliest start date CY 2027. Project applications for the grants that are proposed to be part of the consolidation must be ranked with a unique rank number for each project, and if all those grants are selected, HUD will conditionally award the single surviving grant based on its ranked position to include the amount of funding of all grants included in the consolidation. All other project applications included in the surviving grant will be removed from the CoC's ranking resulting in project applications below to slide up one ranked position. Project applicants must not submit a consolidated project application that contains two different components (e.g., PH and TH).

**(5)** The start date for the consolidated grant, if conditionally awarded, will be the day after the expiration date of the eligible renewal project with the earliest expiration date. HUD will calculate the expiration date for the consolidated grant by averaging the expiration dates for all expiring grants included in the consolidated grant weighted by the size of each expiring grant. If that date falls on the first through the fifteenth of a month, then the expiration date will be the last day of the previous month. If the date falls on the sixteenth through the end of the month, then the expiration date will be the last day of the month.

**(6)** HUD will calculate the expiration date for the consolidated grant as follows: It will be 'X' months after the end of the 12th month after the start date for the consolidated grant

with 'X' determined by calculating the sum for all grants of the total award times the number of months after the expiration of the first expiring grant that the grant expires and dividing that sum by the total award for the consolidated grant. If the calculation of 'X' results in a partial month, if it is less than 0.5, then the consolidated grant will expire on the last day of the previous month, and if it is 0.5 or more, then the consolidated grant will expire on the last day of the calculated month.

**(7)** Collaborative Applicants designated by HUD as UFAs have more flexibility in how they manage their CoC Program-funded projects, making the consolidation of projects during the CoC Program competition unnecessary. A Collaborative Applicant with UFA designation can consolidate projects during the grant term, so long as the consolidations are not combining different component types and the projects are funded under the same grant (e.g., projects are currently funded under the same renewal grant). If a UFA-designated Collaborative Applicant consolidates projects during the grant term, it can apply to renew them during the CoC Program Competition as consolidated projects.

**k. *Transition Grant.*** A Transition grant is an application to fund a new CoC project through the reallocation process to transition eligible CoC renewal project(s) (including a Special NOFO project or DV Renewal project) from one program component to another eligible component over a 1-year period. Transition grant applications awarded FY 2026 funds must fully transition to the new component by the end of the 1-year grant term and may only apply for renewal in the next CoC Program Competition under the component to which it transitioned.

**(1)** Renewal Grants expiring in CY 2027 may submit a FY 2026 transition grant application to request a component type change. The transition grant's operating start date will be the day after the end of the previous grant term for the expiring component. For transition grants reallocated from more than one project, the operating start date of the transition grant will be the day after the end of the earliest expiring grant term. The grant term may be extended consistent with 2 CFR 200.308 and 2 CFR 200.309.

**(2)** Applicants wishing to apply for a transition grant must have the consent of its Continuum of Care; and the new project application must meet project eligibility and project quality thresholds established by HUD in sections V.A.4.a and V.A.4.c of this NOFO. If the project application identifies the project as a transition grant and the CoC accepts the new transition grant project on the New Project Application Project Listing in the CoC Priority Listing, HUD will consider this as CoC consent.

**(3)** For a new project to be considered a transition grant, the new project applicant must be the recipient listed on the current grant agreement for the eligible renewal grant(s) being eliminated and must include the grant number(s) of the project(s) being eliminated to create the new project and attach a copy of the most recently awarded project application. FY 2025 grants expiring in CY 2027 that were not required to submit a FY 2025 renewal application for the FY 2025 funding opportunity, the applicant will attach a copy of the FY 2024 CoC Program Competition project application.

**(4)** Transition Grant Restrictions:

YHDP Renewal grants are not eligible to use the transition grant process. YHDP Renewal grants must submit a YHDP Replacement application to change component

types. If HUD determines a new project submitted as a transition grant does not qualify, but meets all other new project requirements, HUD may award the project as a new non-transition grant project. If this occurs, the new project operating start date will be reflected in the grant agreement.

**4. Renewal Project Requirements.**

As set forth in 24 CFR 578.33, projects may renew under the CoC Program NOFO to continue ongoing leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs.

Awards HUD made under the CoC Program (including projects awarded 1-year of funding under the FY 2025 CoC Program funding opportunity), projects originally awarded under the Special NOFO, and YHDP projects are eligible for renewal with FY 2026 CoC Program funds if they are currently operating and have an expiration date in CY 2027 (the period from January 1, 2027, through December 31, 2027).

**a.** Compliance and re-evaluation. To maintain the competitive and objective nature of the CoC Program under the McKinney Vento Act and comply with 2 CFR 200.309 and 200.205, which together require renewals for federal grants to be issued based on objective and merit-based criteria, all renewals will be re-evaluated each year. Further, HUD may condition renewal on compliance with audits for large grant recipients (over $1,000,000) as required by 2 CFR 200.501 and other post-award requirements from prior years, as required by 2 CFR Part 200, 24 CFR Part 91, 24 CFR Part 578, and other applicable law.

**b.** Renewal project applications must be submitted by the same recipient that signed the executed grant agreement for the grant being renewed, or entity that became the recipient through a grant agreement transfer amendment. To be eligible as a renewal project, the application must (1) be for the same amount of funding before any adjustments described in this NOFO (e.g. FMR adjustments), or the amount reduced due to reallocation; (2) be for the same program component; and (3) in the case of DV Renewal projects and YHDP Renewal projects, must continue to serve the same subpopulation.

**c.** If HUD conditionally selects a renewal grant for funding that does not have an expiration date that meets the renewal eligibility requirements prescribed by this NOFO, HUD will withdraw any funds conditionally selected for award.

**d.** Projects that were eligible under predecessor programs, specifically Safe Haven projects, will continue to be eligible under the CoC Program and will continue to be eligible for renewal of leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs under 24 CFR 578.33(d)(1) so long as the project continues to serve the same population and the same number of program participants or units in the same type of housing as identified in their most recent grant agreement, or amended grant agreement, signed before August 31, 2012. No new Safe Haven projects will be funded; however, existing Safe Haven projects may be renewed to continue to carry out activities that are eligible costs under Subpart D of the Rule.

**e.** The total request for each renewing project, including YHDP Renewal and YHDP Replacement projects, is limited to a project's ARA. In cases where two or more eligible

projects are being consolidated through the project application, the total ARA of the consolidation project must be equal to the sum of the original ARA of the renewal projects before consolidation.

**f.** Because funds for acquisition, new construction, and rehabilitation are not renewable, grants being renewed whose original expiring award included acquisition, new construction, and rehabilitation funds may only renew leasing, supportive services, rental assistance, operating, and HMIS costs and must not exceed 10 percent in administrative costs.

**g.** HUD will recapture grant funds remaining unspent at the end of the previous grant period when it renews a grant.

**h.** Subject to HUD approval and the terms of the NOFO, the following requests may be included in a renewal application:

**(1)** CoC renewal project applications (including DV Renewal projects and projects originally funded under the Special NOFO) may include non-significant changes including shifting up to 10 percent of funds from one approved eligible activity to another.

**(2)** YHDP Renewal project applications from any round may include non-significant changes including adding select Special YHDP Activities in section IV.B.2and shifting up to 10 percent of funds from one approved eligible activity to another.

**(3)** Renewal applications that include requests to shift more than 10 percent of funds from one approved eligible activity to another and other significant changes as defined at 24 CFR 578.105 will not be considered during the CoC Program Competition by HUD, except as provided in Section IV.B.3 of this NOFO. If an application includes a budget shift that exceeds 10 percent, HUD will correct the project budget to reflect the previously awarded budget amounts. Applicants seeking to make significant changes to their grant, such as shifting more than 10 percent of funds from an approved eligible activity, should contact their Field Office and request a grant agreement amendment.

**i. *Actual Per Unit Cost – Renewal Grants.*** Applicants requesting renewal of grants for rental assistance may request a per-unit amount less than the Fair Market Rent (FMR) if the actual rent per unit under lease is less than the FMR. This will help reduce the number of projects receiving rental assistance that have large balances of unspent funds remaining at the end of the operating year. Renewal project applicants must ensure the amount requested will be sufficient to cover all eligible costs as HUD cannot provide funds beyond the amount awarded through the FY 2026 CoC Program funding process. Project applications for rental assistance cannot request more than 100 percent of the published FMR. New project applications must adhere to 24 CFR 578.51(f) and must request the full FMR amount per unit. See section V.D.5.a of this NOFO for additional information regarding FMR adjustments for projects receiving funds for rental assistance.

**j. *Renewal Project Grant Terms.*** Renewal project applications are limited to a 1-year grant term with 1 year of funding. Any renewal PH project that receives project-based rental assistance or operating costs may request up to a 15-year grant term; however, project applicants may only request 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309.

Project applicants must apply for the additional funds as a renewal project application prior to the anniversary of the first expenditure of grant funds by which date grant funds should have been expended; or, if HUD extends the date that funds must be expended, the date the extension expires. HUD does not guarantee CoC Program funds past the 1 year of renewal funding.

**5. New Project Requirements.**

CoCs are encouraged to submit new projects created through CoC Bonus, DV Bonus, CoC Reallocation, DV Reallocation, or YHDP Replacement including YHDP Reallocation. A CoC designated Collaborative Applicant may submit a new CoC Planning project application, and if applicable, a UFA Costs project application in FY 2026.

To expend funds within statutorily required deadlines, applicants funded for sponsor-based and project-based rental assistance must execute the grant agreement and begin providing rental assistance within 2 years. However, HUD strongly encourages all rental assistance to begin within 12 months of award. Applicants that are unable to begin rental assistance within the 12-month period should consult with the local HUD CPD field office.

**a.** HUD will review project subrecipient eligibility as part of the project quality threshold review process. Project applicants must submit documentation of the subrecipient's eligibility with the project application.

**b.** Per the Consolidated Appropriations Act, 2026, to receive funding for a new CoC project, except those created through reallocation, HUD must determine the CoC has demonstrated that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance (See more information on the System Performance rating factor in section V.B.1.b of this NOFO).

**c. *New Project Grant Terms.*** The initial grant term for new project applications may be 1-year, 2-years, 3-years, 4-years, 5-years, or 15-years. HUD may extend the grant consistent with 2 CFR 200.308 and 2 CFR 200.309. The following exceptions apply:

**(1)** HUD will allow new projects to request 1 year of funding with a longer initial grant term not to exceed 18 months. HUD has determined that most new projects requesting 1 year of funding normally take approximately 3 to 6 months to begin fully operating the new project (e.g., hiring staff, developing partnerships with landowners if leasing or renting). Therefore, a new project requesting 1 year of funding may request a grant term of 12 months to 18 months that will allow for the additional start-up process. Any new projects requesting capital costs (i.e., new construction, acquisition, or rehabilitation) are not eligible for 1-year funding requests. See (8) below for more information on new projects requesting capital costs. Transition grant applications cannot request 18-month grant terms.

**(2)** Any new expansion project submitted to expand an eligible renewal CoC Program-funded project may only request a 1-year grant term, regardless of the project type.

**(3)** Any new project that requests tenant-based rental assistance may request a 1-year, 2-year, 3-year, 4-year, or 5-year grant term.

**(4)** Any new project that requests leasing costs - either leasing costs only or leasing costs plus other costs (e.g., supportive services, HMIS) - may request up to a 3-year

grant term.

**(5)** The first year of funding for YHDP Replacement projects will be based on the 1-year renewal amount of the current YHDP project being replaced. The YHDP Replacement project's operating start date will be the day after the end of the previous grant term for the project being replaced.

**(6)** Any new project that requests project-based rental assistance or sponsor-based rental assistance, or operating costs may request up to a 15-year grant term; however, the project applicant may only request up to 5 years of funds. Funding for the remainder of the term is subject to availability. Applicants must apply for additional funds through a renewal project application in the competition held in the calendar year prior to the anniversary of the first expenditure of grant funds, or if HUD has extended the grant term, the date the extension expires. HUD does not guarantee CoC Program funds past the initial 5-year grant term, if conditionally awarded.

**(7)** Any new project that requests operating costs, supportive services only, HMIS, and project administrative costs may request 1-year, 2-year, 3-year, 4-year, or 5-year grant terms with funding for the same number of years.

**(8)** Any new project conditionally selected by HUD that requests new construction, acquisition, or rehabilitation costs (capital costs) must request a minimum of a 3-year grant term and may request up to a 5-year grant term. Any new projects requesting capital costs are not eligible for 1-year funding requests. If a new project requests 1 year of funding with capital costs, HUD will increase the grant term to 3-years and the new project must spend the funds requested over a 3-year period.

If an applicant requests funds for new construction, acquisition, or rehabilitation in addition to requesting funds for operating, supportive services, or HMIS, the funding will be for the 3-years to 5-years requested, and the grant term will be 3-years to 5-years plus the time necessary to acquire the property, complete construction, and begin operating the project. HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

**(9)** All new CoC Planning or UFA Costs project applications are limited to 1-year grant terms and 1 year of funding.

**(a)** The maximum amount for one year of funding to spend on administrative costs associated with the CoC planning activities listed at 24 CFR 578.39 is 5 percent of FPRN, up to a maximum of $1,500,000, or $50,000 whichever is greater.

**(b)** The maximum amount for one year of funding to spend on administrative costs associated with the UFA costs described at 42 USC 11383(a)(11) is up to 3 percent of FPRN or $1,250,000 per fiscal year; whichever is less.

**(c)** CoC Planning and UFA Costs grants are not renewable.

**(10)** Any new project that is requesting consideration under the DV Bonus or DV Reallocation process may only request 1 year of funding, but may request a longer initial grant term not to exceed 18 months regardless of project application component type.

## C. Cost Sharing or Matching

This Program requires cost sharing or matching, as described below.

24 CFR 578.73 of the Rule requires that recipients must match all grant funds, except for leasing funds, with no less than 25 percent of funds or in-kind contributions from other sources.

Project applicants that intend to use program income as a match must provide an estimate of how much program income will be used for the match. HUD will not require YHDP Renewal or replacement projects to meet the 25 percent match requirement if the applicant is able to demonstrate it has taken reasonable steps to maximize resources available for homeless youth or if the recipient has already had a match exemption approved for this renewal as provided in Section I.C.1.b.4 of Appendix A of the FY 2022 Youth Homelessness Demonstration Program NOFO (FR-6700-N-35).

# III. PROGRAM DESCRIPTION

III. Program Description

A. Purpose

B. Goals and Objectives

C. Authority

D. Unallowable Costs

E. Indirect Costs

TABLE OF CONTENTS

# III. PROGRAM DESCRIPTION

## A. Purpose

The Continuum of Care (CoC) Program (24 CFR part 578) is a national competition between geographic areas designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers, states, local governments and Indian Tribes or tribally designated housing entities (as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)) to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness; to promote access to and effective utilization of mainstream programs and programs funded with State or local resources; and to optimize self-sufficiency among homeless individuals and families.

As described in detail below, a "Housing First" approach to homelessness has failed to deliver on the CoC Program's primary goal: to end homelessness.

The FY 2026 CoC Program NOFO funds the renewal of existing CoC grants, including DV Renewal projects and projects originally funded under the Special NOFO to Address Unsheltered and Rural Homelessness, and the competitive renewal or replacement of existing YHDP grants that are expiring in Calendar Year 2027. This NOFO also provides funding for new projects, including those created with DV Bonus, CoC Bonus, and the reallocation of existing renewal projects.

For FY 2026, HUD requires Collaborative Applicants to rank all project applications, except for CoC Planning, and if applicable, UFA Costs project applications.

## B. Goals and Objectives

"Housing First" has been a profound failure by any measure. Far from ending homelessness as promised, since the policy was first mandated by HUD in 2013:

- Literal homelessness (on the street, in emergency shelters, or in transitional housing) has increased 27%,
- Chronic homelessness has increased 80.5%, and
- Unsheltered homelessness has increased 36.1%.[1]

This is despite the fact that, since 2013:

- Taxpayer funded "permanent housing" beds have increased 150.9%[2],
- "Rapid rehousing" was created, artificially lowering numbers by recategorizing people in short-term assistance as "permanently housed," and
- CoC spending has increased 111%.[3]

HUD is restoring the CoC program to its original goals of reducing homelessness and optimizing self-sufficiency by focusing on meaningful outcomes, expanding competition, prioritizing treatment, economic independence, and emphasizing law and order.

More than a decade ago, advocates of "Housing First" argued that the approach would end

all types of homelessness in 10 years.[4] By focusing on permanently subsidized housing with no conditions, the Obama Administration said it would end veteran homelessness by 2015, chronic homelessness by 2016 and family homelessness by 2020.[5]

In 2026, it is evident that those promises have profoundly failed. After focusing on permanently subsidized housing with no conditions for more than a decade, homelessness reached the highest population ever recorded at the highest rate of increase ever recorded last year. [6] There are more people today than ever before who are dependent on indefinitely subsidized housing for homelessness – Permanent Housing. The nation's supply of Permanent Supportive Housing has increased by 111% (more than double) since 2007. When Rapid Rehousing is included, the supply of Permanent Housing (Permanent Supportive Housing and Rapid Rehousing) has increased by 188%. During the same time period, the nation's supply of Transitional Housing has decreased by 59.5%.

The present-day homelessness assistance framework has incentivized the speed at which individuals receive subsidized housing rather than the quality of services individuals receive in order to reach self-sufficiency and independent living.[7] This NOFO takes steps to restore competition, balance, and true outcomes to the CoC program.

**1. Improving Outcomes.**

This NOFO incentivizes outcomes consistent with the purposes of the CoC program including optimizing self-sufficiency, reducing homelessness, and minimizing the trauma caused to communities as a whole by homelessness. HUD is committed to supporting meaningful, sustained reductions in homelessness and increases in self-sufficiency rather than measuring outputs such as the number of beds created or filled.

Because unsheltered homelessness causes unique trauma to individuals, families, and communities, this NOFO focuses on reductions in unsheltered homelessness and encampments.

One of the main objectives for the CoC program, as set out in the McKinney-Vento Act, 42 U.S.C. § 11381, is to optimize self-sufficiency among homeless individuals and families. CoCs should review all projects eligible for renewal under this NOFO to determine their effectiveness in reducing homelessness and increasing self-sufficiency. CoCs should prioritize projects that promote self-sufficiency, increase employment income over government assistance, and promote treatment and recovery.

This NOFO includes several options to help CoCs improve their effectiveness, including reallocation, expansion, and transition grants, and CoC's should take advantage of these options to expand the pool of successful providers, including faith-based providers, and improve the overall performance of the CoC. This NOFO also makes a significant investment in Transitional Housing and Supportive Service Only projects to ensure that those who can recover and achieve self-sufficiency have the support to do so.

**2. Creating Competition to Improve Innovation and Accountability.**

The Continuum of Care Program was intended to be a "national competition between geographic areas" (42 U.S.C § 11386a), which is also consistent with Office of Management and Budget requirements that federal grants be awarded on a competitive, objective basis, even for renewals. 2 CFR 200.204 and 200.205. In 2024, 90% of every CoC's Annual

Renewal Demand was conditionally awarded without any connection to CoC score or project merit.[8] This means that only about 10% of FY24 CoC awards were competed on the basis of merit between geographic areas. In fact, since 2013, the most competitive CoC competition required only 15% competition on the basis of merit, and the least competitive required merely 5% competition.

Competition drives outcomes, effectiveness, innovation, and accountability. Consistent with the FY26 appropriation bill, HUD is setting Tier 1 at 60% and competing 40% of CoC ARD on the basis of merit between geographic areas. Increased competition brings the CoC Program back to its original intent as a competitive program, not an entitlement program or block grant. Competition ensures that CoCs consistently evaluate the effectiveness of their projects and invest in new projects that deliver the best results at reducing homelessness and optimizing self-sufficiency.

### 3. Restoring Balance to the Continuum of Care.

The CoC program has four project components for all CoCs: Permanent Housing, Transitional Housing, Supportive Service Only, and HMIS. This NOFO provides opportunities to restore a healthy balance of CoC-funded projects to further community-wide efforts to reduce homelessness.

From 2007 to 2009 there was a nearly equal distribution of Emergency Shelter beds, Transitional Housing beds, and Permanent Supportive Housing beds.[9] During this time, the number of homeless individuals was decreasing consistently. Beginning in 2010, and reinforced by HUD's 2013 policy changes, Permanent Supportive Housing beds increased dramatically as Transitional Housing beds decreased dramatically. The distribution of types of assistance is far from the balance seen in 2007.

The numbers cited above reference nationwide bed counts. The trend and disparities between Permanent Housing and Transitional Housing is even more apparent when narrowed to CoC-funded housing in particular. In 2024, 88% of the CoC national award went to Permanent Housing, and only 1% supported transitional housing projects.[10]

Instead of a balanced continuum of assistance, the CoC Program has become a "one size fits all" response to homelessness that restricted the spectrum of eligible program components, excluding a wide array of community providers in the process. By investing in Transitional Housing and Supportive Service Only projects, HUD intends to restore the "continuum" to the Continuum of Care Program to help able-bodied people move to self-sufficiency. Individuals who are likely to never be able to return to the workforce–over 62 years old, physically disabled, developmentally disabled–should be prioritized for Permanent Supportive Housing. Instead, many Permanent Supportive Housing units prioritize certain disabilities thereby failing to serve the most vulnerable. Many individuals with disabilities, including impairment due to substance abuse, are able to recover and regain self-sufficiency and deserve every opportunity to receive treatment and services to help them do so.

To the extent permitted by law, HUD is shifting its focus from awarding nearly 90% of CoC funding to Permanent Housing to expand opportunities for other components of the CoC Program.

### 4. Prioritizing Treatment and Recovery as a Means to Self-Sufficiency.

According to a nationwide study, 75% of a survey sample of 64,000 unsheltered homeless individuals reported a substance use disorder and 78% reported a mental health condition. The study found that substance use disorder contributed to the loss of housing for 50% of the unsheltered population, and mental health conditions contributed to loss of housing for 51% of the population.[11] Another study found that two-thirds of homeless individuals self-reported regular use of hard drugs like methamphetamine, cocaine, and opiates. Of those, 29% reported wanting treatment and being unable to receive it.[12] Based on HUD's 2024 Point-In-Time Count data, which asks individuals if they wish to self-report substance abuse, 24.7% of unsheltered homeless individuals select to self-report substance abuse. The results of ignoring the prevalence of substance use disorder among homeless people is deadly.

According to a 2022 study from JAMA, "deaths among people experiencing homelessness in San Francisco more than doubled to 331 deaths during the first year of the COVID-19 pandemic, driven by a large increase in overdose deaths."[13] The risk of fatal overdose inside Permanent Supportive Housing is noteworthy, and tragic. The City of Seattle reported a 282% increase in overdose deaths in King County's Permanent Supportive Housing (and other subsidized housing) between 2020 and 2023.[14] According to HUD's own data, 19.5% of exits from Permanent Supportive Housing among adults living alone are due to death. Between 2019 and 2022, the share of adults living alone who died in Permanent Supportive Housing increased from 13% of exits to 20%, and the *number* of adults who died increased by 31%.[15]

Despite the tragic realities of substance abuse and fatal overdose among those who are homeless or living in Permanent Supportive Housing, there are recipients of CoC funding who reportedly, under the misnomer of "harm reduction," permit, and even encourage, the use and distribution of illicit drugs on their property including by distributing drug paraphernalia like needles, pipes, and foil. This NOFO provides communities opportunities to invest in treatment services and recovery housing, and ensures that recipients do not distribute drug paraphernalia or knowingly permit the use and distribution of fatal, illicit drugs on their properties. This is not a requirement that projects condition assistance on sobriety or treatment, although both are allowable under 24 CFR 578. CoCs should prioritize projects that provide the treatment and services people need to recover and regain self-sufficiency including on-site behavioral health treatment, robust wraparound supportive services, and participation requirements. This NOFO devotes resources to Transitional Housing programs and Supportive Service Only projects with the goal of improving health and long-term economic independence for homeless individuals and families. The NOFO encourages investment in treatment-focused beds, recovery housing, and partnership with community behavioral healthcare providers, drug courts, and other addiction and severe mental illness treatment providers. HUD encourages CoCs to utilize the full array of mainstream programs and local and private resources to provide housing and healthcare needed to maintain safe and stable housing.

### 5. Promoting Economic Self-Sufficiency.

One of the primary purposes of the CoC Program, as outlined in 42 U.S.C. § 11381, is to optimize self-sufficiency. In fact, self-sufficiency is one of only four purposes Congress provided for the CoC Program. CoCs should partner with workforce development centers,

employers, childcare, and other supportive service providers to increase employment and employment income for program participants. CoCs should prioritize projects that help lead to long-term economic independence for individuals and families to exit homelessness to unsubsidized housing and prevent future returns to homelessness.

Although a chief goal of the program is self-sufficiency, HUD's data reveals low rates of increased employment income and exits to unsubsidized housing. As of 2023, a median of only 6% of individuals in CoC-funded housing across the nation increased their earned employment income during that reporting period. In comparison, 33% of individuals in CoC-funded housing increased their benefits and welfare income.[16] Nationwide, 76.1% of Permanent Supportive Housing residents are under age 65.[17] Yet in Permanent Supportive Housing, only 13.2% of all households exited their housing. Of that percentage, only 12.9%, or 1.7% of the total participating households, exited to unsubsidized housing. Nearly twice as many exits were due to death.[18]

One way to advance both recovery and self-sufficiency is through supportive service participation requirements. Service participation requirements have been successfully employed in most federal social service programs and were integral to the welfare policy reforms enacted under President Clinton in 1996. For example, Pell Grants require recipients to make satisfactory academic progress, attend classes, and maintain a passing grade point average. Unemployment insurance benefits require program participation, including demonstrated participation in prescriptive job searches. Temporary Assistance for Needy Families (TANF) requires beneficiaries to work or advance their education.

According to a national poll in 2025, there is strong bipartisan support for supportive service participation requirements, with 64% of respondents in favor of "requiring participation in addiction and mental health treatment and job training programs as a condition of receiving taxpayer-funded housing."[19] Well-designed supportive service participation requirements provide structure and accountability for program participants to meet their unique goals and needs. Rather than hinder participant choice, participation requirements empower goals and participant progress.

In accordance with 24 CFR 578.75(h), HUD encourages supportive service agreements that meet individual needs and advance individual progress towards self-sufficiency and independent living goals set forth in 42 U.S.C. 11386a(b)(1)(F).

### 6. Advancing Public Safety for All.

Safety and security for all members of the public, especially those living on the streets and in encampments, is essential to promoting a community-wide commitment to the goal of ending homelessness and minimizing trauma to individuals, families, and communities. CoCs should cooperate with law enforcement to advance public safety for the entire community impacted by homelessness. No one should sleep outside on the street or in dangerous encampments, and everyone should be able to enjoy public spaces safely. HUD encourages CoCs to assist in preventing and minimizing the trauma associated with living on the streets or in encampments, especially for women and youth that are the victims of sexual assault and trafficking. Unchecked public camping and public illicit drug use inhibit nonprofit providers and local government from effectively addressing homelessness.

Respecting the rule of law is critical to community-wide efforts to address homelessness and protect all residents. According to one report, as unsheltered homelessness increased in King County, gun crimes tied to homeless encampments increased by 122% in just the first six months of 2022. Between 2017 and 2020, 50% of all arrests in Portland, Oregon were of homeless individuals despite the homelessness population comprising only 2% of the total population. According to the same report, drug overdoses were the most common cause of death among homeless individuals in New York City between 2018 and 2021. The number of deaths doubled during that short time period.[20] One recent study indicates that in some states, as many as half of unsheltered homeless individuals are registered sex offenders, in violation of requirements that they have a registered address.[21]

None of the realities above suggest that the entire homeless population is engaged in criminal or illicit activity despite significant disproportionality. Data also indicates that homeless individuals are the victims of crime at higher rates than the general public.[22] Gun violence in encampments, fatal drug overdoses on the streets, and sexual assault in encampments all perpetuate harm and trauma to homeless individuals and to the community. It is common sense to acknowledge the close relationship between unchecked homelessness and illicit activity with its many victims. Enforcing the rule of law is critical to protecting the safety of everyone regardless of their housing status, which in turn promotes one of the core purposes of McKinney-Vento, "community-wide commitment to the goal of ending homelessness." 42 U.S.C. § 11381(1).

In 2024, The City of Seattle reported that 76% of residents surveyed in a downtown neighborhood disagreed or strongly disagreed with the statement "I feel safe in my neighborhood."[23] The respondents included residents of three Permanent Supportive Housing buildings in the neighborhood. The city described a downtown environment that creates "opportunities for illegal street markets, drug markets, and unsanctioned tent encampments to form."[24]

The public supports policies that advance public safety related to homelessness. According to national polling in 2024, there is strong bipartisan support for public camping bans and stricter enforcement of drug laws, with 72% of voters in favor of "moving individuals into shelters over allowing camping" and 60% of voters in favor of "stricter drug enforcement near service providers, including penalties for facilities permitting drug activity."[25]

Advancing public safety policies has been shown to decrease homelessness. Two years after the City of Austin reinstated a ban on public camping, unsheltered homelessness decreased by one-third.[26] Several years after Colorado Springs restricted public camping near creeks and waterways, unsheltered homelessness decreased by 14%.[27]

First responders are critical partners in engaging people into treatment and services and protecting public order and vulnerable homeless individuals. In *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024), the Supreme Court of the United States upheld the authority of local governments to prohibit public camping.

First responders and law enforcement are often the first to encounter our most vulnerable members of society and should be aware of the available services to triage individuals into safe and appropriate services, ideally alongside non-law enforcement service providers in the Continuum of Care. CoCs should work with law enforcement, first responders, and their state

and local governments to reduce encampments, public camping, and public drug use in order to address barriers to maintaining housing and increasing self-sufficiency.

**7. Minimizing Trauma for Vulnerable Populations.**

One of the purposes of the CoC program is to minimize the trauma associated with homelessness 42 U.S.C. § 11381(2). CoCs should encourage providers to provide trauma informed care and ensure participant safety in programs, especially for youth and survivors of domestic violence, dating violence, sexual assault, and stalking.

**8. Expanding Access Based on Merit, and Not Ideology.**

HUD is committed to providing an equal opportunity to every applicant, recipient, and program participant free from discrimination. Part of this commitment is recognizing that faith-based providers deserve a level playing field to compete for CoC funding and participate in the community-wide efforts of their local CoCs. Faith-based organizations first served the nation's homelessness population long before the Federal government was ever involved.[28]

To the fullest extent permitted by law, HUD will ensure that faith-based organizations can participate in the CoC program and operate consistent with their sincerely held religious beliefs, recognizing all relevant protections provided by subsection c of HUD's Equal Participation Rule, 24 CFR § 5.109, the Religious Freedom Restoration Act, and the First Amendment. Promoting equal access for faith-based organizations directly advances the goals of the CoC program by increasing the number and diversity of program providers and increasing overall competition for CoC funds.

Likewise, HUD is committed to promoting equal access to CoC programs for homeless individuals and program participants regardless of their race or other protected status. The prior administration wrongly and illegally pressured or required providers to discriminate against participants based on their race, sex, or other protected status.[29] The purpose of the Fourteenth Amendment of the U.S. Constitution is to "do away with all governmentally imposed discrimination based on race . . . . Eliminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). To that end, this NOFO prohibits the use of federal funds being used for any type of racial preferences, even under the guise of "diversity, equity, and inclusion." HUD wants to increase access to homelessness relief for *all* individuals and families.

## C. Authority

The CoC Program is authorized by subtitle C of title IV of the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act), and the CoC Program rule found in 24 CFR part 578 (the Rule). Pursuant to 42 U.S.C 11386a(a) and 42 U.S.C. 11386a(b)(1)(G), the Secretary can establish criteria for the awarding of funds including factors deemed appropriate to carry out the CoC Program in an effective and efficient manner.

FY 2026 funding for CoC Program Competition NOFO, including the competitive or noncompetitive renewal or replacements of YHDP grants under the CoC program, is authorized by the Consolidated Appropriations Act, 2026 (Public Law 119-75) which makes approximately $4,010,000,000 in CoC Program funding. Under this NOFO, HUD will competitively renew or replace YHDP grants under the CoC Program.

Additionally, HUD is making available approximately $52,000,000 in funding from the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4) for Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus) projects, described in section II.B.3.e of this NOFO.

## D. Unallowable Costs

HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

## E. Indirect Costs

If you expect to charge indirect costs to the award, submit the Indirect Cost Information for Award Applicant/Recipient form (HUD-426) with your application.

The HUD-426 form is built into the *e-snaps* Project Applicant Profile where you will complete the information if requesting indirect costs, and you will also see the information transferred within your project application.

Indirect cost rules under 2 CFR part 200, as may be amended from time to time, apply. Project applicants that intend to charge indirect costs to the award must clearly state in the project application(s) the rate and distribution base the recipient intends to use, and if applicable, the rate and distribution base to be used by any subrecipient(s). If the rate is a Federally negotiated indirect cost rate, the project application must include the corresponding negotiated indirect cost rate agreement signed by the cognizant agency. A government department or agency unit that receives no more than $35 million in direct federal funding per year and has developed and maintains an indirect cost rate proposal and supporting documentation in accordance with 2 CFR part 200, appendix VII, may use the rate and distribution base specified in that indirect cost rate proposal. These governmental departments or agencies are not required to submit their proposals unless they are specifically requested to do so by an awarding Federal agency. The Federal agency's review should be limited to ensuring the proposal is consistent with the principles of this part.

For each applicant or intended subrecipient that meets the conditions for using the de minimis rate under 2 CFR 200.414(f) and will use that rate to charge indirect costs, the project application must clearly state the intended use of the de minimis rate. As described in 2 CFR 200.403, costs must be consistently charged as either indirect or direct costs but must not be double charged or inconsistently charged as both. Once an organization elects to use the de minimis rate, the organization must apply this methodology consistently for all Federal awards until the organization chooses to negotiate for a rate, which the organization may apply to do at any time. Documentation of the decision to use the de minimis rate must be retained on file for audit.

## F. Program History

FY 2026 CoC awards will be made through this NOFO. The following are new or different compared to previous years:

### 1. Investment in New Transitional Housing and Supportive Service Only Projects.

Unlike in prior years, CoCs may apply for Transitional Housing and Supportive Service Only projects including street outreach. In order to increase competition, broaden the applicant pool, and restore balance to the Continuum of Care Program, this NOFO provides a set-aside

of $1,300,000,000 for new projects with a priority for Transitional Housing and Supportive Service Only projects. CoCs may use the Transition Grant process described in Sec. II.B.3.k to create new projects. HUD reminds CoCs that individuals living in Permanent Housing may be eligible for Transitional Housing (see HUD guidance) and encourages CoCs to assess the unique needs of individuals and families to provide appropriate assistance to meet their needs.

**2. Increase in Competition.**

The Continuum of Care program is a national competition between geographic areas (42 U.S.C. 11386a). Consistent with the FY26 HUD appropriation, Tier 1 is set at 60 percent of the CoC's Annual Renewal Demand (ARD). HUD reminds CoCs and applicants of the Solo Applicant appeal process described in Sec. VIII.D.3.a. for project applicants that believe they were denied the right to participate in a reasonable manner.

HUD will competitively renew or replace YHDP projects. Additionally, the CoC may use the YHDP Replacement process (which includes YHDP Reallocation) to create new YHDP grants. If significant changes to a renewing YHDP project are needed the YHDP project may replace its current project with a new YHDP Replacement project, that may wholly or in part include activities ineligible under the CoC Program as outlined in section IV.B.2 of this NOFO.

**3. Increase in Equitable Bonus Funding.**

Due to the increase in competition, CoCs may apply for bonus projects in an amount of up to 15% of the CoC's Final Pro-Rata Need (FPRN). Unless otherwise described in Sec. II.B.3.c, the CoC Bonus will be no less than $500,000 and no more than $5,000,000. The CoC Bonus funding structure described in Sec. II.B.3.c affords all CoCs a more equitable opportunity to compete for bonus funds and better ensures that awards are made on the basis of merit, not merely existing resources.

**4. Expanding Eligible DV Bonus Projects to Include Transitional Housing.**

Unlike prior years, Transitional Housing is an eligible DV Bonus project in this NOFO. Consolidated Appropriations Act, 2026, Pub. L. 119-75, div. D, tit. II, 140 Stat. 173, 399 (Dec. 3, 2026). The Secretary has determined that Transitional Housing is an eligible activity that is critical in order to assist individuals and families of persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking.

**5. Program Components that are eligible under this NOFO.**

The four components that will be funded through this CoC Program Competition are fully described at 24 CFR 578.37 and include: (a). Transitional Housing; (b). Supportive Services Only; (c). Permanent Housing; and (d). HMIS.

Additionally, HUD will allow renewal project applications for Joint TH/PH-RRH component projects, which combine two existing program components in a single project (see section III.G.5 of this NOFO for more information). HUD will not accept new Joint TH/PH-RRH component project applications.

**6. Housing with shared kitchen and bathroom facilities.**

Under the CoC Interim Rule at 24 CFR 578.75, housing leased with Continuum of Care

program funds, or for which rental assistance payments are made with Continuum of Care program funds, must meet the applicable standards at 24 CFR 982.401 (HQS), and starting on October 1, 2026, 24 CFR 5.703 (NSPIRE). Both HQS and NSPIRE require a bathroom and a kitchen in the unit. HUD will consider requests to waive this regulatory requirement for good cause to facilitate projects proposing a housing model that does not meet this standard, such as Single Rooms Occupancy units (SROs).

**7. Special CoC NOFO grants and Rural Costs.**

Grants originally awarded funding under the Special NOFO to Address Unsheltered and Rural Homelessness, that are expiring in Calendar year 2027 are eligible to renew under this NOFO.

Projects originally awarded under the Rural Set Aside through the Special CoC NOFO Competition that are applying for renewal may only request costs that are eligible under the CoC Program.

**8. Reallocation.**

CoCs may reallocate funding from any eligible renewal grant, including grants that have not previously renewed under the CoC Program, so long as the project has an executed grant agreement with an expiration date in Calendar Year 2027. For more information on Reallocation requirements see Sec. II.B.3.f of this NOFO.

**9. Competitive Repurposing of YHDP Renewal Funds**

Pursuant to the Consolidated Appropriations Act, 2026, any CoC, in consultation with their youth action board, that determines it no longer has an identified need for funds to renew an eligible YHDP renewal grant under this NOFO shall notify HUD, and HUD shall recapture the YHDP renewal funding and make the recaptured amounts competitively available for a subsequent YHDP and Youth Homelessness System Improvement (YHSI) grants NOFO Competition. See section VI.B.1.c.(3)

**10. Preferences for Elderly Individuals and Families and Disabled Individuals and Families**

Pursuant to the Consolidated Appropriations Act, 2026 recipients of CoC Program funds, including funds awarded under this NOFO and prior CoC Program Competition NOFOs may establish preferences for:

- Elderly individuals and families. For purposes of establishing preferences under this allowance, HUD is defining elderly as 55 and older.
- Disabled individuals or families as defined by section 401(10) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11360(10)).

When implementing these preferences, all other federal fair housing and nondiscrimination requirements apply.

**11. Award Announcement Timeline.**

Pursuant to the Consolidated Appropriations Act, 2026, HUD will announce FY26 CoC awards no later than December 1, 2026, barring any judicial or congressional intervention.

## G. Other Information

### 1. CoC Program NOFO Requirements.

All requirements for submitting the entire CoC Consolidated Application, including applications for projects eligible for FY 2026 CoC and YHDP funding and the total amount of funds available, are contained in this NOFO. Applicants should read this information carefully and respond to all submission requirements and deadlines as described.

**a.** CoCs should consider the Goals and Objectives established in Section III.B of this NOFO in conjunction with local priorities to determine the ranking of new and renewal project application requests.

**b.** HUD will conduct threshold reviews of project applicants, and project applications for all CoC Consolidated Applications that are submitted by the application submission deadline as described in section VI.A.

**c.** HUD may issue more than one conditional funding announcement, including for instances where a CoC has been affected by a disaster and for which HUD has extended the deadline for application submission.

**d.** HUD will score the FY 2026 CoC Application portion of the Consolidated Application in accordance with the criteria set forth in section V.B of this NOFO.

**e.** With the exception of CoC Planning and, if applicable, UFA Cost applications, CoCs must rank all project applications. This includes CoC Bonus, DV Bonus, CoC Renewal (including DV Renewal projects), New CoC Reallocation, New DV Reallocation, and YHDP Renewal and YHDP Reallocation projects. CoC Planning and, if applicable, UFA Costs project applications are not ranked and will be selected provided they pass project eligibility and project quality threshold review.

### 2. Performance-Based Decisions.

**a.** The CoC must review each project application submitted to the CoC for inclusion on the FY 2026 CoC Priority Listing as part of the CoC Consolidated Application and either approve and rank or reject project application submissions. All project applications approved by the CoC must be listed on the CoC Priority Listings in rank order.

Higher ranked projects will be assigned to Tier 1 and lower ranked projects will be assigned to Tier 2 as described in sections V.D.3.a and V.D.3.b of this NOFO. This two-tiered approach for CoCs notifies HUD, which projects are prioritized for funding.

**b.** Consistent with the requirements of the Consolidated Appropriations Act, 2026:

**(1)** Requests for new CoC project applications are allowed if the CoC evaluates and competitively ranks projects based on how they improve the CoC's system performance as assessed in section V.B.1.a.(1) of this NOFO; and

**(2)** HUD will prioritize funding for CoCs that have demonstrated the capacity to reallocate funding from lower to higher performing projects.

### 3. Eligible Renewal Project.

YHDP and CoC projects originally funded in FY 2025 or earlier, including projects originally

funded under the Special NOFO or DV Bonus are eligible to renew under this NOFO, provided the projects have an expiration date in CY 2027 (between January 1, 2027, and December 31, 2027). Renewal project applications must be submitted by the recipient currently under grant agreement to operate the project. See section II.B.4 for more information on renewal project requirements.

**4. Reallocation.**

Reallocation is a process CoCs use to shift funds in whole or in part from existing eligible CoC renewal projects to create one or more new projects without decreasing the CoC's ARD. CoCs may only reallocate eligible renewal projects so long as the renewal project being reduced or eliminated has a current grant agreement with an expiration date in CY 2027. Additionally, new projects created through reallocation must meet the project eligibility and project quality thresholds established in sections V.A.4.a and V.A.4.c of this NOFO. For more information on the requirements for projects created through reallocation, see sections II.B.3.e (DV Reallocation), II.B.3.f (CoC Reallocation), and II.B.3.h (YHDP Reallocation) of this NOFO.

To create a Transition Grant through the reallocation process, the CoC must reduce or eliminate one or more projects and use those funds to create the single, new transition grant [see section II.B.3.k of this NOFO].

**5. Joint TH/PH-RRH Component Project.**

The Joint TH/PH-RRH component project combines two existing program components – Transitional Housing and Permanent Housing-Rapid Rehousing – in a single project to serve individuals and families experiencing homelessness.

If funded, HUD will limit eligible costs as follows, in addition to other limitations found in the Rule:

- **a.** leasing of a structure or units, and operating costs to provide transitional housing;
- **b.** short- and medium-term tenant-based rental assistance on behalf of program participants to pay for the RRH portion of the project;
- **c.** supportive services;
- **d.** costs of contributing data to the HMIS; and
- **e.** project administrative costs.

Renewal project applicants must include details in the project description of how TH and PH-RRH assistance will be provided. Additionally, if CoC Program funds are not being requested for both TH and PH-RRH units, the renewal project application must describe and include the number of the project's TH units and PH-RRH units that will be paid for from another funding source. Applicants may only use CoC Program Leasing funds or non-CoC Program Funds to pay for the cost of housing program participants enrolled in the TH portion of the project.

When a program participant is enrolled in a Joint TH/PH-RRH component project, the recipient or subrecipient must be able to provide both components, including the units supported by the TH component and the tenant-based rental assistance and services

provided through the PH-RRH component, to all participants. A program participant may choose to receive only the assistance provided through the TH portion of the project or the assistance provided through the PH-RRH component, but the recipient or subrecipient must make both types of assistance available.

**6. Supportive Services Only (SSO) projects not dedicated to Coordinated Entry.**

Project applicants may apply for SSO projects consistent with 24 CFR 578.37 and 578.53, including projects with the outreach service activity described at 24 CFR 578.53(e)(13) to individuals and families primarily residing in places not meant for human habitation. Projects that are primarily providing these outreach services, and identify themselves as such in the project application, must meet the project quality threshold criteria in Section V.A.4.c.(4)(c) of this NOFO. All other SSO projects, except those dedicated to coordinated entry, must meet the threshold criteria in Section V.A.4.c.(4)(b) of this NOFO.

**7. Centralized or Coordinated Assessment System (Coordinated Entry).**

In general, 24 CFR 578.23(c)(9) and (11) requires all CoC program recipients and subrecipients to use the centralized or coordinated assessment system established by CoCs. CoCs may use planning costs to design and plan for the implementation of a Coordinated Entry system; however, once the system is established and operating, the costs of operating it are not eligible planning costs. CoCs must operate the system with CoC Program funds, other funds, or a combination of the two. Section 578.23(c)(9) of the CoC Program Rule exempts victim service providers from using the CoC's coordinated entry process if victim service providers use a coordinated entry process that otherwise meets HUD's requirements.

**8. Non-Dedicated Permanent Supportive Housing Beds.**

A Permanent Supportive Housing bed within a CoC's geographic area that is not currently classified as dedicated for use by chronically homeless individuals and families or as DedicatedPLUS.

**9. Beds Dedicated to Chronically Homeless Individuals and Families.**

A Permanent Supportive Housing bed that is dedicated specifically for use by individuals and families experiencing chronic homelessness [see 24 CFR 578.3 definition of Chronically Homeless] within a CoC's geographic area, as reported in the CoC's housing inventory count (HIC) and permanent housing (PH) project applications.

**10. DedicatedPLUS Project.**

**a.** A PSH project where 100 percent of the beds are dedicated to serve individuals, households with children, and unaccompanied youth (including pregnant and parenting youth) that at intake meet one of the following categories:

**(1)** experiencing chronic homelessness, meaning they qualify as "chronically homeless" as defined in 24 CFR 578.3;

**(2)** residing in a TH project that will be eliminated and meets the definition of chronically homeless in effect at the time in which the individual or family entered the TH project;

**(3)** residing in a place not meant for human habitation, emergency shelter, or Safe Haven and had been admitted and enrolled in a PH project within the last year but were

unable to maintain a housing placement and met the definition of chronically homeless as defined by 24 CFR 578.3 prior to entering the project;

**(4)** residing in transitional housing funded by a Joint TH/PH-RRH component project and who were experiencing chronic homelessness as defined by 24 CFR 578.3;

**(5)** residing and has resided in a place not meant for human habitation, Safe Haven, or emergency shelter for at least 12 months in the last three years, but has not done so on four separate occasions and the individual or head of household meet the definition of 'homeless individual with a disability; or

**(6)** receiving assistance through a Department of Veterans Affairs (VA)-funded homeless assistance program and met one of the above criteria at initial intake to the VA's homeless assistance system.

**b.** A renewal project where 100 percent of the beds were dedicated to individuals and families experiencing chronic homelessness may either be reallocated to create a DedicatedPLUS project or may continue as a renewal project dedicating 100 percent of its beds to individuals and families experiencing chronic homelessness. If the project is reallocated as a DedicatedPLUS project, the project must adhere to all fair housing requirements at 24 CFR 578.93.

**c.** Projects HUD awarded as DedicatedPLUS in a previous CoC Program Competition must continue to include households with children to qualify as a DedicatedPLUS project in the FY 2026 CoC Program Competition.

**11. Participant Eligibility.**

Projects funded through this NOFO must have the following eligibility criteria for program participants. All references to paragraphs of the definition of homeless that are found throughout this NOFO refer to the paragraphs listed under the definition of "homeless" in 24 CFR 578.3 and include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All specific references to the definition of "homeless" under paragraph (4) of 24 CFR 578.3 that are found throughout this NOFO also include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All projects must participate in coordinated entry, and the selection of program participants must be consistent with the CoC's coordinated entry process.

As provided by the Consolidated Appropriations Act, 2026, youth aged 24 and under must not be required to provide third-party documentation that they meet the homeless definition in 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act as a condition for receiving services funded under this NOFO. Additionally, any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under or families headed by youth aged 24 and under who are living in unsafe situations. HUD interprets "youth-serving provider" as a private nonprofit organization whose primary mission is to provide services to youth aged 24 and under and families headed by youth aged 24 and under. HUD interprets "living in unsafe situations" as having an unsafe primary nighttime residence and no safe alternative to that residence. These youth-related requirements supersede any conflicting requirements under this NOFO or the Rule.

Participants eligible to be served by projects funded under this NOFO, are as follows:

**a.** PH-PSH projects awarded CoC funds must serve one of the following:

**(1)** persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act where the head of household also has a qualifying disability as defined section 401(9) of the McKinney-Vento Homeless Assistance Act; or

**(2)** for renewal projects, the same population of individuals and families indicated in the expiring grant agreement (e.g., PSH projects originally awarded under the Special NOFO Competition projects through the Unsheltered Set Aside must serve individuals and families who qualify under paragraph (1) or (4) of the definition of homeless).

**b.** TH, PH-RRH, Joint TH/PH-RRH, SSO projects awarded CoC funds must serve persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act with the following exception:

PH-RRH, TH, Joint TH/PH-RRH, SSO- may serve persons who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**c.** DV Bonus, DV Renewal and DV Reallocation projects must serve individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking and who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act with the following exception:

PH-RRH, Joint TH/PH-RRH, SSO- projects may serve individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**d.** YHDP Renewal and Replacement projects including YHDP projects created through reallocation must serve youth aged 24 or younger, including unaccompanied and pregnant or parenting youth who:

**(1)** qualify as homeless under paragraphs (1), (2), or (4) of the homeless definition in 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act;

**(2)** have an unsafe primary night-time residence and no safe alternative to that residence; or

**(3)** qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

Case: 26-1923 Document: 00118495633 Page: 190 Date Filed: 08/21/2026 Entry ID: 6836472



# IV. APPLICATION CONTENTS AND FORMAT

IV. Application Contents and Forms

A. Standard Forms, Assurances, and Certifications

B. Budget

C. Narratives and Other Attachments

D. Other Application Content

TABLE OF CONTENTS

# IV. APPLICATION CONTENTS AND FORMAT

Applications must include three main elements: a) standard forms, assurances, and certifications; b) budget; and c) narratives and other attachments. The content, forms, and format for each element are included in this section.

You may use this section as a checklist to ensure you submit a complete application.

If you don't provide the required documents in the correct format, your application is incomplete.

Do not submit password protected or encrypted files.

While the CoC Program NOFO is officially posted on Grants.gov, the standard forms, assurances, certifications, budgets, narrative responses, and the ability to include attachments are built into e-snaps, an electronic application system.

HUD does not accept faxed applications or supportive documents.

There are two types of applications under this NOFO that are part of the CoC Consolidated Application;

- CoC Application that includes the CoC responses to the rating factors in Section V.B of this NOFO; and
- Project applications that must be approved by CoCs to be included as part of the CoC Consolidated Application. See Sections II.B and VI of this NOFO for information on eligible project applications and submission requirements.

## A. Standard Forms, Assurances, and Certifications

You must properly complete and submit with your application the standard forms, assurances, and certifications identified below. You can find all forms in the application package or review them and their instructions at Grants.gov Forms. You can also read more about standard forms on HUD's Funding Opportunities page.

The identified forms below are included in the project applicant profile in e-snaps and must be completed by the project applicant before gaining access to the application.

| Forms/Assurances/Certifications | Submission Requirement |
|---|---|
| **Application for Federal Assistance (SF-424)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Applicant and Recipient Assurances and Certifications (HUD-424B)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Applicant/Recipient** | Required with the application and completed |

| Forms/Assurances/Certifications | Submission Requirement |
|---|---|
| **Disclosure/Update Report (HUD-2880)** | in e-snaps via the information from the Project Applicant Profile. |
| **Certification Regarding Lobbying** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Disclosure of Lobbying Activities (SF-LLL)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification for a Drug-Free Workplace (HUD-50070)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Assurances for Construction Programs (SF-424D)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification of Need and Compliance with Housing Quality and Habitability Standards.** | If applicable, required with the application and included in e-snaps.<br>Collaborative Applicants must certify there is a demonstrated need for all PH renewal projects included in the Renewal Project Listing. Additionally, Collaborative Applicants must certify these projects comply with program requirements and appropriate standards of housing quality and habitability on the Renewal Project Listing. |
| **Indirect Cost Rate Certification (HUD-426)** | If applicable, required with the application and included in e-snaps. |

**The following forms are not built into e-snaps but are required to be submitted by Collaborative applicants with the CoC Priority listing:**

**1. Certification of Consistency with the Consolidated Plan Form HUD-2991.**

The standard form, Certification of Consistency with the Consolidated Plan (form HUD-2991), in which a state or local official certifies that the proposed activities or projects are consistent with the jurisdiction's Consolidated Plan and, if the project applicant is a state or unit of local government, that the jurisdiction is following its Consolidated Plan per the requirement of 24 CFR part 91. Collaborative Applicants must download a new HUD-2991 and complete it for

all project applications submitted and listed on the CoC Project Listings either by submitting one correctly signed and dated HUD-2991 form from the appropriate jurisdiction(s) that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction.

The FY 2026 Form HUD-2991 must be completed and dated between December 10, 2025 and August 26, 2026 and attached to the FY 2026 CoC Priority Listing.

**2. Tribal Resolution for Projects on Trust Land or Reservations, if applicable.**

Any applicant that is not a Tribe or TDHE proposing to site a project on a reservation or trust land must include a Tribal resolution or a letter from an official or principal of the Indian Tribe or TDHE, who is authorized to act on behalf of the Indian Tribe or TDHE. Tribes do not need to include a Tribal resolution to site a project on their own reservation or trust land. A Tribal resolution is the formal manner in which the Tribal government expresses its legislative will in accordance with its organic documents. In the absence of such organic documents, a written expression adopted pursuant to Tribal practices is acceptable.

A CoC that is not a Tribe or TDHE that proposes to locate a new project on a reservation or trust land that is not currently included in the CoC's approved geographic service areas, identified during the CoC Registration process, are required to obtain a Tribal resolution or a letter from an official or principal of the Indian Resolution from the Tribe or TDHE and attach it to the CoC Priority Listing.

**3. Code of Conduct.**

Both you, as the award recipient, and all subrecipients must have a code of conduct (or written standards of conduct). The code of conduct must comply with the requirements included in the "Conducting Business in Accordance with Ethical Standards", as well as any program-specific requirements. These requirements include ethical standards related to conflicts of interest for procurements in 2 CFR 200.318(c) and 2 CFR 200.317, as well as HUD-specific conflict of interest standards. HUD maintains a list of organizations that have previously submitted written standards of conduct on its Code of Conduct for HUD Grant Programs webpage. But it is your responsibility to ensure that the standards are compliant with the noted requirements and that HUD has the latest version of the written standards. Updated written standards should be submitted with the application. Any updates to your written standards, after the application period, should be submitted as directed by the HUD program contact for this NOFO.

**4. Certification for Opportunity Zone Preference Points (HUD 2996), if applicable.**

The HUD-2996 form is not built into e-snaps and must be submitted as an attachment to the CoC application in e-snaps on the Attachment screen if the CoC is requesting Opportunity Zone Preference Points.

## B. Budget

You must submit a budget with your application to support your project narrative.

At a minimum, your budget must indicate direct and any indirect costs.

The project application in e-snaps includes the budget forms available under this NOFO. Project applicants will select the appropriate budget form(s) based on the requested activities

and must be completed for the proposed project. Additionally, there is a section to capture indirect cost rate and the HUD-426 form, if applicable.

**Eligible Costs.**

Except as otherwise stated below, 24 CFR 578.37 through 578.63 identifies the eligible costs that applicants may request under the CoC Program.

**1. YHDP Costs.**

Eligible costs for YHDP projects originally funded under the YHDP Competition are also eligible YHDP Renewal project costs under this NOFO (see section II.B.3.g of this NOFO). Additionally, YHDP Renewal projects may include the YHDP Special Activities described in IV.B.2 below, subject to Renewal project requirements in sections II.B.3.gof this NOFO, as well as VAWA Costs, and Rural Costs, described in sections 4 and 5, below. YHDP Replacement including YHDP Reallocation project applications under this NOFO may include requests for eligible CoC Program Costs; the YHDP activities described in section II.B.3.g; VAWA Costs and Rural Costs described in sections IV.B.4 and 5 below; and the YHDP Special Activities in section IV.B.2 below . HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

**2. Special YHDP Activities.**

YHDP Renewal and YHDP Replacement including YHDP Reallocation projects may submit applications that include the following special YHDP activities, which are ineligible under the CoC Program, subject to the conditions specified in this section:

**a.** Recipients may carry out the activities below with written notice to the Director of HUD's Office of Special Needs Assistance Programs (SNAPS), subject to the requirements governing grant agreement amendments at 24 CFR 578.105. HUD will consider the inclusion of these activities in the project application as notification to the Director of SNAPS.

**(1)** Housing projects may have leases for a minimum term of 1 month plus 1 day under rental assistance budget line items.

**(2)** Projects may use leasing, sponsor-based rental assistance, and project-based rental assistance in RRH projects.

**(3)** In addition to the eligible costs listed in 24 CFR 578.59(a), recipients may use project administration funds to support costs of involving youth with lived experience in project implementation, execution, and improvement.

**(4)** Recipient may use project administrative funds to attend conferences and trainings that are not HUD-sponsored or HUD-approved, provided that the subject matter is relevant to youth homelessness.

**(5)** Projects may employ youth who are receiving services, or housing assistance, from the recipient organization. Recipients that use this special YHDP activity must maintain documentation that discloses the nature of work that the youth performs, and that the youth is not in a position that creates a conflict of interest.

**(6)** Recipients of YHDP may utilize the following housing standards for transitional

housing and Rapid Rehousing units. Recipients implementing this special YHDP activity may also establish standards that exceed or add to these minimum standards and must keep documentation of what standards are applied to the units and proof that the units complied with the standards before assistance is provided.

**(a)** ***Structure and materials.*** The structures must be structurally sound to protect residents from the elements and not pose any threat to the health and safety of the residents.

**(b)** ***Space and security.*** Each resident must be provided adequate space and security for themselves and their belongings. Each resident must be provided an acceptable place to sleep.

**(c)** ***Interior air quality.*** Each room or space must have a natural or mechanical means of ventilation. The interior air must be free of pollutants at a level that might threaten or harm the health of residents.

**(d)** ***Water supply.*** The water supply must be free from contamination.

**(e)** ***Sanitary facilities.*** Residents must have access to sufficient sanitary facilities that are in proper operating condition, are private, and are adequate for personal cleanliness and the disposal of human waste.

**(f)** ***Thermal environment.*** The housing must have any necessary heating/cooling facilities in proper operating condition.

**(g)** ***Illumination and electricity.*** The structure must have adequate natural or artificial illumination to permit normal indoor activities and support health and safety. There must be sufficient electrical sources to permit the safe use of electrical appliances in the structure.

**(h)** ***Food preparation.*** All food preparation areas must contain suitable space and equipment to store, prepare, and serve food in a safe and sanitary manner.

**(i)** ***Sanitary conditions.*** The housing must be maintained in a sanitary condition.

**(j)** ***Fire safety.***

**i.** There must be a second means of exiting the building in the event of fire or other emergency.

**ii.** Each unit must include at least one battery-operated or hard-wired smoke detector, in proper working condition, on each occupied level of the unit. Smoke detectors must be located, to the extent practicable, in a hallway adjacent to a bedroom. If the unit is occupied by hearing impaired persons, smoke detectors must have an alarm system designed for hearing-impaired persons in each bedroom occupied by a hearing-impaired person.

**iii.** The public areas of all housing must be equipped with a sufficient number, but not less than one for each area, of battery-operated or hard-wired smoke detectors. Public areas include, but are not limited to, laundry rooms, community rooms, day care centers, hallways, stairwells, and other common areas.

**(7)** Recipients may provide moving expenses to a program participant more than once.

**(8)** Recipients may provide payments of up to $500 per month for families that provide housing under a host home and kinship care model to offset the increased costs associated with having youth housed in the unit.

**(9)** YHDP recipients may continue providing supportive services to program participants for up to 12 months after the program participant exits homelessness, transitional housing or after the end of housing assistance.

**(10)** Projects using grant leasing funds may pay above the Fair Market Rent (FMR) for individual units as long as the amount paid is consistent with the reasonable rent standards at 24 CFR 578.51(g).

**(11)** Recipients may use grant funds for the following if they are necessary to assist program participants to obtain and maintain housing. Recipients and subrecipients must maintain records establishing how it was determined that paying the costs was necessary for the program participant to obtain and retain housing and must also conduct an annual assessment of the needs of the program participants and adjust costs accordingly:

**(a)** Security deposits for units in an amount not to exceed 2 months of rent.

**(b)** The costs to pay for any damage to housing due to the action of program participants, which may be paid while the youth continues to reside in the unit. The total costs paid for damage per program participant may not exceed the cost of 2 months' rent.

**(c)** The costs of providing household cleaning supplies to program participants.

**(d)** Housing start-up expenses for program participants, including furniture, pots and pans, linens, toiletries, and other household goods, not to exceed $500 in value per program participant.

**(e)** The one-time cost of purchasing a cellular phone and service for program participant use, provided access to a cellular phone is necessary to obtain or maintain housing and the costs of the phone and services are reasonable per 2 CFR 200.404.

**(f)** The cost of internet in program participants' units if the costs of the service is reasonable per 2 CFR 200.404.

**(g)** Payment of rental arrears consisting of a one-time payment for up to 6 months of rent in arrears, including any late fees on those arrears.

**(h)** Payment of utility arrears of up to 6 months per utility.

**(i)** Up to 3 months of utilities for a program participant, based on the utility costs schedule for the unit size and location.

**(j)** In addition to transportation costs eligible in 24 CFR 578.53(e)(15), recipients may pay gas and mileage costs for a program participant's personal vehicle for trips to and from medical care, employment, childcare, or other services eligible under this section.

**(k)** Legal fees, including court fees, bail bonds, and required courses and equipment.

**(l)** Program participant's past driving fines and fees that are blocking a young person from being able to obtain or renew a driver's license and impacting their ability to obtain or maintain housing. Additionally, recipients may pay for program participants' costs for insurance and registration for personal vehicles, if the personal vehicle is necessary to reach medical care, employment, childcare, or other services eligible under this section.

**(12)** Recipients of housing projects (RRH, TH, TH-RRH, and PSH) may use YHDP funds to pay for owner incentive and retention payments before occupancy of the unit, or at any point thereafter, provided that the overall amount paid with program funds per unit occupied by the program participant does not exceed three times the rent charged for the unit. These payments may include signing bonuses (a payment offered to an owner as an incentive for leasing a unit to be occupied by a program participant), repairs to bring the unit into compliance with program requirements, or holding fees to reserve a unit for an individual or family experiencing homelessness. Owner incentive and retention payments may not be paid for units owned by the project recipient, subrecipient, their parent organization(s), any other related organization(s), or organizations that are members of a partnership, where the partnership owns the structure.

**(13)** Recipients of Transitional Housing projects may use Single Room Occupancy (SRO) units to house youth. SRO units are subject to regulations at 24 CFR 982.602 and 24 CFR 982.605. Fair Market Rent (FMR) and utility costs for SROs are calculated as 75% of the zero-bedroom FMR and utility costs, respectively.

**(14)** Rental Assistance may be administered by nonprofit providers, Tribes, and TDHEs, in addition to the organizations listed in 24 CFR 578.51(b).

**b.** ***YHDP Exceptions.*** Under the conditions specified below, recipients may make use of the following built-in exceptions to this NOFO's requirements, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. To expedite grant agreement processing, applicants should include as much information as possible as part of their project application to demonstrate they meet the conditions specified below.

**(1)** Projects may provide up to 36 months of leasing or rental assistance in TH or RRH projects to program participants if the recipient demonstrates: (1) the method it will use to determine which youth need rental assistance beyond 24 months and (2) the services and resources that will be offered to ensure youth are able to sustain their housing at the end of the 36 months of assistance.

**(2)** Projects may continue providing supportive services to program participants for up to 24 months after a program participant exits homelessness, transitional housing or after housing assistance ends if the recipient demonstrates: (1) the proposed length of extended services to be provided; (2) the method it will use to determine whether services are still necessary; and (3) how those services will result in self-sufficiency and ensure stable housing for program participants.

**(3)** Projects may continue providing supportive services to program participants for up to 36 months after program participants exit homelessness, if the services are in

connection with housing assistance, such as the Foster Youth to Independence initiative, or if the recipient can demonstrate that extended supportive services ensures continuity of caseworkers for program participants.

**(4)** Rental assistance may be combined with leasing or operating funds in the same unit, provided that the recipient submits a project plan that includes safeguards to ensure that no part of the project would receive a double subsidy.

**(5)** Projects may provide payments of up to $1,000 per month for families that provide housing under a host home and kinship care model, provided that the recipient can show that the additional cost is necessary to recruit hosts to the program.

**(6)** For YHDP Renewal projects only, YHDP recipients may pay for short-term (up to three months) emergency lodging in motels or shelters as the transitional housing component in a Joint transitional housing-rapid rehousing (TH-RRH) project, provided that the recipient can demonstrate that use of the hotel or motel room is accessible to supportive services.

**c. *Innovative Activities*.** In addition to the specific activities authorized above or in 24 CFR part 578, other innovative activities to reduce youth homelessness may be carried out in a YHDP project, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. Requests to carry out YHDP innovative activities are permitted to be requested in any YHDP application. YHDP Replacement applicant must demonstrate to HUD that the activity meets the following criteria; and to expedite grant agreement processing, must include as much information as possible as part of their project application.

YHDP Renewal or YHDP Replacement applications requesting to carry out Innovative Special YHDP Activities must demonstrate the following:

**(1)** The activity is approved by both the Youth Action Board (YAB) and the CoC lead. For purposes of this section, a YAB is defined as a group of at least 4 youth – aged 24 or younger - with voting power on policy decisions of the CoC (particularly on policies that relate to preventing and ending youth homelessness, and where at least two-thirds of the members have lived experience/expertise of homelessness. The YAB must be a formal committee of the CoC. The YAB should be representative of the youth and young adult population experiencing homelessness in the community;

**(2)** That activity will be testing or likely to achieve a positive outcome in at least one of the four core outcomes for youth experiencing homelessness (stable housing, permanent connections, education/employment, and well-being);

**(3)** The activity is cost-effective; and

**(4)** The activity is not in conflict with fair housing, civil rights, or environmental regulations.

**3. Rural Costs for Projects Originally Awarded Under the Rural Set Aside of the Special CoC NOFO Competition.**

Projects originally awarded under the Rural Set Aside through the Special CoC NOFO Competition that are applying for renewal may only request costs that are eligible under

the CoC Program. This means the following costs are no longer eligible in projects originally awarded under the Rural Set Aside:

**a.** Rent or utility assistance after 2 months of nonpayment of rent or utilities to prevent eviction or loss of utility service are no longer eligible. Funds may no longer be used to pay rent or utility arrear payments up to 6 months on behalf of program participants residing in permanent housing.

**b.** ***Emergency food and clothing assistance.*** Costs for providing clothing to program participants are not eligible. Costs for providing meals or groceries are an eligible supportive service (24 CFR 578.53(e)(7) and must now be classified on the supportive services budget line item.

**c.** Costs associated with making use of Federal Inventory property programs to house individuals and families experiencing homelessness are no longer eligible. Federal Inventory property programs means the Use of Federal Real Property to Assist the Homeless program authorized by title V of the Act, and implemented by 24 CFR part 581, and the Single-Family Property Disposition Program authorized by section 204(g) of the National Housing Act (12. U.S.C. 1710(g)) and implemented at 24 CFR part 291.

Applicants may move funds currently allocated to these costs in their current grant agreement to other eligible CoC Program costs through the project application.

Costs for funding repairs, repairs necessary to make housing habitable to be used for transitional or permanent housing, emergency short-term lodging costs, and capacity building activities remain eligible; however, these costs must now be classified as Rural Costs (as identified in paragraph 5 below). Applicants may move funds currently allocated to these costs in their current grant agreement to the Rural Costs BLI through the project application.

**4. VAWA Costs Information.**

Section 605(a)(2) of VAWA 2022 amended section 423(a) of the McKinney-Vento Homeless Assistance Act to add the following eligible activity to the CoC program: "Facilitating and coordinating activities to ensure compliance with the emergency transfer plan requirement in [34 U.S.C. 12491(e)] and monitoring compliance with the confidentiality protections in [34 U.S.C. 12491(c)(4)]."

HUD has determined that eligible activities paid for under the VAWA costs category are not subject to the CoC program's spending caps on administrative costs under section 423(a)(10), (11), and (12). This activity may be included in new project applications, added to eligible renewal projects through expansion or added to eligible renewal projects by shifting up to 10 percent of funds from one eligible activity to the VAWA costs line item.

**a.** Examples of eligible costs for emergency transfer facilitation include the costs of assessing, coordinating, approving, denying and implementing a survivor's emergency transfer which includes:

**(1)** Assistance with moving costs. Reasonable moving costs to move survivors for an emergency transfer.

**(2)** Assistance with travel costs. Reasonable travel costs for survivors and their families

to travel for an emergency transfer.

**(3)** Security Deposits. Grant funds can be used to pay for security deposits of the safe units the survivor is transferring to via an emergency transfer.

**(4)** Utilities. Grant funds can be used to pay for costs of establishing utility assistance in the safe unit the survivor is transferring to.

**(5)** Housing Fees. Fees associated with getting survivors into a safe unit via emergency transfer, includes but not limited to application fees, broker fees, holding fees, trash fees, pet fees where the person believes they need their pet to be safe, etc.

**(6)** Case management. Grant funds can be used to pay staff time necessary to assess, coordinate and implement emergency transfers.

**(7)** Housing navigation. Grant funds can be used to pay staff time necessary to identify safe units and facilitate moves into housing for survivors through emergency transfers.

**(8)** Technology to make an available unit safe. Grant funds can be used to pay for technology that the individual believes is needed to make the unit safe, including but not limited to doorbell cameras, security systems, phone and internet service when necessary to support security systems for the unit, etc.

**b.** Examples of eligible costs for monitoring compliance with the VAWA confidentiality requirements include the costs of ensuring compliance with the VAWA confidentiality requirements which includes:

**(1)** Monitoring and evaluating compliance with VAWA confidentiality requirements.

**(2)** Developing and implementing strategies for corrective actions and remedies.

**(3)** Program evaluation of confidentiality policies, practices and procedures.

**(4)** Training on compliance with VAWA confidentiality requirements.

**(5)** Reporting to Collaborative Applicant, HUD and other interested parties on compliance with VAWA confidentiality requirements.

**(6)** Costs for establishing methodology to protect survivor information.

**(7)** Staff time associated with maintaining adherence to confidentiality requirements.

**5. Rural Costs Information.**

Section 5707 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (PL 117-263, December 23, 2022, 136 Stat 2395) amended section 423(a) of the McKinney-Vento Homeless Assistance Act to allow projects in rural areas [as defined in section 2.b.(11) of Appendix I] to use program funds to pay for the following eligible activities:

**a.** Payment of short-term emergency lodging, including in motels or shelters, directly or through vouchers.

**b.** Repairs to units in which individuals and families experiencing homelessness will be housed; or are currently not fit for human habitation.

**c.** Staff training, professional development, skill development, and staff retention activities.

HUD has determined that eligible activities paid for under the rural costs category may be included in new project applications, including YHDP Replacement projects or added to eligible renewal projects, including YHDP Renewal projects, through expansion.

## C. Narratives and Other Attachments

If applicable, you must upload narrative and non-form attachments in e-snaps.hud.gov. When adding the attachments to the form, you can upload PDF, Word or Excel formats.

Collaborative Applicants will provide narrative responses about the CoC planning body, governance structure, overall performance, and the strategic planning processes in e-snaps. The CoC Application describes the CoC's plan for ending homelessness and increasing self-sufficiency and recovery, describes its system-level performance, and addresses the merit criteria specified in section V.B of this NOFO. HUD scores this part of the application with all charts and narratives completed (as applicable) and all required attachments to determine the order in which competitively ranked CoC projects are funded.

Project applicants will provide narrative responses to questions in e-snaps that demonstrate their ability to meet project eligibility and project quality threshold requirements.

## D. Other Application Content

### 1. Technical Application Errors

HUD will contact you to fix a technical error with your timely application after the due date. Technical errors, if corrected, do not affect (positive or negative) your merit rating under this NOFO. Examples of technical errors include, but are not limited to: inconsistencies in funding requests; a missing or incomplete form or certification; failure to submit an otherwise sufficient application under the correct Assistance Listings number or Funding Opportunity Number in Grants.gov; improper signature on a form or certification; and missing or inappropriate eligibility documentation.

HUD will send notice to the authorized organization representative to fix a technical error. You must respond timely and appropriately to HUD's notice (see submission requirements).

Your application is not eligible for funding if you fail to fix the error to HUD's satisfaction by the due date in HUD's notice. HUD will not review information submitted after the due date in HUD's notice.

Applicants should compare their application submission with the requirements in the CoC Program NOFO. The FY 2026 Continuum of Care and Youth Homeless Demonstration Program Grants NOFO located on Grants.gov is HUD's official NOFO. If a discrepancy in the CoC Program NOFO posted on Grants.gov or other information provided in any other version or supporting documentation is found, please notify HUD immediately as indicated in section VIII of this NOFO. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

HUD will post any corrections or amendments to a CoC Program NOFO on Grants.gov.

For projects conditionally selected for award, HUD verifies that your organization has an active SAM registration prior to release of awarded funds and will withhold processing funds if your organization's SAM registration has expired or isn't consistent with the information provided on the SAM.gov website. A UEI discrepancy may also occur if HUD approves a grant to be amended to a new recipient (see section V.D.8 of this NOFO).

UEI discrepancies are a curable deficiency that may be corrected by the applicant with timely action. If a UEI discrepancy isn't resolved within the timeframe prescribed by the Notification of Curable Deficiency the applicant receives from HUD, HUD may reject the project.

**2. Corrections to Deficient Applications**

Deficiency is information missing or omitted within a submitted application. Deficiencies typically involve missing documents, information on a form, or some other type of unsatisfied information requirement (e.g., an unsigned form, unchecked box, expansion grant application errors, etc.). Deficiencies may be either curable or non-curable. Correction of technical deficiencies must be received by HUD within 7 calendar days after notification is received by the applicant from HUD via email. The start of the cure period will be the date stamp on the email HUD sends to the authorized representative as noted in the Project Applicant Profile in e-snaps; therefore, it is critical the project applicant's authorized representative's information is accurate. Additionally, HUD reserves the right to respond to unanticipated system defects, ambiguities, and technical difficulties in application submissions in e-snaps through a flexible implementation of its authority to cure application deficiencies through written inquires seeking clarification and additional information (also known as callbacks). Upon proper publication in the Federal Register, HUD reserves the right to extend the Competition deadline for good cause.

F. Other Federal Statutes

CoCs may request, in the FY 2026 CoC Application, up to 10 percent of funding for the fiscal year awarded under this NOFO be approved to serve homeless households with children and youth defined as homeless under other federal statutes who are unstably housed (paragraph 3 of the definition of homeless found at 24 CFR 578.3). Approved CoCs are limited to using only up to 10 percent of the total amount awarded for each fiscal year appropriation to the CoC to serve this population and must determine which project(s) HUD will allow to use some or all their funding for this purpose. The only project types that will be funded in this Competition to serve this population are Transitional Housing, Supportive Services Only, and the Joint TH/PH-RRH component projects.

To be approved to serve this population, CoCs making this request must demonstrate serving this population is of equal or greater priority, which means that it is equally or more cost-effective in meeting the overall goals and objectives of the plan submitted under Section 427(b)(1)(B) of the Act, especially with respect to children and unaccompanied youth, than serving the homeless as defined under paragraphs (1), (2), and (4) of the definition of homeless in 24 CFR 578.3. CoCs must thoroughly describe how the requirements described in Section 427(b)(1)(F) of the Act will be met. Some examples of how a CoC can demonstrate that serving this population is of equal or greater priority than serving those defined as homeless under paragraphs (1), (2), and (4) of the definition of homeless in 24 CFR 578.3 include:

**1.** Evidence that the CoC has adequate resources to house all individuals and families defined as homeless under paragraphs (1) and (4) at 578.3 in their geographic area.

**2.** An analysis that demonstrates that the net public cost (including mainstream resources, resources dedicated to preventing and ending homelessness, such as CoC Program funds, and other municipal funds, such as public works) is reduced if the CoC is able to use CoC Program funds to provide housing and supportive services to those individuals defined as homeless under paragraph (3) at 578.3.

**3.** Evidence that the length of time individuals and families in the CoC's geographic area is low (e.g., less than 30 days) and the CoC has adequate resources to house all people who become homeless under paragraphs (1) and (4) at 578.3 within 30 days.

CoCs must identify the specific project(s) that will use funding for this purpose (up to 10 percent of the CoC's total award) by submitting an attachment to the CoC Application in *e-snaps* that must include the following:

**a.** project name(s) as listed on the CoC Priority Listing; and

**b.** amount of funding in the project or per project that will be used for this purpose.

See 24 CFR 578.89 for more information about this limitation.

# V. APPLICATION REVIEW INFORMATION

V. Application Review Information

A. Threshold Review

B. Merit Review

C. Risk Review

D. Selection Process

E. Award Notices

TABLE OF CONTENTS

# V. APPLICATION REVIEW INFORMATION

## A. Threshold Review

**When you apply**: Your application is reviewed to make sure it meets the threshold requirements of this NOFO. If your application has a technical error, HUD will allow you to correct it. If you fail to meet **any** of the threshold requirements, your application is **not** eligible for HUD funding. If you do meet the threshold requirements, your application moves to Merit Review (the next step).

### 1. Timely Application Submission

Late applications are not evaluated and not eligible for funding. See deadlines in Section VI.

Applicants should review and follow the steps outlined below to ensure applications are complete and submitted by the deadlines established in this NOFO. Documents referenced in this section can be found on the CoC Program page of HUD's website: https://www.hud.gov/program_offices/comm_planning/coc.

### 2. Complete Application

If your application is timely, HUD will confirm completeness. Your application is considered for funding if it is complete and responsive to the requirements in this NOFO. If your application is incomplete, HUD will ask you to fix any technical errors. Otherwise, incomplete and nonresponsive applications are not considered for funding.

### 3. Eligible Applicant

Upon receipt, HUD will confirm whether you are an eligible applicant. Applications from ineligible applicants do not proceed to merit review and are not eligible for HUD funding.

**a. *Eligible Project Applicants (McKinney-Vento Act, 24 CFR 578.15, 24 CFR 5.100).*** Eligible project applicants for the CoC Program Competition are found at 24 CFR 578.15 and in the Act and include nonprofit organizations, states, local governments, instrumentalities of state and local governments, Indian Tribes and TDHE [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)]. Public housing agencies, as such term is defined in 24 CFR 5.100, are eligible without limitation or exclusion. For-profit entities are ineligible to apply for grants and are prohibited from being subrecipients of CoC Program grant funds.

**b. *Collaborative Applicants.*** Only CoCs with a valid FY 2026 e-snaps registration will have access to the FY 2026 CoC Consolidated Application in e-snaps, which includes the Consolidated Application (i.e., the CoC Application, the CoC Priority Listing and the project application(s). CoCs should not attempt to change Collaborative Applicants during the FY 2026 CoC Program and YHDP Funding Opportunity without prior HUD approval unless HUD replaces the CoC's designated Collaborative Applicant under the authority of Section 402(c) of the Act. HUD will approve Collaborative Applicant changes outside the annual CoC Program Registration process under the following circumstances:

- the Collaborative Applicant made an error when entering the Collaborative Applicant name in the CoC Applicant Profile;
- the CoC-designated Collaborative Applicant is no longer in business;

• the CoC designates a new Collaborative Applicant; or
• HUD designated a new Collaborative Applicant as a remedial action under Section 402(c) of the Act.

In cases where the CoC changes its designated Collaborative Applicant during the CoC Program Registration process, the CoC must notify the local HUD CPD field office, in writing, stating the reason for the Collaborative Applicant change. The notice to HUD must provide documentation of the CoC's approval of the change (e.g., a copy of the meeting minutes to include the date and attendees).

**c. *Indian Tribes and Tribally Designated Housing Entities (TDHE).*** The Consolidated Appropriations Act, 2021 (Public Law 116-260, approved December 27, 2020) amended Title IV to add Section 435 of the Act to allow Indian Tribes and Tribally Designated Housing Entities (TDHE) to be Collaborative Applicants, eligible entities, or subrecipients of the CoC Program in addition to amending Title IV Section 401 to add the terms "Formula Area" and "Indian Tribe." These amendments mean that not only may Tribes and TDHEs apply for grants through other CoCs, but that formula areas, as that term is defined in the Indian Housing Block Grant program at 24 CFR 1000.302, are eligible to be added to the geographic areas of existing CoCs or may be included in newly formed CoCs through the CoC registration process (see Notice CPD-26-03).

Indian Tribes and TDHEs may:

**(1)** create a CoC;
**(2)** be a Collaborative Applicant;
**(3)** be an eligible project applicant; or
**(4)** receive grant amounts from another entity that receives a grant directly from HUD (i.e. be a CoC grant subrecipient).

However, under 42 U.S.C. 11383(g) only States, Units of General Local Government, nonprofit organizations, and Public Housing Agencies may administer permanent housing rental assistance.

**d. *Solo Applicants.*** Eligible project applicants that attempted to participate in the CoC planning process in the geographic area in which they operate, that believe they were denied the right to participate in a reasonable manner, may submit a solo project application to HUD by following the procedure found in 24 CFR 578.35. If HUD finds in favor of the solo applicant, HUD may award grant funds. Solo applicants requesting FY 2026 funding must submit their solo project application in e-snaps to HUD by 8:00 PM ET, on August 26, 2026. See section VIII.D.3.a of this NOFO for additional information regarding the Solo Applicant appeal process.

**4. Threshold Criteria.**

Applicants who fail to meet the following threshold eligibility requirements are ineligible.

**a. *Project Eligibility Threshold.*** HUD will review all projects to determine if they meet the following project eligibility threshold requirements on a pass/fail standard. If HUD determines the applicable standards are not met for a project, HUD will reject the project. HUD will consider any project requesting renewal funding as having met requirements (1)-(4) through its previously approved grant application unless HUD finds information to the

contrary (e.g., monitoring findings, results from investigations by HUD's Office of Inspector General, the recipient routinely does not draw down funds from eLOCCS at least once per quarter, consistently late Annual Performance Report (APR) submissions). Approval of new and renewal projects is not a determination by HUD that a recipient is compliant with applicable fair housing and civil rights requirements.

**(1)** Project applicants and potential subrecipients must meet the eligibility requirements of the CoC Program as described in the Act and the Rule and provide evidence of eligibility required in the application (e.g., nonprofit documentation).

**(2)** Project applicants and subrecipients must demonstrate the financial and management capacity and experience to carry out the project as detailed in the project application and the capacity to administer federal funds. Demonstrating capacity may include a description of the applicant and subrecipient experience with similar projects and with successful administration of SHP, S+C, or CoC Program funds or other federal, state, local, or private resources.

**(3)** The population to be served must meet program eligibility requirements as described in the Act, the Rule, and section III.G.11 of this NOFO.

**(4)** Project applicants, except Collaborative Applicants that only receive awards for CoC Planning costs and, if applicable, UFA Costs, must agree to participate in a local HMIS system. However, in accordance with Section 407 of the Act, any victim service provider that is a recipient or subrecipient must not disclose, for purposes of HMIS, any personally identifying information about any client. Victim service providers must use a comparable database that meets the needs of the local HMIS.

**(5)** Project applicants must submit the required certifications specified in this NOFO.

**(6)** Project applicants must certify affirmatively to the following:

| |
|---|
| The project applicant will not engage in illegal racial discrimination. This is consistent with the requirements of 2 CFR 200.300(a). |
| The project applicant will not operate drug injection sites or "safe consumption sites" in violation of 21 U.S.C. 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 U.S.C. 863. This is consistent with the objectives outlined in Section III.B above and is consistent with the requirements of 2 CFR 200.300(a).<br><br>This certification is not a requirement that program participants must be sober in order to receive assistance, participate in treatment in order to receive assistance, or be evicted or exited from assistance for a first-time violation of a drug-related program policy or lease requirement. |

**(7)** HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition to ensure that it can

adequately manage federal awards and comply with all applicable federal laws. HUD will not penalize applicants for complying with the terms and conditions of prior HUD grants.

**b. *Renewal Project Threshold.*** To maintain the competitive and objective nature of the CoC Program under the McKinney Vento Act and comply with 2 CFR 200.309 and 200.205, which together require renewals for federal grants to be issued based on objective and merit-based criteria, all renewals will be re-evaluated each year.

CoCs must consider the need to continue funding for projects expiring in CY 2027 (January 1, 2027 to December 31, 2027) when applying for FY 2026 CoC and YHDP funding. Renewal projects must meet the minimum project eligibility, capacity, timeliness, and performance standards identified in this NOFO or they will be rejected from consideration for funding:

**(1)** When considering renewal projects for award; HUD will review information in eLOCCS, APRs, and information provided from the local HUD CPD field office, including monitoring reports and audit reports as applicable, and performance standards on prior grants, and will assess projects using the following criteria on a pass/fail basis:

**(a)** whether the project applicant's performance met the plans and goals established in the initial application or grant as amended;

**(b)** whether the project applicant demonstrated all timeliness standards for grants being renewed have been met, including those standards for the expenditure of grant funds;

**(c)** the project applicant's performance in assisting program participants to achieve and maintain self-sufficiency and independent living and records of success, except dedicated HMIS projects are not required to meet this standard; and

**(d)** evidence of unwillingness of project applicants to accept technical assistance, a history of inadequate financial accounting practices, indications of project mismanagement, a drastic reduction in the population served, program changes have been made without prior HUD approval, or the loss of project site control.

**(2)** HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition based on HUD's evaluation for reasons including, but not limited to, the following:

**(a)** outstanding obligation to HUD that is in arrears or for which a payment schedule has not been agreed upon;

**(b)** audit finding(s) for which a response is overdue or unsatisfactory;

**(c)** history of inadequate financial management accounting practices;

**(d)** evidence of untimely expenditures on prior award;

**(e)** history of other major capacity issues that have significantly affected the operation of the project and its performance;

**(f)** history of not reimbursing subrecipients for eligible costs in a timely manner, or at least quarterly; and

**(g)** history of serving ineligible program participants, expending funds on ineligible costs, or failing to expend funds within statutorily established timeframes.

**(h)** Compliance with audits for large grant recipients (over $1,000,000 or more) as required by 2 CFR 200.501.

**c. *New Project Threshold.*** HUD will review all new project applications to determine if they meet the following project quality threshold requirements. Projects created through reallocation are new projects.

**(1)** HUD will consider YHDP Replacement project applications including applications for new YHDP projects created through YHDP reallocation as having met project quality threshold requirements if the project application activities and costs are eligible under this NOFO. If a YHDP Replacement (including YHDP Reallocation) project application is not for activities and costs that are eligible under this NOFO, HUD will not reject the project under this project quality threshold, but HUD will require the project applicant to correct or revise information submitted after the final CoC Program award announcement but before executing the grant agreement.

**(2)** HUD will review the UFA Costs submitted by the UFA designated Collaborative Applicant to ensure appropriate match and eligibility of costs requested.

**(3)** HUD will assess all new project applications for the following minimum project eligibility, capacity, timeliness, and performance standards.

**(a)** project applicants must have satisfactory capacity, drawdowns, and performance for existing grant(s) funded under the CoC Program, as evidenced by timely reimbursement of subrecipients, regular drawdowns, and timely resolution of any monitoring findings; however, this does not apply to project applicants who have never received a CoC Program funded project;

**(b)** for expansion project applications, project applicants must describe the part of the project that is being expanded and demonstrate the project is not replacing other funding sources; and

**(c)** project applicants must demonstrate their ability to meet all timeliness standards per 24 CFR 578.85. HUD reserves the right to deny a funding request for a new project, if the request is made by an existing recipient that HUD finds to have significant issues related to capacity, performance, unresolved audit, or monitoring findings related to one or more existing grants; or does not routinely draw down funds from eLOCCS at least once per quarter. HUD also reserves the right to withdraw funds if no APR is submitted on the prior grant. Hud also reserves the right to reject a project if the recipient is not compliant with audits for large grant recipients (over $1,000,000 or more) as required by 2 CFR 200.501.

**(4)** Additionally, for HUD to consider new projects as meeting project quality threshold, each new project must meet the following criteria as applicable. If awarded, a recipient must meet all the criteria listed in the criteria column for its component prior to executing a grant agreement.

| (a) Transitional Housing (TH) | | |
|---|---|---|
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New Transitional Housing projects must receive at least 6 out of 8 points available for this project type. New TH projects that do not receive at least 6 points will be rejected. | 2 | Demonstrate that the project will provide and/or partner with other organizations to provide eligible supportive services that are necessary to assist program participants to obtain and maintain housing (i.e., case management, behavioral healthcare, employment training, etc.) |
| | 1 | The applicant has prior experience operating transitional housing or other projects that have successfully helped homeless individuals and families exit homelessness within 24 months or has a plan in place to ensure homeless individuals and families will exit homelessness within 24 months. |
| | 1 | The applicant has previously operated or currently operates transitional housing or another homelessness project, or has a plan in place to ensure that at least 50 percent of participants exit to a positive destination within 24 months and at least 50 percent of participants exit with employment income as reflected in HMIS or another data system used by the applicant. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 2 | Describe how the proposed project will:<br>• assess the service needs of program participants,<br>• and provide individualized services for program participants during their time in Transitional Housing that will result in at least 20 hours per week of engagement in services, activities or employment for all program participants, except for a program participant over age 62 or who is an individual with handicaps as defined in 24 |

| | | |
|---|---|---|
| | | CFR 8.3 or a with a developmental disability as defined under 24 CFR 578.3 (examples of services or activities include case management, counseling, treatment, volunteering, work therapy, education, job training, community-building activities, etc.) Employment may contribute to the 20 hours per week of engagement. The project description provided here does not constitute a reporting or documentation requirement.<br>Indicate that the proposed project will create service plans for each program participant that include:<br>• the services to be provided, when and how often services will be provided, by whom all services will be provided;<br>• program participant goals, strategies for achieving those goals, and target dates for achievement to focus on improved health and wellness, housing stability, and increased employment income leading to financial stability and self-sufficiency. |
| | 1 | Demonstrate the average cost per household served for the project is reasonable. 2 CFR 200.404. |

**(b) Supportive Services Only (SSO) Standalone (24 C.F.R. 578.37(a)(3) and 578.53)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO – Standalone project applications must receive at least 4 out of the 5 points available for | 1 | The Supportive Services project is necessary to assist people in exiting homelessness, addressing barriers to stable housing (e.g., substance use disorder, unemployment, childcare, etc.) and increasing self-sufficiency and the Recipient will conduct an annual assessment of the service needs of the program participants. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants |

| | | |
|---|---|---|
| this project type. New SSO standalone projects that do not receive at least 4 points will be rejected. | | including those with histories of unsheltered homelessness and those who do not traditionally engage with supportive services. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 1 | Demonstrate the average cost per household served for the project is reasonable. 2 CFR 200.404. |

**(c) Supportive Services Only (SSO) Street Outreach**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO project applications that focus on street outreach and indicate so in their project application must receive at least 5 out of the 6 points available for this project type. Projects that do not receive at least 5 points will be rejected. | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants including those with histories of unsheltered homelessness and those who do not traditionally engage with supportive services. |
| | 1 | Demonstrate that the applicant has a history of, or a plan for, partnering with first responders and law enforcement to engage people living in places not meant for human habitation to access emergency shelter, treatment programs, reunification with family, transitional housing or independent living. The applicant must cooperate and not interfere or impede with the enforcement of local laws such as public camping and public drug use laws and assist/be willing to assist first responders in their efforts to engage homeless individuals. |

| | | |
|---|---|---|
| | 1 | The applicant has experience providing outreach services, or a plan for providing outreach services, consistent with the activity description at 24 CFR 578.53(e)(13) and has a plan for or has demonstrated effectiveness at helping people successfully exit from places not meant for human habitation to emergency shelter, treatment programs, transitional housing or permanent housing programs. |
| | 1 | Demonstrate the average cost per household served for the project is reasonable. 2 CFR 200.404. |

**(d) SSO-Coordinated Entry (SSO-CE)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO-CE project applications (also known as centralized or coordinated assessment) must receive at least 3 out of the 4 points available for this project type. New SSO-CE projects that do not receive at least 3 points will be rejected. | 1 | The Coordinated Entry system is easily available and reachable for all persons within the CoC's geographic area who are seeking homelessness assistance. The system must also be accessible for persons with disabilities within the CoC's geographic area. |
| | 1 | There is a strategy for advertising that is designed specifically to reach households experiencing homelessness with the highest needs. |
| | 1 | There is a standardized assessment process. |
| | 1 | The project will ensure program participants are directed to appropriate housing and services that fit their needs. |

**(e) Permanent Housing: Permanent Supportive Housing (PH-PSH)**

| New Project Application | Points Availa | Criteria |
|---|---|---|

| Rating Factors | ble | |
|---|---|---|
| New Permanent Housing projects must receive at least 3 out of the 5 points available for this project type. New Permanent Housing projects that do not receive at least 3 points will be rejected. | 1 | The type of housing proposed, including the number and configuration of units, will fit the needs of the program participants. |
| | 1 | The type of supportive services and assistance that will be offered to program participants will ensure that the participant is able to successfully obtain and retain permanent housing and in a manner that fits their needs (e.g. transportation, safety planning, enhanced case management). If the applicant is proposing to expand an existing PH project, it must demonstrate how they are expanding supportive services to program participants, including where appropriate, on-site supportive services. |
| | 1 | The project will serve homeless individuals or families with a disability in accordance with 24 CFR 578.37(a)(1)(i). |
| | 1 | Demonstrate the average cost per household served for the project is reasonable. 2 CFR 200.404. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |

| (e) Permanent Housing: Rapid Rehousing (PH-RRH) | | |
|---|---|---|
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New Permanent Housing projects must receive at least 4 out of the 6 points available for this project type. New | 1 | The provision of tenant-based rental assistance will help individuals and families achieve self-sufficiency within 24 months. |
| | 2 | The type of supportive services and assistance that will be offered to program participants (e.g., case management, substance use treatment, |

| | | |
|---|---|---|
| Permanent Housing projects that do not receive at least 4 points will be rejected. | | mental health treatment, and employment assistance) will ensure that the participant is able to successfully obtain self-sufficiency and exit homelessness. |
| | 1 | The applicant has previously operated or currently operates a homelessness project where, or has a plan in place to have, at least 50 percent of participants exit to permanent housing within 24 months and at least 50 percent of participants exit with employment income as reflected in HMIS or another data system used by the applicant, or has a plan in place to ensure this. |
| | 1 | Demonstrate the average cost per household served for the project is reasonable. 2 CFR 200.404. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |

**(f) Homeless Management Information System (HMIS)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New HMIS project applications must receive at least 3 out of the 4 points available for this project type. New HMIS projects that do not receive at least 3 points will be rejected. | 1 | How the HMIS funds will be expended in a way that furthers the CoC's HMIS implementation. |
| | 1 | The HMIS collects all Universal Data Elements as set forth in the HMIS Data Standards. |
| | 1 | The ability of the HMIS to un-duplicate client records. |
| | 1 | The HMIS produces all HUD-required reports and provides data as needed for HUD reporting (e.g., APR, quarterly reports, data for CAPER/ESG |

**Suppl.App.213**

HUD-AR-05073

| | | |
|---|---|---|
| | | reporting) and other reports required by other federal partners. |

| (g) CoC Planning – Collaborative Applicants Only | | |
|---|---|---|
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New CoC Planning projects, submitted only by the CoC's designated Collaborative Applicant, must receive at least 3 out of the 5 points available for this project type. CoC Planning projects that do not receive at least 3 points will be rejected. | 1 | Governance and Operations-The CoC conducts meetings of the entire CoC membership that are inclusive and open to members and demonstrates the CoC has a written governance charter in place that includes CoC policies. |
| | 1 | CoC Committees-The CoC has CoC-wide planning committees, subcommittees, or workgroups to address the needs of persons experiencing homelessness in the CoC's geographic area that recommends and sets policy priorities for the CoC. |
| | 2 | The proposed planning project that will be carried out by the CoC with Planning grant funds is compliant with the provisions of 24 CFR 578.7. |
| | 1 | The funds requested will improve the CoC's ability to evaluate the outcome of both CoC Program-funded and ESG-funded projects. |

## B. Merit Review

If your application meets the threshold requirements, a panel will review and score its merits. The panel may include HUD employees and non-employees. They will evaluate your application based on the following criteria. The results of the evaluation are shared with senior HUD officials who make the final decisions about funding consistent with this NOFO.

**Merit Review Summary**

| Merit Review Summary | |
|---|---|
| **Criterion** | **Maximum number of points = 200** |
| **a. Project Capacity, Review, and Ranking.** | 14 |
| **b. System Performance.** | 64 |

| | |
|---|---|
| **c. CoC Coordination and Engagement.**<br>I. Accountable Structure and Planning<br>II. Community Coordination<br>III. Coordination to Serve Subpopulations | 122 |
| **Bonus Points** | |
| **CoC Merger and UFA Bonus (V.B.1.d)** | 6 |
| **Policy Initiative Preference Points (V.B.2)** | 14 |

## 1. Rating Factors

Your application must include a response to the following criteria.

HUD will use all of the factors outlined in this section to establish the CoC's score for the FY 2026 CoC Program Competition.

### Rating Factors Details

**a. *Project Capacity, Review, and Ranking.***HUD will award up to 14 points to CoCs that demonstrate the existence of a coordinated, inclusive, and outcome-oriented community process for the solicitation, objective review, ranking, and selection of project applications.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1) *Objective Criteria and System Performance.*** | 6 | The CoC must attach the written process or tool it used to review, rate, and rank project applications for this NOFO. In making selections, CoCs should consider factors such as financial stability, performance history, capacity, audit findings, and public complaints. This written process or tool must:<br><br>Demonstrate it used objective criteria (e.g., cost-effectiveness, performance data, type of population served) to review, rate, and rank project applications and that these factors account for at least 50% of the total available points (up to 1 point).<br><br>Demonstrate that it used system performance measures in |

| | | |
|---|---|---|
| | | their local review, selection, and rating process and that these factors account for at least 25% of the total points available (up to 2 points).<br>For housing projects (TH, PH-PSH, PH-RRH) that the following measures were considered (up to 3 points):<br>• Returns to homelessness;<br>• Employment income; and<br>• Supportive service participation requirements. |
| **(2) *Ranking and Selection Process.*** | 3 | The CoC must:<br>• Invite new proposals from entities that have not previously received funding if such eligible entities exist;<br>• Prior to the application deadline, post on their website all parts of the Consolidated Application, and notify community members and key stakeholders. CoCs that do not have a website must post this information to a partner website within the CoC (e.g., a city or county website);<br>• Attach a listing of all projects submitted to HUD from their CoC's local competition that includes all projects their CoC considered during their local competition: (1) the final score, (2) project rank, (3) accepted or rejected status, (4) funding amounts, (5) reallocated funds added to or subtracted from projects listed; and<br>• Notify project applicants, in writing outside of *e-snaps*, who submitted their project applications to the CoC by the CoC-established deadline, whether their project application(s) will be accepted and ranked, rejected, or reduced on the CoC Priority Listing no later than 15 days before the NOFO application submission deadline, and where a project application is being rejected or reduced, the CoC must indicate the reason(s) for the rejection or reduction. |
| **(3) *Reallocation.*** | 5 | CoCs are encouraged to review the renewal project eligibility criteria at V.A.4.a and V.A.4.b, the risk review at V.C, data from Annual Performance Reports, system performance measures, and other outcome and performance data to reallocate funding from lower performing projects to higher performing projects.<br>• Describe how the CoC actively reviews the performance of existing CoC Program funded projects and have a |

| | | |
|---|---|---|
| | | standard process for reallocating funding from lower performing projects to create new high performing projects; OR<br>• Demonstrate that the CoC has cumulatively reallocated at least 20 percent of their CoC's ARD between the FY 2021 and the FY 2026 CoC Program Competitions. |

**b. *System Performance.*** HUD will award up to 64 points to CoCs that have a CoC system-wide performance measurement process related to reducing homelessness.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1) *Reducing the Number of Homeless Individuals and Families.***<br>CoCs should work to achieve sustained long-term, meaningful reductions in unsheltered homelessness in their communities. | 20 | The CoC will receive:<br>• Up to 5 points for demonstrating a decrease of at least 20 percent in the number of unsheltered homeless individuals and families in the 2026 PIT compared to the prior year's data.<br>• Up to 5 points for demonstrating decreases in the number of unsheltered homeless individuals and families between the 2024 and 2025 PIT Counts AND the 2025 and 2026 PIT Counts.<br>• 2 points for demonstrating a decrease in the number of unsheltered homeless individuals and families between the 2024 and 2026 PIT Counts.<br>• 2 points for demonstrating a decrease in unsheltered homelessness between 2018 or 2019 and 2026 PIT Counts.<br>• 3 points for demonstrating at least a 5 percent decrease in the number of individuals and families experiencing chronic homelessness between the 2025 and 2026 PIT Counts.<br>• 3 points for demonstrating a decrease of at least 20 percent in the combined number of sheltered and unsheltered individuals and families in the 2026 PIT compared to the prior year's data. |
| **(2) *Reduce Encampments.*** | 8 | • Describe, using quantitative evidence, a reduction in the number of encampments or the number of people residing in encampments in the geographic area of the CoC, and if there is no reduction, explain any plans the CoC has to participate in efforts to |

| | | |
|---|---|---|
| | | reduce these numbers. |
| **(3) *Reduce First Time Homelessness.*** | 2 | • Demonstrate a reduction in the number of first-time homeless of at least 20% as reported in HUD's Homelessness Data Exchange (HDX);<br>• Describe the CoC's plan to decrease the number of individuals and families becoming homeless for the first time. |
| **(4) *Length of Time Homeless.*** | 2 | • Demonstrate a reduction in the length-of-time homeless compared to the prior year's data as reported in HDX;<br>• Describe the CoC's plan to reduce the length of time individuals and families remain homeless. |
| **(5) *Successful Exits from Assistance.*** | 6 | • Demonstrate that the rate of successful exit from ES, SH, TH, and RRH is at least 50% (up to 2 points);<br>• Demonstrate that at least 20% of program participant exits from TH/RRH/PSH collectively are to unsubsidized housing using HMIS data (up to 4 points). |
| **(6) *Returns to Homelessness.*** | 6 | • Demonstrate the rate at which persons who exited to permanent housing destinations experienced additional spells of homelessness over a 12- month and 24-month period as reported in HDX:<br>Is less than 8% over 24 months (3 points, or 1 point if less than 16% over 24 months).<br>Is less than 7% over 12 months (3 points, or 1 point if less than 11% over 12 months). |
| **(7) *Jobs and Income Growth.*** | 12 | • Demonstrate that the percentage of program participants who had an increase in income from employment (not government assistance) in the CoC was 20 percent or higher as reported in HDX (up to 6 points);<br>• Demonstrate that at least 25 percent of people leaving programs in the CoC had an increase in income from employment (up to 6 points); |
| **(8) *Timely*** | 2 | Demonstrate that the CoC: |

Suppl.App.218
HUD-AR-05078

| | | |
|---|---|---|
| ***Submission of Data.*** The CoC collected and submitted data in a timely manner. | | • Conducted a Housing Inventory (HIC) and Point-in-Time (PIT) count during the last 10 days in January 2026, or if an exception was provided by HUD, during the time period agreed upon by the CoC and HUD;<br>• Submitted both the 2026 HIC and PIT count data in HDX 2.0 by April 30, 2026, 8:00 PM EDT, or an alternate date approved by HUD;<br>• Submitted their Longitudinal System Analysis (LSA) data in HDX 2.0 by the submission deadline of January 16, 2026, 11:59 PM EST, or an alternate date approved by HUD; and HUD determined that there were at least 2 usable files; and<br>• Submitted FY 2024 System Performance Measures data in HDX 2.0 by the submission deadline of 8:00 PM EDT on March 4, 2026, or an alternate date approved by HUD. |
| ***(9) HMIS and Comparable Database Participation*** | 2 | • Demonstrate at least 85 percent of the beds in the CoC's geographic area are covered in HMIS and comparable databases. The bed coverage rate is the number of HMIS and comparable database participating beds divided by the number of year-round beds dedicated to persons experiencing homelessness in the geographic area covered by the CoC. |
| **(10) *Tracking Participant Outcomes in HMIS and Comparable Databases.*** The CoC has low rates of unknown exit destinations. | 2 | • Demonstrate the rate of unknown exit destinations in HMIS for housing projects (TH, PSH, RRH, SH) is less than 10 percent. |
| ***(11) Unit Utilization Rates.*** The CoC utilizes funded units. | 2 | • Demonstrate the average unit utilization rate in the CoC across housing projects is at least 85 percent. |

**c. *CoC Coordination and Engagement.*** HUD will award up to 122 points to CoCs that

demonstrate coordination with other systems of care that serve homeless individuals and families.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **Accountable Structure and Planning (up to 16 points)** | | |
| **(1) *Stakeholder Participation*** | 2 | The CoC must indicate it has participation from a broad array of stakeholders, not limited to organizations listed in 24 CFR 578.5(a), within the geographic area:<br>Relevant organizations include nonprofit homeless assistance providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies including Certified Community Behavioral Health Clinics (CCBHCs) and CMHCs, local court systems, hospitals, universities, affordable housing developers, law enforcement, employment programs including the Local Workforce Development Board (WDB) and American Job Centers, and organizations that serve veterans and homeless and formerly homeless individuals. |
| **(2) *Representative Governance Board*** | 8 | Indicate a CoC decision-making governance board representative of the community that includes:<br>• at least 1 person with current or former experience of homelessness (up to 1 point);<br>• at least 3 elected public officials (or 1 elected official if the CoC is in a rural area) (up to 3 points);<br>(4 points for including all of the below, 2 points for a majority of the below.)<br>• a representative of the business community such as a member of a Business Improvement District;<br>• a representative of law enforcement;<br>• a representative of a recovery housing/sober living provider;<br>• a representative from a behavioral or primary health provider such as from a Federally Qualified Health Center, CCBHC, Healthcare for the Homeless, or other accessible primary care |

Suppl.App.220
HUD-AR-05080

| | | |
|---|---|---|
| | | provider;<br>• a representative of a local workforce development organization or system such as a member of the Local Workforce Development Board, State Workforce Agencies, or American Job Centers;<br>• a representative from a local court system managing Assisted Outpatient Treatment (AOT) and/or other civil commitment processes; or from specialty courts (e.g., Mental Health Court, Drug Court, Care Court.) |
| **(3) *Transparent Processes.*** | 2 | Describe how the CoC has a transparent process (e.g., communicated in a public manner such as on the CoC's website) in place to:<br>• Invite new members to join and the invitation process is publicly available within the CoC's geographic area at least annually.<br>• Solicit and consider opinions regarding the CoC's general performance, strategies, and priority setting process from a broad array of individuals and organizations with knowledge of homelessness in the geographic area or an interest in preventing or ending homelessness in the geographic area.<br>• Accept and consider proposals from organizations that have not previously received CoC Program funding including faith-based organizations. |
| **(4) *Comprehensive Strategies.*** | 4 | Describe how the CoC will incorporate comprehensive strategies for reducing homelessness, including interventions in 42 U.S.C. 11386b(d) and other targeted projects for specific subpopulations, by providing a plan to address a gap in the CoC's current homelessness system. The plan should include:<br>• Identifying the gap, using data or stakeholder feedback;<br>• The strategy to address the needs of all relevant subpopulations;<br>• Quantifiable performance measures;<br>• Timelines for the completion of specific tasks; |

| | | |
|---|---|---|
| | | • Identifying specific funding sources for planned activities; and<br>• An individual or body responsible for overseeing implementation of specific strategies. |
| **Community Coordination. (up to 72 points)**<br>The CoC is coordinating with specific housing and service providers and other community partners to address homelessness. | | |
| **(5) *Treatment and Recovery Services.*** | 20 | • Demonstrate, by listing the projects and treatment providers, that substance use treatment is available on-site for at least 30% of TH/RRH/PSH projects by listing the projects and treatment providers. Rural CoCs (as listed at https://www.hud.gov/hud-partners/community-coc) will receive full points for identifying access to treatment;<br>• Describe how the CoC partners with, or has projects that provide, outpatient treatment for mental health and substance use disorders with a range of appropriate levels of care, psychosocial interventions, medication management, suicide prevention, and recovery supports;<br>• Describe how the CoC partners with, or has projects that provide access to, peer recovery specialists or other forms of peer support and recovery navigation;<br>• Describe how the CoC identifies individuals experiencing Serious Mental Illness and connects them with the services necessary to promote stability, such as Assertive Community Treatment teams and other models that combine intensive care coordination and assertive outreach with comprehensive treatment.<br>• Identify partnerships the CoC has with providers and entities providing services in connection with Drug Courts and other specialty courts serving individuals with mental and substance use disorders, Assisted Outpatient Treatment (AOT) programs, and inpatient civil commitment.<br>  ○ Describe how the CoC coordinates with |

| | | |
|---|---|---|
| | | these providers to support housing stability and movement towards independence, including by leveraging court orders.<br>• Identify partnerships the CoC has with the local crisis system of care including 988 and crisis contact centers, mobile crisis and outreach services, and crisis stabilization services.<br>• Demonstrate that for every 2 persons reporting chronic substance use in the CoC's most recent PIT count, there is at least 1 CoC-funded unit that requires program participant engagement in substance abuse treatment services as a condition of continued participation in the program in accordance with 24 CFR 578.75. List the projects the units are part of. The units may be existing renewals or newly proposed under this NOFO.<br>○ At least 1 unit per 2 per persons = 6 points<br>○ At least 1 unit per 4 persons = 3 points<br>• Indicate the availability of 24/7 access to detox, residential, and inpatient behavioral health treatment within the geographic area of the CoC;<br>• Identify at least one formal partnership with a Certified Community Behavioral Health Clinic (CCBHC) or Community Mental Health Center (CMHC), SAMHSA Projects for Assistance in Transition from Homelessness (PATH) provider, Grants for the Benefit of Homeless Individuals (GHBI) provider, or a similar facility if none of the above are located in the geographic area;<br>• Identify at least one new or existing CoC project that operates sober housing in accordance with 24 CFR 578.93(b)(5).<br>• Describe how the CoC coordinates with the programs named in this section to facilitate warm hand-offs to stable housing providers and prevent entry into homelessness. |
| **(6) *Investment in Supportive*** | 8 | Demonstrate that the CoC is investing adequately in |

| | | |
|---|---|---|
| ***Services.*** | | supportive services by showing either:<br>• through proposed CoC funding, leveraging, match, and other formal partnerships, the CoC is providing supportive services with a value of 50% of the CoC's Annual Renewal Demand; or<br>• 30% of their proposed CoC funding is used for supportive services relative to their Annual Renewal Demand. |
| **(7) *Participation Requirements for Supportive Services.*** | 8 | Demonstrate that housing projects (TH, PH-PSH, PH-RRH, and Joint projects) require program participants to take part in supportive services (e.g. case management, employment training, substance use disorder treatment) in line with 24 CFR 578.75(h) by providing direct language from supportive service agreements (contract, occupancy agreement, lease, or equivalent).<br>• 100% of CoC housing projects have participation requirements (8 points).<br>• 50% of CoC housing projects have participation requirements (4 of the 8 points).<br>Except that consistent with 24 CFR 5.2005(b)(1) assistance may not be denied on the basis or as a direct result of the fact that the participant is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, if the participant otherwise qualifies for admission, assistance, participation, or occupancy. |
| **(8) *ESG Recipients and Emergency Shelter.*** | 2 | • Describe how the CoC has and will continue to consult with ESG recipients in the planning and allocation of ESG funds;<br>• Describe how the CoC coordinates with shelter providers to connect individuals and families with CoC assistance. |
| **(9) *Data Sharing for Improved Outcomes and Transparency.*** | 2 | • Describe how the CoC has or will share PIT, HIC, HMIS, and System Performance data with state and local government as permitted by law in order to inform the homelessness response system.<br>• Describe how the CoC utilizes other data sources alongside HMIS to improve care (e.g., health care utilization and claims data, electronic health care record data; admission, discharge, and transfer |

| | | |
|---|---|---|
| | | data; and law enforcement and corrections system data). |
| **(10) *Employment and Workforce Development.*** | 5 | Identify at least one partnership that the CoC has with employment and workforce development programs and organizations such as the Local Workforce Development Board, State Workforce Agency, American Job Center (also known as One-Stop Career Centers), registered apprenticeship program, community and technical college, union training program, adult education provider, or State Vocational Rehabilitation agency. |
| **(11) *Street Outreach, Law Enforcement and First Responders.*** | 5 | • Demonstrate an increasing number of people exit street outreach to a positive destination;<br>• Describe how Street Outreach projects (including co-response) cooperate with first responders and law enforcement to increase positive interactions in order to increase housing and service engagement and promote use of CoC services. |
| **(12) *Family or Support Network Reunification.*** | 4 | Describe how the CoC or its recipients assist with family or support-network reunification efforts for individuals experiencing homelessness or living in CoC-funded housing (e.g., case management, travel costs, arrangement of assistance in another geographic area.) |
| **(13) *Public Housing Agencies.*** | 2 | • Indicate that the CoC has an agreement in place with one or more of their public housing agencies to enable participants to transition from Transitional Housing, Rapid Re-Housing, and Permanent Supportive Housing to HUD assisted housing. |
| **(14) Protecting Public Safety.**<br>HUD encourages the most effective use of funding for efforts to end homelessness, quickly rehouse individuals, and minimize trauma (42 U.S.C 11381). | 14 | HUD has a vested interest in ensuring that all grantees are maximizing their potential Federal award to accomplish the program's purposes. To that end, to receive full points, CoCs should:<br>• Demonstrate, by providing evidence, that the CoC cooperates and does not interfere with or impede local efforts to advance the objectives below, and assists first responders in providing services to homeless individuals.<br>• Identify local laws, policies, or other practices that help or hinder the CoC's ability to advance |

**Suppl.App.225**

HUD-AR-05085

| | | |
|---|---|---|
| Law enforcement and public safety protections play a critical role in accomplishing these purposes. | | the objectives below and provide a plan explaining how the CoC will leverage beneficial policies while overcoming the harmful effects of restrictive ones. If you cannot provide any mitigating steps, please explain why. Include qualitative and quantitative details in your response.<br>○ Quickly clear tents and encampments on public property and connect individuals who are camping in public with appropriate services. In your response, describe the current status of tents and encampments in the CoC's geographic area.<br>○ Decrease the public use of illicit drugs and quickly connect individuals who are using illicit drug in public with appropriate services and/or law enforcement. In your response, describe the current status of overdoses and illicit drug use in public spaces in the CoC's geographic area.<br>○ Utilize standards that address homeless individuals who are a danger to themselves or others (e.g., involuntary commitment.)<br>○ Comprehensively share information, including location information, in accordance with the Sex Offender Registry and Notification Act (SORNA).<br>The CoC should maintain records reflecting the analysis performed in response to this rating criteria. |
| ***(15) Outreach*** | 2 | Describe the CoC's strategy to outreach to all individuals and families experiencing homelessness across their geographic area. |
| **Coordination to Serve Subpopulations. (up to 34 points)**<br>The CoC is coordinating outreach, assistance and services for specific subpopulations experiencing homelessness. | | |
| ***(16) Children and Youth.*** | 6 | • Indicate written agreements are in place between the CoC or its HUD-funded projects and educational supports and services for |

Suppl.App.226
HUD-AR-05086

| | | |
|---|---|---|
| | | children ages 0-5, such as Public Pre-K, Head Start, Child Care (including Child Care and Development Fund), or home visiting (including Maternal, Infant and Early Childhood Home and Visiting or MIECHV);<br>• Identify formal partnerships the CoC has with youth education providers including Local Educational Agencies (LEAs), McKinney-Vento liaisons, school districts, GED programs, community and technical colleges, and other post-secondary education providers;<br>• Describe policies and procedures that have been adopted to inform individuals and families who become homeless of their eligibility for educational services;<br>• Describe how the CoC coordinates with foster care or child welfare services to assist youth transitioning from public systems of care;<br>• Describe how the CoC coordinates with RHY-funded providers including Street Outreach Programs, Basic Center Programs, Transitional Living Programs, and Maternity Group Homes where such providers exist. |
| **(17) *Families.*** | 4 | Identify at least one RRH or TH project in the CoC that primarily or exclusively serves families with children experiencing homelessness in accordance with 24 CFR 578.93(b). Describe how the project:<br>• Provides supportive services focused on improving incomes to pay rent such as workforce development, job training, or registered apprenticeship programs; and<br>• Leverages funding from mainstream family service systems such as Temporary Assistance for Needy Families (TANF).<br>• Combines housing assistance with childcare, parenting support, pregnancy-related and child healthcare, and education. |
| **(18) *Veterans.*** | 4 | Identify at least one partnership the CoC has with the Department of Veterans Affairs or other Veteran Serving Organizations to do the following: |

Suppl.App.227
HUD-AR-05087

Case: 26-1923 Document: 00118495633 Page: 230 Date Filed: 08/21/2026 Entry ID: 6836472


| | | |
|---|---|---|
| | | • Refer veterans identified by the CoC to VA or other Veteran Serving Organizations for assistance;<br>• Coordinate the provision of emergency shelter, outreach, supportive services, and housing;<br>• Ensure access to a full spectrum of employment and career pathway opportunities;<br>• Share data with the Department of Veterans Affairs as appropriate; and<br>• Identify and fill service gaps for veterans. |
| (19) ***Survivors of Domestic Violence, Dating Violence, Sexual Assault, and Stalking.*** | 4 | Identify at least one partnership the CoC has with victim service providers, state domestic violence coalitions, state sexual assault coalitions, anti-trafficking service providers or other organizations who help provide shelter, housing, and services to individuals and families of persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking. |
| (20) ***Justice System Re-entry.*** | 4 | Identify at least one partnership the CoC has to prevent homelessness among people transitioning from prisons, jails, or court-ordered programs. |
| (21) ***High Utilizers of Healthcare Systems.*** | 4 | Identify at least one partnership or project the CoC has to provide specialized supportive services for homeless individuals with a high level of medical needs. |
| (22) ***Aging and Elderly.*** | 4 | Identify at least one partnership or project the CoC has to serve aging and elderly individuals experiencing homelessness such as with a provider of residential care, assisted living, or medical respite services. CoC-funded projects may establish preferences for elderly individuals or families. |
| (23) ***Permanent Supportive Housing for Chronically Homeless Individuals and Families.*** | 4 | Identify at least one RRH or PSH project that prioritizes individuals experiencing chronic homelessness. Describe how that project:<br>• Provides on-site behavioral healthcare;<br>• Has a policy for assessing program participant need for higher level of care (i.e., assisted living, residential treatment); and |

| | | |
|---|---|---|
| | | • Has a policy for assessing program participant readiness for moving on to unsubsidized or other permanent housing. |

**d. *CoC Merger or Unified Funding Agency Bonus Points.*** HUD will award up to a possible 6 bonus points to Unified Funding Agencies or to CoCs that merged after the FY 2024 CoC Program Registration deadline. To receive consideration as a merged CoC, new CoCs must contain all the geographic area of at least two CoCs that were considered completely separate CoCs in prior CoC Program competitions.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **Unified Funding Agency or CoCs Merged after the FY 2024 CoC Program Registration CoC Program Registration deadline.** | 6 | Unified Funding Agency – all UFAs will receive maximum points.<br>Merged CoCs - all CoCs that merged will receive maximum points. |

*For the Section 3 requirements above, you can opt to have the default Section 3 rating factor below, or incorporate the rating elements below into another rating factor that includes other elements.*
*If 24 CFR Part 75 (Section 3) applies to the grant, retain the rating factor titled **"Section 3"** below and adjust the points accordingly, up to a maximum of four (4) points. These points are part of the total 100 points available.*
*NOFOs for grants that are required to comply with Section 3 must award points (maximum of 4) for the inclusion of a quality Section 3 plan.*
*If the NOFO is **not** required to comply with Section 3 and does not award Section 3 points, you may either keep the final row of text for informational purposes or simply remove this row from your NOFO.*

## 2. Policy Initiative Preference Points

Preference points are added to your overall application score. You do not need to address the policy initiatives in this section to receive an award. If you choose to address a policy initiative in your application, you must adhere to the information with any award.

Suppl.App.229
HUD-AR-05089

### a. Opportunity Zones

You may receive up to four (4) points, if your proposed activities are within an Opportunity Zone. To receive points, you must complete and submit form HUD-2996, Certification for Opportunity Zone Preference Points. If you expect to use less than 50% of the award in Opportunity Zones, you won't receive preference points.

#### b. Advancing Recovery by Prohibiting Illicit Drug Enablement

Apart from the required selection criteria, you may receive up to ten (10) points if you can describe the policy or statement the CoC has in place to ensure that all housing projects submitted by the CoC will not operate drug injection sites or "safe consumption sites," knowingly distribute drug paraphernalia on or off property under their control, knowingly permit the use or distribution of illicit drugs on property under their control, or conduct, permit, encourage, or allow any of these activities under the pretext of "harm reduction."

None of the above constitute a requirement that program participants must be sober in order to receive assistance, participate in treatment in order to receive assistance, or be evicted or exited from assistance for a first-time violation of a drug-related program policy or lease requirement, although those practices may be allowable under 24 CFR 578. Full points will be awarded for a description of a clear CoC policy or statement in addition to affirmative certifications in section V.A.4.a.(6) for all projects submitted by the CoC.

To receive full points, the policy or statement must:

**(1)** Prohibit CoC-funded housing projects from operating drug injection sites or "safe consumption sites," knowingly distributing drug paraphernalia on or off property under their control, knowingly permitting the use or distribution of illicit drugs on property under their control, or conducting any of these activities under the pretext of "harm reduction;"

**(2)** Describe what remedies will be taken for CoC-funded housing projects determined by the CoC to be in violation of the above;

**(3)** Encourage the provision of substance use disorder treatment and recovery housing within or outside of the CoC; and

**(4)** Not restrict or prohibit CoC-funded housing projects that require program participants to be sober or to participate in treatment as a condition of assistance in accordance with 24 CFR 578.

### 3. Other Factors

Your application must respond to the following additional criteria.

### a. Budget

HUD may evaluate the budget. HUD may assess whether the budget aligns with planned program activities and objectives. HUD may consider whether the budget and the requested performance period are fully justified and reasonable in relation to the proposed project.

The project budget information will be reviewed to ensure:

- The requested costs are eligible under the CoC Program and this NOFO.
- The total amount of funding is within the amount of funding available to the CoC.

- If funds are requested for project administrative costs, the amount requested is no more than 10 of the total funding requested.

### b. Certification of Consistency with the Consolidated Plan

You must ensure that the activities in your application are consistent with your local Consolidated Plan.

All project applications submitted and listed on the CoC Priority Listing by Collaborative Applicants must be included in the certification either by submitting one correctly signed and dated HUD-2991 from the appropriate jurisdiction that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction. See section IV.A.1 for more information.

## C. Risk Review

Before making any awards, including renewal awards, HUD will evaluate each applicant's likelihood of successfully carrying out the project. This assessment helps identify risks that may affect the advancement toward or the achievement of a project's goals and objectives. 2 C.F.R. 200.206(b)(1). Here's what HUD looks at:

**Past Performance:**

- Government-wide performance data, as noted in 2 CFR 200.206(a)
- Public sources like news reports, Inspector General findings, Government Accountability Office reports, and complaints with a reasonable basis
- History of performance. The applicant's record in managing Federal awards, if it is a prior recipient of Federal awards, including timeliness of compliance with applicable reporting requirements, failing to make significant progress in a timely manner, failing to meet planned activities in a timely manner, conformance to the terms and conditions of previous Federal awards, and, if applicable, the extent to which any previously awarded amounts will be expended prior to future awards. HUD will not penalize a renewal applicant who sufficiently complied with the terms and conditions in prior NOFOs that are in direct conflict with those contained herein.
- Reports from past audits, including those performed under 2 CFR part 200, subpart F–Audit Requirements
- History of finishing activities on time and using any promised matching or leveraged funds
- Debarments or suspensions
- Misuse of federal funds for purposes outside of the program

**Organizational Health:**

- Financial stability and capacity, including compliance with cost principles in 2 CFR Part 200 Subpart E (200.400 et seq.), and where applicable, 200 Part 170
- Quality of management systems and ability to meet the management standards in 2 CFR part 200

- Ability to follow all required laws and rules
- The applicant's ability to effectively implement statutory, regulatory, or other requirements imposed on non-Federal entities
- Capacity, including staffing structures and capabilities

**Results:**

- Ability to promote self-sufficiency and economic independence
- Number of people served or targeted for assistance
- History of illegal discrimination, including illegal racial discrimination
- History of subsidizing or facilitating illicit drug use or other illicit activities that conflict with the purposes of this NOFO

HUD in its discretion may use the results of the risk review as a sufficient and independent basis to make adverse funding decisions, including rejecting an award, applying special conditions on the award, or reducing the amount of an award.

## D. Selection Process

When making award funding decisions, HUD will consider:

- Threshold review results, including eligibility requirements.
- Merit review results.
- Risk review results.

To the extent allowed by law, HUD may also consider:

- The scope of the overall projected impact on the program and administrative goals and priorities in this NOFO.
- Reasonableness of the estimated costs to the government.
- The applicant's readiness to conduct the proposed work.
- Likelihood that the proposed project will result in the benefits expected.
- Broad range of recipients beyond recurrent recipients.
- Geographic dispersion.
- All else being equal, preference for applicants with lower indirect cost rates.
- Applicants with demonstrated success in implementing Gold Standard Science (applicable to research awards).
- Applicants with potential to produce immediate results and potential for longer-term, breakthrough results, based on the goals of this NOFO (applicable to research awards).

To the extent allowed by law, HUD may exercise its discretion in deciding whether and how to issue an award based on the above criteria, including decisions to:

- Fund applications in whole or in part.
- Impose special conditions on an award
- Fund applications at a lower amount than requested.
- Choose to fund no applications under this NOFO.
- Withdraw an award offer and make an offer of funding to another eligible application, if terms and conditions are not finalized or met timely.
- Use additional funds made available after NOFO publication to either fully fund an application or fund additional applications.
- Correct HUD review and selection errors. If HUD commits an error that causes an applicant not to be selected, HUD may make an award to that applicant when and if funding is available.
- Release another NOFO, if funding is available and if HUD does not receive applications of merit to obligate the funds.

**1. Threshold Review.**

HUD will conduct a project eligibility review on all projects, and a new project threshold review and renewal project threshold review on new and renewal projects respectively.

If a new project application passes the project eligibility threshold review in section V.A.4.a and receives enough points to pass the new project threshold review in section V.A.4.c of this NOFO but does not receive all the points available for its project type, HUD may place conditions on the grant award that must be satisfied before HUD will execute a grant agreement with the applicant for the project. If an applicant is unable to satisfy the condition(s) within the timeframe specified by HUD, HUD reserves the right to withdraw the conditionally awarded funds.

**2. Conditional Selection and Adjustments to Funding.**

HUD Headquarters will conditionally select project applications for funding using the following process:

**a. *HUD Funding Process.*** All project applications, including YHDP renewal and replacement projects, must be competitively ranked, except for CoC Planning and, if applicable, UFA Costs Applications.

**(1)** HUD will select all CoC Planning and UFA Costs applications that meet project eligibility threshold requirements. Only one CoC Planning and one UFA Costs (if applicable) project application can be submitted per CoC.

**(2)** HUD will then select all projects in Tier 1 that pass project eligibility thresholds as described in section V.A.4 of this NOFO.

**(3)** HUD will then review DV Bonus projects (this does not include DV Reallocation or the renewal of projects originally funded under the DV Bonus) already selected for funding through the above process and determine whether $104,000,000 has been awarded to DV Bonus projects:

**(a)** If at least $104,000,000 has been selected for conditional award no further action is needed.

**(b)** If $104,000,000 has not been selected for conditional award – HUD will continue down the list and fund additional DV Bonus projects by project-level score until at least $104 million has been selected.

**(4)** HUD will then review Permanent Housing projects for families with children already selected for funding through the above process and determine whether $430,000,000 has been awarded to Permanent Housing projects that serve families with children:

**(a)** If at least $430,000,000 has been selected for conditional award no further action is needed.

**(b)** If $430,000,000 has not been selected for conditional award – HUD will continue down the list and fund additional Permanent Housing for families with children projects by project-level score until at least $430 million has been selected.

**(5)** HUD will then select new Transitional Housing (TH) or Supportive Service Only (SSO) projects ranked in Tier 2 that meet project eligibility thresholds in the order of project score as described in section V.D.3.b below until $1,300,000,000 of new projects have been selected.

**(6)** HUD will then continue selecting new projects ranked in Tier 2 that meet project eligibility thresholds in the order of project score as described in section V.D.3.b below until $1,300,000,000 of new projects have been selected.

**(7)** If at any point, HUD selects new projects in an amount more than $1,300,000,000 HUD will remove all remaining unselected new projects, recalculate Tier 2 scores, and continue selecting projects.

**b.** As authorized under the Consolidated Appropriations Act, 2017 (Public Law 115-31; 131 Stat. 135) for fiscal year 2017 and hereafter, HUD will conditionally select a renewal grant that exceeds $10 million that was originally awarded pursuant to the matter under the heading "Department of Housing and Urban Development–Permanent Supportive Housing" in chapter 6 of title III of the Supplemental Appropriations Act, 2008 (Public Law 110-252; 122 Stat. 2351).

**c.** If an ineligible renewal project submitted under this NOFO is used in the reallocation process; or an ineligible YHDP Renewal or YHDP Replacement project is submitted, HUD will remove the ineligible project when calculating the final ARD amount for the CoC. To be eligible for renewal, reallocation, or replacement in the FY 2026 CoC and YHDP Competition, a project must have an expiration date in Calendar Year (CY) 2027 (between January 1, 2027, and December 31, 2027).

**3. Additional HUD Funding Process Information.**

CoCs and applicants should ensure there is a thorough understanding of the information provided in this NOFO. HUD has a two-tier funding selection process for FY 2026 funding. HUD will establish Tier 1 and Tier 2 amounts for each CoC, based on each CoC's Annual Renewal Demand. HUD will post a report that lists the available amounts for each CoC's PPRN, estimated ARD, Tier 1, CoC Planning, estimated CoC Bonus amounts, and estimated

DV Bonus amounts on HUD's website.

The maximum amount a CoC may apply for is the sum of the CoC's ARD, eligible CoC Bonus amounts, eligible DV Bonus amounts, eligible CoC planning amounts and if applicable, eligible UFA costs amounts.

The selection process described in this section of the NOFO will also be used for CoC Collaborative Applicants designated as UFAs.

Note that for FY 2026, DV Bonus and YHDP projects will be selected using the Tier 1 and Tier 2 selection process.

**a. *Tier 1.*** Tier 1 is equal to 60 percent of the CoC's Annual Renewal Demand (ARD). HUD will conditionally select project applications in Tier 1 from the highest scoring CoC application to the lowest scoring CoC application and according to the rank assigned by the CoC on the CoC Priority listing, provided the project applications pass project eligibility thresholds.

Any competitively ranked project may be placed in Tier 1 according to the CoC's local rating and ranking process and based on local needs and priorities.

**b. *Tier 2.*** Tier 2 is the difference between Tier 1 and the sum of each CoC's ARD, CoC Bonus, and DV Bonus.

HUD will evaluate project applications placed in Tier 2 for project eligibility and project quality threshold requirements and project renewal threshold requirements, if applicable; and HUD will determine funding using the CoC Application score as well as the CoC project ranking.

HUD will award a point value to each ranked new and renewal project application that is in Tier 2 using a 100-point scale, and conditionally select applications in Tier 2 using this point value from the highest scoring project application to the lowest:

**(1)** *CoC Score.* Up to 50 points in direct proportion to the score received on the CoC Application, e.g., if a CoC received 65 out of 130 points on the CoC Application, the project application would receive 25 out of 50 points for this criterion.

**(2)** *CoC Project Ranking.* Up to 40 points for the CoC's ranking of the project application(s). To consider the CoCs ranking of projects, HUD will assign point values directly related to the CoCs' ranking of project applications. The calculation of point values will be 40 times the quantity (1-x) where x is the ratio of the cumulative funding requests for all projects or portions of projects ranked higher by the CoC in Tier 2 plus one half of the funding of the project of interest to the total amount of funding available in Tier 2 for the CoC.

**(3)** *Service Participation.* Up to 10 points for projects that indicate that they have or will incorporate supportive service participation requirements in their program design, based on individual need in accordance with 24 CFR 578.75(h). Supportive Service Only (SSO) and HMIS will automatically receive 10 points in this category.

Consistent with 24 CFR 5.2005(b)(1) assistance may not be denied on the basis or as a direct result of the fact that the participant is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, if the participant otherwise qualifies for

admission, assistance, participation, or occupancy.

c. ***Projects Straddling Tiers.*** If a project application straddles the Tier 1 and Tier 2 funding line, HUD will conditionally select the project up to the amount of funding that falls within Tier 1. Using selection criteria in section V.D.3.b above, HUD may fund the Tier 2 portion of the project. If HUD does not fund the Tier 2 portion of the project, HUD may award the project at the reduced amount based on the amount of funding that falls within Tier 1, provided the project is still feasible with the reduced funding (e.g., is able to continue serving homeless program participants effectively).

d. ***Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus).*** This NOFO provides approximately $104 million for "rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist survivors of domestic violence, dating violence, sexual assault, or stalking." In this NOFO, Transitional Housing is an eligible activity determined critical to assist survivors of domestic violence, dating violence, sexual assault, or stalking.

Each CoC may only submit one new SSO-CE DV Bonus project; however, there is no limit to the number of TH projects and PH-RRH projects CoCs may apply for, provided each application is for at least $50,000. A project applicant may also apply to expand an existing renewal project, including one that was previously awarded with DV Bonus funding, in accordance with section II.B.3.iof this NOFO; however, only the new project application for the expansion will be considered for DV Bonus funds through this process. DV Bonus funding may be used to expand an existing renewal project that is not dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act so long as the DV Bonus funds for expansion are solely for additional units, beds, or services dedicated to persons eligible to be served with DV Bonus funding.

CoCs must rank all new DV Bonus project applications on the New Project Listing of the CoC Priority Listing with a unique number ranking and, when the project is part of an expansion, the corresponding renewal project application must be on the Renewal Project Listing with a unique rank number as well. HUD will only select a new DV Bonus project that expands an existing renewal project if HUD conditionally selects the existing renewal project for funding.

**4. Conflict of Interest of Consultants or Technical Experts Assisting HUD.**

Consultants and technical experts who assist HUD in evaluating applications for funding under published CoC Program NOFOs are subject to 18 U.S.C. 208, the Federal criminal conflict-of-interest statute, and the Standards of Ethical Conduct for Employees of the Executive Branch regulation published at 5 CFR Part 2635. Therefore, consultants and technical experts who have assisted or plan to assist applicants with preparing applications for CoC Program NOFOs are prohibited from serving on a selection panel or serving as a technical advisor to HUD. Anyone involved in reviewing CoC Program NOFO applications, including departmental staff, experts, and consultants, must avoid conflicts of interest or the

appearance of such conflicts. These individuals must also disclose to HUD's Office of General Counsel Ethics Law Division the following information, if applicable:

**a.** How the selection or non-selection of any applicant under a CoC Program NOFO will affect the individual's financial interests, as provided in 18 U.S.C. 208, or

**b.** How the application process involves a party with whom the individual has a covered relationship under 5 CFR 2635.502.

The consultant or technical expert assisting HUD must disclose this information before participating in any matter regarding a program NOFO. Applicants with questions regarding these provisions or concerning a conflict of interest should call the Office of General Counsel Ethics Law Division, at (202)708-3815 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

**5. Adjustments to Projects.**

HUD may adjust the selection of competitive projects as follows:

**a.** ***CoC Maximum Award and FMR Adjustments.*** The process for determining a CoC's maximum award amount is detailed in 24 CFR 578.17(b). HUD must adjust awards for leasing, operating, and rental assistance BLIs based on changes to the Fair Market Rents (FMR). 24 CFR 578.51(f) requires that HUD will determine the award amount for Rental Assistance projects by multiplying the number and size of units proposed by the FMR in place at the application submission deadline.

HUD will make these adjustments as follows:

**(1)** Funds awarded for rental assistance will be adjusted in one of two ways:

**(a)** Funds awarded for rental assistance in all new and renewal projects requesting the FMR will be adjusted by applying the FMR in effect at the time of application submission to HUD, including instances where the FMR for a specific area has decreased from the previous year.

**(b)** Funds awarded for rental assistance for renewal projects that request less than FMR, that is, a per-unit amount based on the actual rent costs per unit (II.B.4i.) will be increased based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. If the FMR for a specific area decreased from the previous year, the project will be awarded the lesser amount of the per-unit amount requested by the project applicant, based on the actual rent costs per unit, or the FMR after adjustment.

**(2)** HUD will increase funds awarded for operating and leasing in PH projects based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. Because leasing and operating costs do not decrease relative to rent amounts for specific units (e.g., operating costs for 10 units that have rents of $500 are likely the same as for 10 units that have rents that are $450) HUD will not decrease leasing and operating BLIs if FMRs decrease in the geographic area. The operating and

leasing BLIs in these projects will remain the same as in the most recent grant agreement or grant agreement amendment.

**b. *Cost of Living Adjustment Factor.*** HUD will adjust amounts for the supportive services and HMIS Costs budget lines for renewing projects by the following factor: Most recent three-year average of changes in State Quarterly Census of Employment and Wages (QCEW) for the category Social Assistance (NAICS 624). Data can be found at: https://www.bls.gov/cew/data.htm.

**6. Geographic Diversity.**

HUD has determined that geographic diversity is an appropriate consideration in selecting homeless assistance projects in the CoC Program Competition. HUD believes that geographic diversity can be achieved best by awarding grants to as many CoCs as possible. To this end, in instances where any of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Northern Mariana Islands, the Virgin Islands, and American Samoa do not have at least one funded CoC, HUD reserves the right to fund eligible project(s) with the highest total score in the CoC.

**7. Funding Diversity.**

HUD reserves the right to reduce the amount of a grant, if necessary, to ensure that no more than 10 percent of assistance made available under this NOFO will be awarded for projects located within any one unit of general local government or within the geographic area covered by any one CoC.

**8. Grant Award Transfers and Recipient Changes.**

Except as identified in (a)-(e) below, HUD will only execute grant agreements with the organization that submitted the FY 2026 project application in e-snaps. In instances where HUD and the conditionally selected applicant do not finalize the terms and conditions of the award, HUD may select another eligible applicant [Sec. II.A]

HUD will continue to consider requests to change a project recipient after a grant agreement has been executed in accordance with 24 CFR 578.105.

Under this NOFO, HUD may treat the change of a project applicant as a curable deficiency in instances where a FY 2026 CoC renewal application does not reflect the new recipient as the applicant. These instances include:

**a.** In cases where a recipient of an expiring grant awarded under a prior FY CoC or YHDP competition NOFO applies to renew their award under this NOFO and after applying for FY 2026 funds, HUD approves and both HUD and the recipient execute a grant agreement amendment to transfer the expiring grant;

**b.** In cases where a nonprofit organization is awarded a FY 2026 grant and subsequently merges with another or reorganizes, and the grant will be operated by substantially the same entity;

**c.** For HMIS grants, in cases where the CoC designates a new HMIS lead, but the prior HMIS lead is awarded a FY 2026 HMIS grant

**d.** For CoC Planning grants, in cases where the CoC designates a new Collaborative

Applicant, but the prior Collaborative Applicant is awarded the FY 2026 CoC Planning grant

**e.** At its sole discretion, HUD may consider the transfer of an Award under other circumstances not described in (a)-(d) above.

**9. Use of unawarded funds.**

In the case that funding remains available under this NOFO after HUD follows the selection process described in V.D.2 and V.D.3 above and any subsequent appeals process as described in VIII.D below, HUD reserves the right to issue a supplemental NOFO.

## E. Award Notices

If your application is successful, HUD will email an award notice to the authorized official representative from the SF-424. HUD will also notify unsuccessful applicants.

The award notice communicates the amount of the award, important dates, and the terms and conditions you need to follow. The notice may also include HUD-imposed award conditions as provided under 2 CFR 200.208.

You agree to the award terms and conditions by either drawing funds from HUD's payment system or signing the agreement with HUD. If you do not agree to the award terms and conditions, HUD may select another eligible applicant.

Under 2 CFR 200.458 pre-award costs are allowable with written approval from HUD if such costs: a) are consistent with 2 CFR 200.458; and b) would be allowable as a post-award cost; and c) do not exceed 10 percent of the total funds obligated to this award. However, HUD will not consider eligibility for pre-award costs until after the date of the HUD selection notice. Additionally, the incurrence of pre-award costs in anticipation of an award imposes no obligation on HUD either to make the award, or to increase the amount of the approved budget, if the award is made for less than the amount anticipated and is inadequate to cover the pre-award costs incurred.

For selected projects, HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

If the award includes funds for acquisition, HUD may allow recipients to draw down acquisition funds before recording the Declaration of Restrictive Covenant if the HUD Field Office confirms that the escrow agent has received the Declaration of Restrictive Covenant and the recording instructions. The recipient or subrecipient may not draw down any funds other than acquisition funds until HUD Field Counsel has confirmed the Declaration of Restrictive Covenants has been recorded.

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

VI. Submissions Requirements and Deadlines

A. Deadlines

B. Submission Methods

C. Other Submissions

D. False Statements

TABLE OF CONTENTS

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

You must apply electronically, unless you qualify to submit a paper application. See Find the Application Package to make sure you have everything you need to apply online.

Make sure you are current with SAM.gov and UEI requirements before applying for the award. See the Before You Begin section of this NOFO.

## A. Deadlines

### 1. Application submission deadline:

The application deadline is 11:59:59 PM Eastern time on:

08/26/2026

HUD must receive your application by the deadline. Applications received after the deadline are late. Late applications are not eligible for HUD funding.

If HUD receives more than one application from you, HUD will review only the last submission.

HUD may extend an application due date based on emergency situations such as Presidentially-declared natural disasters. An improper or expired registration and password issues are not causes to allow HUD to accept applications after the deadline date.

Applicants must complete and submit their applications in *e-snaps* at **https://esnaps.hud.gov/**. The deadline to submit applications for FY 2026 funding is 8:00 PM ET on August 26, 2026.

24 CFR 578.9 requires CoCs to design, operate, and follow a collaborative process for the development of an application in response to a NOFO issued by HUD. As part of this collaborative process, CoCs must implement internal deadlines to ensure transparency and fairness at the local level. The implementation of deadlines that meet the standards outlined below for FY 2026 CoC Program project applications are part of the scoring criteria as detailed in section V.B of this NOFO.

### 2. CoC Notification to Project Applicants.

The CoC is required to notify, in writing outside of e-snaps, all project applicants who submitted their project applications to the CoC by the local CoC-established deadline whether their project application(s) will be accepted and ranked on the CoC Priority Listing, rejected, or reduced by the CoC no later than 15 days of the FY 2026 CoC Program application submission deadline.

Where a project application is being rejected or reduced, the CoC must provide the project applicant with the reason(s) for the rejection or reduction. CoCs failing to provide this information to a project applicant that submits its project application by the local competition deadline will receive 0 points under section V.B.1.a.(2) of this NOFO.

### 3. Major Disaster Areas.

If a major disaster impacts a CoC's geographic area, as declared by the President under the Stafford Act, during the CoC Program application process that will impact the submission of

the CoC Priority Listing and FY 2026 project applications, the CoC's Collaborative Applicant must send written notification to Karen DeBlasio, Office of Special Needs Assistance Program (SNAPS) at CoCDisaster@hud.gov. The email must include:

**a.** the nature of the disaster, date(s) the major disaster occurred, how the major disaster affected the Collaborative Applicant, the CoC, or its project(s);

**b.** the duration, and the impact on the Collaborative Applicant, the project applicants, or the CoC to meet the local competition deadline; and

**c.** the anticipated amount of time the CoC is requesting for an extension (e.g., number of days, weeks, or months). This does not mean HUD will allow the full amount of time requested.

Based on the timing and the extent of the major disaster, HUD may extend the application deadline for the affected CoC(s). All requests received will be confirmed via the Federal Emergency Management Agency (FEMA) website, https://www.fema.gov/disaster.

## B. Submission Methods

### 1. Electronic Submission

The official documents HUD uses to solicit applications for this NOFO are posted on Grants.gov; however, you must register and submit your application through esnaps.hud.gov. HUD does not accept applications or supportive documents via fax.

**a. *CoC Registration.*** HUD required Collaborative Applicants to complete the FY 2026 CoC Program Registration in accordance with Notice CPD-26-03: Continuum of Care Program Registration. If a Collaborative Applicant did not complete the FY 2026 CoC Program Registration, HUD moved the previous year's registration forward with no changes.

**b. *CoC Review of Project Applications Prior to Submission to HUD.*** HUD expects CoCs to implement a thorough review and oversight process at the local level for both new and renewal project applications to be submitted to HUD for the FY 2026 CoC Program Competition. HUD's experience is that many project applications contain information resulting in conditions on the grant; or for more serious infractions, HUD rejecting a project application. Deficient project applications prolong HUD's review process, which results in delayed funding announcements, lost funding for CoCs due to HUD rejecting projects, and delays accessing project funds to house and assist homeless individuals and families. HUD expects CoCs to closely review the information provided in each project application, including Renewal, Replacement, or Reallocation projects, to ensure:

**(1)** all proposed program participants will be eligible for the program component type selected;

**(2)** the information provided in the project application and proposed activities are:

**(a)** eligible and consistent with program requirements in the Rule;

Suppl.App.242
HUD-AR-05102

**(b)** eligible and consistent with DV Renewal, DV Reallocation and DV Bonus requirements in sections II.B.3.d, II.B.3.e, and V.D.3.d of this NOFO; or
**(c)** eligible and consistent with YHDP Renewal and YHDP Replacement project requirements which includes YHDP Reallocation provided in sections II.B.3g and II.B.3.h of this NOFO;

**(3)** each project narrative is fully responsive to the question being asked and that it meets all the criteria for that question as required by this NOFO;

**(4)** the data provided in various parts of the project application are consistent; and

**(5)** all required attachments correspond to the list of attachments in e-snaps, must contain accurate and complete information and must be dated between December 10, 2025 and August 26, 2026.

**c. *Collaborative Applicant Submission Requirements*.** Collaborative Applicants must submit the FY 2026 Consolidated application by the FY 2026 application submission deadline. HUD will consider the CoC Consolidated Application properly submitted for review when the Collaborative Applicant submits the FY 2026CoC Application, the FY 2026 CoC Priority Listing, and all FY 2026 project applications on behalf of the CoC.

The "Submit" button will not be available on the Submission Summary of the FY 2026 CoC Application and FY 2026 CoC Priority Listing until all required sections of the application and all parts of the listings have been completed. Collaborative Applicants should review the Submission Summary form carefully to ensure no sections state "Please Complete."

Collaborative Applicants should export a PDF copy of the Submission Summary form from the FY 2026 CoC Application and the FY 2026 CoC Priority Listing after they have been submitted to HUD and before closing their internet browser. This is the Collaborative Applicant's receipt of submission and proof of compliance with the FY 2026 application deadline.

The CoC Consolidated Application includes the following:

**(1) FY 2026 CoC Application which includes the following:**

**(a) CoC Review, Score, and Ranking Procedures.** The CoC's written procedures that are publicly posted for all interested stakeholders and applicants that clearly describe the project-level review and ranking process that is used by the CoC to determine how CoC Program project applications submitted to the CoC are reviewed, scored, and ranked.

**(b) CoC Public Notice.** A screenshot(s) from the CoC's website, or a partner website, that includes the date the CoC notified the public of its local competition process, the due date for project applications, and the full CoC Application and CoC Priority Listing that includes all Project Listings of project applications submitted to HUD as accepted (in the case of non-competitive CoC Planning and UFA costs), approved and ranked or rejected.

**(c) CoC Review and Ranking Process.** Documents the process used by the CoC in the local competition to review, assess, and score new and renewal project

applications, a copy of one scored project application form used by most renewal project applicants that includes the objective criteria and system performance criteria and their respective maximum point values and the actual points your CoC awarded to the project applicant; and the local competition selection results for new and renewal project applications.

**(d) Notification to Project Applicants of projects rejected or reduced.** The notification of the action (rejection or reduction) that must be sent to the project applicant at least 15-days prior to the HUD application submission deadline, if a new or renewal project application was submitted to the CoC in the local competition and the CoC rejected it or reduced its funding request as part of the CoC's local process.

**(e) Public Notification of Ranked Project Applications.** The notification of action that all project applicants who submitted new and renewal project applications in the local CoC competition are notified at least 15-days prior to the HUD application submission deadline of the CoC's acceptance that includes the ranked position of the project applications. This notification may be posted publicly or sent via email to individual project applicants.

**(f) Projects to Serve Persons Defined as Homeless under paragraph (3) of 24 CFR 578.3.** If the CoC is seeking to serve persons defined as homeless under paragraph (3) of the homeless definition, a list of projects that will serve persons defined as homeless under paragraph (3) of the homeless definition.

**(g) The FY 2026 HDX Competition Report.** The FY 2026 HDX Competition Report contains data submitted to HUD via HDX, including HIC, PIT count, and system performance data.

**(2) FY 2026 Project Application(s), including for each project application:**

**(a) Charts, narrative responses, and attachments.**

**(b) Documentation of Applicant and subrecipient Eligibility.** All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

**(c) HUD required forms.** The HUD-required forms are built into e-snaps and must be fully completed and electronically signed before project applicants have access to the project application (see section IV.A of this NOFO).

**(3) FY 2026 CoC Priority Listing.** The CoC Priority Listing in e-snaps must include the following completed forms, certifications, and attachments:

**(a) Project Reallocation Form.** The Reallocation form allows CoCs to indicate which eligible new projects, if any, will be reduced or eliminated through the reallocation process.

**(b) CoC and YHDP Project Listings.** The CoC project listing forms require the following project applications to be ranked, with unique rank numbers, in order of priority. Any project not ranked with a unique rank number must be rejected. The forms under this requirement include:

**i.** CoC New Projects (including CoC Bonus and CoC Reallocation projects);
**ii.** CoC Renewal Projects (including DV Renewal and Special NOFO Renewal projects);
**iii.** DV Bonus Projects;
**iv.** DV Reallocation Projects;

**v.** YHDP Renewal Projects;

**vi.** YHDP Replacement Projects (including YHDP Reallocation projects).

If a CoC, in collaboration with the Youth Action Board (YAB), determines that it no longer has an identified need to renew an eligible YHDP project under this NOFO, the Collaborative Applicant must indicate in the Priority Listing the project information and amounts that will be removed from the CoC's ARD and made available under a subsequent YHDP NOFO Competition.

**(c)** CoC Planning and UFA Costs Project Application Listings. These project listing forms include the following non-ranked project applications:

**i.** CoC Planning Project Listing; and
**ii.** UFA Costs Project Listing, if applicable.

Collaborative Applicants must ensure the CoC only submits one project application for CoC Planning, and if the CoC's Collaborative Applicant is a HUD-designated UFA, one UFA Costs project application.

**(d)** Form HUD-2991, Certification of Consistency with the Consolidated Plan (See section IV.A.1 of this NOFO).

**(e)** Tribal Resolution, if applicable (See section IV.A.2 of this NOFO).

**d. Project Application Submissions.**

Project applications must include the population(s) and subpopulation(s) they will serve, the type of housing and services they will provide, and the budget activities they are requesting. Project applicants must also provide documentation of applicant and subrecipient eligibility. All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

Collaborative Applicants applying for CoC Planning and UFA Costs (if designated as a UFA by HUD) must provide a description of the activities that will be carried out with CoC Program grant funds.

Additionally, all project applicants must ensure their organization has a Code of Conduct that complies with the requirements of 2 CFR part 200, as may be amended from time to time, and is included on HUD's website. If the organization's Code of Conduct does not appear on HUD's website, the project applicant must attach its Code of Conduct that includes all required information to its Project Applicant Profile in e-snaps.

For more information on project applications, see section II.B of this NOFO.

**e. Timely Submissions.**

HUD will not fund applications that are not received on time. Also, failure to submit a complete CoC Consolidated Application may result in HUD finding that the CoC does not meet the requirements of the Act or its implementing regulations under 24 CFR 578.13. If the Secretary makes that finding, HUD may take remedial action to ensure fair distribution of grant funds to eligible entities within the CoC's geographic area, which includes the possibility that HUD will designate another eligible applicant to be the Collaborative Applicant for the CoC. In addition to the remedial actions listed in 24 CFR 578.13(a), HUD may also impose another remedial action, such as requiring the CoC to create new policies and procedures to ensure that the Collaborative Applicant performs its duties.

**f. Resolving Technical Difficulties.**

CoC and project applicants experiencing technical difficulty with any part of the Application should notify HUD immediately for assistance and document all attempts to obtain assistance. Notification of technical difficulties are to be sent to CoCNOFO@hud.gov. HUD will not provide assistance directly related to content, only to troubleshoot submission issues.

CoCs that are submitting new and renewal applications for FY 2026 CoC and YHDP funding should print the Submission Summary form for the FY 2026 CoC Priority Listing for proof of compliance with the FY 2026 application deadline. HUD will not give funding consideration to any Collaborative Applicant whose FY 2026 CoC Priority Listing is determined to be late and the Collaborative Applicant is unable to provide HUD with a record of submission that verifies the CoC Consolidated Application was submitted prior to the application deadline date and time.

HUD strongly suggests that applicants use the "Export to PDF" functionality in e-snaps to save a hard copy of all submission documents for their records. This can be completed prior to or after submission.

If after notice and reasonable opportunity to be heard, HUD finds pursuant to 24 CFR 578.13 that one or more CoCs have failed to comply with the requirements of the Act and the Rule, HUD may, solely at its discretion and only if sufficient funds become available by recapture, publish a new NOFO for eligible applicants in CoCs that HUD determined do not meet the requirements of the Act and program regulations.

**Need Help?** See the Contact and Support section of this NOFO.

## 2. Electronic Submission Application Waiver

You may request a waiver from the requirement to submit your application electronically. The request must show good cause and detail why you are technologically unable to submit electronically. An example of good cause may include: a valid power or internet service disruption in the area of your business office. Lack of SAM.gov registration is not good cause.

Use the information in the Contact and Support section of this NOFO to submit a written request to HUD. You must **submit your waiver request at least 15 calendar days before the application deadline**.

The regulatory framework of HUD's electronic submission requirement is the final rule

established in 24 CFR 5.1005. CoCs seeking a waiver of the electronic submission requirement must request a waiver in accordance with 24 CFR 5.1005. If a Collaborative Applicant finds it cannot submit its application electronically and must seek a waiver of the electronic grant submission requirement, its request must be postmarked no later than 60 days after the publication date of this NOFO. To expedite the receipt and review of each request, Collaborative Applicants may email their written requests to the Office of Special Needs Assistance Program (SNAPS) at CoCNOFO@hud.gov. If HUD does not have sufficient time to process the waiver request, HUD will not grant a waiver. HUD will not consider paper applications received without a prior approved waiver or after the established deadline.

## C. Other Submission Information

### 1. Intergovernmental Review

This NOFO is not subject to Executive Order 12372. No action is needed.

### 2. Technical Application Errors

HUD will contact you to fix a technical error with your timely application after the due date. Use the following submission requirements to respond to HUD's notice.

#### a. Fix Errors in Electronic Applications

To fix an error in response to a HUD notice, you must email the corrections to HUD at CoCNOFO@hud.gov.

HUD allows 7 calendar days from the date of the HUD notice to fix an error. If the due date to fix an error falls on a Saturday, Sunday, Federal holiday, or on a day when HUD's Headquarters office in Washington, DC is closed, then the due date is the next business day.

#### b. Fix Errors in Paper Applications

You must fix an error in your paper application, in accordance with HUD's notice. If your paper application includes an incorrect UEI, HUD will request you supply the correct UEI.

## D. False Statements

By submitting your application, you acknowledge that you have read and understood federal laws and regulations, grant terms and conditions, and rules and requirements applicable to HUD's Continuum of Care (CoC) program as described in this NOFO. As part of your application for CoC funding, you must provide the certifications and assurances described below to ensure that you understand your obligation to protect the funds from fraud. Furthermore, grant recipients must require each subrecipient to provide the same anti-fraud certifications and assurances.

On behalf of the applicant, and in support of your application for the CoC grant, you certify under the penalty of perjury, that:

(1) You have the authority to make the following representations on behalf of yourself and the applicant, and you understand that these representations will be relied upon as material in any HUD decision to make an award to the applicant based on its application.

(2) You have the legal authority to apply for the federal assistance sought by the application, and that the applicant has the institutional, managerial, and financial capability to ensure proper planning, management, and completion of the project described in the application.

(3) The information provided in the application is true, accurate, and complete.

(4) Throughout the period of performance for the award, if any,

a. The applicant will comply with and follow all federal laws and regulations, grant terms and conditions, and rules and requirements applicable to HUD's Continuum of Care program;

b. The applicant will require all subrecipients to comply with and follow all federal laws and regulations, grant terms and conditions, and rules and requirements applicable to HUD's Continuum of Care program;

c. The applicant will notify HUD within fifteen (15) calendar days if the applicant becomes aware of any violation of HUD requirements pertinent to the award by any person or entity–including, but not limited to the applicant, any subrecipient, or contractor;

d. The applicant will maintain safeguards to address and prevent any conflicts of interest, and to prohibit employees from using their positions in any manner that poses, or appears to pose, a personal or financial conflict of interest; and

d. The applicant will comply with HUD's conflict-of-interest requirements stated at 24 CFR 578.95.

(5) The applicant will give HUD, the Office of Inspector General, and the Comptroller General of the United States, through any authorized representative, access to and opportunity to examine all records, books, papers, documents, or electronic records related to the award, if any, made by HUD.

(6) The applicant will establish an accounting system in accordance with generally accepted accounting standards or HUD directives, consistent with 2 C.F.R. § 200.302, "Financial Management," and 2 C.F.R. § 200.303, "Internal Controls."

(7) The applicant will submit the performance, financial, and program reports as outlined in the NOFO and required by federal laws and regulations.

(8) The applicant will require that the language of these Anti-Fraud Certifications and Assurances be included in the award documents or agreements for all subawards as defined at 2 CFR 200.1and that the applicant will seek from all subrecipients the same certifications and assurances.

(9) You understand that complying with the terms, conditions, and requirements of your award, if any, is a material condition of remaining eligible for HUD funding.

Finally, by submitting your application, you acknowledge that you understand that providing false or misleading information during any part of the application, award, or performance phase of an award may result in criminal, civil, or administrative sanctions, including but not limited to: charges and remedies provided for by applicable state laws and regulations; fines,

restitution, and/or imprisonment under 18 U.S.C. §§ 287, 1001, 1010, 1012, 1014; treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 et seq.; double damages and civil penalties under the Administrative False Claims Act, 31 U.S.C. §§ 3801-3812; civil recovery of award funds; suspension and/or debarment from all federal procurement and non-procurement transactions, Federal Acquisition Regulations Part 9.4 or 2 C.F.R. Part 180; and other remedies including termination of active HUD award.

Case: 26-1923 Document: 00118495633 Page: 252 Date Filed: 08/21/2026 Entry ID: 6836472



# VII. POST - AWARD REQUIREMENTS AND ADMINISTRATION


VII. Post-Award Requirements and Administration

A. Administrative, National and Departmental Policy Requirements and General Terms and Conditions

B. Environmental Requirements

C. Remedies for Noncompliance

D. Reporting


TABLE OF CONTENTS

# VII. POST-AWARD REQUIREMENTS AND ADMINISTRATION

## A. Administrative, National and Departmental Policy Requirements, and General Terms and Conditions

You must follow the applicable provisions in the Administrative, National & Departmental Policy Requirements and Terms for HUD Financial Assistance – 2026:

**Administrative**

1. Build America, Buy America (BABA) (Sections 70901-52 of Public Law 117-58; 41 U.S.C. 8301 et seq; and 2 CFR Part 184)

2. Uniform Relocation Assistance and Real Property Acquisition Policies Act (42 U.S.C. § 4601 et seq.; 49 CFR part 24; and applicable program regulations)

3. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR part 200)

4. HUD requirements related to safeguarding resident/client files consistent with 2 CFR 200.303(e)

5. The Federal Funding Accountability and Transparency Act (FFATA) (2 CFR part 170)

6. Eminent Domain

7. Participation in HUD-Sponsored Program Evaluation (12 U.S.C. 1701z-1; 12 U.S.C. 1702z-2; 24 CFR part 60; and FR-6278-N-01)

8. The Freedom of Information Act (FOIA) (5 U.S.C. § 552(b) and 24 CFR 15.107(b))

9. Presidential Executive Actions affecting federal financial assistance programs

- Executive Order (EO) 14332 (*Improving Oversight of Federal Grantmaking*)
- EO 14303 (*Restoring Gold Standard Science*)
- EO 14219 (*Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative*);
- EO 14218 (*Ending Taxpayer Subsidization of Open Borders*);
- EO 14202 (*Eradicating Anti-Christian Bias*);
- EO 14205 (*Establishment of the White House Faith Office*)
- EO 14182 (*Enforcing the Hyde Amendment*);
- EO 14173 (*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*);
- EO 14168 (*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*)
- EO 14151 (*Ending Radical and Wasteful Government DEI Programs and Preferencing*); and

- EO 14148 (*Initial Rescissions of Harmful Executive Orders and Actions*)

**Civil Rights and Other Protections**

10. The Fair Housing Act (42 U.S.C. 3601-3619) and Civil Rights laws (24 CFR 5.105(a))

11. Affirmatively Furthering Fair Housing (AFFH) requirements (42 U.S.C. § 3608(e)(5) and 24 CFR 5.150 et seq)

12. Economic Opportunities for Low-and Very Low-income Persons (12 U.S.C. § 1701u and 24 CFR part 75)

13. Compliance with Immigration Requirements (8 U.S.C. § 1601-1646; and Executive Order 14218, *Ending Taxpayer Subsidization of Open Borders*)

14. Accessible Technology requirements (29 U.S.C. § 794d; 29 U.S.C. 794; and 42 U.S.C. 12131-12165 and implementing regulations at 36 CFR part 1194 (Section 508 regulations), 24 CFR § 8.6 (Section 504 effective communication regulations), 28 CFR part 35, subpart H (DOJ Web Access Rule), and 28 CFR part 35, subpart E (DOJ's Title II communications regulations))

15. Ensuring, when possible, the consideration of small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms consistent with 2 CFR 200.321

16. Equal Participation of Faith-based Organizations in HUD Programs and Activities consistent with 42 U.S.C. 2000bb et seq.; 24 CFR 5.109; Executive Order (EO) 14202, *Eradicating Anti-Christian Bias;* and EO 14205, *Establishment of the White House Faith Office*

17. Accessibility for Persons with Disabilities requirements (29 U.S.C. § 794 and implementing regulations at 24 CFR parts 8 and 100; 28 CFR part 35)

18. Applicable Violence Against Women Act (VAWA) requirements in the Housing Chapter of VAWA (34 U.S.C. § 12491-12496); 24 CFR part 5, subpart L; and program-specific regulations

19. Trafficking in persons (Section 106(g) of the Trafficking Victims Protections Act of 2000 (TVPA), as amended 22 U.S.C. § 7104(g) and implementing regulations at 2 CFR part 175)

**Environmental**

20. Environmental requirements that apply in accordance with 24 CFR part 50 or part 58; 42 U.S.C. 4321 et seq.

**Business Integrity**

21. Conducting Business in Accordance with Ethical Standards (Code of Conduct), including 2 CFR 200.317, 2 CFR 200.318(c), and other applicable conflicts of interest requirements

22. Prohibition on Certain Telecommunication and Video Surveillance Services or Equipment (41 U.S.C. § 3901 and 2 CFR 200.216)

23. Waste, Fraud, Abuse, and Whistleblower Protections (41 U.S.C. § 4712)

24. Drug-Free Workplace (2 CFR part 2429)

In addition, if any part or provision of the award agreement or terms of this NOFO are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective as to such jurisdiction and only to the extent of such prohibition or enjoinment and shall not invalidate or affect the legality or enforceability of the remaining provisions and applications of the Agreement and Notice. In the event the enjoinment of such provisions is stayed, dissolved, or reversed, the full terms of the award agreement and NOFO, including such provisions, will automatically become effective. This clause is self-executing and will become effective, binding, and enforceable automatically upon issuance of this NOFO.

Additionally,

**1.** Awards made under this NOFO will not be used to engage in illegal racial discrimination including racial preferences.

**2.** Awards made under this NOFO will not be distributed in a way that violates or otherwise is used to interfere with constitutional protections guaranteed for speech and religious beliefs and the free exercise of religion.

**3.** Awards made under this NOFO will not be used to fund any project, service provider, or organization that operates illegal drug injection sites or "safe consumption sites" in violation of 21 U.S.C. § 856, knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 USC 863. This is not a requirement that program participants must be sober in order to receive assistance, participate in treatment in order to receive assistance, or be evicted or exited from assistance for a first-time violation of a drug-related program policy or lease requirement.

**4.** Pursuant to 2 CFR 200.332(b)(2), all agreements or contracts made with subrecipients under this NOFO must contain the same terms and conditions as those in the grant agreement issued by HUD. Any conflicting terms and conditions must be approved by HUD.

## B. Environmental Requirements

### 1. Environmental Review

You must follow these environmental review requirements, including regulations at:

24 CFR part 50

24 CFR part 58

Notwithstanding 24 CFR 578.31 and 24 CFR 578.99(a) of the Rule, and in accordance with Section 100261(3) of MAP-21 (Pub. L. 112-141, 126 Stat. 405), activities under this NOFO are subject to environmental review by a responsible entity under HUD regulations at 24 CFR part 58 or by HUD under 24 CFR part 50.

**a.** All HUD assisted activities, even projects that only involve exempt activities, require some level of environmental review. Two types of projects are Categorically Excluded from review under the National Environmental Policy Act (NEPA) and not subject to compliance with the laws and authorities listed under 24 CFR 58.5 (CENST): All scattered-site projects where program participants choose their own unit and are not restricted to units within a pre-determined specific project site or sites are categorized in

24 CFR 58.35(b)(1) as CENST. This includes both tenant-based rental assistance and tenant-based leasing projects where program participants choose their own unit and do not involve any physical work or impacts beyond routine maintenance as defined by Notice CPD-16-02: Guidance for Categorizing an Activity as Maintenance for Compliance with HUD Environmental Regulations. The Exempt/CENST environmental review form is only required for each project, not every unit.

**b.** For activities under a grant to a recipient other than a state or unit of general local government that generally would be subject to review under 24 CFR part 58, HUD may make a finding in accordance with 24 CFR 58.11(d) and may itself perform the environmental review under the provisions of 24 CFR part 50 if the recipient objects in writing to the responsible entity's performing the review under part 24 CFR part 58.

**c.** Irrespective of whether the responsible entity in accordance with 24 CFR part 58 (or HUD in accordance with 24 CFR part 50) performs the environmental review, the recipient must supply all relevant and available information necessary for the responsible entity (or HUD, if applicable) to perform for each property any required environmental review. The recipient also must carry out mitigating measures required by the responsible entity (or HUD, if applicable) or select alternative property.

**d.** The recipient, its project partners, and their contractors may not acquire, rehabilitate, convert, lease, repair, dispose of, demolish, or construct property for a project under this NOFO, or commit or expend HUD or non-HUD funds for such eligible activities under this NOFO, until the responsible entity (as defined by 24 CFR 58.2(a)(7)) has completed the environmental review procedures required by 24 CFR part 58 and the environmental certification and Request for Release of Funds (RROF) have been approved or HUD has performed an environmental review under 24 CFR part 50 and the recipient has received HUD approval of the project. HUD will not release grant funds if the recipient or any other party commits grant funds (i.e., incurs any costs or expenditures to be paid or reimbursed with such funds) before the recipient submits and HUD approves its RROF (where such submission is required).

### 2. NOFO Impact Determination Related to the Environment

This NOFO has no significant impact related to the environment. HUD has made a Finding of No Significant Impact (FONSI) as required by HUD regulations at 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act of 1969 (42 USC § 4332(2)(c)). To learn more about this FONSI, go to HUD's Funding Opportunities web page.

### 3. Lead-Based Paint Requirements

You must follow the lead-based paint rules below if you fund any work on pre-1978 housing. This includes buying, leasing, support services, operating, or work that disturbs painted surfaces.

- HUD's rules (Lead Disclosure Rule; and Lead Safe Housing Rule).
- EPA's rules (Renovation, Repair and Painting Rule, and Lead Abatement, Inspection and Risk Assessment Rule).

You must discuss the Lead Disclosure Rule if you fund education or counseling on buying or

renting housing that may have been built before 1978. You must also discuss the Lead Safe Housing Rule if the education or counseling focuses on buying or renting HUD-assisted pre-1978 housing.

## C. Remedies for Noncompliance

HUD may terminate all or a part of your award as described under 2 CFR 200.340 through 200.343 pursuant to the terms and conditions of your award, including, to the extent authorized by law:

- if an award no longer effectuates the program goals or agency priorities; or
- in the case of a partial termination, if HUD determines that the remaining portion of the award will not accomplish the purposes for which the HUD award was made.

HUD may also impose specific conditions on your award or take other remedies as described by 2 CFR 200.339 through 200.343, if you do not comply with the U.S. Constitution, Federal statutes, regulations, or your award terms and conditions.

For more information on CoC Program sanctions and remedies for noncompliance see 24 CFR 578.107.

## D. Reporting

HUD requires recipients to submit performance, financial, and program reports as outlined below. You must comply with these reporting requirements to remain eligible for HUD funding. See Section VII.C. of this NOFO.
Further, the Recipient hereby acknowledges that HUD is in the process of implementing new grants management and reporting tools for all records pertinent to the Federal award. Recipient agrees to report on grant performance and financial activities (including vendor and cash disbursement supporting details for the Recipient and its Subrecipients) using these new tools when they are released and to satisfy occasional requests for records pertinent to the federal award, consistent with the requirements for recordkeeping, access to records, and reporting laid out in 2 CFR part 200, which may be amended from time to time. HUD will work with the Recipient to support its transition to the new reporting tools. HUD reserves the right to exercise all of its available rights and remedies for any noncompliance with these grants management and financial reporting requirements, to include, without limitation, requiring additional or more detailed financial reports, suspension of disbursements, and all other legally available remedies, to the furthest extent permitted by law.

| Report | Description | When |
|---|---|---|
| Federal Funding Accountability and Transparency Act (FFATA) | • Awards equal to or greater than $30,000<br>• Data on executive compensation and first-tier subawards<br>• See Public Law 109-282 | See 2 CFR Appendix A to Part 170(a)(2)(ii) |

| Report | Description | When |
|---|---|---|
| | and 2 CFR part 170<br>• HUD reports initial prime recipient data to usaspending.gov<br>• Submit via SAM.gov | |
| Reporting on Recipient Integrity and Performance Matters | • Total value of all current Federal awards exceeds $10,000,000 for any period of time during the period of performance of this Federal award<br>• See Appendix XII to 2 CFR 200<br>• Submit via SAM.gov | See 2 CFR Appendix-XII to Part 200 I.(d) |
| Annual Performance Report (APR) | • Collect and report data use of funds annually.<br>• Projects receiving funds for acquisition, new construction, or rehabilitation must submit APRs for 15 years from the date of initial occupancy or the date of initial service provision. | See 24 CFR 578.103(e) |
| Federal Financial Report, SF-425 | • Summary of key financial data<br>• See 2 CFR 200.328 | See 2 CFR 200.328 or award terms |
| Race, Ethnicity, and Other Data Reporting | Recipients that provide HUD-funded program benefits to individuals or families, report data on the race, color, religion, sex, national origin, age, disability, and family characteristics of persons and households funded by this program. | Annually through the Homeless Data Exchange submission. |

| Report | Description | When |
|---|---|---|
| Audit Requirements | In accordance with program regulations at 24 CFR 578.103, project recipients must maintain records within the timeframe required and make any reports that HUD may require. Project recipients may report the data as part of their APR submission to HUD.<br>• Single or program-specific audit is required if annual expenditures equal to or greater than $1,000,000 in Federal awards<br>• Required for the fiscal year in which the expenditure occurs<br>Financial statement audit and programmatic compliance evaluation | See 2 CFR part 200 subpart F and Appendix XI to 2 CFR part 200 |
| Section 3 Reporting Regulations | Recipients are required to report their Section 3 activities per 24 CFR 75.25 if funds were awarded for housing rehabilitation, housing construction, and other public constructions. | See HUD's Section 3 website for additional information including annual reporting requirements. |

**1. Program Specific Reporting Requirements.**

**a.** In accordance with program regulations at 24 CFR 578.103, project recipients must maintain records within the timeframe required and make any reports that HUD may require. Project recipients may report the data as part of their APR submission to HUD. Also, project recipients who expend $1,000,000 or more in 1 year in federal awards must have a single or program-specific audit for that year in accordance with the provisions of 2 CFR part 200, subpart F.

**b. Section 3 Reporting Regulations.** Recipients are required to report their Section 3 activities per 24 CFR 75.25 if funds were awarded for housing rehabilitation, housing construction, and other public constructions. See HUD's Section 3 website for additional

information including annual reporting requirements.

**c.** Award notices may also include requirements for sub-award reporting in compliance with the requirements of the Federal Financial Assistance Accountability and Transparency Act of 2006 (Pub. L. 109-282) (FFATA) and Section 872 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417), referred to as "Section 872." See the General Section for further information.

**e.** An estimate of the reporting and recordkeeping burden of the CoC Program can be found in the Federal Register Publication of the Rule.

**2. Administrative and Other Program Requirements.**

Federal agencies are required to measure the performance of their programs. HUD captures this information from monitoring visits and APRs

Case: 26-1923 Document: 00118495633 Page: 261 Date Filed: 08/21/2026 Entry ID: 6836472



# VIII. CONTACT AND SUPPORT

VIII. Contact and Support

A. Agency Contact

B. Grants.gov

C. Sam.gov

D. Debriefing

E. Applicant Experience Survey

F. Other Online Resources

# VIII. CONTACT AND SUPPORT

Individuals who are deaf or hard of hearing, as well as individuals who have speech or communication disabilities may use a relay service. To learn more about how to make an accessible telephone call, visit the webpage for the Federal Communications Commission.

## A. Agency Contact

### 1. Program and Application Requirements

Name: HUD Office of Community Planning and Development

Email: CoCNOFO@hud.gov

Note: HUD's assistance is limited by the standards at 24 CFR 4.26.

HUD staff will be available to provide general clarification on the content of this NOFO; however, HUD staff are prohibited from assisting any applicant in preparing the application(s) in e-snaps.

**a. Local HUD Community Planning Development (CPD) Office.** Questions regarding specific program requirements should be directed to the local HUD CPD field office, a directory of which can be found at https://www.hud.gov/program_offices/field_policy_mgt/localoffices.

**b. Training and Resources.** Collaborative Applicants and project applicants that need assistance completing the applications in e-snaps or understanding the program requirements under the CoC Program may access the Rule, training materials, and program resources via https://www.hud.gov/hud-partners/community-coc.

**c. Questions.** CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions up to the deadline of 8:00 PM ET on August 26, 2026. Applicants experiencing technical difficulty should contact CoCNOFO@hud.gov immediately for assistance and document their attempts to obtain assistance.

### 2. Paper Application Waiver Request

Name: Office of Special Needs Assistance Programs

Email: CoCNOFO@hud.gov

Phone: (202) 708-4300

HUD Organization: Community Planning and Development

Street: 2415 Eisenhower Ave

City: Alexandria

VA VIRGINIA

22314

**HUD Reform Act.** HUD is prohibited from disclosing covered selection information during the selection process. The selection process includes NOFO development and publication, and concludes with the announcement of selected recipients of financial assistance. HUD will not assist you with completing your application.

HUD will only return calls related to paper application requests. All other calls will not be returned.

All other requests or questions regarding this NOFO must be sent via email to CoCNOFO@hud.gov

## B. esnaps.hud.gov

CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions

## C. SAM.gov

If you need help, you can call 866-606-8220 or live chat with the Federal Service Desk.

## D. Debriefing and Appeals

1. After public announcement of awards, HUD will debrief the Collaborative Applicant upon your written request. Submit your written request to the agency contact for program and application requirements in this NOFO. HUD may limit the information provided to protect the integrity of the competition.

2. You may appeal an application decision or a HUD funding decision. Email your appeal to snapsappeals@hud.gov. The subject line of your email must include the CoC Number, "Appeal Notice," and type of appeal, i.e., Participation, HUD Error, or Consolidated Plan Certification. A sample email Subject Line is, Subject: XX-500 – Appeal Notice–Consolidated Plan Certification.

24 CFR 578.35 provides the appeal process options. Sections 578.35(b)(3), (b)(4), (c)(1), and (d)(2) authorize HUD to establish requirements for the form and manner of submissions for appeals by Solo Applicants, applicants with denied or decreased funding, and from competing CoCs. For HUD to consider an appeal under 24 CFR 578.35(b) or (c), the solo project applicant must follow the applicable application process set forth in this NOFO. This NOFO also provides guidance to CoCs and applicants regarding appeals of a jurisdiction's refusal to sign the Consolidated Plan certification for a project under 24 CFR 578.35(c).

Additionally, HUD is clarifying the impact that Solo Applicant appeals will have on HUD signing grant agreements for funds awarded under this NOFO. If HUD receives one or more Solo Applicant appeals from a CoC, HUD will determine the amount of funding the Solo Applicant(s) have requested which may delay signing grant agreements for the awarded project(s) listed at the bottom of the CoC's Priority Listing that has requested funding under this NOFO equal to double the amount requested by the Solo Applicant(s). Refer to the Solo Applicant appeal process in section VIII.D.3.a of this NOFO for additional information about

the Solo Application appeal process.

Finally, for the purposes of the appeals identified in this NOFO where 24 CFR 578.35 requires that all evidence be sent to the CoC and that the CoC respond to evidence, this means that correspondence to the CoC should be addressed to the CoC-designated Collaborative Applicant and all correspondence to HUD from the CoC should be addressed from the CoC's designated Collaborative Applicant. If the CoC has authorized another entity other than the Collaborative Applicant to respond to the appeals identified in this NOFO on its behalf, it should notify HUD by sending an email to snapsappeals@hud.gov.

### 3. Types of Appeals.

The provision at 24 CFR part 578 sets forth the following types of appeals:

- ***Solo Applicants.*** A process for eligible project applicants that attempted to participate in their CoC planning process and believe they were denied the right to participate in a reasonable manner.
- ***Denied or Decreased Funding.*** A process for eligible applicants that are denied funds by HUD or that requested more funds than HUD awarded to them.
- ***Consolidated Plan Certification.*** A process for eligible applicants whose jurisdiction refused to provide a Certification of Consistency with the Consolidated Plan (form HUD-2990).
- ***Competing CoCs***. A process when more than one CoC selects the same geographic area, for eligible applicants of lower-scoring CoCs, to appeal to HUD's decision to fund the competing CoC. Should two or more CoCs select the same geographic codes associated with formula areas during the CoC Program Registration process, HUD will use the competing CoC process provided by 24 CFR 578.35(d).

#### a. Solo Applicant.

Per the Act, "A solo applicant may submit an application to the Secretary for a grant under subsection (a) and be awarded such grant on the same basis as such grants are awarded to other applicants based on the criteria described in section 11386a of this title, but only if the Secretary determines that the solo applicant has attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner. The Secretary may award such grants directly to such applicants in a manner determined to be appropriate by the Secretary." 42 U.S.C. 11382(*i*)

To apply as a solo applicant, the project applicant must submit a Solo Applicant Project Application in e-snaps by the application submission deadline of August 26, 2026 at 8:00 PM ET. Additionally, the solo applicant, Collaborative Applicant, and HUD must take the following steps (See 24 CFR 578.35 for more information):

**(1)** ***Written Notice of Intent to Appeal.*** The solo applicant must submit a written notice of intent to appeal, with a copy to the CoC, with their funding application.

**(2)** No later than 30 days after the date that HUD announces the awards, the solo applicant shall submit in writing, with a copy to the Collaborative Applicant, all relevant evidence supporting its claim. The submission shall be emailed to

snapsappeals@hud.gov.

**(3)** The CoC has 30 days from the date of its receipt of the solo applicant's evidence to respond to HUD in writing, with a copy to the solo applicant. The submission must be emailed to snapsappeals@hud.gov.

**(4)** HUD will notify the solo applicant and the CoC of its decision within 60 days of receipt of the CoC's response.

**(5)** If HUD finds that the solo applicant was not permitted to participate in the Continuum of Care planning process in a reasonable manner, then HUD may award a grant to the solo applicant when funds next become available and may direct the Continuum of Care to take remedial steps to ensure reasonable participation in the future. HUD may also reduce the award to the Continuum's applicant(s) and may order the Continuum of Care to take remedial steps to ensure that the solo applicant can reasonably participate in future funding opportunities.

**b. Denied or Decreased Funding.**

Eligible applicants, including project applicants and Collaborative Applicants, that submitted an application to HUD in response to this NOFO, that were either not awarded funds by HUD, or that requested more funds than HUD awarded, may appeal HUD's decision within 45 days after the final funding announcement. HUD will only consider for funding or additional funding applicants the CoC ranked within the CoC's maximum amount available. Collaborative Applicants that submitted CoC planning, and if applicable, UFA Costs project applications can appeal decreased funding if they can demonstrate HUD decreased the submitted project application's funding request to less than 5 percent of the CoC's FPRN or $1,250,000; whichever is less. To appeal HUD's decision, the applicant must submit a written appeal to HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant. The written appeal must include evidence demonstrating HUD error and follow the instructions in this section.

The applicant must submit its written appeal by email to snapsappeals@hud.gov, from the organization's email address on the organization's letterhead and signed by the authorized representative–electronic signatures are acceptable.

**(1)** ***Denied Funding.*** To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in Section VIII.D.2 of this NOFO within 45 days of the date of the funding announcement of the conditional awards from HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant.

**(a)** Projects, including projects for CoC Planning funds and Unified Funding Agency (UFA) costs, could have been rejected by HUD because:

**i.** the individual project application failed to meet project eligibility, project quality, and project renewal thresholds set forth in this NOFO;

**ii.** the individual project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO, but was ranked in a position where a portion of the grant funds was outside the CoC's maximum award

amount, and after HUD reduced its funding to fit within the CoC's maximum award amount, HUD determined that the project was no longer feasible; or

**iii.** HUD did not have sufficient funding to fund all eligible projects ranked within the CoC's maximum award amount.

**(b)** For applicants that were fully denied funding for a grant, the applicant must provide evidence that demonstrates HUD error in not awarding the grant. Documentation submitted by the applicant must include:

**i.** documentation that the project was ranked within the maximum award amount available to the CoC;

**ii.** evidence from the project application supporting the applicant's claim that the project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO; and

**iii.** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO, which resulted in the project not being funded.

**(c)** For applicants that were denied funding due to the individual project's funding being decreased to such a level that the project was no longer feasible, documentation submitted by the applicant must include:

**i.** documentation that the project was ranked within the maximum award amount available to the CoC;

**ii.** evidence from the project application supporting the applicant's claim that the project application met project eligibility and project quality thresholds set forth in this NOFO;

**iii.** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO which resulted in the project not being funded (e.g., selecting a lower-scored project within the CoC or a similar project from another CoC); and

**iv.** the evidence in section VI.B.1.b of this NOFO as well as evidence for decreased funding in section VIII.D.3.b.(2) of this NOFO.

**(d)** For CoCs that were denied funding due to the score of the CoC Application or the score of the project application not being high enough to result in the funding of project(s) within the CoC, and the lower score for one or both application types was the result of HUD error, the CoC may appeal the CoC or project application score and request funding for affected projects. Documentation submitted by the Collaborative Applicant on behalf of the CoC must include evidence of HUD error when calculating the Coc Application or project application score.

**(2)** ***Decreased Funding.*** To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in section VIII.D.2 of this NOFO within 45 days of the date of the final funding announcement of the conditional awards from HUD, with a copy to the authorized representative of the CoC's designated Collaborative Applicant.
Documentation submitted by the applicant must include evidence of the HUD error the

applicant believes was made.

**(3)** ***HUD Decision and Notification of Decision.*** Where HUD determines that HUD error occurred, and the applicant should have been awarded additional funding, HUD will provide funding from the next available funds and make necessary adjustments by amending the award. HUD will reverse a decision only when the applicant can show that HUD error caused the denial or decrease.

**c. Consolidated Plan Certification**

1. ***Written Appeal.***

An applicant may appeal to HUD a jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan. The appeals process is as follows:

With the project application that is submitted by the application deadline, the applicant must submit a written appeal. Project applicants may submit its appeal in e-snaps with its project application. When submitted with the project application in e-snaps, the applicant must also email a copy of this appeal to the jurisdiction that denied the Certification of Consistency with the Consolidated Plan and should send a copy to the authorized representative from the CoC's designated Collaborative Applicant, unless it is the Collaborative Applicant that is filing the appeal. Otherwise, the project applicant or Collaborative Applicant may submit the appeal to HUD using one of the methods in section VIII.D.2 of this NOFO. The written appeal must include the following information:

**(a)** a copy of the applicant's request to the jurisdiction for the Certification of Consistency with the Consolidated Plan;

**(b)** a copy of the jurisdiction's response stating the reasons for denial, including the reasons the proposed project is not consistent with the jurisdiction's Consolidated Plan in accordance with 24 CFR 91.510(c); and

**(c)** a statement of the reasons why the applicant believes its project is consistent with the jurisdiction's Consolidated Plan.

The appeal may include additional information the applicant believes supports its appeal, including:

**i.** any additional communication between the applicant and the jurisdiction regarding the request for certification of consistency; and

**ii.** documentation that identifies to whom within the jurisdiction the evidence was sent and the date on which it was sent.

**(2)** ***Jurisdiction Response.*** The jurisdiction will have 10 days after the receipt of the applicant's written appeal to submit a written response to HUD. The response must be sent by email to snapsappeals@hud.gov on the organization's letterhead, with a copy to the project applicant and the authorized representative of the CoC's designated Collaborative Applicant. The response must include the following information:

**(a)** an explanation of the reasons originally given for refusing to provide the Certification of Consistency with the Consolidated Plan; and

**(b)** written rebuttal to any claims made by the applicant in the written appeal.

**(3)** ***HUD Decision and Notification of Decision.***

**(a)** HUD will review the submissions and will provide written notification, by email, of its decision to the applicant and the jurisdiction, with a copy to the authorized representative from the CoC's designated Collaborative Applicant within 45 days of the date of the receipt of the jurisdiction's response. In making its decision, HUD will consider whether the applicant submitted the request to the appropriate certifying jurisdiction and the reasonableness of the jurisdiction's refusal to provide the certificate.

**(b)** If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was reasonable, then HUD will automatically reject the project application. If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was not reasonable, then HUD will consider the project application for funding in the respective FY CoC Program Competition in accordance with the review standards set forth in this NOFO.

**(c)** If the jurisdiction failed to provide written reasons for refusal, including the reasons why the project is not consistent with the jurisdiction's Consolidated Plan in its initial response to the applicant's request for a certification, HUD will find for the applicant without further inquiry or response from the political jurisdiction.

**(d)** HUD will provide written notification of its decision within 45 days of the date of HUD's receipt of the jurisdiction's response. Where the jurisdiction failed to provide a written response, HUD will provide written notification of its decision within 55 days of the date of HUD's receipt of the project applicant's response.

## E. Applicant Experience Survey

You are encouraged to provide feedback on your application experience by completing our Applicant Experience Survey. Your feedback is optional; you are not required to provide personal information. HUD may use your feedback to improve future NOFOs. Your feedback has no impact on funding decisions.

## F. Other Online Resources

You are encouraged to review the online resources to learn background on some of the NOFO requirements.

# APPENDIX

Appendix

Appendix I Definitions

TABLE OF CONTENTS

# APPENDIX

## Appendix I. Definitions

### 1. Standard Definitions

For standard definitions not listed below, refer to 2 CFR 200.1.

**Affirmatively Furthering Fair Housing (AFFH)** - statutory obligation to affirmatively further the purposes and policies of the Fair Housing Act (see also 24 CFR 5.151, as amended by 90 FR 11020).

**Consolidated Plan** has the same meaning as defined at 24 CFR part 91.

**Eligibility requirements** are mandatory requirements for an application to be considered for funding.

**Opportunity Zone (OZs)** are defined in 26 U.S.C. 1400Z-1. In general, OZs are census tracts located in low-income communities where new investments, under certain conditions, may be eligible for preferential tax treatment.

**Primary Point of Contact (PPOC)** is the person HUD may contact with questions about the application submitted. The PPOC is listed in item 8F on the SF-424.

**System for Award Management (SAM)** has the same meaning as in 2 CFR 25.100(b).

**Threshold Requirements** are eligibility requirements you must meet before HUD rates your application for funding.

**Unique Entity Identifier (UEI)** has the same meaning as in 2 CFR 25.100(a).

### 2. Program Definitions.

Regulatory citations are provided below so applicants can refer to specific areas of the Rule. Projects awarded CoC Program funds are subject to the program regulations as they may be amended from time to time. However, YHDP Renewal and YHDP Replacement projects and awards are subject to CoC Program regulations except as otherwise provided in this NOFO.

The definitions and concepts contained in this section include terms that are important for all applicants to understand in order to complete all parts of the FY 2026 CoC Consolidated Application in e-snaps on behalf of the CoC.

**a. *The following terms are defined in 24 CFR 578.*** Applicants must refer to the Rule for the definitions contained in this section.

**(1)** Annual Renewal Amount (ARA)
**(2)** Applicant
**(3)** Centralized or Coordinated Assessment System
**(4)** Chronically Homeless
**(5)** Collaborative Applicant
**(6)** Continuum of Care
**(7)** Consolidated Plan
**(8)** Establishing and Operating the CoC. -24 CFR 578.5 and 24 CFR 578.7 detail the requirements for the establishment of a CoC and its responsibilities.

**(9)** Final Pro Rata Need (FPRN)
**(10)** High Performing Community (HPC)
**(11)** Homeless Management Information System (HMIS)
**(12)** HMIS Lead
**(13)** Homeless. - Although not reflected in the regulation, section 605 of Violence Against Women Act Reauthorization Act of 2022 amended Section 103(b) of the Act and requires HUD to consider certain individuals and families as homeless. This amendment took effect on October 1, 2022. Notwithstanding anything to the contrary contained elsewhere in this NOFO, where 578.3 paragraph (4) is referenced, applicants may apply to serve the population as defined in Section 103(b) of the Act.
**(14)** Permanent Housing
**(15)** Permanent Supportive Housing
**(16)** Preliminary Pro Rata Need (PPRN)
**(17)** Private Nonprofit Organization
**(18)** Program Participant
**(19)** Project
**(20)** Rapid Rehousing (RRH).
**(21)** Recipient
**(22)** Subrecipient
**(23)** Transitional Housing
**(24)** Unified Funding Agency
**(25)** Victim Service Provider

**b. *CoC Program NOFO Terms***. The following terms may be used during the administration of CoC Program grants. The definitions and specific concepts pertaining to these terms are further explained below:

**(1) Annual Renewal Demand (ARD) (24 CFR 578.17(b)(2)).** The total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments to funding for leasing, rental assistance, and operating Budget Line Items (BLIs) based on FMR changes. HUD will calculate the ARD by combining the total amount of funds requested by eligible renewal projects in each FY funding opportunity, including:

**(a)** renewal projects approved and ranked on the Renewal Project Listing;
**(b)** renewal project amount(s) that were reallocated as recorded on the reduced or eliminated reallocation forms of the CoC Project Listing;
**(c)** YHDP renewal projects on the YHDP Renewal Project Listing; and
**(d)** YHDP Replacement projects, including YHDP Reallocation projects, on the YHDP Reallocation and Replacement Project Listing. YHDP Replacement projects are eligible for funding through the replacement of YHDP Renewal projects. The YHDP Replacement application must request the same amount of funding that is eligible for YHDP Renewal.

**(2) CoC Merger.** The CoC merger is a process where two or more CoCs voluntarily agree to merge the entire geographic area of all CoCs into one larger CoC. HUD strongly encourages CoCs that struggle with capacity to merge with a neighboring CoC or Balance of State CoC during each fiscal year's CoC Program Registration process.

To encourage CoC mergers and mitigate the potential adverse scoring implications that may occur when a high performing CoC merges with one or more lower-performing CoC(s), HUD will award 6 bonus points to the FY 2026 CoC Application Score for CoCs that registered as a merged CoC during the FY 2026 CoC Program Registration process.

**(3) Formula Area**. Defined in the Indian Housing Block Grant Program at 24 CFR 1000.302.

**(4) CoC Geographic Area.** 24 CFR 578.5 requires representatives from relevant organizations within a geographic area to establish a CoC to carry out the duties within the geographic area. The boundaries of identified CoC geographic areas cannot overlap, and any overlapping geographies are considered Competing CoCs. HUD follows the process at 24 CFR 578.35(d) to determine which CoC HUD will fund in the case of CoC geographic areas that overlap.

**(5) Homelessness and Human Trafficking.** HUD is clarifying that persons who are fleeing or attempting to flee human trafficking may qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and may be eligible for certain forms of homeless assistance under the CoC Program, subject to other restrictions that may apply. HUD considers human trafficking, including sex trafficking, to be "other dangerous or life-threatening conditions that relate to violence against the individual or family member" under paragraph (4) of the definition of homeless at 24 CFR 578.3 and "other dangerous, traumatic, or life-threatening conditions related to the violence against the individual or a family member in the individual's or family's current housing situation" under section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(6) Host Home and Kinship Care.** Host Home and Kinship Care is limited to YHDP Renewal and replacement grants. This is a model of housing where a family agrees to permit a youth program participant to reside with them. Recognizing the addition of another person in the home may increase costs to the family, HUD will consider YHDP Replacement project applications that propose to house youth with families and subsidize the additional costs attributable to housing the youth, including recruitment of hosts. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination for HUD review upon request. The residence is in a community-based setting and the family may be related to youth program participants with a time-limited or unlimited length of stay.

**(7) Housing Inventory Count (HIC).** A complete listing of the CoC's HUD and non-HUD funded beds dedicated to individuals and families experiencing homelessness in the CoC's geographic area.

**(8) Merged CoC.** A Merged COC is a CoC that includes geographic area that was associated with one or more other CoCs in any of the prior three registration periods (the FY 2023 CoC Registration period or later) and that CoC no longer operates.

**(9) New Tribal CoC. A** New Tribal CoC is a CoC that has newly registered in one of the prior three registration periods (FY 2023 CoC Registration period or later) that includes a

Formula Area (see definition in paragraph (3) above).

**(10) Reservation and Trust Land.** For purposes of this Notice, Reservations and Trust Land are types of formula areas as specifically delineated under HUD's IHBG program at 24 CFR 1000.302.

**(11) Rural Area.** For this competition a rural area is a county which:

**(a)** has no part of it within an area designated as a standard metropolitan statistical area by the Office of Management and Budget;

**(b)** is within an area designated as a metropolitan statistical area or considered as part of a metropolitan statistical area and at least 75 percent of its population is local on U.S. Census blocks classified as non-urban; or

**(c)** is located in a state that has a population density of less than 30 persons per square mile (as reported in the most recent decennial census), and of which at least 1.25 percent of the total acreage of such State is under Federal jurisdiction, provided that no metropolitan city in such State is the sole beneficiary of the grant amounts awarded under this NOFO. A metropolitan city means a city that was classified as a metropolitan city under section 102(a) of the Housing and Community Development Act of 1974 (42. U.S.C. 5302(a)) for the fiscal year immediately preceding the fiscal year for which CoC program funds are made available.

**(12) Self-sufficiency.** Consistent with the purposes of the McKinney-Vento Act, 42 U.S.C. § 11381(4), means the ability to meet basic needs, including a place to live, without public or private assistance. This is consistent with dictionary definitions of the term. The Oxford English Dictionary defines *self-sufficiency* as the "state or condition of not needing or relying on external assistance, support, or aid." Similarly, Merriam-Webster defines *self-sufficient* as "able to maintain oneself or itself without outside aid : capable of providing for one's own needs."

**(13) Shared Housing.** YHDP Renewal and YHDP Replacement projects, including YHDP Reallocations, may provide rental assistance for shared housing where youth may reside with family or another unrelated person. The youth leases from the property owner and shares the unit with the family or unrelated person. The unit may be a house or an apartment.

**(a)** YHDP rental assistance cannot be provided to a youth to reside in a unit occupied by an immediate family member. For this NOFO "immediate family member" includes parents, grandparents, and legal guardians.

**(b)** YHDP rental assistance cannot be provided to a youth in a shared housing unit if the landlord is an immediate family member of the youth.

**(c)** YHDP rental assistance may only be provided to a youth if the youth can enter into a valid, binding, and enforceable lease under applicable state or local law. This includes a legally appointed guardian executing a lease on behalf of a youth or an emancipated youth entering into a lease.

**(d)** YHDP Renewal and replacement grants may provide a shared housing option for youth program participants who are not part of a household but are interested in

sharing a housing unit with a roommate unrelated to the program participant.

**(14) Special NOFO.** A competition administered under the Continuum of Care Supplemental to Address Unsheltered and Rural Homelessness designed to target efforts to reduce unsheltered homelessness in communities with very high levels of unsheltered homelessness and homelessness in rural areas. Funding through this Competition was awarded through either the Unsheltered Set Aside or the Rural Set Aside.

**(15) Split CoC.** A split CoC is a CoC that has newly registered during the prior three registration periods (FY 2023 CoC Registration period or later) and includes geographic area that was previously associated with another CoC that continues to operate.

**(16) YHDP Replacement Process, including YHDP Reallocation.** The YHDP Replacement process occurs when: (1) a CoC reallocates a YHDP Renewal project to create one or more new YHDP project(s) that has the same recipient referred to as YHDP Replacement in this NOFO; (2) a CoC is reallocating a YHDP Renewal project to create one or more new projects with a new recipient referred to as YHDP Reallocation in this NOFO; or (3) a CoC is reallocating YHDP Renewal project(s) to create YHDP Expansion applications through the YHDP Replacement process. For more information on YHDP Reallocation, see sections II.B.3.h of this NOFO.

Appendix II. Endnotes

[1] 2025 AHAR

[2] 2025 AHAR

[3] Based on national award reports at HUD Exchange

[4] Are Cities' Pledges to End Homelessness Working?

[5] USICH Opening Doors - Federal Strategic Plan to Prevent and End Homelessness - HUD Exchange

[6] The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[7] How-Congress-Can-Reform-Governments-Misguided-Homelessness-Policies-20221011.pdf

[8] Tier 1 of FY24-25 CoC NOFO

[9] The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[10] CoC_AwardComp_NatlTerrDC_2024.pdf

[11] Health Conditions Among Unsheltered Adults in the US

[12] CASPEH_Report_62023.pdf

[13] Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic | Public Health | JAMA Network Open | JAMA Network

[14] Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

15 2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

16 System-Performance-Measures-Data.xlsx

17 2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

18 2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

19 National Crime Poll | Cicero Institute

20 How-Congress-Can-Reform-Governments-Misguided-Homelessness-Policies-20221011.pdf

21 Sex Offenders: An Overlooked but Significant Subpopulation of the Homeless | Cicero Institute

22 Homeless Data and Plan News Release FINAL 3-21-22.pdf

23 hes_resultsupdated.pdf

24 Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

25 2024 National Public Safety and Homelessness Poll | Cicero Institute

26 Austin's homeless population dispersing after 2 years of camping ban enforcement | Community Impact

27 20240304161555229_23-175 Amicus BOM Cicero PDFA.pdf

28 History of The Salvation Army

29 EXCLUSIVE: In Cities Across America, Homeless Services Are Doled Out Based on Race and Sexual Identity

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-636-MSM-AEM |

**NOTICE AND REQUEST FOR STATUS CONFERENCE**

Plaintiffs respectfully request a status conference with the Court regarding Defendants' ongoing delays in noncompetitively renewing expired and expiring CoC grants, as required by the Transportation, Housing and Urban Development, and Related Agencies Appropriations Act (THUD Appropriations Act) enacted on February 3, 2026. Plaintiffs have attempted to resolve the matter without the Court's involvement, but those efforts have not been fruitful. In addition, HUD's explanations for its delay have suggested that HUD has not faithfully complied with the Court's December 23 order granting preliminary relief (Dkt. No. 52). Plaintiffs respectfully request a status conference to discuss a path forward for addressing these issues, including a plan for supplementing the complaint and seeking expedited relief.

As brief background, as the parties previously informed the Court, on February 3, Congress passed the THUD Appropriations Act, which included a provision designed to ensure continuity in funding for the CoC program. Under that law, HUD must noncompetitively renew

existing projects with awards expiring in the first quarter of 2026. The law also requires HUD to renew grants expiring later this year if HUD has not made awards under a NOFO by set dates—April 1 for grants expiring in the second quarter and July 1 for grants expiring in the third and fourth quarters. As a result of this law, HUD is now required to noncompetitively renew existing grants that expire in the first and second quarters of this year. For the third and fourth quarters, HUD has acknowledged that the only practicable options are either (1) to noncompetitively renew all expiring grants pursuant to the Appropriations Act or (2) to make awards under the FY24-25 NOFO. HUD has informed Plaintiffs that they plan to take the first option and noncompetitively renew all expiring grants.

Yet, despite this law being enacted over 2.5 months ago, HUD still has not finalized a single renewal award, and projects are still unable to access their critically needed grant funds. For a project to be able to draw down funds, HUD must issue a final grant agreement. To date, HUD has not issued a single grant agreement.

To the limited extent that HUD has taken *any* steps toward issuing final grant agreements, HUD appears to have slow-walked them. For instance, HUD notified Congress of the intended first-quarter renewals on March 25 and publicly announced them on March 31—56 days after the THUD Appropriations Act was passed. For context, the last time Congress mandated noncompetitive renewals, HUD announced the full year's worth within just 33 days—even though that involved more than 10 times the number of grants that HUD announced here.

HUD is similarly delaying renewal awards for projects expiring in quarters 2-4. Many awards have already expired, and those projects are already struggling through funding gaps. Without prompt action now, projects with grants expiring in the remainder of the year will face funding gaps as well.

Plaintiffs have consistently pressed HUD for an explanation for their delay, and HUD has provided no satisfactory response. In fact, HUD's response has raised concerns that HUD has not faithfully complied with the Court's December 23 order granting preliminary relief (Dkt. No. 52). In particular, HUD has attempted to justify its delay by claiming that it must conduct "threshold financial-management and risk assessments" before renewing awards and does not know when those reviews will be complete. But, pursuant to the December 23 order, that step should already be complete for the vast majority of awards. The Court's order required HUD to "tak[e] all steps necessary to process eligible renewals for FY 2025 CoC funding pursuant to the FY24-25 NOFO," short of actually making awards. Dkt. No. 52 at 2-3. In its court-mandated implementation plan, HUD explained that this would entail "conducting threshold reviews and risk reviews for … renewals" and that it anticipated this process would be complete by March 31. Dkt. No. 62-1 at 1. A significant majority of the renewals now mandated under the THUD Appropriations Act are the same renewals that HUD should have already processed under the Court's order. HUD either did not take all steps necessary to process eligible renewals as described in their implementation plan or is using the supposed need to conduct "assessments" as a pretext for delaying awards.

Plaintiffs respectfully request a status conference to discuss with the Court and Defendants a path forward for ensuring that FY 2025 awards are made expeditiously, consistent with Congress's command, so that communities do not continue to suffer harm from the continued delays in funding.

April 22, 2026

Respectfully submitted,

/s/ Kristin Bateman
KRISTIN BATEMAN +
(DC Bar No. 90037068)

AMY R. ROMERO
(RI Bar No. 8262)
KEVIN LOVE HUBBARD +
(MA Bar No. 704772)

Case: 26-1825 Document: 00118495633 Page: 279 Date Filed: 04/22/2026 Entry ID: 6836472

DELUCA, WEIZENBAUM,
BARRY & REVENS, LTD.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com
kevin@dwbrlaw.com
Cooperating counsel,
Lawyers' Committee for RI

*Counsel for All Plaintiffs*

TONY LOPRESTI +
(CA Bar No. 289269)
COUNTY COUNSEL
KAVITA NARAYAN +
(CA Bar No. 264191)
CHIEF ASSISTANT COUNTY COUNSEL
MEREDITH A. JOHNSON +
(CA Bar No. 291018)
LEAD DEPUTY COUNTY COUNSEL
STEFANIE WILSON +
(CA Bar No. 314899)
DEPUTY COUNTY COUNSEL
LEILY ARZY +
(CA Bar No. 364187)
LITIGATION FELLOW
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of Santa Clara*

DAVID CHIU +
(CA Bar No. 189542)
CITY ATTORNEY
YVONNE R. MERÉ +
(CA Bar No. 173594)
CHIEF DEPUTY CITY ATTORNEY
MOLLIE M. LEE +
(CA Bar No. 251404)
CHIEF OF STRATEGIC ADVOCACY

MADELINE H. GITOMER +
(DC Bar No. 1023447)
ALESHADYE GETACHEW +
(DC Bar No. 1007161)
AMAN T. GEORGE +
(DC Bar No. 1028446)
SIMON C. BREWER +
(DC Bar No. 90042403)
CHRISTINE L. COOGLE +
(DC Bar No. 1738913)
YENISEY RODRÍGUEZ +
(DC Bar No. 1600574)
CARRIE Y. FLAXMAN +
(DC Bar No. 458681)
ROBIN THURSTON +
(DC Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
mgitomer@democracyforward.org
agetachew@democracyforward.org
ageorge@democracyforward.org
sbrewer@democracyforward.org
ccoogle@democracyforward.org
yenisey.rodriguez@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

LYNETTE LABINGER
(RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel,
ACLU Foundation of RI

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

SARA J. EISENBERG +
(CA Bar No. 269303)
CHIEF OF COMPLEX AND AFFIRMATIVE LITIGATION
RONALD H. LEE +
(CA Bar No. 238720)
ASST. CHIEF OF COMPLEX AND AFFIRMATIVE LITIGATION
MICHAEL LEVIN GESUNDHEIT +
(CA Bar No. 292930)
DEPUTY CITY ATTORNEY
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
(415) 554-4240
michael.levin@sfcityatty.org

*Counsel for Plaintiff City and County of San Francisco*

WALLACE W. DIETZ +
(TN BPR No. 009949)
DIRECTOR OF LAW
JOHN K. WHITAKER +
(TN BPR No. 039207)
SENIOR COUNSEL
ABBY GREER +
(TN BPR No. 041470)
ASSISTANT METROPOLITAN ATTORNEY
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
wally.dietz@nashville.gov
john.whitaker@nashville.gov
abby.greer@nashville.gov

*Counsel for Plaintiff Metropolitan Government of Nashville and Davidson County*

ANTONIA K. FASANELLI +
(DC Bar No. 481856)
KATHRYN M. SCOTT +
(WA Bar No. 38978)*
NATIONAL HOMELESSNESS LAW CENTER
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org
kmeyerscott@homelesslaw.org

*Counsel for Plaintiffs National Alliance to End Homelessness and National Low Income Housing Coalition*

TOBY MERRILL +
(MA Bar No. 601071)
CASSANDRA CRAWFORD +
(NC Bar No. 45396)
GRAHAM PROVOST +
(DC Bar No. 1780222)
KAYLA SVIHOVEC +
(DC Bar No. 1735588)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
cassandra@publicrightsproject.org
graham@publicrightsproject.org
kayla.svihovec@publicrightsproject.org

*Counsel for Plaintiffs City of Boston, City of Cambridge, Martin Luther King, Jr. County, Metropolitan Government of Nashville and Davidson County, City of Tucson*

DAVID J. HACKETT +
(WA Bar No. 21236)
GENERAL COUNSEL, KING COUNTY DEPARTMENT OF LOCAL SERVICES
CHRISTOPHER M. SANDERS +
(WA Bar No. 47518)
GENERAL COUNSEL TO THE KING COUNTY EXECUTIVE
CRISTY J. CRAIG +
(WA Bar No. 27451)

SENIOR DEPUTY PROSECUTING ATTORNEY
OFFICE OF THE KING COUNTY PROSECUTING ATTORNEY
401 5th Avenue, Suite 600
Seattle, WA 98104
(206) 477-1163
david.hackett@kingcounty.gov
chrsanders@kingcounty.gov
cristy.craig@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*

+ Admitted *pro hac vice*
* Not admitted in the District of Columbia; practicing under the supervision of members of the D.C. Bar

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2026, I electronically filed the within document, and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

/s/ *Kristin Bateman*
Kristin Bateman

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF WASHINGTON, *et al.*,

Plaintiffs,

v.

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,

Defendants.

AND

NATIONAL ALLIANCE TO END HOMELESSNESS, *et al.*,

Plaintiffs,

v.

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,

Defendants.

Case Nos. 25-cv-626-MSM-AEM
25-cv-636-MSM-AEM

District Judge Mary S. McElroy
Magistrate Judge Amy E. Moses

**DEFENDANTS' STATUS REPORT**

Defendants file this sixteenth status report pursuant to the Court's Order at its April 27, 2026 status conference. On May 4, 2026, Defendants provided the "granular" detail that the Court requested about the status of fiscal year 2025 Continuum of Care (CoC) renewals. *State of Washington v. HUD*, No. 25-cv-626 (D.R.I.) ("*State Litigation*"), ECF No. 101; *Nat'l All. to End Homelessness*, No. 25-cv-636 (D.R.I.) ("*NAEH Litigation*"), ECF No. 88. On May 11, 2026, Defendants updated this Court that the fiscal year 2025 CoC renewal grant agreements were underway. *State Litigation*, ECF No. 103; *NAEH Litigation*, ECF No. 90. On May 18, 2026, Defendants notified this Court that the majority of the first quarter's grant agreements had been

issued. *State Litigation*, ECF No. 105; *NAEH Litigation*, ECF No. 92. On May 26, 2026, Defendants informed the Court that more first quarter grant agreements had been issued and second quarter grant agreements had begun to be issued. *State Litigation*, ECF No. 106; *NAEH Litigation*, ECF No. 93.

On June 1, 2026, Defendants updated the Court that it was continuing to issue first and second quarter grant agreements, and it had begun issuing award letters for third and fourth quarter renewals. *State Litigation*, ECF No. 107; *NAEH Litigation*, ECF No. 94. On June 8, 2026, Defendants notified this Court that HUD continued to issue more first and second quarter grant agreements and finished issuing third and fourth quarter award letters. *State Litigation*, ECF No. 108; *NAEH Litigation*, ECF No. 95. On June 15, 2026, Defendants provided further updates on their progress in issuing awards. *State Litigation*, ECF No. 109; *NAEH Litigation*, ECF No. 96. On June 22, 2026, Defendants provided another update. *State Litigation*, ECF No. 110; *NAEH Litigation*, ECF No. 98. On June 29, 2026, the Court granted in part and denied in part Plaintiffs' motions for summary judgment, holding that rescission of earlier NOFOs and implementation of a new 2025 NOFO was arbitrary and capricious for failing to adequately consider the impacts its change in policy might have and failing to provide a rational basis for the new grant instruments. *See State Litigation*, ECF No. 113 at 9; *NAEH Litigation*, ECF No. 99 at 9. The Court retained its requirement that Defendants file weekly status reports. *See id.* at 12. On the same day, Defendants updated the Court again on their progress in issuing awards. *See State Litigation*, ECF No. 114; *NAEH Litigation*, ECF No. 100. Defendants provided further updates on July 6 and 13. *State Litigation*, ECF Nos. 115, 117; *NAEH Litigation*, ECF Nos. 101, 102. On July 20, Defendants notified the Court that third and fourth quarter grant agreements would begin issuing that week. *State Litigation*, ECF No. 118; *NAEH Litigation*, ECF No. 103. And on July 27, Defendants

reported that HUD had begun issuing those agreements and was continuing to issue and execute first and second quarter agreements. *State Litigation*, ECF No. 119; *NAEH Litigation*, ECF No. 104. Additional updates followed on August 3 and August 10. *State Litigation*, ECF Nos. 120, 121; *NAEH Litigation*, ECF Nos. 105, 106. In this status report, Defendants provide another update on the status of renewal grants for projects with awards expiring in quarters one ("Q1"), two ("Q2"), three ("Q3"), and four ("Q4") of this year.

*Quarter 1 renewals*. As of the date of this filing, HUD has issued 604 out of 608 grant agreements for awardee signature. Of that amount, 573 have been signed and returned to HUD, including 554 that are fully executed. Sixteen awards had conditions, all of which have been resolved. All grant agreements have been modified to remove Addendum 1.

*Quarter 2 renewals*. As of the date of this filing, HUD has issued 1,502 out of 1,795 grant agreements for awardee signature. Of that amount, 1,419 have been signed and returned to HUD for execution, including 1,386 that have been fully executed. There are 57 Q2 renewals that require additional preparation before they can be issued, including 11 agreements with conditions that grantees have yet to be resolved.

*Quarter 3 renewals*. As of the date of this filing, HUD has issued 1,861 out of 2,522 grant agreements for awardee signature. Of that amount, 1,090 have been signed and returned to HUD, including 894 that have been fully executed. There are 43 Q3 renewals that require additional preparation before they can be issued, including 31 agreements with conditions that grantees have yet to resolve.

*Quarter 4 renewals*. As of the date of this filing, HUD has issued 1,381 out of 1,775 grant agreements for awardee signature. Of that amount, 675 have been signed and returned to HUD, including 518 that have been fully executed. There are 53 Q4 renewals that require additional

preparation before they can be issued, including 29 agreements with conditions that grantees have yet to resolve.

Date: August 17, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

JOHN BAILEY
Counsel to the Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ William S. Jankowski*
WILLIAM S. JANKOWSKI
D.C. Bar No. 90021524
PARDIS GHEIBI
PETER R. GOLDSTONE
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20530
Tel.: (202) 353-7578
Fax: (202) 616-8640
Email: william.s.jankowski@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on August 17, 2026, the above document was filed with the CM/ECF filing system.

*/s/ William S. Jankowski*